# Exhibit 1

Page 1

1

2          UNITED STATES DISTRICT COURT

        SOUTHERN DISTRICT OF NEW JERSEY

3

4    ------------------)
                       )
5    IN RE BIOGEN '755  ) Case No. 10-cv-02734

     PATENT LITIGATION  )  (CCC) (JAD)

6                       )
     ------------------)

7

8

9                     September 7, 2011

10                     9:35 a.m.

11

12

13       VIDEOTAPED DEPOSITION of DAVID JACKSON,

14   an Expert Witness on behalf of Biogen, taken by

15   Defendants, held at the offices of Paul Weiss

16   Rifkind Wharton & Garrison located at 1285 Avenue

17   of the Americas, New York, New York, before

18   Eileen Mulvenna, CSR/RMR, Certified Shorthand

19   Reporter, Registered Merit Reporter and Notary

20   Public of the State of New York.

21

22

23

24

25

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4
         PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
 5       Attorneys for Plaintiff
               1285 Avenue of the Americas
 6             New York, New York  10019-6064
         BY:   NICHOLAS GROOMBRIDGE, ESQ.
 7             PETER SANDEL, ESQ.,
               psandel@paulweiss.com
 8
 9       GIBSON DUNN & CRUTCHER, LLP
         Attorneys for Defendants EMD Serone and
10       Pfizer
               333 South Grand Avenue
11             Los Angeles, California  90071-3197
         BY:   WAYNE BARSKY, ESQ.
12             wbarsky@gibsondunn.com
               TIMOTHY P. BEST, ESQ.
13             tbest@gibsondunn.com
14
15       WILLIAMS & CONNOLLY, LLP
         Attorneys for Defendants Bayer
16             725 Twelfth Street, N.W.
               Washington, D.C.  20005-5901
17       BY:   DAVID I. BERL, ESQ.
               dberl@wc.com
18             BRUCE R. GENDERSON, ESQ.
               bgenderson@wc.com
19             JAMIE L. SIMPSON, ESQ.
               jsimpson@wc.com
20
21
22
23
24
25
```

Page 3

1

2   A P P E A R A N C E S (Continued):

3

4

        WHITE & CASE, LLP
5       Attorneys for Defendant Novartis
                1155 Avenue of the Americas
6               New York, New York  10036-2787
        BY:   R. GREGORY PARKER, ESQ.
7               gparker@whitecase.com
                LESLIE MORIOKA, ESQ.
8               lmorioka@whitecase.com

9

10

11  A L S O   P R E S E N T:

12              Elizabeth A. Hurley, Ph.D., J.D.,
                    Biogen idec
13

14              Peter Cooper, Videographer

15

16

17

18

19

20

21

22

23

24

25

Page 4

1

2          IT IS HEREBY STIPULATED AND AGREED,

3    by and between the attorneys for the respective

4    parties herein, that filing and sealing be and

5    the same are hereby waived.

6

7          IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the form of the

9    question, shall be reserved to the time

10   of the trial.

11

12          IT IS FURTHER STIPULATED AND AGREED

13   that the within deposition may be signed and

14   sworn to before any officer authorized to

15   administer an oath, with the same force and

16   effect as if signed and sworn to before the

17   officer before whom the within deposition was

18   taken.

19

20

21

22

23

24

25

Page 5

1              DAVID JACKSON

2          THE VIDEOGRAPHER:  Good morning.

3          My name is -- please note that all

4      the microphones are sensitive and may pick

5      up whispering and private conversations.

6      Please turn off cell phones or place them

7      away from the microphones as they can

8      interfere with deposition audio.  Recording

9      will continue until all parties agree to go

10     off the record.

11         My name is Pete Cooper representing

12     Veritext New York.

13         The date today is September 7, 2011,

14     and the time is approximately 9:35 a.m.

15         This deposition is being held at

16     Paul Weiss Rifkind Wharton & Garrison

17     located at 1285 Avenue of the Americas in

18     New York, New York and is being taken by

19     the counsel for the defendant.

20         The caption of this case is In Re:

21     Biogen '755 Patent Litigation.  This case

22     is filed in the United States District

23     Court for the District of New Jersey, Civil

24     Action No. 10-cv-02734.

25         The name of the witness is

```
 1                    DAVID JACKSON
 2         David Jackson.
 3              At this time the attorneys present
 4         in the room and attending remotely will
 5         identify themselves and the parties they
 6         represent.
 7              MR. GROOMBRIDGE:  Nicholas
 8         Groombridge on behalf of Biogen.
 9              MR. SANDEL:  Peter Sandel on behalf
10         of Biogen.
11              MS. HURLEY:  Elizabeth Hurley,
12         Biogen Idec.
13              MS. NYARADY:  Catherine Nyarady on
14         behalf of Biogen.
15              MR. BARSKY:  Wayne Barsky, Gibson
16         Dunn, on behalf of Merck Serono and Pfizer.
17              MR. BEST:  Tim Best, also Gibson
18         Dunn, also on behalf of EMD Serono and
19         Pfizer.
20              MR. BERL:  David Berl, Williams &
21         Connolly, on behalf of Bayer.
22              MR. GENDERSON:  Bruce Genderson,
23         also with Williams & Connolly, on behalf of
24         Bayer.
25              MS. SIMPSON:  Jamie Simpson, also
```

1                    DAVID JACKSON

2          with Williams & Connolly, on behalf Bayer.

3                    MR. PARKER:  Greg Parker from

4          White & Case on behalf of Novartis.

5                    THE VIDEOGRAPHER:  Thank you.

6                    Our court reporter, Eileen Mulvenna,

7          representing Veritext will swear in the

8          witness and we can proceed.

9    DAVID JACKSON,

10            having been duly sworn by Eileen Mulvenna,

11            a Notary Public of the State of New York,

12            was examined and testified as follows:

13   EXAMINATION

14   BY MR. BARSKY:

15        Q.     Good morning, Dr. Jackson.

16        A.     Good morning.

17        Q.     In front of you I've placed three

18   exhibits.

19                Exhibit 1 is your initial

20   declaration in connection with the claim

21   construction proceedings in this case.

22                Exhibit 2 is your responsive

23   declaration.

24                And Exhibit 3 is a copy of what

25   we'll refer to as the '755 patent.

Page 8

1                    DAVID JACKSON

2         A.     Okay.

3         Q.     Is that how you also refer to that

4    patent?

5         A.     Yes.

6                (Jackson Exhibit 1, No Bates

7         numbers, Expert Declaration of David A.

8         Jackson, Ph.D., marked for identification.)

9                (Jackson Exhibit 2, No Bates

10        numbers, Responsive Expert Declaration of

11        David A. Jackson, Ph.D., marked for

12        identification.)

13               (Jackson Exhibit 3, Bates Nos.

14        BIMA0000001 through 45, US Patent No.

15        7,588,755, marked for identification.)

16               MR. BARSKY:  Does anyone need extra

17        copies of any of those documents?  Because

18        I have a few left still.  Okay.

19   BY MR. BARSKY:

20        Q.     We're going to be using some

21   specific terms.  And I thought we would spend

22   just a few moments clarifying our respective

23   meanings of those terms.

24               In the course of your reports, and

25   in the '755 patent itself, there are references

```
                                          Page 9
 1                   DAVID JACKSON
 2    to polypeptide.
 3                You're aware of that?
 4        A.     Correct.
 5        Q.     And there are also references to
 6    protein; correct?
 7        A.     Yes.
 8        Q.     In the '755 patent, there is a
 9    specific definition of polypeptide.
10                Did you see that?
11        A.     I did.
12        Q.     And for purposes of your initial and
13    responsive expert reports and for purposes of
14    your analysis and opinions in this case, have you
15    used the definition of polypeptide set forth in
16    the '755 patent?
17        A.     Well, as I explained in my
18    responsive declaration, the way the term
19    "polypeptide" and the frequently interchangeably
20    used term "protein" are actually used in the
21    scientific literature is, as I indicated there,
22    largely interchangeable.
23                I did, however, make the distinction
24    in saying that there was -- to the extent that
25    there was a difference between the two, there was
```

Page 10

DAVID JACKSON

1

2   a tendency for "polypeptide" or "polypeptide

3   chain" to be used to -- when talking about a -- I

4   need another third word now here -- talking about

5   a string of amino acid residues hooked together

6   by peptide bonds to be used for what you might

7   call just a primary sequence of the protein, that

8   is to say the sequential string of amino acid

9   residues without some of the covalent

10  modifications that often occur, particularly in a

11  cellular context.

12              And similarly, there is a tendency,

13  although even less pronounced, I think, for the

14  word "protein" to be used when referring to a

15  fully modified mature protein or polypeptide

16  chain, which may have a whole variety different

17  kinds of posttranslational modifications or other

18  kind of covalent modifications to it.

19              But the key point, and the reason I

20  put this in my responsive declaration, was really

21  to assist the court in not getting sidetracked by

22  trying to parse distinctions between

23  "polypeptide" or "polypeptide chain" and

24  "protein" because they really are, in scientific

25  discourse in 1980 and now and also in the

1                    DAVID JACKSON

2    scientific literature, used largely

3    interchangeably.

4         Q.    So for purposes of your analysis and

5    opinions in this case, did you use and rely on a

6    specific definition of polypeptide that appears

7    in the '755 patent, or did you rely on what you

8    understood a person of skill working in 1980

9    would have understood about those terms?  In

10   other words that they were used loosely and

11   interchangeably?

12        A.    More the latter than the former.

13   The definition that is given in the patent is

14   fine as far as it goes.  It just doesn't go far

15   enough and it doesn't -- it's not limiting in the

16   sense.  That's because, as I say, "protein" and

17   "polypeptide" can be used interchangeably.  That

18   was the primary point I was trying to make.

19        Q.    In the --

20        A.    And that's the way I understood it,

21   just to respond directly to your question.

22        Q.    And that's the way you understood

23   what?

24        A.    That's the way I thought about the

25   term "polypeptide" as something that was

```
                                          Page 12
 1                    DAVID JACKSON
 2    interchangeable with "protein."
 3          Q.    So for purposes of your opinions,
 4    you did not apply the specific definition of
 5    polypeptide that appears at Column 8, lines 61 to
 6    64 or so; is that correct?
 7          A.    May I refresh my memory as to just
 8    what that is?
 9          Q.    Sure, yeah.  It's Column 8, and I
10    believe it starts at line 61, 62.
11          A.    62.
12                (Witness peruses the exhibit.)
13          A.    I certainly used that --
14          Q.    Excuse me, Dr. Jackson --
15          A.    Should I read it out?
16          Q.    -- why don't you read it into the
17    record so we're on the same page and then you can
18    answer the question.
19          A.    So the definition of polypeptide in
20    the '755 patent at Column 8, line 62, is
21    "Polypeptide - a linear array of amino acids
22    connected one to the other by peptide bonds
23    between the alpha amino acid and carboxy groups
24    of adjacent amino acids."
25          Q.    Now, would you go ahead and answer
```

1              DAVID JACKSON

2    the question as to whether or not, for purposes

3    of your analysis and opinions, you used that

4    specific deposition of polypeptide that appears

5    in the '755 patent?

6         A.    Okay.  And as I said, yes, to the --

7    as far as this goes, I did; but I didn't use it

8    as a limiting definition.  In other words, this

9    definition is asking one to make assumptions one

10   way or the other because it's silent on the topic

11   of whether the amino acid residues referred to

12   here are modified or not.

13        Q.    It is silent as to that point.

14              Are there portions of your initial

15   or responsive expert declarations in this case

16   where the opinions that you expressed or the

17   observations that you made are dependent more on

18   what you have described as this loose or

19   interchangeable uses of the words "polypeptide"

20   and "protein" as opposed to the specific

21   definition that appears in Column 8?  And feel

22   free to make reference to Exhibits 1 and 2 if you

23   need to.

24        A.    Okay.  Because I -- if you have some

25   places in here where I specifically used that

                        DAVID JACKSON

1
2    that you'd like to point me to, I'd be glad to
3    speed up the process.  I genuinely don't know the
4    answer to that question without looking at --
5          Q.     That's okay --
6          A.     -- this --
7          Q.     What we want to understand,
8    Dr. Jackson, as you're flipping through this is
9    whether there are portions of your report and
10   your opinions that depend more on what you've
11   described as this loose or interchangeable use of
12   the term "polypeptide" as opposed to the more
13   specific deposition that appears in the patent.
14   That's the question.
15               And I don't have any specific
16   portion of your reports in mind, but if, looking
17   through it quickly now, anything pops out to you
18   or if, during the day, you see something that
19   strikes you as applicable more to one definition
20   than the other, I would ask you to point that
21   out.
22         A.     Okay.  Fair enough.
23               MR. GROOMBRIDGE:  Will you give me a
24         continuing objection to form to the extent
25         that you're characterizing Dr. Jackson's

```
                                          Page 15

 1                    DAVID JACKSON

 2        testimony in your questions?

 3                 MR. BARSKY:  Fine.

 4                 MR. GROOMBRIDGE:  Thank you.

 5   BY MR. BARSKY:

 6        Q.    Do you want to take just a quick

 7   look now and see if anything pops out at you,

 8   without necessarily reading it word for word?

 9        A.    Right.

10               (Witness peruses the exhibit.)

11        A.    Well, let's -- nothing occurs to me

12   at this point.  My tendency certainly would have

13   been to use the broader more interchangeable

14   definition between protein and polypeptide

15   because that's the way I and other people in the

16   field have always used the term.  And I certainly

17   didn't, as I was writing this, have the literal

18   specific definition in a limiting sense that is

19   found in the '755 patent in mind.

20        Q.    Okay.  Let me ask you to turn to

21   your responsive report, which is Exhibit 2.

22        A.    Uh-huh.

23        Q.    And in particular, paragraph 3,

24   which begins on page 2.

25        A.    Okay.
```

1                    DAVID JACKSON

2        Q.      You see there's a section there

3    entitled -- Subsection A entitled "Protein and

4    Polypeptide"?

5        A.      On page 2, yes.

6        Q.      Okay.  And do you see that, around

7    the middle of page 2, you offer a commentary on

8    the distinction between a polypeptide and a

9    protein?

10       A.      Exactly.

11       Q.      If I use the term "polypeptide"

12   during the course of our discussion today, I'm

13   going to be using it in the manner that it is

14   referred to in the patent in Column 8, the manner

15   in which it's defined, as well as in the manner

16   that you recite here when you say that

17   polypeptide, "tends to be used to refer to a

18   sequence of amino acids linked by peptide bonds

19   whether produced by translation of mRNA in a

20   living cell or by chemical synthesis in a test

21   tube."

22       A.      So just for avoidance of confusion

23   and clarification, does your use of that term

24   explicitly imply that there are no chemical

25   modifications, no covalent modifications

```
                                          Page 17

 1                    DAVID JACKSON

 2   whatsoever of any of the amino acid chains -- any

 3   of the amino acid residues in that polypeptide?

 4        Q.     I believe if I were to have read the

 5   entire sentence into the record, it would have

 6   gone on to say, "without any chemical

 7   modifications to the amino acids and with no

 8   implication about its three-dimensional

 9   confirmation."

10        A.     Sorry.  That's what I said, but you

11   were referring to the definition in '755, which

12   doesn't say that.

13        Q.     I see.

14        A.     So that's what I'm trying --

15        Q.     I'm just trying to come to an

16   agreed --

17        A.     If you will buy into that extended

18   sentence there as how you're using it --

19        Q.     Then what?

20        A.     Then I will know how you're using

21   it.

22        Q.     Okay.  Well, what you said in your

23   report you considered to be an accurate

24   definition of polypeptide; correct?  In other

25   words what I just read into the record.
```

1                    DAVID JACKSON

2          A.      Yeah, I think that's an accurate

3    definition of polypeptide.

4          Q.      And where do you -- where, if at

5    all, do you see any distinction between what

6    you've put in paragraph 3 of your responsive

7    declaration and what appears as the explicit

8    definition of polypeptide in the '755 patent?

9          A.      Well, I've just expanded a little

10   bit.  This whole section and the subsequent

11   section were written by me to try to assist the

12   court in understanding terms that are used

13   somewhat loosely and perhaps ambiguously in the

14   scientific literature.

15         Q.      But you understand for purposes of

16   today's deposition, Dr. Jackson, we would like to

17   have a more specific --

18         A.      I -- I do.

19         Q.      -- in mind.

20                 So if I use the word "polypeptide"

21   during the course of my questioning, unless I

22   indicate otherwise, I am using it in the manner

23   that you have defined in paragraph 3 of your --

24         A.      Okay.

25         Q.      -- responsive expert declaration and

```
 1                    DAVID JACKSON
 2   as it appears in Column 8 of the '755 patent --
 3        A.      Okay.
 4        Q.      -- and its explicit definition.
 5                Will you understand that?
 6        A.      Yes.
 7        Q.      Okay.
 8                MR. GROOMBRIDGE:  Objection to the
 9        form there.  I think that's a
10        mischaracterization.
11                MR. BARSKY:  Well, let's be clear.
12                MR. GROOMBRIDGE:  Indeed, let's be
13        clear.
14                MR. BARSKY:  Any mischaracterization
15        as to the way I'm using the term?
16                MR. GROOMBRIDGE:  What you just said
17        is contrary to the testimony that we've
18        already had today inasmuch as you're taking
19        something from the patent and something
20        from Dr. Jackson's report and saying
21        they're identical.  You've already
22        established testimony that that's not
23        necessarily the case.  So let's be clear.
24        Why don't you spell out one single
25        definition of what it is you plan to --
```

```
                                            Page 20

 1                    DAVID JACKSON

 2              MR. BARSKY:  That's fine.

 3              MR. GROOMBRIDGE:  -- refer to as

 4        polypeptide.

 5              MR. BARSKY:  That's fine.

 6              MR. GROOMBRIDGE:  Not two of them

 7        with your editorial comments that the two

 8        are the same.

 9              MR. BARSKY:  That's fine.  By the

10        way, I disagree with what you just said,

11        but never mind that.

12  BY MR. BARSKY:

13        Q.    Dr. Jackson, if I use the word

14  "polypeptide," I'll be using it as it is

15  explicitly defined in Column 8 of the '755

16  patent.

17        A.    Right.

18        Q.    Will you understand that, sir?

19        A.    Yes.

20        Q.    Okay.

21        A.    Thank you.

22              With that in mind.

23        Q.    Why don't we turn to page -- excuse

24  me -- to paragraph 18 of your responsive

25  declaration.
```

1                    DAVID JACKSON

2   mammalian system capable of glycosylating the

3   interferon beta protein.

4              Do you have that in mind?

5        A.    Yes.

6        Q.    Do you agree that that protein is

7   not necessarily different in structure than the

8   native protein?

9        A.    Since I'm not an expert on protein

10  glycosylation in cells, I really don't know

11  whether there are other mammalian cells that have

12  been shown to put precisely the same

13  glycosylation on -- at the same sites as occurs

14  in human cells.  I just don't know that, so I

15  can't really answer that question.

16       Q.    Is that the reason why you were

17  careful not to rule that out in your report in

18  paragraph --

19       A.    To be perfectly honest, I didn't

20  realize I was being careful about this point.  I

21  was not trying to make this particular point.

22       Q.    Okay.  Let's go back to the word

23  "polypeptide" for a minute because I'm going to

24  use it now in connection with this discussion

25  that we just had.

1                    DAVID JACKSON

2        A.       Okay.

3        Q.       With respect to the interferon beta

4   polypeptide produced in a recombinant system,

5   that polypeptide would be identical to the native

6   polypeptide regardless of whether there are

7   differences in posttranslational modifications,

8   carbohydrate compositions and so on; correct?

9        A.       Well, no.  Let's make sure we're

10  clear on this as well.

11       Q.       Okay.

12       A.       So interferon beta is, in human

13  cells, produced as a peptide chain which is

14  longer than the mature native interferon beta.

15  And so there's an internal sequence that is

16  cleaved off that.  So to that extent --

17       Q.       Yes, go ahead.

18       A.       To that extent, the structures might

19  well be different.

20       Q.       I'll rephrase the question.

21       A.       Okay.

22       Q.       Would you agree that the polypeptide

23  of a mature recombinant beta interferon protein

24  would be identical to the polypeptide of native

25  interferon beta in its mature form regardless of

```
 1                    DAVID JACKSON
 2  whether the proteins may be the same or
 3  different?
 4       A.     So you're asking if the primary
 5  product of translation in a cell containing a
 6  recombinant DNA molecule would produce a
 7  polypeptide, using the definition in the '755
 8  patent of polypeptide, that is -- or could be
 9  identical to the polypeptide that is produced in
10  human cells as the native protein?  Is that what
11  you're asking?
12       Q.     It's very close.  We're trying to
13  compare two things.
14       A.     Okay.
15       Q.     And I'm going to ask you to compare
16  two things.
17              On the one hand a recombinant
18  interferon beta polypeptide in its mature form.
19       A.     Right.
20       Q.     On the other hand, a native
21  interferon beta also in its mature form.
22       A.     Uh-huh.
23       Q.     And I'm asking you now whether the
24  polypeptides of those two proteins are identical
25  regardless of whether the proteins themselves are
```

```
                                                Page 38
 1                        DAVID JACKSON
 2    identical.
 3          A.      It would depend on what the
 4    construct was that you used to make the
 5    recombinant polypeptide, but I think it ought to
 6    be possible, and I think it has been possible, to
 7    make a recombinant polypeptide that would be the
 8    same in structure -- in its primary structure as
 9    the one that's found in human cells.
10          Q.      You say you think it has been
11    possible.  What do you mean by that?
12          A.      I suspect that in all of the work
13    that was done on beta interferon, somebody has --
14    somebody did that.  I think I remember that that
15    work has been done, but I'm not -- I couldn't
16    give you a citation to it and I don't know that
17    for sure.
18          Q.      By "that work" having been done, you
19    mean that a recombinant beta interferon was
20    produced in a form in which the polypeptide was
21    identical to the native beta interferon; correct?
22          A.      In terms of its amino acid sequence,
23    yes.
24          Q.      In terms of the polypeptide as
25    defined in the '755 patent --
```

```
                                           Page 39

 1                     DAVID JACKSON
 2        A.      Well --
 3        Q.      -- correct?
 4        A.      -- that's the amino acid sequence;
 5   right?  So the complete amino acid sequence, the
 6   primary structure and the polypeptide are all
 7   interchangeable terms, I believe, in terms of the
 8   definition given there in '755.
 9        Q.      Okay.  Do you remember what work was
10   done --
11        A.      I don't.  I'm sorry.
12        Q.      Okay.  Do you recall an article by a
13   gentleman named Kagawa?
14        A.      I know the name; but I don't recall
15   the specific article, no.
16        Q.      That would be true, by the way, that
17   you could have identical polypeptides in both
18   native and recombinant beta interferon,
19   regardless of the host system in which the
20   protein was produced, provided that in both cases
21   you are looking at the mature form of the
22   protein; correct?
23        A.      I think that's correct.
24        Q.      Bear with me one second --
25        A.      Sure.
```

```
                                            Page 40

  1                    DAVID JACKSON

  2        Q.       -- while I get organized here.

  3                 (Pause from the record.)

  4                 MR. BARSKY:  Can we mark this,

  5        please.

  6                 (Jackson Exhibit 5, Bates Nos.

  7        S00020660 through 670, Response from Patent

  8        Office, marked for identification.)

  9   BY MR. BARSKY:

 10        Q.       Dr. Jackson, the reporter has placed

 11   before you a copy of Exhibit 5, which I will

 12   represent to you is a response to an office

 13   action in the '503 application, which is related

 14   to the '755 patent.  And I'm going to refer you

 15   to just some specific comments in here in a

 16   moment, but I just wanted to ask you to just take

 17   a moment and breeze through it and tell me if you

 18   think you've seen it before.

 19                 MR. GROOMBRIDGE:  Is there an

 20        Exhibit 4?

 21                 MR. BARSKY:  There is.

 22                 MR. GROOMBRIDGE:  But we haven't

 23        gotten to it yet?

 24                 MR. BARSKY:  No.

 25                 (Witness peruses the exhibit.)
```

                                                    Page 41

1                        DAVID JACKSON

2   BY MR. BARSKY:

3          Q.     Any of that look familiar to you?

4          A.     Well, some of the topics certainly

5   look familiar, but as you know, there were a lot

6   of exchanges with the Patent Office that

7   discussed similar kinds of topics.

8          Q.     I'm actually just asking if you the

9   document itself is familiar to you, not if the

10  material in it is familiar to you.

11         A.     In fact, I don't believe I have seen

12  this specific document before.

13         Q.     Okay.  Let me ask you to kindly turn

14  to page 9 of Exhibit 5.

15         A.     Okay.

16         Q.     And you should feel free to read as

17  much of the context as you would like, but I will

18  represent to you that the discussion here is with

19  respect to the understanding in the art as of

20  1980 --

21         A.     Okay.

22         Q.     -- or thereabouts.

23         A.     Okay.

24         Q.     All right.  On page 9, there's a

25  paragraph that appears right in the middle of the

Page 42

1                    DAVID JACKSON
2    page that begins with the words "Wholly apart."
3                    Do you see that?
4         A.      Yes.
5         Q.      Would you just take a moment and
6    read that paragraph to yourself?
7         A.      Uh-huh.
8         Q.      Thank you.
9                    (Witness peruses the exhibit.)
10        A.      You'd like me to go on and read the
11   listing A through G of the particular
12   difficulties --
13        Q.      If you'd like to, go right ahead.
14        A.      I thought that might be part of the
15   context.
16        Q.      We will get to that, but if you'd
17   like to read that as part of the context, you're
18   free to do that.
19        A.      Okay.
20                   (Witness peruses the exhibit.)
21        A.      Okay.
22        Q.      Let me just ask you in general
23   whether you agree with the two paragraphs that
24   you read as a -- to the extent they refer to the
25   state of the art in 1980.

1                    DAVID JACKSON

2        A.    I agree -- so what these paragraphs

3   do is to make the point that it was anticipated

4   to be difficult to produce any particular

5   recombinant DNA -- any particular protein, human

6   protein, from a recombinant gene at this time.

7              And then it listed a number of

8   possible reasons as to why mechanistically and --

9   series of mechanistic steps as to where there

10  might be difficulties.  And so if you're asking

11  do I agree with the overall notion that this was

12  a difficult thing to do in 1980, yes, I do.

13       Q.    Okay.  What about the statement at

14  the -- and I'll read it into the record so you

15  know exactly which statement I'm referring to.

16       A.    Okay.

17       Q.    "In fact, researchers in the art of

18  molecular biology were seriously concerned that

19  attempts to produce any particular mammalian

20  protein in bacteria would be fraught with

21  problems."

22              Do you agree with that as a

23  statement to the extent that it refers to the art

24  in 1980?

25       A.    Basically, I do.  There were still a

1                    DAVID JACKSON

2     lot of problems at that -- at that time.  Some of

3     them had started to become solved, but as

4     somebody who's responsible for groups doing this

5     kind of work at the time, there were lots of

6     problems still there, yes.

7          Q.     For purposes of your opinion and

8     your analysis, you defined what you considered to

9     have been a person of skill in the art as of

10    1980; correct?

11         A.     I did.

12         Q.     And you were working in this art --

13         A.     I was.

14         Q.     -- in 1980?

15                And do you consider that you were a

16    person of at least ordinary skill in the art as

17    of 1980?

18         A.     Yes.

19         Q.     And do you agree that a person of

20    skill in the art working in 1980 would be

21    seriously concerned about his or her ability to

22    express mammalian protein in bacteria?

23         A.     In general, yes, but let me make

24    one -- one qualification I think may be helpful

25    going forward.

1                          DAVID JACKSON

2                  It's one thing to be able to express

3      a mammalian protein from a recombinant gene at a

4      level of one or two molecules per cell.  So, you

5      know, you can write a scientific paper on that.

6      You can say I've demonstrated expression.  To the

7      extent that it is a weigh station to where one is

8      trying to get, it's a very useful thing to have

9      done.  If you can get a little bit of expression,

10     then it's -- that points you in a direction in

11     which you can maybe get much more.

12                  But the goal was, in virtually all

13     cases, to make large amounts, commercially useful

14     amounts, medical application useful amounts, of

15     these proteins in the cells.

16                  And so if that's what we mean by

17     "expression," then yes, I think most people at

18     that time who were skilled in the art had real

19     concerns about being able to produce many

20     mammalian cells in -- from recombinant genes.

21     Many mammalian proteins from recombinant --

22          Q.      Thank you.  In bacteria?

23          A.      In bacteria, yes.

24          Q.      When in your view was -- were these

25     problems solved such that a person working in

```
                                              Page 46
 1                    DAVID JACKSON
 2     this field could reasonably expected to produce a
 3     mammalian protein in E. coli, let's say?
 4          A.      Well, that technology has really
 5     evolved over the course of the last 30 years.
 6     For any particular protein, it still is not
 7     necessarily trivial to produce commercially
 8     substantial quantities, commercially relevant
 9     quantities of a protein from recombinant
10     constructs even today.
11               The technology is so good today that
12     the probability of being able to do that
13     ultimately -- if you're willing to invest the
14     resources to try a whole bunch of different
15     things, the probability is pretty good and much
16     higher than it was back in 1980.
17               But I would assert that there is no
18     general formula that you can apply that will
19     allow you to produce an unknown protein in
20     bacterial cells easily even today.
21          Q.     Okay.  Are you speaking of -- only
22     of nonbacterial genes?
23          A.     Actually, not -- not -- well,
24     probably -- yeah, probably nonbacterial genes.
25     Bacterial -- although certain very distantly
```

Page 47

1                          DAVID JACKSON

2       related bacterial genes, you can occasionally

3       have problems in expressing them; but in general,

4       prokaryotic genes are expressed more readily in

5       prokaryots than eukaryotic genes are, whether

6       those genes are from higher or lower eukaryots.

7            Q.     At what point in time, either a year

8       or range of years, do you believe that the field

9       ceased to be fraught with problems, as suggested

10      in Exhibit 5?

11           A.     Well, that depends on what -- what

12      your definition of "fraught" is.  Could you maybe

13      expand on that a little bit?

14           Q.     Well, how about the problems that

15      are itemized beginning on page 9 continuing on

16      page 10 in subparagraphs A through G?  I believe

17      that is probably among the references by the

18      author here.

19                  So at what point that time do you

20      think a person of skill working in this field

21      would have ceased to view the expression of a

22      nonbacterial gene in a bacterial host system as

23      being fraught with problems?

24           A.     Okay.  So let me try this answer and

25      see if it gets to what you want.

```
                                        Page 48
 1                   DAVID JACKSON
 2            I think that by probably the early
 3    '90s, the technology had improved enough so that
 4    there was a reasonable expectation that, if you
 5    tried hard enough -- and sometimes that might be
 6    trying very hard indeed -- if you tried hard
 7    enough, you could express almost any protein from
 8    a eukaryotic source in bacteria.
 9         Q.    When you just used the verb
10    "express" in your answer, were you referring to
11    expression in what you described earlier as
12    nontrivial or potentially commercial --
13         A.    Yes --
14         Q.    -- quantities?
15         A.    -- I was.
16         Q.    What if we were to change the
17    definition of expression that we're using; would
18    your answer change?  For example, if I were to
19    suggest that expression is -- let me start over
20    again.
21            What if we were to agree that
22    expression for purposes of this discussion means
23    the ability of a transformed cell to express any
24    quantity of a recombinant polypeptide --
25         A.    Right.
```

                        DAVID JACKSON

1

2          Q.       -- or protein regardless of whether

3     that cell or culture could be harnessed to be

4     produced in commercially significant quantities;

5     would your answer change with respect to whether

6     a person of skill would have viewed the

7     expression of a nonbacterial gene in a bacterial

8     system as being fraught with problems?

9          A.       And you want to know when such a

10    person of ordinary skill in the art --

11         Q.       Thank you, yes.

12         A.       Okay.  It's obviously in the general

13    case, although not always in every specific case,

14    easier to express very small quantities than it

15    is to express the large quantities.  And so it

16    would have been sooner, maybe say the mid to late

17    1980s as opposed to the early to mid 1990s, for

18    the large quantities that I'm talking about.

19    That's the distinction you're looking for?

20         Q.       Thank you, yes.  You've answered my

21    question.

22                   So up until that time, the mid to

23    late 1980s, a person of skill working in this

24    field would have viewed the expression of a

25    nonbacterial gene in a bacterial host system as

```
                                        Page 50

 1                   DAVID JACKSON

 2   being fraught with problems --

 3              MR. GROOMBRIDGE:  Objection.

 4        Q.      -- right?

 5        A.      Well, I don't know exactly what

 6   "fraught" means, so -- I think such a person

 7   would have viewed the expression of a

 8   nonbacterial gene in bacterial systems as

 9   potentially having significant problems that

10   would take significant time and resources to

11   solve well into the 1980s.

12        Q.      Now, the exhibit goes on to state,

13   and I'll quote, "Successful expression of one

14   mammalian protein in bacteria, such as

15   somatostatin, could not and would not provide a

16   basis for one of ordinary skill in the art to

17   predict with a reasonable expectation of success

18   that any specific mammalian protein, such as

19   interferon beta, would be producible in

20   transformed host cells."

21              Do you see that?

22        A.      I do.

23        Q.      Do you agree with that statement as

24   a -- as to the state of the art in 1980?

25        A.      I would agree with it without
```

```
                                          Page 100

 1                     DAVID JACKSON
 2              (Jackson Exhibit 9, Bates Nos.
 3          BIMA0010403 through 419, Amendment and
 4          Response, marked for identification.)
 5     BY MR. BARSKY:
 6          Q.    Now, I've handed you an amendment
 7     and response filed in the '658 application.
 8                 Do you see that, sir?
 9          A.    Yes.   There's the number, okay.
10          Q.    And it's dated July 16, 1996?
11          A.    Yes.
12          Q.    And this particular filing includes
13     Claim 31 as it stood when the claims were
14     rejected in the earlier office action that you
15     looked at.
16                 Do you see that?
17          A.    That would be at the bottom of the
18     page below the line that's drawn across?
19          Q.    Exactly, where it says --
20          A.    Where it says "31 amended."
21          Q.    Exactly.
22          A.    Okay.
23          Q.    Do you see that in the preamble of
24     Claim 31 in this Exhibit 9, that there's a
25     reference to "administering a therapeutically
```

                        DAVID JACKSON

1

2    effective amount of a composition"?

3              MR. GROOMBRIDGE:  Objection.

4         A.    I see those words there.  I'm not

5    sure whether that's in the preamble or not.  I'm

6    not clear precisely what the breakdown between

7    the preamble and the body in these claims is.

8         Q.    Okay.  But you see that there's a

9    references to the administering -- excuse me.

10             You see there's a reference to

11   "administering a therapeutically effective amount

12   of a composition"?

13        A.    Yes.

14        Q.    Okay.  And you also see that, in

15   Claim 31, it has the same language as appears in

16   Claim 1 of the '755 patent, beginning with the

17   words, "A polypeptide produced by a nonhuman host

18   transformed by a recombinant DNA molecule"?

19             Do you see that?

20        A.    Yes.

21        Q.    And do you understand that the words

22   in brackets are words that have been deleted --

23        A.    Deleted, yes.

24        Q.    -- right?

25             Going back to Exhibit 8, when the

|    | DAVID JACKSON |
|----|---------------|
| 1  | DAVID JACKSON |
| 2  | applicant told the Patent Office that Claim 31 of |
| 3  | the '658 application also -- quote -- "also |
| 4  | recites those positive process steps," do you |
| 5  | have an opinion as to what that referred to in |
| 6  | Claim 31 of the '658 application now that you've |
| 7  | looked at it? |
| 8  | A.    Well, as I've said in my responsive |
| 9  | declaration, the process step in this claim, it |
| 10 | seems to me, is the step of administering a |
| 11 | therapeutically effective amount of the |
| 12 | composition comprising, and then there's a long |
| 13 | description that comes below as to what that |
| 14 | composition consists of. |
| 15 | Q.    And in your answer you said "this |
| 16 | claim." |
| 17 | What were you referring to?  Were |
| 18 | you referring to Claim 31 of the '658 |
| 19 | application? |
| 20 | A.    I thought I was. |
| 21 | Q.    Okay.  I just wanted to clarify. |
| 22 | And so the words that were used to |
| 23 | communicate with the Patent Office by the |
| 24 | applicant are "positive process steps," plural; |
| 25 | correct? |

1                    DAVID JACKSON

2        A.      That's right.

3        Q.      And so my question to you was, do

4    you have an opinion as to what the applicant was

5    referring to when the applicant told the Patent

6    Office that Claim 31 of the '658 application also

7    recited "those positive process steps"?

8        A.      Yeah, my opinion is that what was

9    being referred to is the step of administering a

10   therapeutically effective amount of a

11   composition.  And that has got many complexities

12   to it, and so that might have been what

13   occasioned the use of the word "those" and

14   "steps" in this case.

15       Q.      Okay.  Which complexities are you

16   referring to now?

17       A.      Well, if you're going to administer

18   a therapeutically effective amount of a

19   composition, there are various elements of

20   administering, how much, under what regimen and

21   in what -- with what other adjuvants or anything

22   like that that you might use.  That's an example

23   of one type of complexity.

24       Q.      So it's your testimony then that

25   when the applicant said, "those positive process

1                     DAVID JACKSON

2     steps" in referring to Claim 31 of the '658

3     application, the applicant was referring to the

4     positive process step of administering; is that

5     correct?

6          A.    That's my interpretation, yes.

7          Q.    How confident are you in that

8     interpretation?

9          A.    Well, if I look at the whole

10    prosecution history, I'm pretty confident of that

11    interpretation because it seems to me that as

12    I've explained in my responsive declaration, that

13    there are a number of cases where it is less

14    ambiguous, in fact, it's quite unambiguous, and I

15    agree that it is somewhat ambiguous here, that

16    what's being referred to as the -- the positive

17    process step is the step of administering a

18    therapeutically effective amount of a composition

19    and that, in many exchanges that I've seen in

20    this file history, the use of the plural

21    "positive process steps" is because they're

22    referring to the same step in multiple patents,

23    patent applications.

24                And, therefore --

25          Q.    And --

1                      DAVID JACKSON

2          A.       -- when you understand it that way,

3     the use of the plural is perfectly appropriate.

4     And I think there is other internal evidence that

5     that is what the examiner meant that I have cited

6     in my responsive declaration and that I know

7     Biogen attorneys have cited as well.

8          Q.       The applicant is not referring in

9     this particular response to anything other than

10    Claim 31 of the '658 application; correct?

11         A.       Uh-huh.

12         Q.       Correct?

13         A.       I believe that's true.

14         Q.       And you're reading this as being the

15    same as if the applicant had instead said that

16    the Claim 31 of his copending '658 application

17    also recites the same positive process step --

18         A.       Uh-huh.

19         Q.       -- is that correct?

20         A.       I believe so.

21         Q.       And would you agree that that is

22    anomalous to read this as meaning the same thing,

23    whether it says "those positive process step" or

24    "the same positive process step"?

25         A.       Yeah, I've already said that I

                        DAVID JACKSON

1

2    believe this is ambiguous.  There are, I think,

3    several instances of potential ambiguity in the

4    extensive exchanges using much this same language

5    that occurred between applicant and examiner.

6    And it would have been clearer if -- and more

7    precise, obviously, if they'd used the singular

8    there, but they didn't.  And I gave you a

9    speculation as to why they might not have.

10        Q.    You understand that the defendants

11   are reading this particular reference to

12   "positive process steps," as well as the other

13   references to "positive process steps," in a

14   manner that diverges from your --

15        A.    I certainly do understand that.

16        Q.    Would you agree that the section of

17   Exhibit 8 that we've been focusing on in

18   connection with the '658 application is

19   consistent with the interpretation that the

20   defendants are advancing for what those positive

21   process steps are?

22        A.    Yes, I would agree that it's

23   consistent with that interpretation, which I

24   believe to be erroneous.

25        Q.    Okay.  But you believe -- but you

```
 1                    DAVID JACKSON
 2   will allow that it is consistent?
 3        A.     Yes.
 4        Q.     Okay.
 5        A.     Yes.
 6        Q.     All right.  Let me ask you to turn
 7   back to Exhibit 4, please, the affidavit of
 8   Dr. Fiers.  In particular, could you turn to
 9   page 40, please.
10        A.     Okay.
11        Q.     In the middle of that page, there's
12   a Roman numeral with a heading.
13               Do you see that?
14        A.     Yes, Roman numeral V.
15        Q.     Can you just read that first
16   sentence into the record, please.
17        A.     Following 68?  Or do you want the
18   heading read that --
19        Q.     The heading, just the first sentence
20   of the heading.
21        A.     "The complete DNA sequence that
22   characterizes human beta interferon was publicly
23   available by mid April 1980."
24        Q.     And as someone who was working in
25   the field at the time, were you aware that that
```

1                    DAVID JACKSON

2    was the case?

3         A.    I doubt that I was because that was

4    actually a couple of months before I joined Genex

5    Corporation.

6         Q.    Since you have continued to work in

7    this field and developed an expertise in

8    connection with the subject matter of your

9    reports and the '755 patent and worked on this

10   particular case, is this information consistent

11   with your current understanding of when the DNA

12   sequence was available?

13        A.    I believe it is.

14        Q.    Okay.  Why is that?

15        A.    Because I believe that in terms of

16   public availability, I think Taniguchi made that

17   sequence information available sometime in the

18   spring of 1980.  I can't tell you at this point

19   exactly when.

20        Q.    Okay.  And what's your understanding

21   as to how Dr. Taniguchi made that -- made the

22   complete DNA sequence for human beta interferon

23   publicly available by that time?

24        A.    I'm not sure I can tell you

25   precisely.  I know he gave a seminar in which he

Page 109

1                          DAVID JACKSON

2     talked about it, but I'm not clear to exactly

3     what extent or even whether he disclosed the

4     entire sequence at that time or maybe a partial

5     sequence.  And I can't tell you off the top of my

6     head when this was actually published in the

7     scientific literature.

8          Q.      Okay.  But in either event, it's

9     your present understanding that the sequence was

10    publicly available by mid April of 1980; correct?

11         A.      I believe that's correct.

12         Q.      Okay.  Do you know Dr. Charles

13    Weissmann?

14         A.      I've met him on a couple of

15    occasions at meetings, yes.

16         Q.      Did you work with him at all in

17    connection with your work on alpha interferon?

18         A.      No.

19         Q.      Let me ask you to turn to page 45,

20    please.  In particular, I'm going to ask you to

21    focus on the sentence that -- the first complete

22    sentence on this page --

23         A.      Starting with "Dr. Taniguchi"?

24         Q.      Exactly.

25         A.      Yes.

```
                                            Page 110

 1                    DAVID JACKSON

 2       Q.     This says, "Dr. Taniguchi had, in

 3  fact, published his beta interferon DNA and amino

 4  acid sequences even earlier, May 1980."

 5              And then there's citation to an

 6  article.

 7              Do you see that?

 8       A.     Right.

 9       Q.     Is that consistent with your

10  recollection and understanding?

11       A.     As I've indicated, I am -- I don't

12  have a specific recollection of dates.  I

13  remember that this became available in the spring

14  of 1980.

15       Q.     Okay.

16       A.     So that would be consistent with

17  this.

18       Q.     Okay.  Let me ask you to turn to

19  page 32, please, in particular paragraph 55.

20       A.     Okay.

21       Q.     I'm going to direct your attention

22  to just the last two sentences that appear in

23  this paragraph; but if you'd like to read as much

24  before or after, feel free, for context.

25       A.     Is this paragraph 55?
```

Page 150

1                    DAVID JACKSON

2        A.     Well, I have -- I have knowledge and

3   expertise relative to a number of the issues that

4   are discussed in the patent.  I know more about

5   some of them and less about others of them.

6        Q.     And you have knowledge and

7   expertise, for example, regarding cloning of

8   genes; correct?

9        A.     Yes.

10        Q.     And expression of polypeptides;

11   correct?

12        A.     Yes.

13        Q.     Including recombinant expression of

14   polypeptides?

15        A.     Yes.

16        Q.     You spent a significant amount of

17   your career on issues relating to expression of

18   recombinant polypeptides?

19        A.     I wouldn't say I've spent as much on

20   expression as I've spent on the -- developing the

21   cloning technology.  I started that work when I

22   was a postdoc at Paul Bert's laboratory at

23   Stanford.  And I'm actually the first author on

24   the first publication that was published on

25   recombinant DNA technology.

Page 151

1                     DAVID JACKSON

2               And so through much of the time that

3    I was an academic in the 1970s, I continued to

4    work on developing that technology and applying

5    it to the tumor virus SV40.

6         Q.     Were there any problems or issues

7    that were discussed in the '755 patent that you

8    thought you had insufficient expertise to render

9    an opinion about?

10        A.     As I said, I thought, that with the

11   work that I did to help prepare myself on this, I

12   could do an adequate job of assisting Biogen.  If

13   I hadn't felt that, I would have declined the

14   assignment.

15        Q.     I guess my question is, were there

16   any parts of the '755 patent that discussed

17   scientific issues that you thought to yourself

18   that's not something I have enough knowledge

19   about to participate?

20        A.     I don't recall any at this point,

21   no.  I felt genuinely comfortable that I knew an

22   adequate amount about the issues presented in the

23   '755 patent and that, if I didn't, it was

24   information that I could acquire.

25        Q.     You understand that the

Page 152

1                       DAVID JACKSON

2       specification and the claims are interpreted

3       through the lens of the hypothetical person of

4       ordinary skill; right?

5              A.      Yes.

6              Q.      You thought that you, I think you

7       said this morning, possessed sufficient education

8       and expertise to meet those requirements as it

9       related to the issues addressed in the '755

10      patent; right?

11             A.      Yes.

12             Q.      Now, have you ever treated a cancer

13      patient?

14             A.      No.

15             Q.      Have you ever treated a patient with

16      viral disease?

17             A.      That's a little more complicated to

18      answer.  Since I'm not an MD, I have not treated

19      any patient directly with my own hands.

20                     When I was at DuPont Merck, one of

21      my responsibilities, among others, was to head up

22      the development program for the -- what became

23      the anti-HIV drug Sustiva.

24                     And one of the significant

25      activities in that development program was

1                    DAVID JACKSON
2    clinical trials of Sustiva.  And I had MDs that
3    worked for me, whose supervisor I was, who did
4    treat patients.  And I was quite heavily involved
5    in design and monitoring the clinical trials and
6    the clinical trial data.
7                    So in that indirect sense, I've had
8    responsibility in some sense.  It's, though, not
9    the kind of responsibility you have if you've got
10   a medical license for treating patients.
11        Q.     Have you ever treated any patients
12   using interferon?
13        A.     No.
14        Q.     Have you ever treated a patient with
15   MS?
16        A.     No.
17        Q.     Have you ever sought to
18   down-regulate the immune system by administering
19   a compound or protein?
20        A.     Well, as I've said consistently, I'm
21   not an MD, so I haven't -- anything that requires
22   administering drugs to patients is not something
23   that I have personally done.
24        Q.     Do you have any expertise with
25   respect to the dosing of interferon to treat

                            DAVID JACKSON

1

2    cancer?

3          A.     It depends on what you mean by

4    "expertise."  That's something that in reading

5    the literature, one learns about what kinds of

6    doses others report are effective.

7          Q.     But do you bring with you any

8    particular insight in that regard?  Anyone can

9    read the literature.  I can read the literature

10   too, but I'm not an expert on dosing.

11               My question --

12         A.     That's how you get insight, is by

13   reading the literature and reading what knowledge

14   other people have generated.

15         Q.     Do you have any training in the area

16   of, for example, treatment of multiple sclerosis?

17         A.     No.

18         Q.     Cancer?

19         A.     Again, in the supervisory context, I

20   have had some responsibility for MDs who were

21   involved in clinical trials of compounds that we

22   were developing.

23         Q.     You said in your report you were

24   very familiar with the field of molecular

25   biology, including cloning and protein expression

Page 155

                         DAVID JACKSON

1

2    in 1980; is that accurate?

3        A.     Yes, I think that is accurate.

4        Q.     Would you likewise say that you're

5    very familiar with the field of clinical use of

6    interferon in 1980?

7        A.     No.

8        Q.     Now, I don't want to retread some of

9    the territory you covered this morning with

10   respect to what the word "polypeptide" means in

11   the '755 patent.  I just wanted to make sure I

12   understood your testimony and clarify a few

13   things.

14              You've reviewed the '755 patent?

15       A.     Yes.

16       Q.     Does the '755 patent provide any

17   description of a structural difference between

18   native beta interferon and recombinant beta

19   interferon produced by a mammalian host cell?

20       A.     Certainly not.  The '755 patent

21   doesn't discuss at all recombinant interferon

22   produced by a mammalian host cell.

23       Q.     Let alone the structure of such a

24   polypeptide; right?

25       A.     Yes.

1                    DAVID JACKSON

2          Q.     And when we've been discussing in

3     the last few questions mammalian host cell, it's

4     obviously not limited to human -- I'm talking

5     about human as well as nonhuman host mammalian

6     cells; right?

7          A.     Well, the '755 patent explicitly

8     does not cover human host cells.

9          Q.     So when you've been answering my

10    questions about mammalian host cells, you've been

11    thinking about nonhuman mammalian host cells?

12         A.     Yes.

13         Q.     Why don't you take a look at the

14    definition of polypeptide in the '755 patent.  I

15    think it was at Column 8, line 62 to 64.

16         A.     Right.

17         Q.     Do you have that in front of you?

18         A.     I do.

19         Q.     And that definition provides no

20    implication about the chemical or biochemical

21    modification of any amino acid in the recombinant

22    peptide; correct?

23         A.     That's right.

24         Q.     So any polypeptide that has that

25    linear array sequence of the amino acid meets

```
                                      Page 157
 1                   DAVID JACKSON
 2   that definition; is that right?
 3               That was actually --
 4       A.      Meets that definition of what?  Of
 5   being a polypeptide?
 6       Q.      That was inartfully asked.  Let
 7   me -- why don't you go to the claim at the end
 8   of -- at the end of the patent.
 9       A.      Yes.
10       Q.      Do you have Claim 1?
11       A.      I do.
12       Q.      And you understand that Claim 1
13   defines some set of DNA sequences that are
14   contained in the recombinant DNA molecule; is
15   that right?
16       A.      Uh-huh.
17       Q.      In Subpart A of the claim; is that
18   right?
19       A.      Uh-huh.
20               THE REPORTER:  Yes?
21       Q.      You have to say yes or no.
22       A.      Yes.
23       Q.      Those are DNA sequences which are
24   capable of hybridizing to the probes that are
25   listed there; right?
```

Page 158

1                     DAVID JACKSON
2          A.      That's correct.
3          Q.      And that set of DNA sequences
4    corresponds to a set of amino acid sequences per
5    the genetic code; right?
6          A.      Yes.
7          Q.      And so my question is, per the
8    definition of polypeptide in Column 8, that any
9    polypeptide that meets the amino acid sequence
10   requirements of Claim 1 is within the scope of
11   the recombinant polypeptide of the '755 patent
12   without regard to any chemical or biochemical
13   modification of any amino acid in the sequence?
14                MR. GROOMBRIDGE:  Objection.
15         A.      So again, let me understand -- let
16   me make sure I understand what you're asking.
17                You're asking if a polypeptide whose
18   primary sequence is one -- and by "primary
19   sequence," I mean just the sequence of amino
20   acids without modifications or whatever -- whose
21   primary sequence is one that would be produced if
22   a DNA sequence included in Subpart A here were
23   used as the source of information, whether that
24   polypeptide is within this claim?
25         Q.      Yes.

1                    DAVID JACKSON

2          A.     I believe that's correct.

3          Q.     Okay.  And put another way, the --

4     you understand that -- I think you said in your

5     report some proteins are phosphorylated and some

6     are not; is that correct?

7          A.     That's correct.

8          Q.     You can have, for example,

9     interferon in phosphorylated form or not

10    phosphorylated form; correct?

11         A.     That's right.

12         Q.     Whether it's phosphorylated or not,

13    it's the same polypeptide, the same linear array

14    of amino acids; right?

15         A.     It certainly is.  Whether or not --

16    what its activity is may well depend upon whether

17    that same sequence is phosphorylated or not, but

18    the primary sequence of amino acids is the same.

19         Q.     It's the same polypeptide applying

20    the definition of --

21         A.     It's the same polypeptide applying

22    that definition.

23         Q.     And you said something about its

24    activity.  The patent discloses that both

25    phosphorylated and nonphosphorylated beta

1                    DAVID JACKSON

2    interferon essentially have the same activity,

3    doesn't it?

4         A.    I don't recall that one way or the

5    other.

6         Q.    I'll refer you to Column 2 at about

7    line 18.

8              (Witness peruses the exhibit.)

9         A.    Sorry, Column 2, line 18?

10        Q.    Right.  You see the sentence that

11   starts, "Although authentic" --

12        A.    Right.

13        Q.    -- "HU interferon" --

14        A.    Right.

15        Q.    -- "beta is glycosylated"?

16              Do you see that sentence?

17        A.    Right.

18        Q.    That paragraph of the patent

19   discloses that unglycosylated interferons are

20   equally as active as native glycosylated

21   interferons; right?

22        A.    I'm sorry, the problem is you said

23   phosphorylated, and that's what I was trying to

24   find.

25        Q.    I'm sorry.

1                    DAVID JACKSON

2          A.      If you mean glycosylated, I agree

3     with you.

4          Q.      I asked you a few minutes ago

5     whether the beta interferon is phosphorylated or

6     not, it's the same polypeptide applying the

7     Column 8 definition.

8                  Do you recall that question?

9          A.      Yes.

10         Q.      Let me ask the same question with

11    respect to glycosylation.  Whether it's

12    glycosylated or not, that beta interferon is the

13    same polypeptide, applying the Column 8

14    definition; right?

15         A.      Applying the Column 8 definition;

16    right.

17         Q.      So you're helping me, too.

18                 You understand that Claim 1 covers

19    both glycosylated and nonglycosylated recombinant

20    polypeptide; right?

21         A.      If it were glycosylated when it was

22    produced in a nonhuman host, then it would, I

23    think, be covered by Claim 1.

24         Q.      Okay.  In other words, if one

25    administers a recombinant polypeptide that is not

Page 162

DAVID JACKSON

 1
 2    glycosylated, one still can be practicing
 3    Claim 1?
 4         A.    I think one can be practicing
 5    Claim 1 whether you administer -- whether it's
 6    the glycosylated or nonglycosylated form.
 7         Q.    And both the glycosylated and
 8    nonglycosylated form of interferon beta was --
 9    had been disclosed in the prior art, too; right?
10         A.    I believe that's -- yes, that's
11    correct.
12         Q.    You mention in your expert report
13    acetylation.
14         A.    Yes.
15         Q.    Is interferon beta acetylated?
16         A.    Not to my knowledge.
17         Q.    You mentioned phosphorylation in
18    your report.  Is beta interferon phosphorylated?
19         A.    Again, not to my knowledge.
20         Q.    And again, per the agreed-upon -- or
21    strike that.
22               Per the definition in Column 8 of
23    the patent, whether or not a recombinant
24    interferon beta polypeptide is acetylated or not,
25    it's the same recombinant polypeptide; right?

```
                                              Page 163
  1                     DAVID JACKSON
  2        A.      Yes.
  3        Q.      The same with phosphorylation?
  4        A.      Yes.  Whether it would be active or
  5   not is another question.
  6        Q.      But as far as you know, there's no
  7   such thing as phosphorylation of interferon beta;
  8   right?
  9        A.      Right.
 10        Q.      I'm sorry if you've answered this
 11   before, but Claim 1 is not limited with respect
 12   to the nonhuman host that is used to produce the
 13   recombinant polypeptide; correct?
 14        A.      That's right.
 15        Q.      It covers production of the nonhuman
 16   host in bacterial and mammalian cells alike?
 17        A.      Nonhuman mammalian cells.
 18        Q.      And yeast cells and --
 19        A.      And yeast, right.
 20        Q.      Had the glycosylation site of beta
 21   interferon been elucidated by the middle of 1980?
 22        A.      I don't know the answer to that.
 23        Q.      Had the particular sugar that is
 24   added to beta interferon been determined by
 25   middle of 1980?
```

1                    DAVID JACKSON

2          A.     Again, I don't know definitively,

3     but I would doubt that because that's -- that

4     kind of carbohydrate technology was not

5     particularly well developed at that point in

6     time.

7          Q.     If -- if one had recombinantly

8     produced beta interferon from a nonhuman

9     mammalian host cell in one hand --

10                 Are you with me so far?

11         A.     Yes.

12         Q.     -- and native human beta interferon

13    that had been isolated in the other hand, in

14    1980, would you have been able to tell the

15    difference by virtue of the glycosylation of

16    which was which?

17         A.     It would depend on what the nonhuman

18    mammalian host was.

19         Q.     Can you explain that further?

20         A.     Well, as I said this morning,

21    different mammalian and other higher eukaryotic

22    cell lines have different glycosylation patterns.

23    And so certainly the composition and sequence and

24    to some extent the exact position of the

25    glycosylation can vary on the same protein if

Page 165

1                          DAVID JACKSON
2       it's produced in different hosts.
3            Q.      So with respect to some mammalian
4       hosts, it's your testimony that you could have
5       determined that it was recombinantly produced
6       rather than native human interferon; but with
7       respect to other mammalian hosts, you could not
8       have determined?
9            A.      I'm sorry, if that is your question,
10      I misunderstood the original question.  The
11      question I thought you were asking was whether
12      you could tell the difference between the native
13      human interferon and a recombinantly produced
14      interferon in some nonhuman host.
15                   And my answer to that question is it
16      depends on what the nonhuman host is.  If there's
17      a nonhuman mammalian host that has exactly the
18      same glycosylation pattern as human cells do,
19      then, by definition, the two compounds would be
20      the same and you couldn't distinguish them.
21           Q.      But in 1980, you didn't know what
22      the native glycosylation pattern was, did you?
23           A.      That's right.  I'm sorry, I thought
24      you were asking a hypothetical question and I was
25      answering a hypothetical question.

```
                                                    Page 166

 1                       DAVID JACKSON
 2          Q.      Sorry.   Let me be more clear then.
 3    I apologize.
 4                  In 1980, would one have been able to
 5    tell the difference and determine which was which
 6    as between human native beta interferon that had
 7    been isolated on the one hand and recombinantly
 8    produced in a nonhuman mammalian cell beta
 9    interferon on the other hand?
10          A.      So either I'm misunderstanding the
11    question or we're somehow not communicating
12    because my answer has to be the same.   Again it
13    depends on what the nonhuman mammalian host is.
14          Q.      Okay.
15          A.      If it puts the same glycosylation
16    pattern onto the beta interferon -- oh, so when
17    you say "in 1980," so -- I'm sorry, I didn't
18    consider this possibly.
19                  No, you couldn't do it in 1980
20    because there weren't any mammalian hosts that
21    could be used to produce recombinant DNA
22    molecules.   Is that what you were --
23          Q.      Fair enough.   That's an answer to
24    the question, I guess.
25                  Now, make one more assumption, which
```

                       DAVID JACKSON

1
2   is that I now am able to produce in a nonhuman
3   mammalian host cell recombinant beta interferon.
4   And that's now in your left hand.
5          A.     Yes.
6          Q.     You have a flask with what I've
7   produced.
8          A.     Yes.
9          Q.     Even though you don't think that
10  could have been done in 1980; right?  You don't
11  think I could have done that in 1980; right?
12         A.     Depends how dilute it was.
13         Q.     And in your right hand, you have
14  native interferon that's been isolated.  Based on
15  what was known in June of 1980, could you have
16  determined which of the two flasks had the
17  recombinantly produced beta interferon and which
18  of the two flasks had the native isolated beta
19  interferon?
20         A.     It depends on what the mammalian
21  host was.
22         Q.     Do which mammalian hosts could you
23  not have determined that?
24         A.     Ones that -- ones that put on the
25  same glycosylation as human cells do.

1                    DAVID JACKSON

2         Q.     But -- what glycosylation is that?

3         A.     I mean, I can't tell you what the

4    structure of it is.

5         Q.     No one -- that was known in 1980;

6    right?

7         A.     Oh, whether it was known with

8    respect to the absolute sequence of the sugar

9    residues, I don't know; but you could certainly

10   get the glycosyl residues off the protein.  There

11   are glycosylates that will do that.  And there

12   were pretty sophisticated gas chromatographic and

13   maybe even by that time mass spec analyses by

14   which I think you probably could have determined

15   pretty definitively whether the glycosylation was

16   the same or not.

17        Q.     Okay.  And let's for a moment assume

18   that one does that analysis in 1980 and finds two

19   different glycosylation patterns.  Okay?

20        A.     Then --

21        Q.     You with me?

22               How do you know which one was human

23   and which one was recombinantly produced in a

24   nonmammalian --

25        A.     You label your flask.

1                    DAVID JACKSON

2         Q.        I'm telling you flasks are labeled A

3    and B.  I'm asking for you to determine it.

4         A.        Yes.  So you'd say how do you know

5    which one is the native one, and it's the one

6    that you pulled out of the flask.  You're saying,

7    okay, you know what it is, but it's a blindfold

8    test for me.

9         Q.        Yes.

10        A.        Ah, that's a different question.  So

11   now I understand.

12        Q.        Okay.

13        A.        So what I would have done is go to

14   authentic native glycosylated interferon isolated

15   from human sources, defined what that was and

16   then compared it with both of the two flasks that

17   you handed me with their labels obscured.  And I

18   would say either one of them is the same and one

19   of them is not or they're both the same.

20                  In the case where one of them is the

21   same, then I would say the other one is

22   recombinant.  In the case when they're both the

23   same, I would say I don't know.

24        Q.        And is there such a thing as a

25   single glycosylation pattern for authentic native

1                    DAVID JACKSON

2    beta interferon?

3         A.    I don't know in detail whether

4    that's true.

5         Q.    That's heterogenous amongst, for

6    example, the population; right?  You won't have

7    the same glycosylation pattern necessarily that I

8    will in my beta interferon; correct?

9         A.    I don't know the answer to that.

10         Q.    Even within the same person, there

11    can be different glycosylation patterns; correct?

12         A.    There can be, but you're asking the

13    question specifically with respect to beta

14    interferon, and I don't know the answer to that.

15    But the point that you by implication are making,

16    that there is heterogeneity in glycosylation of

17    proteins, is in many cases correct.

18         Q.    And which means if that's the case,

19    there's not a single standard against which to

20    compare to determine whether the glycosylation

21    pattern is the same as native beta interferon;

22    right?

23         A.    Well, no, I don't think that's --

24    you do this analysis on the glycosylation and

25    you're going to get a result.  Okay.  That result

1                    DAVID JACKSON

2     provides an operational definition of what the

3     sugar residues on the particular preparation of

4     protein that you started with were.

5                    Okay.  That may or may not be

6     heterogenous.  Let's assume it is heterogenous.

7     There will nonetheless be a signature with

8     respect to that heterogeneity.  I don't know how

9     broad that is.  I don't know what would happen if

10    you went out and you collected serum from ten

11    other individuals and pooled it and similarly

12    determined the glycosylation pattern.

13                   And I don't know what the variation

14    would be in a cell line that was nonhuman that

15    glycosylated because there may well be

16    heterogeneity within a given cell line.  There

17    are multiple glycosylations around.

18                   So one of the reasons this wasn't

19    very well characterized at the time, it's really

20    complicated chemistry.  So a lot of the questions

21    that you're asking I think want a degree of sort

22    of rigor and specificity in the standards that I

23    don't think was available.

24                   And so the best you could have done

25    is to look at what signal you get from authentic

                         DAVID JACKSON

1

2   beta interferon and look at what signal you get

3   doing the same kind of analysis from the other

4   samples.  And if they're the same, then you

5   either have to conclude that it's authentic beta

6   interferon or you have to conclude that it's a

7   nonmammalian cell line that puts on that -- as

8   best your analytical methods can determine, the

9   same glycosylation pattern.  That's the real

10  world.

11       Q.    Let's change the hypothetical

12  slightly.  I'll give you a single flask that has

13  interferon beta in June of 1980.

14            And my question is, can you tell me

15  in June of 1980 whether that beta interferon was

16  produced recombinantly by a nonhuman mammalian

17  host or whether it was beta-isolated beta

18  interferon?

19       A.    Again, presuming that in 1980 there

20  were a nonhuman mammalian host that could produce

21  it, which as far as we know there wasn't -- I

22  mean, this is getting really pretty deep into

23  hypotheticals.  I think my only honest answer in

24  that situation is I don't know.

25       Q.    Nothing in the patent leads you to

```
                                              Page 173
 1                      DAVID JACKSON
 2   an answer one way or the other; is that fair to
 3   say?
 4          A.     I think that's fair to say.
 5          Q.     You talked about biochemical and
 6   chemical modifications of amino acids in your
 7   report.  Other than the glycosylation that we've
 8   been discussing, are you aware of any such
 9   modifications that occur with respect to
10   interferon beta?
11          A.     No.
12                 MR. BERL:  We've been going about an
13          hour.  I'm at a breaking point.  Do you
14          want to take a little break?
15                 MR. GROOMBRIDGE:  Sounds good.
16                 THE VIDEOGRAPHER:  The time is
17          approximately 2:43 p.m.  This is the end of
18          Media No. 3.  We are off the record.
19                 (Recess from the record.)
20                 THE VIDEOGRAPHER:  The time is
21          approximately 2:53 p.m.  This is the
22          beginning of Media No. 4.  We are on the
23          record.
24   BY MR. BERL:
25          Q.     Before we move to another topic, are
```

                    DAVID JACKSON

1

2   there any textbooks in the area of molecular and

3   cellular biology that you consider authoritative?

4        A.    Yes.

5        Q.    What would that or those be?

6        A.    Well, Jim Watson's "The Molecular

7   Biology of the Gene," which is now in its

8   probably sixth or seventh or eighth edition, is

9   one of the classics in the area.

10                  Benjamin Lewin has a textbook on

11   molecular and cell biology, which is very good.

12                  A little bit off to the side, Lubert

13   Stryer's book on biochemistry and molecular

14   biology is an excellent textbook.

15                  And those are three examples.

16        Q.    You agree that in your expert

17   report, you refer repeatedly to transformation as

18   a process; is that correct?

19        A.    Yes, in certain contexts, it

20   absolutely is a process.

21        Q.    And including in the context in

22   which you used it in your expert report; correct?

23        A.    Well, I don't know whether that's

24   true in every instance because it can certainly

25   be used as an adjective as well as, for instance,

```
                                            Page 175
 1                    DAVID JACKSON
 2    Dr. Ravetch did in his expert report.
 3          Q.     But at least in some instances, you
 4    used it as a process?
 5          A.     Sure, yes.
 6          Q.     And likewise you used the term
 7    "expressed" or "produced" to refer to a process,
 8    too; is that right?
 9          A.     Yes.
10          Q.     In fact, you noted in your first
11    expert declaration that the specification of the
12    Fiers patent provides a definition for expression
13    as "the process undergone by a structural gene to
14    produce a polypeptide, it is a combination of
15    transcription translation"; is that right?
16          A.     Yes.
17          Q.     So you agree that the specification
18    defines expression as a process; is that right?
19          A.     Actually, I don't know whether there
20    is an explicit definition of that as a process.
21          Q.     You can refer to paragraph 32 of
22    your first expert report.  That's Exhibit 1, I
23    believe.  And it's on page 20, near the bottom.
24                 (Witness peruses the exhibit.)
25          Q.     You see the sentence that begins,
```

```
                                     Page 176
 1                  DAVID JACKSON
 2   "The specification of the Fiers patent also
 3   provides a definition for expression as 'the
 4   process'," and then you continue?
 5        A.     "To produce a polypeptide, it is a
 6   combination of transcription translation," yes.
 7        Q.     And so you agree that the
 8   specification defines expression as a process; is
 9   that right?
10        A.     Yes.
11        Q.     And production is also a process; is
12   that right?
13        A.     Yes.
14        Q.     And there are two steps, you say in
15   that same paragraph, two primary steps to a
16   protein or polypeptide synthesis in the cell; is
17   that right?  And it's the same paragraph, the
18   middle of the page.
19        A.     I put that away prematurely.  That
20   was page 20, I think you said?
21        Q.     Right.  Paragraph 32.
22               (Witness peruses the exhibit.)
23        A.     Here we go.  I'm sorry, could you --
24        Q.     It says -- do you see the sentence
25   that says, "As I explained earlier, there are two
```

1                    DAVID JACKSON
2     primary steps to protein or polypeptide synthesis
3     in a cell"?
4          A.     Yes.
5          Q.     And those two steps are
6     transcription and translation; is that right?
7          A.     Yes.
8          Q.     What do you mean by "two primary
9     steps"?
10          A.     Well, so the first step -- the first
11    primary step, as I've said here, is
12    transcription, but there are this series of
13    discrete molecular events that have to occur in
14    order for transcription to initiate and start
15    proceeding.  And then there's another series of
16    discrete molecular events that have to occur for
17    translation -- transcription to terminate at the
18    appropriate point.
19                    So I think that's probably why I
20    said there are two primary -- maybe I should have
21    said principal or overarching -- steps.
22          Q.     Then the series of what you've
23    called molecular events together constitute a
24    step?
25          A.     Yes.

1              DAVID JACKSON

2        Q.      And is it likewise correct to say

3   that there are two principal or primary steps to

4   recombinant polypeptide production, the first

5   being the introduction into a host cell line of

6   recombinant DNA and the second being that the

7   host cell expresses the recombinant polypeptide?

8        A.      I think that would be one way of

9   characterizing it.  You could break it down in

10  other ways as well, but those are two of a number

11  of component actions that have to occur or steps

12  that have to occur in order for you ultimately

13  to -- for the cell to produce a recombinant

14  polypeptide.

15       Q.      You're aware that the parties in

16  this case dispute the meaning of the language or

17  the effect of the language "produced by a

18  nonhuman host transformed by recombinant DNA

19  molecule"; right?

20       A.      My -- I think I would characterize

21  it in a somewhat different way.  I think in

22  effect what is being argued here is a grammatical

23  point, whether these, in fact, constitute two

24  distinct steps that are defined as processes or

25  whether, in fact, these are just part of an

1                    DAVID JACKSON

2  adjectival phrase that modifies "recombinant

3  polypeptide," which is itself part of the process

4  step as the people from Biogen see it.

5          Q.     And you would agree that that

6  language limits the process by which a

7  recombinant DNA -- by which a recombinant

8  polypeptide is prepared, don't you?

9          A.     Well, it limits it in the sense that

10  if you're going to make a recombinant

11  polypeptide, there's got to be DNA involved which

12  is put into some kind of vector which is put into

13  a host cell.  And that host cell has got to be

14  able to synthesize protein from that DNA, so the

15  construct has to be one that enables that to

16  occur in the particular host cell, sure.

17          Q.     And in principle, one could prepare

18  a recombinant polypeptide using a human host

19  cell; correct?

20          A.     Sure.

21          Q.     And preparation of a recombinant

22  polypeptide using a human host cell would not be

23  within the scope of Claim 1 of the '755 patent?

24          A.     That's correct.

25          Q.     Because of the language that recites

                    DAVID JACKSON

1
2    "expressed in a nonhuman host"?

3        A.    That's correct.

4        Q.    Sorry, "produced in a nonhuman

5    host."

6        A.    "Produced in a nonhuman host."

7        Q.    So that that language is limiting

8    the process by which the recombinant polypeptide

9    is prepared in a manner that it wouldn't be

10   limited if the language were absent?

11       A.    That's correct.

12       Q.    You -- you used the term in your

13   answer a moment ago and you also used it in your

14   expert report -- you used the term "adjectival

15   phrase."

16       A.    Yes.

17       Q.    I think you suggest in your expert

18   report that "produced by a nonhuman host" is an

19   adjectival phrase?

20       A.    Right.

21       Q.    It's your testimony that "produced"

22   is being used as an adjective in the claim?

23       A.    My testimony is that that phrase is

24   being used as an adjective and that phrase has

25   words in it which are nouns and verbs and

```
 1                    DAVID JACKSON
 2   articles and so on, which, taken together in the
 3   grammatical structure of that sentence, have a
 4   meaning that is an adjective that modifies "a
 5   recombinant polypeptide."  It says what kind.
 6          Q.     You said that that phrase has words
 7   in it which are verbs.  Which words in that
 8   phrase are verbs?
 9          A.     Well, let me -- if I may --
10                 (Witness peruses the exhibit.)
11          A.     So we're talking -- the term now,
12   just to be clear, is "produced by a nonhuman host
13   transformed by a recombinant DNA molecule."
14          Q.     That's the phrase that I'm talking
15   about.
16          A.     So the two verbs in there are
17   "produced" and "transformed."
18          Q.     You said in your expert report that
19   that phrase describes the recombinant
20   polypeptide.  Do you recall saying that, or do
21   you believe that to be the case?
22          A.     Well, what it does, as you said a
23   moment ago in one of your questions, is it puts
24   limits or boundaries around what the recombinant
25   polypeptide must be.  It has to be produced.  It
```

```
 1                    DAVID JACKSON
 2   has to be one that's produced in a nonhuman host,
 3   for instance.
 4         Q.     That's a boundary on the process
 5   used to prepare the recombinant polypeptide;
 6   right?
 7         A.     Right.
 8         Q.     Are there other boundaries that this
 9   phrase that we've been talking about, "produced
10   by a nonhuman host transformed by a recombinant
11   DNA molecule" places on the recombinant
12   polypeptide other than the process used to
13   prepare the recombinant polypeptide?
14         A.     I'm sorry, I'm trying to think
15   through --
16         Q.     Take as long as --
17         A.     -- the implications of the word
18   "boundaries."
19         Q.     Take as long as you need to answer
20   my question.
21         A.     Okay.
22                (Pause from the record.)
23         A.     No, I think it's as I said in my
24   responsive report for Dr. Ravetch, that saying
25   that a polypeptide is produced in a nonhuman host
```

1                    DAVID JACKSON

2    transformed by a recombinant DNA molecule is just

3    the longer and more precise way of saying

4    recombinant DNA -- recombinant polypeptide except

5    for the limitation that it has to come from a

6    nonhuman cell line.  So I think that's the

7    boundary.

8         Q.    Let me make sure I understand that

9    because I think that's an answer to a different

10   question than the one I was asking.

11              Are there any limitations on the

12   recombinant polypeptide that are imposed by the

13   language "produced by a nonhuman host transformed

14   by a recombinant DNA molecule" other than

15   limitations on how that recombinant DNA -- on how

16   that recombinant polypeptide is prepared?

17        A.    Okay.  I missed an important part of

18   your question, which was limitations on the

19   recombinant DNA molecule.  And no, I don't think

20   there are.

21        Q.    So that language, "produced by a

22   nonhuman host transformed by a recombinant DNA

23   molecule," only limits the process by which the

24   recombinant polypeptide is prepared; correct?

25        A.    I think that's right.

1                    DAVID JACKSON

2          Q.      It doesn't impose, in other words,

3     any structural limitation on the recombinant

4     polypeptide?

5          A.      Well, in the context of the claim, I

6     think it does impose a critical structural

7     limitation in the sense that recombinant DNA

8     molecules got to involve DNA.  The DNA that has

9     to be involved in this case is specified.  And

10    the specification of that DNA, in fact, as I've

11    explained, does, in fact, specify the structure

12    of the polypeptide.

13         Q.      The DNA is specified not by the

14    language we've been talking about, "produced by a

15    nonhuman host transformed by a recombinant DNA

16    molecule," but rather by the portion of the claim

17    that begins with "A" in parentheses; right?

18         A.      But the reference -- the

19    "recombinant DNA molecule" reference within the

20    language that we've been talking about does refer

21    specifically to the specific DNA molecule as

22    outlined in the part of the claim beginning "A."

23         Q.      Right.

24         A.      So in that sense, there's that

25    connection between the languages we've been

```
 1                    DAVID JACKSON
 2  talking about and lower parts of the claim.
 3        Q.    Right, but if you changed, for
 4  example, the set of DNA sequences within the
 5  scope of what we've been calling Limitation A,
 6  which are the DNA sequences that --
 7        A.    Right.
 8        Q.    -- hybridized to the probes; right?
 9        A.    Yes.
10        Q.    Let's say you added five new probes
11  and thereby added DNA sequences.  That would
12  change the scope of DNA sequences that could be
13  in the recombinant DNA molecule; correct?
14        A.    Uh-huh.  So it would change the --
15  it would change the recombinant polypeptides that
16  could be produced by nonhuman hosts transformed
17  by those recombinant DNA molecules.
18        Q.    Because you've changed the scope of
19  what we've been calling A.  And by "A," I mean
20  where it says parentheses "A" and then it says,
21  "The hybridizing to the probes."
22        A.    Yes.
23        Q.    And other than that section which
24  defines the scope of the DNA sequences, is there
25  anything else in the claim that limits the
```

Page 186

1                    DAVID JACKSON
2    primary structure of the recombinant polypeptide?
3         A.     No, I don't think so.
4         Q.     And is there anything -- again,
5    limiting yourself to the claim language at issue
6    here, "produced by a nonhuman host transformed by
7    a recombinant DNA molecule" -- that imposes any
8    limitation on the structure of the recombinant
9    polypeptide?
10              MR. GROOMBRIDGE:  Objection.
11        A.     Other than the connection that I've
12   been trying to explain between the reference to
13   the recombinant DNA molecule in here and the
14   specific sequences, no.  But that seems to me to
15   be a pretty important exception.
16        Q.     If, for example, the language --
17   rather than "changes the scope of DNA sequences"
18   in A, as we just did in the last hypothetical, we
19   changed the language at issue, "produced by a
20   nonhuman host transformed by a recombinant DNA
21   molecule," let's say we just took it out
22   completely for a moment --
23        A.     Took out that entire phrase?
24        Q.     Took out the entire phrase.  It just
25   says "Recombinant polypeptide" and then it

1              DAVID JACKSON

2    defined the scope of DNA sequences that

3    correspond in A.  Have I structurally changed the

4    recombinant polypeptide?  Have I removed any

5    structural limitation on the recombinant

6    polypeptide by doing that?

7              MR. GROOMBRIDGE:  Objection.

8         A.    Other than the one "introduced by

9    the nonhuman host" portion of that phrase, I

10   think not.

11        Q.    Well, by removing that disputed

12   language, I think we've agreed 30 minutes ago

13   that I would -- I've thereby expanded the

14   processes that can be used to prepare the

15   recombinant polypeptide.  I can now prepare it

16   using a human host rather than a nonhuman host;

17   right?

18        A.    Right.

19        Q.    Have I changed anything

20   structurally?  Have I broadened the structural

21   definition of recombinant polypeptide by removing

22   the language "produced by a nonhuman host

23   transformed by a recombinant DNA molecule"?

24        A.    Only in the broader sense of the

25   term "polypeptide," which is one that has got

1                      DAVID JACKSON

2    potential posttranslational modifications to it

3    that will vary from one cell to another.  So if

4    you remove that nonhuman host restriction,

5    there -- you might well have different structures

6    that you would -- that would develop.

7          Q.     Let me ask you the same question.  I

8    want you to apply the definition of polypeptide

9    in the patent.  Okay?

10         A.     Apply --

11         Q.     The patent's definition of

12   polypeptide.  Okay?

13                And my question is, if I remove the

14   language "produced by a nonhuman host transformed

15   by a recombinant DNA molecule," have I somehow

16   enlarged the structural scope of recombinant

17   polypeptide in Claim 1?

18                MR. GROOMBRIDGE:  Objection.

19         A.     Yeah, I think if you require that

20   limiting definition of polypeptide, then

21   that's -- that's correct.

22         Q.     That I have not?

23         A.     Yes.

24         Q.     I've not enlarged the structural

25   scope of recombinant polypeptide; is that what

1                   DAVID JACKSON

2   you're saying?

3        A.     Yes.

4        Q.     If you apply the patent's definition

5   of polypeptide?

6        A.     Yes.

7        Q.     Let me -- there's so many negatives,

8   I just want to make the record clear.  I think I

9   know what you're saying.

10              But if one were to remove the

11  language "produced by a nonhuman host transformed

12  by a recombinant DNA molecule," it is correct

13  that one would not enlarge the structural scope

14  of the recombinant polypeptide of Claim 1 --

15              MR. GROOMBRIDGE:  Objection.

16        Q.     -- using the definition of

17  polypeptide in the patent?

18        A.     I believe that's correct.

19        Q.     In your review of the '755 patent,

20  did you find any novel clinical use for --

21  sorry -- for beta interferon that Dr. Fiers

22  purports to have invented?

23        A.     No.

24        Q.     Did you find any novel treatment

25  regimen?

```
                                              Page 190

 1                   DAVID JACKSON
 2        A.     No.
 3        Q.     Any novel composition with respect
 4   to adjuvants or carriers?
 5        A.     No.
 6        Q.     Any novel diseases that he claims
 7   can be treated by administration of beta
 8   interferon?
 9        A.     No.
10        Q.     You'll agree that with respect to
11   all of those parameters that I just asked you
12   about, he teaches to administer beta interferon
13   as it was administered in the prior art?
14        A.     No, I wouldn't agree with that.  I
15   don't think he -- he teaches that the prior art
16   has shown the potential for beta interferon.  And
17   he explicitly teaches that having much larger
18   quantities of authentic beta interferon could
19   expand the possibilities for treatment, both with
20   respect to disease and with respect to regimen
21   and dosage and so on.
22        Q.     When you say "expand the
23   possibilities," that is making the prior
24   disclosed clinical uses and regimens more
25   effective rather than having new regimens or new
```

```
                                          Page 191

 1                      DAVID JACKSON
 2   diseases to be treated; right?
 3               MR. GROOMBRIDGE:  Objection.
 4        A.      No, not necessarily.  I think it
 5   would certainly open up the possibility of
 6   finding new diseases to be treated.
 7        Q.      Does he disclose any of those
 8   anywhere?
 9        A.      He doesn't disclose any of those
10   specifically, I don't believe.
11        Q.      Generally --
12        A.      Well, I think -- as I've said just
13   now, what I think he does disclose is that the
14   development of interferon as a therapeutic has
15   been severely limited by its supply and that what
16   he has done is to invent a method for overcoming
17   that limitation with respect to supply in a way
18   that's not just quantitative, but is so large as
19   to be qualitative and to open up a whole variety
20   of additional possibilities.  I think that's a
21   fair reading of the specification.
22        Q.      And his method of overcoming that
23   problem that he identifies in the art is a method
24   for producing interferon beta; correct?
25        A.      It's a method for -- that depends on
```

Page 192

1              DAVID JACKSON

2    being able to produce a -- interferon beta in

3    large quantities, and safely and all of this sort

4    of thing, which can then be used in the step of

5    administering a therapeutically effective amount

6    of that to a patient needing treatment.

7        Q.      And you've referred now a few times

8    in your answers to other diseases that you can

9    treat when you have more beta interferon.  And I

10   guess I still don't understand the basis for

11   those answers.  Is there something in the patent

12   that identifies these new qualitative

13   possibilities that are opened up with respect to

14   treatment using beta interferon?

15       A.      No.  Fiers didn't specify any of

16   those, and I'm not saying that he did.  What I am

17   saying is that the spectrum of viral diseases,

18   for instance, which had been assessed using the

19   limited quantities of beta interferon that were

20   available was fairly limited.

21              That spectrum could have been and

22   was expanded as interferons became much more

23   widely available because they could be produced

24   in larger quantities.

25              Same things with cancers.  The

1             DAVID JACKSON

2    spectrum of tumor types that had been able to be

3    investigated with the limited quantities was

4    relatively limited and interferons -- recombinant

5    interferons made possible to test a much broader

6    variety with many different regimens in

7    combination with other anticancer agents and so

8    on.  And he -- I mean, Fiers pretty clearly

9    anticipates those possibilities.

10           Q.    Does he demonstrate with any data

11   whatsoever the utility of his beta interferon

12   that he's prepared?

13           A.    Well, he demonstrates by reference

14   the utility of it.  He -- the presumption is that

15   if you make beta interferon and possibly even

16   molecules which are just closely related to beta

17   interferon by these recombinant techniques, then

18   you can use those to treat diseases of various

19   sorts.

20                 And why do you think that?  Well,

21   because using the native material, it's already

22   been done and there's already been some success

23   indicated.  That's a fair presumption.

24           Q.    When you say he demonstrates the

25   utility of it "by reference," you mean by

```
 1                    DAVID JACKSON
 2   reference to prior art that disclosed the
 3   administration of beta interferon to treat
 4   various diseases?
 5         A.     Yes.
 6         Q.     Any disclosure of the
 7   pharmacokinetic properties of the recombinant
 8   beta interferon that you found in the '755
 9   patent?
10         A.     No.
11         Q.     Any discussion or disclosure with
12   respect to its toxicity?
13         A.     I don't believe so.
14         Q.     Any reference whatsoever to any of
15   its pharmacological properties?
16         A.     Well, again, by reference to the
17   successful work that has been done, but not to
18   specific detailed pharmacological properties.
19         Q.     Any disclosure whatsoever of any
20   pharmacological difference between the interferon
21   beta that Dr. Fiers discloses how to produce and
22   the native beta interferon?
23         A.     No, but maybe I'm misunderstanding
24   your question because I don't see how there could
25   have been any such disclosure.  I mean, he
```

1                    DAVID JACKSON

2    certainly doesn't claim it, but if you haven't

3    produced and tested the material, I don't -- I

4    don't see how you're going to be able to disclose

5    that.

6         Q.    He couldn't have known about any

7    such difference because he had never actually

8    tested the beta interferon?

9         A.    Right.

10        Q.    By the way, you know Dr. Ravetch was

11   deposed in this case; correct?

12        A.    Yes.

13        Q.    Did you read his transcript?

14        A.    Yes -- oh, no, no, no.  I have not

15   seen -- I don't know anything about the content

16   of his transcript.

17        Q.    You didn't look at it?

18        A.    No.

19        Q.    So just to be clear -- sorry for

20   that divergent [sic] -- the skilled artisan

21   reading the '755 patent disclosure would not

22   understand that Dr. Fiers was in possession of

23   the idea of any pharmacological or other

24   difference between the recombinant beta

25   interferon and native beta interferon?

1                    DAVID JACKSON

2          A.      I think that's correct.

3          Q.      You discussed the prosecution

4    history somewhat with Mr. Barsky this morning,

5    but I wanted to discuss some other aspects of it

6    as well and make sure I understand what your

7    position is.

8                    (Jackson Exhibit 11, Bates Nos.

9           BIMA0005496, Preliminary Amendment, marked

10          for identification.)

11   BY MR. BERL:

12         Q.      You've been handed what's been

13   marked as Exhibit 11, which is entitled

14   "Preliminary Amendment."  It has a stamp on it of

15   May 25, 1995.  I'll represent to you that this is

16   a preliminary amendment in the '930 application

17   that --

18         A.      '930.

19         Q.      -- issued as the '755 patent.

20                 If I could turn your attention to

21   page 5, do you see where it says, "Add new

22   Claims 31 through 34 as follows" in the middle?

23         A.      Yes, right above the line.

24         Q.      Right.

25                 And then what follows are Claims 31,

```
 1                    DAVID JACKSON
 2    32, 33 and 34; is that right?
 3         A.    Yes.
 4         Q.    And Claim 31 includes the language
 5    "produced by a host transformed by a recombinant
 6    DNA molecule"; is that right?
 7         A.    Yes.
 8         Q.    And Claim 32 does not include that
 9    language; right?
10         A.    That's correct.
11         Q.    And Claims 33 and 34, if you could
12    turn to those on pages 6 and 7 --
13         A.    Yes.
14         Q.    -- they have before the amendment
15    the method according to Claim 31 or 32.
16               Do you see that?
17         A.    I do.
18         Q.    And do you understand that to mean
19    that the language of Claim 31 or 32 is included,
20    by operation of law, in Claims 33 and 34?
21         A.    I'm sorry, say that again.
22         Q.    Do you understand that, by reference
23    to or dependence on Claims 31 or 32, Claims 33
24    and 34 are incorporating the language from the
25    referenced claims into their own claims?
```

Page 198

1                    DAVID JACKSON

2        A.      Ah, yes.

3        Q.      So when you said in your expert

4   report that the "produced by" and "transformed"

5   language that Dr. Ravetch pointed to does not

6   appear anywhere in Claims 32 through 34, that's

7   not exactly correct, is it?

8                MR. GROOMBRIDGE:  Objection.

9        A.      Well, it's certainly literally

10  correct.

11       Q.      But you understood, when you wrote

12  that, that by operation of law, that language,

13  "produced by a host transformed by a recombinant

14  DNA molecule," was incorporated in the Claims 33

15  and 34; right?

16       A.      Actually, when I wrote that, I don't

17  think I did.  I don't think it was until right

18  now that I understood, when you made that point,

19  that operation of law -- my understanding was

20  that these were dependent claims.

21       Q.      Right.

22       A.      All right.  And I actually believed,

23  I thought, that the connection went in the

24  opposite direction, if you'd like, that these two

25  claims were associated with 31 and 32 and so it

1                    DAVID JACKSON

2    would still be the case that, in 31, that was the

3    only place that that language occurred.

4         Q.    What do you mean, these two claims,

5    34 and 33, are associated with 31 and 32?  What

6    did you understand that to mean?

7         A.    Well, I'm -- I had -- these had been

8    identified as dependent claims.

9         Q.    Okay.

10        A.    And so that suggested to me that

11   these were claims that then, in essence,

12   illustrated the DNA sequence selected from the

13   group, for instance --

14        Q.    Did you think --

15        A.    -- the illustration of it.

16        Q.    Did you think you had sufficient

17   expertise to be commenting and advising the court

18   as to the meaning of these dependent claims?

19        A.    Well, I thought I did.  In this case

20   I may not have.

21        Q.    Did anyone look at your report after

22   you wrote it?

23        A.    I would assume they did.

24        Q.    Did you -- I assume you and your

25   lawyers engaged in the process of editing your

```
                                        Page 200

  1                    DAVID JACKSON

  2  report?

  3        A.     Yes.

  4        Q.     Did you ask them about these

  5  dependent claims before you made a statement

  6  about what they did or did not include?

  7        A.     There was some discussion about the

  8  dependent claims, but it was mostly in terms of

  9  that they were identified as dependent claims.

 10        Q.     You see that all these claims in the

 11  '930 recite a method for treating human viruses?

 12        A.     Yes.

 13        Q.     Okay.  Let's take a look at the '723

 14  application that you reference as well in your

 15  expert report.  And I've handed you what's been

 16  marked as Exhibit 12.

 17                THE REPORTER:  Not yet.

 18                (Jackson Exhibit 12, Bates Nos.

 19        BIMA0010885 through 892, Preliminary

 20        Amendment, marked for identification.)

 21  BY MR. BERL:

 22        Q.     You've now been handed what's been

 23  marked as Exhibit 12, which is a preliminary

 24  amendment in the '723 application.

 25        A.     Uh-huh.
```

```
 1                    DAVID JACKSON
 2        Q.      If you could look at page 5 of this
 3   preliminary amendment.  Do you likewise see that
 4   it says, "Add new Claims 31 through 34"?
 5        A.      Yes.
 6        Q.      You see 31 has the language
 7   "produced by a host transformed by a recombinant
 8   DNA molecule"?
 9        A.      Right.
10        Q.      32 does not?
11        A.      Right.
12        Q.      And 33 and 34 depend from 31 or 32;
13   right?
14        A.      Yes.
15        Q.      And these claims recite a method for
16   amino modulation; is that right?
17        A.      Yes.
18        Q.      Could you go back to Exhibit 7,
19   which was marked this morning.  That was the --
20        A.      What was that?
21        Q.      -- rejection of the '930 application
22   in September of 1996.
23        A.      Here we go.
24                MR. GROOMBRIDGE:  That's the one.
25        Q.      Do you have it in hand?
```

Page 202

1                       DAVID JACKSON

2          A.      I do.

3          Q.      Do you understand that, in this

4      rejection, on page 2, Claims 31 through 34 of the

5      '930 application were rejected on grounds of

6      double patenting over Claims 31 through 34 of the

7      '723 application; right?

8          A.      Yes.

9          Q.      And in the middle of the page, the

10     examiner says -- I'll just read it into the

11     record and we'll discuss it in a moment -- "The

12     positive process steps in Claims 31 through 34 of

13     the instant application and Claims 31 through 34

14     respectively of the '723 application are

15     identical.  The only difference in the claims is

16     in the preamble, i.e., the intended uses of the

17     two processes.  Since the actual process steps of

18     the two sets of claims are the same, the scope of

19     the two sets of claims is the same."

20                 Do you see that?

21         A.      Yes.

22         Q.      You commented on that language in

23     your expert report; is that right?

24         A.      I believe so.

25         Q.      The examiner is stating here that

Page 203

1                        DAVID JACKSON

2      the only difference between the claims of the

3      '930 application and the '723 application is in

4      the preamble; correct?

5            A.      Yes.

6            Q.      And that what's inside the preamble

7      differs and what's outside the preamble is the

8      same; is that right?

9            A.      That's what the examiner is saying,

10     yes.

11           Q.      And outside the preamble is where

12     the actual process steps are; correct?

13           A.      So that gets into an issue of what

14     constitutes the preamble.  And --

15           Q.      That's not what I'm asking you

16     about.  I'm asking you whether the examiner is

17     saying here that what's outside the preamble is

18     identical.  You already said that's right.

19           A.      Yes.

20           Q.      And that what's outside the preamble

21     is where you have the actual process steps.

22           A.      So where does the examiner say that

23     the actual process steps are outside the

24     preamble?

25           Q.      It says that the actual process

1                    DAVID JACKSON

2    steps of the two sets of claims are the same; is

3    that right?

4          A.     Yes.

5          Q.     And you just agreed with me, and I

6    think it's clear from what the examiner said,

7    that what's inside the preamble differs from the

8    '903 and '723 and what's outside the preamble is

9    the same.

10         A.     Right.

11         Q.     So what's outside the preamble is

12   where the actual process steps are?

13              (Witness peruses the exhibit.)

14         A.     What the examiner says is "The

15   positive process steps in Claims 31 through 34 of

16   the instant application and of the '723 are

17   identical's.  Okay.

18              So that could include the things

19   that are outside the preamble, which the

20   defendants are contending are the positive

21   process steps.

22              But it could also include the

23   language of administering -- the step of

24   administering a composition to a patient in need

25   of an effective amount, which is within the

1                    DAVID JACKSON

2    preamble -- or what you're characterizing as the

3    preamble.

4                    And everything that the examiner

5    says here would I think still be true because

6    there are then still differences in what you're

7    characterizing in the preamble, but there's

8    nonetheless a positive process step, and, in

9    fact, we believe the only positive process step,

10   that is in the -- in the preamble.

11           Q.    So --

12           A.    So I think what the examiner says

13   here is correct.  But if I'm understanding you, I

14   think you are not representing correctly or

15   completely what the examiner was referring to

16   here.  I mean, as I've just explained it, I don't

17   think there is any logical disconnect with what

18   he says here and the fact that there's a positive

19   step -- positive process step in the preamble

20   that is identical in both of these patents.

21           Q.    The examiner says the only

22   difference in the claim is in the preamble;

23   right?

24           A.    He does.

25           Q.    And then he says the actual process

Page 206

1                    DAVID JACKSON

2    steps of these claims are the same; correct?

3         A.    That's right.

4         Q.    Now --

5         A.    So that could include the ones

6    outside the preamble and the ones inside the

7    preamble.

8         Q.    It could include either, you

9    think --

10        A.    Okay.

11        Q.    -- right?

12        A.    I'm sorry?

13        Q.    Yes, he could be referring to either

14   of the steps inside the preamble or outside the

15   preamble?

16        A.    Yes, I'm agreeing with that.

17        Q.    Either interpretation is reasonable?

18        A.    (Nods head.)

19        Q.    You need to answer audibly.

20        A.    Well, I actually don't think that

21   either interpretation is equally reasonable, as

22   I've indicated before.  I believe that what

23   you're characterizing as positive process steps

24   outside the preamble is, in fact, simply a phrase

25   that modifies what kind of recombinant DNA

Page 207

1                    DAVID JACKSON

2  molecule is referred to in the positive process

3  step.

4          Q.     You said "positive process step,"

5  but he didn't say positive process step here;

6  right?  He said "positive process steps"?

7          A.     Well, there are two patents and,

8  therefore, there are two positive process steps

9  that are the same in the preamble.

10          Q.     Would you agree that he's drawing a

11  distinction between the preamble and the rest of

12  the claim?

13          A.     Yes.

14          Q.     You would agree that he's saying

15  what's in the preamble is what's different?

16          A.     Yes.

17          Q.     You'd agree that what he's saying is

18  outside the preamble is the same?

19          A.     Yes.

20          Q.     And he's saying that the actual

21  process steps of the two sets of claims are the

22  same?

23          A.     Yes.

24          Q.     And when you say the step of

25  administering to, what does that step involve?

Page 208

1                    DAVID JACKSON

2          A.      Well, it involves having a

3   recombinant beta interferon that has been

4   formulated in such a way that it's appropriate

5   for administration to a human, presumably in the

6   context of a clinical trial or a established

7   approved treatment.

8          Q.      So what do you actually do when you

9   perform that step?

10         A.      What do you actually do?

11         Q.      Right.

12         A.      You could do a variety of -- you

13  could do a variety of things.  As I think was

14  outlined in the specification of the patent, even

15  the limited clinical trials that had taken place

16  up till that time had administered the interferon

17  in a variety of different parenteral and oral

18  routes as well.  I think they referred to

19  inhalation therapy and so on.

20         Q.      So that administration step involves

21  providing by some route of administration

22  interferon to a patient; correct?

23         A.      Yes.

24         Q.      Certain amount of interferon;

25  correct?

                        DAVID JACKSON

1

2          A.      Yes.

3          Q.      In a certain regimen?

4          A.      Yes.

5          Q.      For a certain amount of time?

6          A.      Yes.

7          Q.      That's the activity, so to speak, of

8     the administration step?

9          A.      Yes.  You do all of those things

10    when you're administering a recombinant

11    polypeptide.

12         Q.      Because you say administration is a

13    step, you actually say it's the only step, and a

14    step refers to some kind of action?

15         A.      That's right.

16         Q.      The action is what we just agreed

17    upon, giving by some route of administration beta

18    interferon to a patient in a certain amount for a

19    certain amount of time; right?

20         A.      Right.

21         Q.      Now, why don't you go to the patent

22    in Column 2.  We looked at this before.  Are you

23    there?

24         A.      Yes, I am.

25         Q.      We looked at the bottom of Column 2

                        DAVID JACKSON

1
2    somewhat before.  We talked -- we saw it's

3    administered one to three times daily in dosages

4    of 104 to 107 units.

5                    Do you see that?

6         A.     Yes.

7         Q.     Then it says "the extent of the

8    therapy depends on the patient and the condition

9    being treated."

10                   Do you see that?

11        A.     Yes.

12        Q.     Then it says, "Virus infections are

13   usually treated by daily or twice daily doses

14   over several days to two weeks."

15                   Do you see that?

16        A.     Yes.

17        Q.     Then it says, "And tumors and

18   cancers are usually treated by daily or multiple

19   daily doses over several months or years."

20                   Do you see that?

21        A.     Yes.

22        Q.     So the physical step of

23   administering beta interferon to treat cancer is

24   different from the physical step of administering

25   beta interferon to treat a viral condition?

```
 1                    DAVID JACKSON
 2              MR. GROOMBRIDGE:  Objection.
 3        A.     No, I would not necessarily agree
 4   with that.
 5        Q.     Okay.
 6        A.     The length of time may be different.
 7        Q.     Do you recall two minutes ago when
 8   we agreed on what the physical step of
 9   administering beta interferon was?
10              MR. GROOMBRIDGE:  Objection.
11        Argumentative.
12        A.     I think so.
13        Q.     And you agreed with me that it's
14   administering beta interferon by some route of
15   administration in a certain amount for a certain
16   length of time; correct?
17        A.     Yes.
18        Q.     And that administration is different
19   for cancer versus viral conditions?
20              MR. GROOMBRIDGE:  Objection.
21        A.     No, I absolutely disagree with you,
22   Mr. Berl --
23        Q.     The length --
24              MR. GROOMBRIDGE:  Just a second.
25        Please let --
```

```
                                          Page 212

 1                    DAVID JACKSON

 2   BY MR. BERL:

 3        Q.    Were you finished with your answer?

 4              MR. GROOMBRIDGE:  He obviously

 5        wasn't finished with his answer.  Please

 6        restrain yourself and let him finish before

 7        you start talking.

 8              MR. BERL:  He paused.  I thought he

 9        was finished.

10              MR. GROOMBRIDGE:  It would do credit

11        to the whole proceeding if we were all a

12        little calmer.

13              MR. BERL:  Thank you for your

14        advice, yourself included.

15   BY MR. BERL:

16        Q.    You can answer.

17        A.    I disagree with that.  In the first

18   place, as I have said earlier, but maybe let me

19   try to say it a little more precisely now, to

20   characterize viral diseases as some single entity

21   that can be treated by a single administration

22   step, single defined administration step just is

23   not correct.  It is not how you treat diseases in

24   the real world.

25              You have to figure out how those --
```

Page 213

1                         DAVID JACKSON

2    the viral disease responds best, if at all, to

3    the treatment that you're applying and you can

4    have quite different routes of treatment and

5    different regimens of treatment.

6                    That is even more true in the case

7    of cancer, where there are tremendous variations

8    between one sort of cancer and another that may

9    well require different administration steps.

10                   And so to say, as I understood you

11   to be saying, that there are different ways of

12   treating cancer and viral diseases with

13   recombinant beta interferon is not correct.

14                   That's not to say they're the same.

15   It's that you can't make the categorization that

16   all of viral diseases go one way, all the cancers

17   go the other way.

18        Q.     Are you finished with your answer

19   yet?

20        A.     I believe so.

21        Q.     Now --

22        A.     For the time being.

23        Q.     Well, you can amend your remarks

24   later.

25                   Let's look at the patent.  Okay.

Page 214

1                      DAVID JACKSON

2        A.      Okay.

3        Q.      Would you agree with me that the

4    patent provides two lengths of treatment and

5    categorizes them, one for viral conditions to be

6    treated, then it says over several days to two

7    weeks, and another one for tumors and cancers

8    over several months or years?

9        A.      What the patent says is that virus

10   infections are usually treated by daily or twice

11   daily doses over several days to two weeks, and

12   tumors and cancers are usually treated by daily

13   or multiple daily doses over several months or

14   years.

15              So that certainly indicates that

16   there are some circumstances in which those

17   generalities don't apply.  And again, I would say

18   the amount of clinical research that had been

19   done at this point in time --

20       Q.      Were you done?

21       A.      Back with us?

22       Q.      I'm listening.

23       A.      The amount of clinical research that

24   had been done at this point in time was really

25   quite limited.  And so to be able to make any

1                       DAVID JACKSON

2    generalizations, even these qualified

3    generalizations, at this point was to some extent

4    projecting things that weren't known.

5           Q.     Let me ask you this:  You understand

6    that the specification is read through the lens

7    of a person of ordinary skill?

8           A.     Yes.

9           Q.     You said that you believe you had

10   the qualifications in 1980 of a person of

11   ordinary skill?

12          A.     Yes.

13          Q.     Would a person of ordinary skill in

14   the art read Column 2 to convey that the length

15   of time for which one administers beta interferon

16   is the same when one treats viral diseases as it

17   is for treatment of cancer?

18                 MR. GROOMBRIDGE:  Objection.

19          A.     Person of ordinary skill, and I'll

20   use myself as an example, in 1980 would read this

21   and say, hum, that's interesting.  Maybe that's

22   true, maybe that's not true.  There's not enough

23   data available at this point to really say.

24          Q.     Okay.  So let's take the patent at

25   its word for a moment.  Because I understand that

1               DAVID JACKSON
2   you say you wouldn't know for sure.  But you
3   would agree that the patent is disclosing two
4   different time durations, one for antiviral
5   diseases and another for cancer treatments?
6         A.      What Fiers is doing is saying that
7   in the research that's been done, it is usually,
8   whatever that means, the case that the treatment
9   for viral diseases has been shorter than the
10   treatment for cancers has usually been.  That's
11   what he's saying.
12         Q.      So that if one were practicing this
13   claim based on the disclosure of the
14   specification and one sought to administer beta
15   interferon to treat a viral disease, one would
16   follow the specification by administering the
17   doses daily or twice daily over several days to
18   two weeks; right?
19               MR. GROOMBRIDGE:  Objection.
20         Q.      I just read from the patent.
21         A.      I know you read from the patent, but
22   you read from the specification.  Nobody is going
23   to look at this paragraph -- no physician is
24   going to look at this paragraph and say, Oh,
25   jeez, I can't give beta interferon for a viral

1                    DAVID JACKSON

2     disease for more than two weeks because this

3     specification says usually that's what's done in

4     a viral disease.

5                    Nor are they going to say, Oh, jeez,

6     if I'm going to treat this tumor, I've got to

7     give beta interferon on a daily basis for a year

8     because that's what it says in this

9     specification.  They're going to do clinical

10    research that's going to determine that.

11                    Fiers is making a -- a very general

12    statement about a limited amount of research that

13    had been done at that period of time.

14         Q.      The general statement that he makes

15    is that there's one time period or duration

16    that's associated with treating viral conditions

17    and a different duration that's associated with

18    treating cancer; right?

19         A.      In the research that had been done

20    up until that time in the usual case for both

21    viruses and cancer, that is true.  That's what he

22    said.

23         Q.      So the administration step for

24    treating cancer using the recombinant beta

25    interferon polypeptide is different from the

Page 218

1                    DAVID JACKSON

2    administration step for treating a viral

3    condition using the beta interferon polypeptide?

4              MR. GROOMBRIDGE:  Objection.

5        A.     In some circumstances, yes.

6        Q.     And so when the examiner writes in

7    what's been marked as Exhibit 7 that the actual

8    process steps of the various claims are the same,

9    the administration step would be understood to

10   differ as between, for example, the '658

11   application that is directed to cancer and the

12   '930 which is directed to treatment of viral

13   diseases?

14             MR. GROOMBRIDGE:  Objection.

15       A.     No, the administration step is

16   administration of a -- let's look at the claim

17   and make sure I say it correctly.

18             (Witness peruses the exhibit.)

19       Q.     Was your answer earlier about what

20   the administration step is correct, or did you

21   testify incorrectly about that?

22       A.     Let's come back to that, can we,

23   after I read this, after I made this point?

24       Q.     You don't know whether your

25   testimony was correct?

```
                                           Page 219

 1                     DAVID JACKSON

 2             MR. GROOMBRIDGE:  Just a second.

 3             MR. BERL:  I'm asking him a

 4      different question.  I withdrew the last

 5      one.

 6  BY MR. BERL:

 7      Q.     Was your testimony about what the

 8  administration constitutes earlier, about 15

 9  minutes ago, correct, or would you somehow like

10  to retract that?

11      A.     Could you read back exactly what I

12  said?

13             MR. GROOMBRIDGE:  I believe --

14      Q.     Do you believe you've said anything

15  incorrect with respect to the meaning of the

16  administration step?

17      A.     How can I answer that question when

18  I can't remember literally what I said?  And you

19  have the ability to read it back to me, so I can

20  give you an accurate answer to that question.

21      Q.     If you testified that the

22  administration step was administering a certain

23  amount of beta interferon by some route of

24  administration for a certain period of time,

25  would that testimony have been wrong?
```

1                    DAVID JACKSON

2        A.      I'm sorry, try that again.

3        Q.      Sure.

4                If you testified earlier that the

5    step of administering in these claims that we've

6    been discussing refers to the administration by

7    some route of a certain amount of beta interferon

8    for a certain amount of time, would that

9    testimony be wrong?

10               MR. GROOMBRIDGE:  Objection.

11       A.      I'm really sorry, but I'm having

12   some kind of problem with the phraseology of that

13   question.  Can you ask it in another way?

14       Q.      What are you having trouble

15   understanding?

16       A.      Well, if I knew that, I'd be able to

17   tell you and to answer the question.

18       Q.      Is it correct testimony that the

19   step of administering refers to the

20   administration by some route of a certain amount

21   of beta interferon for a certain amount of time?

22       A.      Yes.

23       Q.      Okay.

24       A.      Okay.  And that will vary depending

25   upon what is a therapeutic amount -- an effective

                          DAVID JACKSON

1    therapeutic amount --

2         Q.     And that varies per the --

3         A.       -- and what the disease is.

4         Q.     That varies by the disease per the

5    specification that we've been talking about for

6    the last 15 minutes?

7         A.     No, it varies by the disease in the

8    real world as it is defined in the future

9    relative to when this patent was -- was filed.

10        Q.     But you understand that this term --

11   this claim has a fixed meaning as of the time of

12   1980?

13        A.     I understand the claim's got a fixed

14   meaning.  What you keep talking about is the

15   specification and talking as though the

16   terminology in the specification is determinative

17   with respect to this.  And I don't think that's

18   correct.

19        Q.     But with respect to what a skilled

20   artisan in 1980 would you have understood the

21   administration step to mean with regard to

22   different diseases, that would depend on the

23   skilled artisan's understanding of the

24   specification because all these future clinical

Page 222

DAVID JACKSON

1

2    trials that you're talking about didn't exist in

3    1980; right?

4                 MR. GROOMBRIDGE:  Objection.

5         A.      The skilled artisan in 1980 would

6    have approached this specification, and

7    particularly someone who knew what the current

8    state of the art in clinical research using

9    interferons was at that point, with a good deal

10   of skepticism and said, Okay, that's Fiers'

11   projection.

12                But you would have gotten

13   approximately as many different opinions about

14   this broad area of how to treat viral and

15   cancer -- viral diseases and cancer with various

16   interferons as there were people that you asked

17   at that time.

18        Q.      You don't hold the opinion, for

19   example, that the duration of therapy for

20   interferon to treat cancer is the same as it is

21   to treat viral conditions, do you?

22        A.      What I hold is that that duration

23   for both cancers and viral diseases will vary

24   from cancer to cancer and from viral disease to

25   viral disease and there may well be circumstances

1                    DAVID JACKSON

2     in which, for certain viral diseases, the

3     effective treatment will take a longer period of

4     treatment, for instance, than it does for certain

5     cancers, for instance.

6          Q.     Again, you've never treated a

7     patient with cancer; right?

8          A.     That's correct.

9          Q.     You don't have an MD?

10         A.     That's correct.

11         Q.     You'll agree that if the step of

12    administering beta interferon to treat cancer is

13    different from the step of administering beta

14    interferon to treat a viral condition, then the

15    examiner cannot be referring to the

16    administration step in Exhibit 7 when he says

17    that the actual steps of the two sets of claims

18    are the same; right?

19              MR. GROOMBRIDGE:  Objection.

20         A.     No, no, no.  What the claim says is

21    "The step of administering to a patient in need

22    of such treatment a therapeutically effective

23    amount of a composition comprising" -- hang on.

24    I'm not finished with my answer yet.

25         Q.     I'm asking you about the claims of

1                    DAVID JACKSON

2    the application.  You're reading from the patent.

3    I'm asking about something different.  I think

4    you're confused?

5          A.     Okay, I'm confused, then.  What are

6    the claims that you're asking about?

7          Q.     Turn to Exhibit 7.  And let me also

8    mark for you, just so it's complete --

9                    MR. BERL:  Do you have Tab 10?

10         Q.     -- Exhibit 13, which I'll show you

11    in a second.

12                    (Jackson Exhibit 13, Bates Nos.

13          BIMA0010234 through 250, Amendment and

14          Response, marked for identification.)

15         A.     I don't think I have the actual

16    claims --

17         Q.     I've handed you what's been marked

18    as Exhibit 13, which is an amendment in response

19    to the '658 application.

20                    What were you saying, Doctor?

21         A.     Yes, in Exhibit 7, you said you

22    wanted to look at the claims in Exhibit 7.  And I

23    don't think Exhibit 7 has got any actual claims

24    in it, does it?

25         Q.     Let me go through this so my

Page 225

1                    DAVID JACKSON

2    question is clear.

3                 Do you see you've just been handed

4    Exhibit 13, which is an amendment in response to

5    the '658 application?

6                 Do you see that?

7         A.    Yes.

8         Q.    Do you see that Claim 31 on page 2

9    refers to a method for treating human cancers or

10   tumors comprising a step of administering, and it

11   goes on?

12                Do you see that?

13        A.    I do.

14        Q.    And you have before you the claims

15   of the '930 application by preliminary amendment.

16   I believe that was Exhibit 10 -- Exhibit 11.

17   Excuse me.  Here's Exhibit 11.

18                And do you see that it has on

19   page 5 -- we looked at this method for treating

20   human viruses?

21        A.    Yes.

22        Q.    And you understand that there was a

23   double-patenting rejection in the '930

24   application both over the claims to the '723

25   application for treatment of immunomodulation and

```
 1                    DAVID JACKSON
 2    the '658 application Exhibit 13 for the treatment
 3    of cancers or tumors?
 4         A.    Yes.
 5         Q.    And you understand that the basis
 6    for the examiner's double-patenting rejections of
 7    the claims of the '930 applications is that the
 8    actual process steps are the same in the
 9    application so the scope of the claims is the
10    same and you can't get two patents for that?
11         A.    Yes.
12         Q.    Do you understand that?
13               And my question for you, after we've
14    looked now at Column 2 of the patent and we've
15    had the discussion we had -- and I'll direct your
16    attention, for example, to Exhibit 7, which was
17    the rejection in the '723, there's also a
18    rejection in the -- over the '658 application,
19    which I'm happy to show you -- that -- where the
20    examiner states, as you see here, the actual
21    process steps of the two sets of claims are the
22    same.
23               Do you see that?
24         A.    Yes.
25         Q.    My question is that -- given that a
```

```
                                           Page 227

 1                    DAVID JACKSON
 2   skilled artisan would understand Dr. Fiers to be
 3   conveying in Column 2 that the duration of
 4   treatment is different for treating cancer than
 5   it is for treating viral conditions, a skilled
 6   artisan would have understood the examiner's
 7   statement that the actual process steps of the
 8   claims are the same not to refer to the step of
 9   treating since that step differs; right?
10              MR. GROOMBRIDGE:  Objection.
11        A.    No, I don't agree with that.
12        Q.    Explain why you don't agree with
13   that.
14        A.    Because what's being claimed is the
15   step of administering a therapeutically effective
16   amount.  And that encompasses a very large
17   amount -- a very large number of potential ways
18   of administering the compound, including
19   different times, different amounts, different
20   regimens and so on.
21              And so to say that the steps are
22   different because in the specification Fiers
23   summarizes some limited experience with viral
24   diseases and some limited experience with cancer
25   being treated with beta interferon, I think it
```

1                   DAVID JACKSON

2    does not follow that you -- your claim saying

3    that the examiner can't be referring to -- I'm

4    sorry, I've lost my train of thought on this now.

5         Q.     You'll agree that a skilled artisan

6    wouldn't read Column 2 to convey that the

7    administration to treat viral conditions is the

8    same with respect to duration as the

9    administration of beta interferon to treat

10   cancer?

11                MR. GROOMBRIDGE:  Objection.

12        A.     Well, let me try again.

13                The skilled artisan reading that at

14   the time I think would say, Okay, that's

15   interesting, but not dispositive, and that there

16   are likely to be many different variations, some

17   of which will fall within what Fiers' summary is

18   and some of which will not.

19                And so to conclude -- I don't think

20   that the skilled artisan would have said that

21   based on the information that they knew in the

22   field, that -- that the generalizations that

23   Fiers made, which he himself qualified, represent

24   two nonoverlapping categories of how you treat

25   two different sets of diseases.

1              DAVID JACKSON

2         Q.     I didn't use the word "overlapping."

3    I said you agree that a skilled artisan wouldn't

4    read Column 2 to convey that the administration

5    step to treat viral conditions is the same as the

6    administration step to treat tumors; right?

7         A.     That's right.  That's right.

8         Q.     Whether they overlap or not, clearly

9    the specification identifies two different

10   categories of duration of treatment for treating

11   viral conditions as compared to treating tumors?

12              MR. GROOMBRIDGE:  Objection.

13        Q.     Sorry, you said yes?

14        A.     No, I didn't say yes.

15        Q.     Have you said anything?  I thought I

16   heard you say something.

17        A.     No.  That was Mr. Groombridge

18   objecting.

19              MR. GROOMBRIDGE:  What I said was

20        "objection."

21              MR. BERL:  Sorry, I misheard you.

22        A.     I -- I do not agree that there is a

23   medically useful functional difference that has

24   been defined based on the work that Fiers is

25   referring to at that -- at that time in the

```
 1                    DAVID JACKSON
 2   specification in Column 2, I think it was.
 3        Q.    So what you're basically saying is
 4   that the skilled artisan would read Column 2 and
 5   essentially ignore it because it's not medically
 6   supported?
 7                 MR. GROOMBRIDGE:  Objection.
 8        Argumentative.
 9        A.    No, I am not saying that.  I am
10   saying that that would be a -- one of many
11   different useful inputs to what the skilled
12   artisan at that time would use to formulate his
13   or her own opinion.  But that, as I said a minute
14   ago, not a dispositive one by any means.
15        Q.    It's the only one identified in the
16   patent, though; right?
17        A.    Yes, but the patent doesn't
18   represent the totality of the real world.
19        Q.    Okay.  I understand that.
20              I'm asking you what a skilled
21   artisan would understand from the patent.  And I
22   think we're on the same page.
23              THE WITNESS:  Can I have your napkin
24        for a minute?
25              MR. GROOMBRIDGE:  By all means.
```

Page 231

1                         DAVID JACKSON

2                  (Pause from the record.)

3    BY MR. BERL:

4         Q.      Could you turn to Exhibit 8?  We

5    marked that this morning.  It's labeled

6    "Amendment and Response" in the '930 application,

7    and it's dated March of 1997.

8         A.      Exhibit 8.

9         Q.      You have that?

10        A.      March 24, 1997, yes.  The '930.

11        Q.      And you understand this was Biogen's

12   response to the double-patenting rejection we

13   looked at earlier over the claims of the '723

14   application?

15        A.      Yes.

16        Q.      And on the first page, Biogen

17   writes, "Please cancel Claim 32."

18                Do you see that?

19        A.      Yes.

20        Q.      And then Claim 31 --

21        A.      Right.

22        Q.      -- is amended.

23                Do you see that?

24        A.      Yes.

25        Q.      And there are remarks starting on

```
                                              Page 232
 1                    DAVID JACKSON
 2    page 3 that go over to Claim 4 [sic]?
 3              Do you see that?
 4         A.    Yes.
 5         Q.    And if I could direct your attention
 6    to the first paragraph of page 4, in the second
 7    sentence.
 8              Do you see that?
 9         A.    Sentence starting "The preamble"?
10         Q.    Yes.
11              And it says -- well, do you see,
12    first of all, that the amendment on page 2 added
13    the medical conditions that previously were
14    recited in the '723 and '658 applications of
15    immunomodulation and cancer?
16         A.    Yes.
17         Q.    So it collapsed all of the clinical
18    uses that used to be in three separate
19    applications into one claim; correct?
20         A.    Right.
21         Q.    And on page 4, Biogen wrote, "The
22    preamble of amended Claim 31 now recites the
23    several intended uses incorporated from the claim
24    preambles of the '723 and '658 applications for
25    the positive process steps claimed."
```

Page 233

1                     DAVID JACKSON

2              Do you see that?

3         A.    Yes.

4         Q.    So he's referring -- Biogen and

5    Fiers are referring here to Claim 31 as amended;

6    correct?

7         A.    That's right.

8         Q.    And it says that recites the several

9    intended uses for the positive process steps

10   claimed; right?

11        A.    Yes.

12        Q.    And looking at Claim 31 on page 2,

13   can you identify for me the positive process

14   steps claimed?

15        A.    The positive process step in there

16   is the step of administering to a patient in need

17   of such treatment a therapeutically effective

18   amount of a composition.  And I believe that the

19   reference -- the use of the plural again refers

20   to the fact that there were -- that same step was

21   present in both the '723 and the -- I thought it

22   was '930, but maybe it's '658 applications.

23        Q.    This sentence is now referring to

24   amended Claim 31 and what it recites; right?

25              MR. GROOMBRIDGE:  Objection.

Page 234

```
 1                    DAVID JACKSON
 2         Argumentative.
 3         Q.     Well, it wasn't argumentative a
 4    minute ago when you agreed with me.
 5                  Do you still agree with me that this
 6    sentence is referring to what amended Claim 31
 7    recites?
 8                  MR. GROOMBRIDGE:  Just so the
 9          transcript is clear, my objection is to
10          your tone of voice.
11                  MR. BERL:  Okay.  That's somewhere
12          in the Federal Rules.
13    BY MR. BERL:
14         Q.     You can answer.
15         A.     Preamble.
16                  (Witness peruses the exhibit.)
17         A.     I mean, I really do think this could
18    be interpreted -- the positive process steps
19    claimed "incorporated from the claim preambles of
20    the '723 and '658 applications" could refer to
21    the step that we've been disputing about all
22    afternoon, the step of administering a
23    therapeutically effective amount.
24         Q.     And it's, in your view, referring to
25    the same step that appears in multiple claims and
```

Page 235

                          DAVID JACKSON

1

2    that's why it says "steps" there?

3         A.     I think that's the most likely

4    interpretation of that or that it was a -- a

5    mistake.  This language has been copied so many

6    times in so many different exchanges with the

7    examiner that I think there's probably some

8    errors in this.

9         Q.     Or it may be there weren't errors

10   and it's just right and what Dr. Ravetch says it

11   means is correct?

12        A.     That's a possibility as well.

13        Q.     Now, afterwards it says, "Applicant

14   agrees to abandon the '723 and '658 applications

15   if amended Claim 31 is allowed."

16              Do you see that?

17        A.     Yes.

18        Q.     So Biogen is not distinguishing its

19   method of treatment claims that previously were

20   present in the '658, '723 and '930 applications

21   from each other; right?

22        A.     In the sense -- you're saying

23   they're not distinguishing them because they're

24   putting them all in a single claim in a single

25   patent?

Page 236

                    DAVID JACKSON

1

2       Q.      Right.

3       A.      Yes.

4       Q.      They're not arguing that they're

5    separably patentable and they should overcome the

6    rejection; right?

7       A.      That's right.

8       Q.      They're simply agreeing with the

9    examiner that they're not separably patentable

10   and they're merging them all into the same claim;

11   correct?

12      A.      Yes.

13              MR. GROOMBRIDGE:  I shall need to

14       take a break.

15              MR. BERL:  Why don't we take a

16       break.

17              THE VIDEOGRAPHER:  The time is

18       approximately 4:13 p.m.  This is the end of

19       Media No. 4.  We are off the record.

20              (Recess from the record.)

21              THE VIDEOGRAPHER:  The time is

22       approximately 4:30 p.m.  This is the

23       beginning of Media No. 5.  We are on the

24       record.

25

```
                                           Page 237

 1                      DAVID JACKSON

 2    BY MR. BERL:

 3         Q.     Still feeling okay?

 4         A.     Yes.

 5         Q.     Nothing going wrong --

 6         A.     Right.

 7         Q.     -- medically?

 8                Okay.  You referred and we've

 9    referred several times today to prior art

10    treatments using isolated interferon; correct?

11         A.     Correct.

12         Q.     Both alpha and beta.

13                In those cases, it was sometimes the

14    case that the same hospital or entity would both

15    isolate the interferon and then use it in a

16    clinical trial to determine whether it could be

17    useful to treat diseases; is that right?

18         A.     I don't know that definitively.

19         Q.     You don't know one way or the other?

20         A.     Right.

21                MR. BERL:  Let's take a look at the

22         next exhibit, which is 14.

23                (Jackson Exhibit 14, No Bates

24         numbers, Cancer Treatment Reports Volume

25         62, No. 11, November 1978, marked for
```

```
 1                    DAVID JACKSON
 2         identification.)
 3                   MR. BERL:  For the record,
 4         Exhibit 14 is entitled, "Human Interferon
 5         and Its Inducers:  Clinical program
 6         overview at Roswell Park Memorial
 7         Institute," by Carter, et al.
 8   BY MR. BERL:
 9         Q.     Is there a reason that you're
10   laughing about this?
11         A.     Yes, but it's a private one.
12         Q.     Is it anything pertinent in any way
13   to the case?
14         A.     I don't think so.
15         Q.     Do you have some relationship with
16   one of the authors?
17         A.     I know Dr. Carter.
18         Q.     Is there anything noteworthy about
19   Dr. Carter as it relates to this article?
20         A.     I don't know because I don't know
21   this article.
22         Q.     Why don't you take a moment to
23   review it.
24         A.     Sure.
25                (Witness peruses the exhibit.)
```

1                    DAVID JACKSON

2        A.      Okay.

3        Q.      Have you had an opportunity to

4    familiarize yourself with Exhibit 14?

5        A.      Yes.

6        Q.      It's an article published in

7    November of 1978 by Carter in Cancer Treatment

8    Reports?

9        A.      Yes.

10       Q.      And this is describing a program at

11   the Roswell Park Memorial Institute in New York?

12       A.      Yes.

13       Q.      And this program it recites -- and

14   I'm looking at the first column of the first

15   page -- includes large-scale production and

16   purification of hFIF; correct?

17       A.      Right.

18       Q.      That's interferon beta?

19       A.      Yes.

20       Q.      And, including other things,

21   researching the clinical application of hFIF --

22       A.      Right.

23       Q.      -- correct, of interferon beta?

24       A.      That's correct.

25       Q.      So that this institute is both

```
  1                    DAVID JACKSON
  2     generating interferon beta and administering
  3     interferon beta --
  4           A.     Right.
  5           Q.     -- to treat diseases; correct?
  6           A.     That's right.
  7           Q.     And this was part of the prior art
  8     relating to the treatment of disease using beta
  9     interferon; correct?
 10           A.     Yes.
 11           Q.     Now, you have discussed on several
 12     occasions today some of the challenges associated
 13     with expression of proteins recombinantly,
 14     especially including in host cells; right?
 15           A.     No, in bacterial host cells.
 16           Q.     I think you testified that there was
 17     even less available information regarding the
 18     expression of proteins in mammalian host cells as
 19     of 19- --
 20           A.     In 1980, that was certainly true.
 21           Q.     Now, all of the expression that
 22     we've talked about today has been expression of
 23     wild-type proteins; correct?
 24                  MR. GROOMBRIDGE:  Objection.
 25           A.     By "wild-type," you mean proteins
```

                      DAVID JACKSON

1    coded by the sequence that was ultimately derived

2    from messenger RNA coding for beta -- human beta

3    interferon with --

4         Q.      Sure.

5         A.      -- presumably no mutation in it?

6         Q.      Let's use that definition.

7         A.      Okay.  Yes.

8         Q.      That's what you've been discussing

9    today; correct?

10        A.      Yes.

11        Q.      That interferon -- that wild-type

12   interferon, as you've defined it, would have the

13   same amino acid sequence as the native beta

14   interferon?

15        A.      With the -- with the caveat that, as

16   we've discussed earlier, beta interferon can be

17   produced as a pre protein.  And so if the

18   processing were not appropriate in the host

19   strain that was used, then the sequence might be

20   different.

21        Q.      Other than the cleavage of the pre

22   sequence, the sequence is the same?

23        A.      It should be.

24        Q.      What was the state of the technology

1                    DAVID JACKSON

2    with respect to making mutations so that the

3    amino acid sequence of the recombinantly produced

4    protein would differ from the native sequence and

5    then treating diseases using that mutated

6    sequence?

7         A.    Well, can we break that question

8    into two parts, what was the state of the

9    technology with respect to making the changes and

10   then come back to the treatment?

11        Q.    Sure.

12        A.    Okay.  So the technology with

13   respect to making the changes was it existed, it

14   was still developing, it was not remotely as

15   facile as it is today, as I discussed this

16   morning; but the technique called

17   oligonucleotide-directed mutagenesis where one

18   synthesized a relatively small segment of DNA

19   that incorporated a mutation that one wished to

20   introduce and then introduced this DNA -- the

21   segment of mutated DNA along with the wild-type

22   DNA, transformed cells, you would get at a low

23   frequency out of that -- you could expect to get

24   the mutations that you were looking for.

25                 So it existed.  It was not perfect.

1              DAVID JACKSON

2    There were some -- as almost always the case,

3    some situations where you thought it should work

4    and it wouldn't, but it was -- it was an

5    available technology that was an important one.

6         Q.     That was -- what you just described

7    was a directed mutagenesis approach where one

8    identifies a particular mutation one wishes to

9    make; correct?

10        A.     That's right.

11        Q.     Now, was there technology available

12   for making numerous mutants?

13        A.     Oh, sure.

14        Q.     And producing all of them

15   recombinantly?

16        A.     Well, so that technologies that I'm

17   thinking of for making numerous mutations was

18   basically of, generally speaking, two sorts.  One

19   was to use ionizing radiation, either X-rays or

20   ultraviolet light.  And that would introduce, in

21   the case of ionizing radiation, essentially

22   random changes into DNA.  In the case of

23   ultraviolet light, they were mechanistically not

24   random, but the genetic effect was roughly the

25   same as if they had been -- if you were talking

Page 244

1                          DAVID JACKSON

2    about a large DNA molecule.

3                    And then the second general class of

4    approach in introducing these random mutations

5    was to use chemical mutagens, things like

6    ethylmethane sulphonate and various other

7    DNA-reactive and modifying agents.

8                    All of those approaches basically

9    put mutations at random positions in the DNA that

10   you were treating.  And so you had to sort

11   through a large number of mutants if what you

12   were looking for was a particular one.

13        Q.    And then with respect to expressing

14   the mutants, it would be a process akin to a new

15   project for expressing a new protein?

16                    MR. GROOMBRIDGE:  Objection.

17        A.    Again, I don't think you can make an

18   ironclad generalization about this.  But with

19   some specific kinds of exceptions that I can

20   touch on if you would like, a number of the new

21   random mutations that you would make would

22   generate a protein that you might expect would be

23   more likely than not to be able to be purified in

24   much the same way without too many modifications

25   as you purified the wild-type protein.

Page 245

1                          DAVID JACKSON

2                  Now, the exceptions to that would be

3      situations where either the mutation was one that

4      introduced a premature termination codon into the

5      decoding sequence, and so you wouldn't get a

6      full-length protein.

7                  And the other exception would be

8      one -- and again, there's several specific

9      examples of it; but, for instance, if you

10     introduced a cysteine residue, and that could

11     participate in inappropriate disulfide bond or,

12     in many cases, it could cause in turn molecular

13     reaction through the formation of disulfide bond,

14     that might totally change the purification

15     process that you would have to use.

16                 Also, if you put certain hydrophobic

17     residues in what turned out to be bad positions,

18     that could change the folding pattern of your

19     protein in such a way that it would have quite

20     different physical characteristics.

21          Q.     And you say in your report that

22     making virtually any protein in functional form

23     was a difficult, nonintuitive and unpredictable

24     exercise.  You discussed that part of your report

25     earlier today.

Page 246

1                    DAVID JACKSON

2         A.      Right.

3         Q.      How would you compare that exercise

4    with the process of, let's say, making a thousand

5    different mutant forms of a given protein?

6         A.      So can we be a little more explicit

7    about what you mean by "making"?  To make the

8    mutations is trivial.

9         Q.      Expressing them.

10        A.      Making and expressing, which

11   includes the purification and recovery of active

12   protein, okay.

13               So using a thousand -- and the

14   purpose of this exercise would be to find a

15   particular mutation you're interested in amongst

16   the thousand, or it would be to characterize all

17   thousand --

18        Q.      Characterize all thousand.

19        A.      Okay.  So to do the thousand

20   proteins would be a lot of work, but each one

21   would have a higher probability of your being

22   able to at least do it successfully than for some

23   random protein that was novel now and you're

24   going to say, I want to express this and how do I

25   do that?

1            DAVID JACKSON

2                 So it's the difference between a

3     situation where, as I said before, for a

4     particular protein that one might choose at

5     random it was difficult, nonintuitive, a

6     developing art, with a low probability of

7     success, but you've only got one thing to work

8     on.  So you can focus a lot of effort and you can

9     try to produce and purify -- express and purify

10    that protein.

11                In the other case, your probability

12    of technical success for each clone is going to

13    be higher, but you've got a thousand things to

14    work on rather than one.

15                They're both difficult projects.

16         Q.     What if you had a million?

17         A.     If you have a million, you've got

18    to -- and realistically speaking, even if you had

19    a thousand you've got to develop tricks that

20    enable you to focus in on what you're interested

21    in in this vast array of clones that you've got.

22         Q.     And referring now more specifically

23    to beta interferon, was there a known

24    relationship between mutations one can make in

25    the amino acid sequence and the functional

1                    DAVID JACKSON

2    properties of the resulting protein?

3         A.      There is now.  Whether that was true

4    in 1980, I don't know, but I doubt it.

5         Q.      You're not aware of any kind of

6    structure activity relationship that would

7    identify which of the amino acids should be

8    mutated in interferon beta to optimize its

9    properties and to what amino acid they should be

10   mutated?

11        A.      I don't think there was any actual

12   experimental data where people had made those

13   such mutations and then asked the question, you

14   know, what was the impact of it.  There was

15   certainly speculation that bore on the question

16   of what kinds of mutations you might want to try

17   to make first that started being made as soon as

18   the sequence was available -- the DNA sequence

19   was available.

20               Because, of course, you could then

21   infer the amino acid sequence from that and you

22   could draw certain conclusions from knowing that

23   amino acid sequence.

24        Q.      And when you say that speculation

25   started being made --

1                       DAVID JACKSON

2          A.       Yes.

3          Q.       -- are you referring to anything in

4   particular, literature or . . .

5          A.       I seem to remember reading that --

6   in one of Taniguchi's publications, I think he

7   had commented on the fact that beta interferon is

8   extremely hydrophobic and that that is likely to

9   have certain consequences, in particular that

10  it's likely to make it difficult to purify and

11  more likely to aggregate with itself and with

12  cell membranes and so on.

13                  And if I remember correctly, in that

14  same communication, he identified the fact that

15  there were three cysteine residues in interferon

16  and speculated that disulfide bond formation

17  might be important and I think noted the fact

18  that it was possible to form three different

19  disulfide bonds, presumably only one of which was

20  the correct one.

21                  It wasn't known at that point, to

22  the best of my knowledge, what the impact of

23  forming an incorrect disulfide bond or indeed

24  maybe even which disulfide bond was the correct

25  one; but there was plenty of information from

Page 250

1                      DAVID JACKSON
2     other proteins that had been studied during the
3     '60s and '70s to indicate that disulfide bonds
4     were important, that they could perform
5     incorrectly, and that the consequences for that
6     were likely to be bad.
7          Q.      Other than modification of the
8     cysteine residues, which constitute three of the
9     many residues in the sequence of interferon beta,
10    would there have been any other basis to identify
11    which amino acids should be mutated to optimize
12    the properties of beta interferon?
13         A.      I don't know of any at this point.
14         Q.      And just so I understand your
15    testimony, there was no technology available for
16    kind of parallel expression of numerous mutant
17    forms so that you can make a thousand at a time
18    or something?
19         A.      There were certainly technologies
20    being developed at about that time.  And again, I
21    don't remember specifically when in the kind of
22    1980, '81 time frame, maybe even later than that,
23    some of these came online.
24              One of the technologies that was
25    under development -- and again, I can't remember

1                          DAVID JACKSON

2      when it became broadly available -- was to do

3      what's called an amino blot procedure where you

4      can grow thousands to maybe 10,000 or so clones

5      in 96-well plates, for instance, was I think the

6      way it was first done.

7                          You lyse the cells and then you use

8      an antibody that's directed against beta

9      interferon and you look to see which clones

10     produce immunoreactive protein.  That probably

11     doesn't get you very far in terms of really

12     whittling down this large number of clones, but

13     it gets you usefully far.  It's worth doing.

14                         Subsequent technology, as I recall,

15     was actually developed to the point that you

16     could take a petri dish that just had a whole

17     series of clones on it and essentially do the

18     immunochemical reaction on the colonies that were

19     lysed on the surface of the petri dish.  And then

20     the immunoreactivity of those colonies developed

21     and you can get many more colonies on a petri

22     dish than you can in a 96-well plate.

23          Q.    Is there a particular time frame

24     that you associate with the development of that

25     technology or particular group of scientists?

Page 252

1                    DAVID JACKSON

2        A.    I can't remember who was doing it.

3   I think a number of labs actually were working on

4   that -- that sort of approach.  And as far as the

5   time frame goes, I just don't -- I don't remember

6   that.

7              I think it was in the early '80s,

8   but it may well have been later than the early

9   1980 time frame that we're talking about.

10       Q.    You discussed introns in your expert

11  report.

12       A.    Yes.

13       Q.    Are there any introns in the beta

14  interferon gene?

15       A.    Not in beta interferon, no.

16             MR. BERL:  Why don't we take a

17       couple-minute break and see if we have

18       anything else.

19             MR. GROOMBRIDGE:  Sounds great.

20             THE VIDEOGRAPHER:  The time is

21       approximately 4:53 p.m.  We are off the

22       record.

23             (Recess from the record.)

24             THE VIDEOGRAPHER:  The time is

25       approximately 5:02 p.m.  We are back on the

Page 253

1                   DAVID JACKSON

2         record.

3                   MR. BERL:  We're ready.  We have no

4         more questions right now.

5                   MR. GROOMBRIDGE:  I just have a

6         couple of follow-up questions.

7    EXAMINATION

8    BY MR. GROOMBRIDGE:

9         Q.    Dr. Jackson, you mentioned at

10   various times in your testimony the primary

11   structure of a polypeptide.

12                 What is that?

13        A.    The primary structure is the --

14   generally agreed to be the sequence of amino

15   acids running from the amino terminus to the

16   carboxyl terminus.  So it is just a list of the

17   amino acid residues that comprises the

18   polypeptide chain or the protein.

19        Q.    Are there other kinds of structures

20   apart from primary structures?

21        A.    Yes.

22        Q.    What other kinds are there?

23        A.    Well, there is secondary structure,

24   which is what are formed -- kinds of structures

25   that are formed in relatively localized regions

1                    DAVID JACKSON

2    of a protein when it starts to fold up into its

3    ultimate active structure.

4              The two most common forms of

5    secondary structure are the so-called alpha helix

6    and the beta-pleated sheet.  In fact, beta

7    interferon has significant areas of beta-pleated

8    sheet, which is one of the reasons it's such a

9    sticky, and hydrophobic surfaces make it stick to

10   membranes.

11             There is then what's called the

12   tertiary structure.  And that is the structure

13   that's generally thought of as the active mature

14   form of the single polypeptide chain.  And that's

15   where the polypeptide chain and the regions of

16   secondary structure fold into what are generally

17   an even more compact structure that, as I say,

18   has the typical function that's associated with a

19   protein.

20             And then finally, many proteins, in

21   fact, act as parts of complexes.  So there is

22   what is known as quaternary structures, which is

23   the structure that multiple polypeptide chains,

24   which can be either identical or different from

25   one another, assume to form a multichain

```
                                        Page 255
 1                    DAVID JACKSON
 2    functional structure that is the operative
 3    structure in a cell.
 4         Q.    Does the polypeptide of the '755
 5    patent have to fold in the right way in order to
 6    be biologically active?
 7                 MR. BERL:  Objection.
 8         A.    Yes, it does.
 9         Q.    Now, one final thing.
10                 Mr. Berl asked you about your
11    mandate in this case, what it was that you were
12    hired to do.
13                 Do you remember that?
14         A.    Yes.
15         Q.    And as I recall, you said something
16    to the effect that you had been hired as an
17    expert to help in the claim construction phase of
18    the case?
19         A.    That's correct.
20         Q.    Mr. Berl then mentioned something
21    about the next phase of the case pertaining to
22    patent validity.
23                 Do you recall that?
24         A.    I do.
25         Q.    In the course of your analysis
```

Page 256

1                    DAVID JACKSON

2    that's reflected in the two declarations we've

3    seen in this, did you do anything in an effort to

4    investigate issues pertaining to the validity or

5    alleged invalidity of the '755 patent?

6               MR. BERL:  Objection.

7               You can answer.

8         A.    No, I did not.

9               MR. GROOMBRIDGE:  Thank you.

10        Nothing further.

11              MR. BERL:  If you can turn to your

12        second -- Oh, do you want to go first?  Go

13        ahead.

14              MR. BARSKY:  Okay.  I just have a

15        couple of quick questions.

16   EXAMINATION (Cont'd)

17   BY MR. BARSKY:

18        Q.    You just testified -- you were just

19   asked a question about the primary structure --

20        A.    That's right.

21        Q.    -- of a polypeptide.

22              Do you recall that?

23        A.    I do.

24        Q.    And then you were also asked about

25   secondary, tertiary and quaternary structures as

Page 257

1                      DAVID JACKSON

2   well.

3         A.      Correct.

4         Q.      Those are all characteristics of

5   proteins; correct?

6         A.      Are you making a distinction between

7   protein and polypeptide chain here?

8         Q.      Yes.

9         A.      Then the answer is no.  They can be

10  characteristics both of what you would call a

11  protein, that is to say polypeptide chains that

12  have some sort of covalent modification to it,

13  and polypeptide chains, that is to say sequences

14  of amino acids that have no -- no other covalent

15  modifications to them.

16              There are plenty of proteins that --

17  there are plenty of polypeptide chains that don't

18  have further covalent modifications that fold

19  into secondary, tertiary and even quaternary

20  structures.

21        Q.      That are not proteins?

22        A.      No, no, they are proteins.  Proteins

23  and polypeptide chains, I keep saying, are the

24  same thing.  They are used interchangeably.  And

25  in -- maybe a useful way to think of it is that

Page 258

1                    DAVID JACKSON

2    the category protein subsumes polypeptide chains

3    as well as covalently modified polypeptide

4    chains.

5         Q.    Let me direct your attention back to

6    what we discussed this morning about the use of

7    the term "polypeptide."

8              Do you have that discussion in mind?

9         A.    I do, indeed.

10        Q.    In particular, I want to draw your

11   attention back to the discussion and part of your

12   report in which you distinguish between

13   polypeptides or the general usage of the term

14   "polypeptide" to the extent that it's different

15   than a protein, "protein" to the extent it's

16   different than a polypeptide.

17             Do you recall that?

18        A.    I do recall that.

19        Q.    Do you recall that in Column 8 of

20   the '755 patent there's a specific definition

21   of --

22        A.    That's right.

23        Q.    -- polypeptide?

24        A.    Right.

25        Q.    In each of the instances in which

1                    DAVID JACKSON

2    you were talking about these different structures

3    of what you called polypeptides, are you using

4    that phrase, "polypeptide," in what you described

5    this morning as the loose and interchangeable

6    manner?

7         A.     You mean during the course of the

8    day?

9         Q.     When Mr. Groombridge was just asking

10   you questions.

11        A.     Well, I thought I had just answered

12   that question a minute ago.  So let me try again.

13              There are polypeptides that in all

14   respects would fit the definition that is in the

15   '755 patent --

16        Q.     Yes.

17        A.     -- that have primary structure, have

18   secondary structure, have tertiary structure and

19   participate in quaternary structures.

20        Q.     And my question to you was, are all

21   of those polypeptides that fit into those

22   categories also proteins?

23        A.     Yes.

24        Q.     Okay.  Now, if we were to use the

25   definitions -- the narrow definition of

1                     DAVID JACKSON

2    polypeptide that appears --

3          A.     Right.

4          Q.     -- in the --

5          A.     Right.

6          Q.     -- '755 patent --

7          A.     Right.

8          Q.     -- using that definition, would you

9    say that the polypeptides of -- as defined in

10   Column 8 of the '755 patent --

11         A.     Yes.

12         Q.     -- and as distinct from proteins

13   would also have those different structures --

14                MR. GROOMBRIDGE:   Objection.

15         Q.     -- in the secondary, tertiary and

16   quaternary?

17         A.     I really don't know how to say this

18   more clearly than I have said it now about five

19   times during the course of the day --

20         Q.     You may have, but --

21         A.     -- but let me try again.

22                So if you -- I don't understand the

23   question that you're asking.  Because it seems to

24   me I've said very clearly that polypeptides, that

25   is to say strings of amino acids without further

Page 261

1                    DAVID JACKSON
2    chemical modification -- covalent modification to
3    them can participate in all four levels of
4    structure.
5                    What in addition to that do you need
6    to know to answer your question?
7                    And I've also said that all of those
8    things can also be referred to as proteins and
9    are proteins.  They are both polypeptides and
10   proteins, polypeptides by the '755 definition and
11   proteins.
12        Q.     Okay.
13        A.     So now what else do you need to
14   know?
15        Q.     In those cases where you have what
16   you've described as polypeptides within the
17   meaning of the '755 patent --
18        A.     Right.
19        Q.     -- that have acquired these
20   different secondary, tertiary and quaternary
21   structures --
22        A.     Right.
23        Q.     -- in those cases, are the
24   polypeptides themselves the same?
25        A.     Well, except for the fact that

1                    DAVID JACKSON

2    they're now folded into somewhat different

3    three-dimensional structures, they're chemically

4    the same.

5          Q.     Okay.

6          A.     They're chemically identical.  You

7    can denature them back to their random coil --

8    what you would call polypeptide chain form.  And

9    then you can renature them again and they will

10   fold back up into the active structure.

11         Q.     Okay.  If you consider that the

12   polypeptide is the linear chain that is described

13   in the '755 patent in Column 8 or the linear

14   array --

15         A.     Yes.

16         Q.     -- of a particular sequence, then

17   would you say that those are identical regardless

18   of these secondary, tertiary or quaternary

19   structures?  Referring just to the polypeptide

20   that is defined in the '755 patent.

21         A.     So do you think I have not said

22   that?  Do you think I've said something different

23   from that?  And if so, please tell me what,

24   because I really don't understand what you're

25   getting at.

Page 263

1                    DAVID JACKSON

2       Q.     If you can answer my question.

3       A.     So the answer is yes --

4       Q.     Answer it again.

5       A.     -- they are the same.

6              MR. BARSKY:  Thank you.

7              That's all I have.

8              MR. BERL:  I'm done, too.

9              MR. GROOMBRIDGE:  Okay.  I'm done as

10      well.  So we're all finished.

11             THE VIDEOGRAPHER:  The time is

12      approximately 5:13 p.m.  This concludes

13      Media No. 5 as well as today's deposition.

14      We are off the record.

15

16

17

18

19

20

21

22

23

24

25