Exhibit 2

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW JERSEY

3          Civil Action No. 10-2734 (CCC/JAD)

4

5

6     _____

7     IN RE BIOGEN '755 PATENT                    )

8     LITIGATION                                  )

9     _____ )

10

11

12

13

14

15        DEPOSITION OF DR. JEFFREY V. RAVETCH

16               Washington, D.C.

17               August 30, 2011

18

19

20

21

22

23

24    Reported by:  Mary Ann Payonk, RDR-CRR

25    Job No. 41405

Page 2

1

2

3

4

5                         August 30, 2011

6                         9:30 a.m.

7

8          Deposition of DR. JEFFREY V. RAVETCH,

9     held at the offices of Williams & Connolly, 725

10    Twelfth Street, N.W., Washington, D.C.,

11    pursuant to Notice before Mary Ann Payonk, a

12    Certified Realtime Reporter and notary public

13    of the District of Columbia.

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2    ON BEHALF OF BIOGEN:

3            PETER SANDEL, ESQUIRE

4            Paul Weiss

5            1285 Avenue of the Americas

6            New York, New York 10019

7                        and

8            REBECCA FETT, ESQUIRE

9            Weil, Gotshal & Manges, LLP

10           767 Fifth Avenue

11           New York, New York 10153

12

13   ON BEHALF OF BAYER:

14           DAVID BERL, ESQUIRE

15           BRUCE GENDERSON, ESQUIRE

16           GEORGE A. BORDEN, ESQUIRE

17           Williams & Connolly

18           725 Twelfth Street, N.W.

19           Washington, D.C. 20005

20

21   ON BEHALF OF EMD SERONO, INC.:

22           TIMOTHY P. BEST, ESQUIRE

23           Gibson, Dunn & Crutcher

24           333 South Grand Avenue

25           Los Angeles, CA 90071

Page 4

1    APPEARANCES (Cont'd.):

2    ON BEHALF OF NOVARTIS:

3           R. GREGORY PARKER, ESQUIRE

4           WHITE & CASE

5           1155 Avenue of the Americas

6           New York, New York 10036

7

8    ALSO PRESENT:

9           Elizabeth Hurley, Biogen

10          Mia Marbury, Legal Video Specialist

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     J. Ravetch

2    used in a variety of clinical studies.

3         Q.   I understand.  But we are discussing

4    the citations that appear in the '755 patent

5    which you said that you have reviewed, at least

6    some of them.

7              My question for you is:  Those

8    studies that you reviewed that appear in the

9    '755 patent, the interferon that was used to

10   treat humans, was that -- was that native beta

11   interferon or recombinant beta interferon?

12        A.   So, once again, I would have to have

13   the reference or -- to answer your questions

14   accurately; otherwise, I'd just be relying upon

15   my memory.

16        Q.   Do you have any recollection sitting

17   here today as to the purity of the beta

18   interferon that was used to treat human

19   patients and described in the papers which are

20   cited in the '755 patent?

21        A.   Be the same answer, counselor.  I

22   would need to review the particular publication

23   to answer the question as to the degree of

24   purity of a particular preparation that might

25   have been used.

1                          J. Ravetch

2        Q.    And sitting here today, you don't

3   have any idea as to how pure those -- those

4   preparations were?

5        A.    I don't have a distinct recollection.

6   They were degrees of purity.  In fact, the

7   patent itself describes the -- the range of

8   purity in column 4, for example.  They talk

9   about purity of 50 percent yields, 100 percent

10  yields at specific activities of -- ranging

11  from 10 to the 4th to 10 to the 9th units per

12  milligram.  So there's a -- certainly a large

13  range that is summarized in the patent.

14            So for any particular reference, I

15  would need to refer to that reference to answer

16  your question.

17       Q.    I want to turn your attention to the

18  discussion of genetic engineering, which I

19  believe you mention at approximately paragraph

20  21.  Are you there?

21       A.    Yes.

22       Q.    Paragraph 21, you state that -- let

23  me make sure that I read this correctly -- you

24  say there, "By The late 1970s, a variety of

25  experimental techniques converged and gave rise

1               J. Ravetch

2    to the field of genetic engineering."

3               It continues.  Last paragraph is,

4    "The recombined human and plasmid DNA could

5    then be reintroduced into bacteria.  This

6    process of introducing foreign DNA into a

7    bacterial cell is referred to as

8    transformation."  Do you see that?

9         A.   Yes, I do.

10         Q.   The term "transformation" as it was

11    understood in the -- the late 1970s, did that

12    require that the foreign DNA be incorporated

13    into the chromosome of the host?

14         A.   No, it did not.  The term

15    "transformation" is a term that developed from

16    bacterial genetics and is one of the three

17    mechanisms by which DNA can be transferred into

18    a bacterial cell, the other two being

19    conjugation and transduction.

20               In each case, the presence of the DNA

21    is detected by its phenotypic characteristics,

22    how it modifies the cell, conferring the

23    particular selectable or screenable marker.

24               In the case of transformation, it's

25    naked DNA and the process leads to a stable

1                    J. Ravetch

2  phenotype in order to be detected through

3  multiple generations of growth.  That stable

4  phenotype does not require integration into the

5  chromosomal DNA but it does require stable

6  propagation of the introduced DNA.

7       Q.   Paragraph 22, "Because the

8  transformed bacteria now contain the human DNA

9  sequence, it could transcribe that sequence

10  into mRNA and translate that sequence into a

11  polypeptide.  Using this process, the scientist

12  could cause bacteria to make a polypeptide

13  previously only made in human cells."  Do you

14  see that?

15       A.   Yes, I do.

16       Q.   What would the results be if the

17  human gene that were inserted into the bacteria

18  contained introns?

19            MR. BERL:  Objection.

20       A.   If the human DNA had intervening

21  sequences, those sequences would be

22  transcribed, assuming that there is a -- a

23  correct transcription initiation sequence

24  that's recognized by a bacterial polymerase

25  either because of its integration into the

                        J. Ravetch

1  chromosome or by virtue of providing such a

2  transcription initiation sequence on the -- the

3  autonomously replicating plasmid --

4       THE REPORTER:  On the?

5       A.   On the autonomously replicating

6  plasmid, and that DNA sequence would be treated

7  like the bacterial host DNA as a template for

8  RNA polymerase to generate a transcript.

9       Q.   And would that -- would that then be

10 translated into a polypeptide?

11      A.   So there too it would depend upon

12 whether the DNA sequence that was inserted

13 either on a plasmid or in the chromosome was in

14 the correct configuration so that it is able to

15 be recognized by the initiation of ribosome

16 binding and translation used in the

17 translational machinery of the bacterial cell

18 to initiate a -- a polypeptide that would read

19 from the RNA strand.

20      In that case, either a fusion protein

21 to a bacterial coding region or to -- or in the

22 absence of a translational effusion, a de novo

23 translation product as a polypeptide would be

24 generated until which case a termination codon

1                          J. Ravetch

2     was able to terminate translation.

3          Q.    Now, do -- do procaryotic cells,

4     bacteria, for example, do they have the

5     endogenous mechanisms to splice out introns?

6          A.    That's a very complicated question,

7     counselor.  The procaryotic cells represent a

8     very large kingdom, and there are members in

9     that kingdom which have interrupter genes in

10    which splicing of a sort occurs.

11              I would rather not go into the

12    specific details of how those various systems

13    differ because it is a world of complexity.  So

14    the answer to your question is in some

15    circumstances, it does happen.

16         Q.    That's fair.  Let's try confining the

17    question, then, to bacteria.

18         A.    Same answer.

19         Q.    All right.  So there are bacteria

20    that you believe do have mechanisms by which

21    they can process and remove introns?

22         A.    There are bacteria that have

23    interrupter genes, and in those bacteria there

24    are examples of -- of a processing event that

25    occurs.  If you restrict it to E coli, where we

1                    J. Ravetch

2    have not seen evidence of that, the answer

3    would be a little easier.

4        Q.   We -- we're getting there.

5        A.   Thank you.

6        Q.   Working our way down.

7             In the case of E coli, does E coli

8    have the endogenous mechanisms required to

9    splice or to remove introns?

10       A.   So I think the key in your question

11   is endogenous mechanisms.  Right.  One can

12   engineer E coli to do almost anything you

13   want --

14       Q.   Understood.

15       A.   -- but endogenously, E coli, to my

16   understanding, does not process intervening

17   sequences.

18       Q.   And as such, if one wanted to express

19   a human gene in E coli that had not been

20   otherwise modified, and the human gene

21   contained intervening sequences, one would have

22   to remove those prior to insertion into the

23   E coli; correct?

24            MR. BERL:  Objection.

25       A.   So the -- as I mentioned in paragraph

1          J. Ravetch

2    21, the technology for doing that was -- was

3    well developed.  I was doing it in the NIH in

4    Phil Leder's lab.  It involved isolating the --

5    the processed messenger RNA and not using the

6    chromosomal DNA as your source of the genetic

7    information for the gene of interest.  And

8    using the spliced RNA as a cDNA copy in most

9    cases avoided that complication.  And those

10   were techniques that had been developed in the

11   mid to late '70s.

12       Q.   So that would be yes?

13           MR. BERL:  Objection.  You can

14       answer.

15       A.   The answer is what I gave you.

16       Q.   So one would remove or use cDNA in

17   which the intervening sequences had already

18   been removed if one wanted to express that DNA

19   or cDNA in a bacterial cell?

20           MR. BERL:  Objection.

21       A.   That's one approach.  I said there

22   are a variety of techniques that have been

23   developed.

24           One popular and common one was to use

25   cDNA derived from a processed mRNA from a

1               J. Ravetch

2    eukaryotic cell.  In many cases, the eukaryotic

3    gene lacked introns, in which case there was no

4    such concern.  Many of the early studies in

5    yeast, for example, studies that we did in

6    malaria parasites, for example, other

7    protozoans, lacked intron-containing genes in

8    each case, chrysophilized (ph) L intron

9    containing genes.  So in many cases, it was

10   unnecessary.  But in cases where it was a -- a

11   consideration, the techniques had been

12   developed to do that.

13        Q.   Proteins expressed in E coli are not

14   glycosylated; is that correct?

15             MR. BERL:  Objection.

16        A.   I -- I'll qualify it for you.  In the

17   unmodified E coli, there are E coli strains

18   that have been modified to glycosylate;

19   however, in the -- the unmodified E coli,

20   glycosylation does not occur.  On -- sorry.

21   Protein glycosylation of the sort that we see

22   in eukaryotic cells does not occur.  There is a

23   glycosylation, of course, that occurs on the

24   cell wall which is quite important to the

25   bacterial survival, but it's a different type

1                   J. Ravetch

2     of pathway.

3          Q.   Understood.

4               Just out of curiosity, you -- you

5     mentioned that E coli had been modified so that

6     they can glycosylate.  When was the first time

7     you were aware of E coli being developed that

8     could glycosylate a protein?

9          A.   So it's not -- so it's not a question

10    that I've researched thoroughly.  I'm certainly

11    aware of the more recent work because it

12    impinges on my own studies.  And strains of

13    coli have been developed that have the

14    glycosylation machinery for human glycant

15    structures.  But I can't answer your question

16    in terms of a -- a thorough review as to when

17    such were first developed.

18         Q.   Did such E coli exist in 1980?

19         A.   I can't answer the question.  I

20    haven't reviewed the literature with that issue

21    in mind.

22         Q.   Do you have any reason to believe

23    that E coli that were capable of -- that had

24    been modified such that they were capable of

25    glycosylating proteins existed in 1980?

1            J. Ravetch

2        MR. BERL:  Objection.

3        A.   It was a very important field, then

4   and today, and many people were actively

5   involved in studying glycosylation of proteins,

6   polypeptides, so that it wouldn't surprise me

7   if there were some studies that were done in

8   the early '80s.  But I don't have a definitive

9   date I can give you.

10          THE WITNESS:  Wonder if we can take

11       a break shortly.  I've run out of water.

12       It's been about an hour.

13          MR. SANDEL:  Sure.  Of course we

14       can take a break.

15          THE WITNESS:  Now would be a good

16       time?

17          MR. SANDEL:  Off the record.

18          THE VIDEOGRAPHER:  Here marks the

19       end of videotape number 1 taken in the

20       deposition of Dr. Jeffrey Ravetch.  The

21       time on the video screen is 10:47 and 46

22       seconds.

23       (A recess was taken from 10:47 a.m.

24       through 10:47 a.m.)

25          THE VIDEOGRAPHER:  Here marks the

1                    J. Ravetch

2          beginning of videotape number 2 taken in

3          the deposition of Dr. Jeffrey Ravetch.

4          Going back on the record.  The time on

5          the video screen is 10:48 and 44

6          seconds.  Please continue.

7     BY MR. SANDEL:

8          Q.   Welcome back, doctor.

9          A.   Thank you.

10         Q.   Just let me ask you, as of 1981, how

11    many recombinant human proteins had been

12    produced?

13              MR. BERL:  Objection.

14         Q.   You may find it helpful to refer to

15    page -- or, sorry, paragraph 24 of your report.

16         A.   Thank you.  I was looking for that.

17              MR. BERL:  Objection.  Since it's

18         colloquy, can you repeat the question?

19         (The reporter read from the record.)

20         A.   So in paragraph 24 of my report, I

21    summarize the published reports of expression

22    of various recombinant polypeptides in nonhuman

23    cells.  And of the published reports of -- of

24    human proteins -- human polypeptides, excuse

25    me, in -- as recombinant molecules, I count

1                    J. Ravetch

2    about a half dozen in the exhibits I provided

3    from 5 to 21.

4            I'm aware of additional ones that

5    were either not published, that was work in

6    progress.  Our own work, for example, on the

7    human immunoglobulins didn't lead to published

8    reports per say because they were part of the

9    research program to develop various molecules

10   that we use as probes to make antibodies and so

11   forth.

12           So I think the estimate of a half

13   dozen of published reports would probably

14   indicate that at least two or three times that

15   number were in common usage by the molecular

16   biology community.

17   BY MR. SANDEL:

18       Q.   Let's start with the ones that were

19   published that you cite.  So human growth

20   hormone is a human polypeptide; correct?

21       A.   Human growth hormone is a human

22   polypeptide, yes.

23       Q.   And that was expressed in recombinant

24   form?

25       A.   That was expressed in recombinant

                         J. Ravetch
1
2   form, that's correct as well.
3       Q.   And the paper describing that is
4   Exhibit 10 to your report; correct?
5       A.   That's one of the reports.
6       Q.   Published in Nature in October 1979?
7       A.   That's reference -- Exhibit 10 of my
8   report, that's correct.  There's another report
9   under tab -- Exhibit 13 of human growth growth
10  hormone expression of bacteria that is a -- a
11  Nature paper from 1979, August of '79 of the --
12  different --
13      Q.   I'm sorry --
14      A.   -- group.
15      Q.   -- doctor, do you mean a Science
16  publication?
17      A.   I'm sorry.  Science publication, yes,
18  it's a Science publication, yes, Science
19  publication, August of '79 from Howard
20  Goodman's group.
21      Q.   It's not a statin.  Is that a human
22  protein?
23      A.   It's a polypeptide.
24      Q.   Polypeptide?
25      A.   It's a human polypeptide.

J. Ravetch

1

2    Q.    And is that produced in recombinant

3    form?

4          THE REPORTER:  Sir, repeat.

5    Q.    Strike that.  Was somatostatin

6    produced in recombinant form?

7    A.    Somatostatin --

8    Q.    Doctor --

9    A.    Yes?  Which tab is it?  The question

10   is where.  I'm looking for the reference, to be

11   precise.

12   Q.    I think it was actually Exhibit 12.

13   A.    Yes.  Exhibit 12 is a Science

14   publication, Expression in E coli of a

15   Chemically Synthesized Gene for the Hormone

16   Somatostatin.  And that's a study that I

17   believe came from the Riggs Itukara group.

18   Q.    And interferon alpha had been

19   expressed in recombinant form; is that correct?

20   Point you to Exhibit 15.

21   A.    Leukocyte interferon or interferon

22   alpha, yes, Exhibit 15.  And that's a -- a

23   publication in Nature -- Nature right, in 1980,

24   yes, March of 1980.

25   Q.    And beta interferon had been

1                        J. Ravetch

2    expressed as a recombinant protein, had it not?

3    And let me direct to you Exhibit 25 of your

4    report.

5         A.    September 1980 publication from Fiers

6    in Nature describes the expression of human

7    fibroblast interferon gene in E coli.  And

8    there are a few other publications relevant to

9    that as well.  Exhibit 26 and 27 describe --

10   and 28 all describe other groups who generated

11   beta interferon as -- in recombinant form in

12   E coli, for example.  I believe insulin as well

13   was a human polypeptide that was expressed in

14   E coli as a recombinant molecule.

15        Q.    Now, the publications describing

16   the -- the production of recombinant human

17   growth hormone, somatostatin, alpha interferon,

18   and beta interferon were all published in -- in

19   prestigious journals; correct?

20        A.    Yes.  I say that because I publish in

21   those journals.

22        Q.    How would you characterize Nature

23   amongst journals in terms of prestige?

24        A.    It -- it's very subjective.  You

25   know, like I said, it's a journal that many of

1                    J. Ravetch

2    macrophage," and it continues from there.  Do

3    you see that?

4          A.   I do --

5               MR. BERL:  Objection.

6          A.   -- see those words.

7          Q.   All right.  Would you turn to the

8    summary of the invention, which appears in

9    column 3?

10         A.   Yes.

11         Q.   Starting at line 14, your patent

12   specification states "The invention also

13   provides a cell line capable of stably

14   expressing an FC receptor protein which is

15   expressed on NK cells."  Do you see that?

16         A.   Yes, I do.

17         Q.   Okay.  Is that -- the cell line that

18   you're referring to in the summary of the

19   invention, is that the host cell that you refer

20   to in the claims?

21               MR. BERL:  Objection.

22         A.   As I said, counselor, in the absence

23   of being able to review not just the -- the

24   patent that you've given me but the file

25   history, I couldn't comment on what had

1              J. Ravetch

2    occurred in the Patent Office that led to the

3    specific language of different claims.

4         Q.   Do you have a reason to believe that

5    a -- a host cell comprising a recombinant

6    cloning vehicle is not adequately described as

7    a cell line capable of stably expressing an FC

8    receptor which is expressed on NK cells?

9              MR. BERL:  Objection.

10        A.   I have no opinion one way or the

11   other.

12        Q.   So what's your current understanding

13   of host cell in the claim of your patent?

14             MR. BERL:  Objection, calls for a

15        legal conclusion.

16        A.   I -- I have no current understanding

17   of the claims of this patent.  As I understand,

18   and the reason why we're here today, is to

19   offer opinions regarding the claim construction

20   of the '755 patent.  And, I mean, claim

21   construction is a matter for the Court to

22   determine.  I can offer my scientific opinion,

23   and that has to be based on a review of all the

24   pertinent information, including the file

25   history.  So unless I can see a file history

                    J. Ravetch

1

2  and understand something, I can't even offer my

3  scientific understanding of what may have

4  occurred to generate a particular claim term.

5  Even with that, it's still a matter for the

6  Court to decide.

7      Q.   I understand.

8          And I'm asking your scientific

9  opinion as to one of the skill in the art

10  reading your patent would understand that a

11  host cell could also be described as a cell

12  line that's capable of stably expressing a

13  recombinant protein.

14          MR. BERL:  Objection.

15      A.   I'm not going to be able to answer

16  your question.  I've given you the reason why I

17  can't answer it.  I have the opportunities to

18  review not just the '755 patent but the file

19  history, which as you hopefully will get to,

20  influenced my opinion as to the scientific

21  understanding of one of skill in the art as to

22  what some of the terms may mean.  In the

23  absence of similar ability, I can't opine on

24  the meaning of claim terms in the '031 patent.

25      Q.   All right.  So -- so you yourself as

1                      J. Ravetch

2       the inventor of the patent sitting here today

3       cannot provide an opinion as to what your

4       patent means --

5               MR. BERL:  Objection.

6           Q.   -- what the patent means; is that

7       right?

8               MR. BERL:  Objection.

9           A.   In the absence of being given the

10      opportunity to review the information I asked

11      for, I will not be able to provide you with the

12      opinion sitting here today for this -- this

13      patent, these claims.

14              MR. SANDEL:  Fair enough.  Go off

15          the record.

16              THE VIDEOGRAPHER:  Going off the

17          record.  The time on the video screen is

18          12:26 and 18 seconds.

19          (A luncheon recess was taken from

20          12:26 p.m. through 1:23 p.m.)

21              - AFTERNOON SESSION -

22              THE VIDEOGRAPHER:  Going back on

23          the record.  The time on the video

24          screen is 13:23 and 4 seconds.  Please

25          continue.

                         J. Ravetch

1

2    BY MR. SANDEL:

3        Q.   Welcome back.  I trust you had a

4    pleasant lunch.

5        A.   Yes, I did.  Thank you.

6        Q.   Would you turn to -- you still have

7    Exhibit 1 before you?

8        A.   Yes, I do.

9        Q.   All right.  Would you turn to tab 3

10   or Exhibit 3 of your expert declaration?

11   That's the '755 patent.  And turn to Claim 1,

12   which appears at the back of the patent.

13       A.   I have it.

14       Q.   And in the first indented paragraph

15   of Claim 1 is the phrase "produced by a

16   nonhuman host, transformed by a recombinant DNA

17   molecule."  Do you see that?

18       A.   Yes.

19       Q.   Do you believe that one of skill in

20   the art in 1980 -- strike that.

21            Do you believe that in 1980, that

22   phrase would be commonly understood by one of

23   skill in the art?

24       A.   I believe one of skill in the art

25   would understand that phrase to refer to a

1                         J. Ravetch

2   process of making a recombinant polypeptide.

3       Q.   Let's take that in baby steps first.

4       A.   Okay.

5       Q.   Do you -- do you understand that in

6   1980, that phrase would be commonly understood

7   by one of skill in the art?

8       A.   I'm not -- I'm not quite sure what

9   you mean by "commonly understood."  I think the

10  words do speak for themselves, and they

11  describe a process, or several processes.

12      Q.   So take this in little steps.  So

13  correct me if I'm wrong.  So yes, you believe

14  that that phrase would be commonly understood

15  by one of skill in the art in 1980?

16           MR. BERL:  Objection.

17      A.   I'm -- I'm not quite sure what you

18  mean by "commonly understood by one of skill in

19  the art in 1980."  I think one of skill in the

20  art reading this part of the claim would have

21  an understanding as to what that means, and it

22  refers to process steps.

23      Q.   Haven't quite gotten to what they

24  would understand it to be yet, so try to take

25  this in baby steps.  They would understand the

1                       J. Ravetch

2      meaning of the term.

3           A.   Terms, terms.

4           Q.   Right.

5           A.   One of skill --

6           Q.   Terms, right.

7           A.   -- in the art would understand the

8      words in that part of the claim, and I offer my

9      opinion as to what I believe they would

10     understand those terms to mean.

11          Q.   And the meaning of that -- so you

12     offer a -- an opinion as to how they would

13     understand that.  Is -- is that influenced by

14     the context in which it appears in Claim 1?

15          A.   I believe it's understood in the

16     context of the entire patent and its

17     specification and the file history.

18          Q.   So let's start by, standing alone,

19     just the term "produced by a nonhuman host,

20     transformed by a recombinant DNA molecule,"

21     just that term, all right, would that term have

22     a commonly understood meaning in 1980?

23          A.   I think that term -- you'd -- you'd

24     have to show me how that term was being used,

25     in what application, to understand anything

                        J. Ravetch

1
2    beyond what I've said.  I think the words have
3    distinct meaning, and the distinct meaning is
4    informed in this particular case by what's in
5    the patent and in the file history and what one
6    of ordinary skill in the art would understand.
7         Q.   Let's talk about that, then.  Now, in
8    your report -- sorry, declaration, paragraph
9    35, you say that "The requirement of the
10   recombinant polypeptide be produced by a
11   nonhuman host does not in any way define the
12   structure of the recombinant polypeptide.  The
13   requirement that the nonhuman host be
14   transformed by a recombinant DNA molecule
15   likewise does not define the structure of the
16   recombinant polypeptide."  Is that right?
17        A.   That's correct.
18        Q.   All right.  And that's the opinion
19   you hold here today?
20        A.   Yes, it is.
21        Q.   And I should have done this earlier,
22   and I'm sorry for not.  The -- the opinions set
23   forth in your declaration, do those represent
24   your current opinions?
25        A.   Yes, they do.

1                    J. Ravetch

2      Q.    All right.  You haven't had any

3  occasion to alter or change those opinions

4  since this report was drafted and submitted?

5      A.    That's correct.

6      Q.    And do the opinions expressed in this

7  report accurately represent the opinions you

8  would provide were you asked to testify at

9  trial or at a hearing?

10          MR. BERL:  Objection.  You can

11      answer.

12      A.    The opinions I express in this report

13  in relation to the particular matters I've been

14  asked to address are the opinions that I would

15  express in court if asked to testify.

16      Q.    Now, tell me, why doesn't the -- the

17  requirement that the recombinant polypeptide be

18  produced in nonhuman host in any way define the

19  structure of the recombinant polypeptide?

20      A.    As I explain in other parts of my

21  report, the -- the recombinant polypeptide is

22  the product of gene expression, and that is

23  dictated by the recombinant DNA molecule that

24  is provided, because a recombinant polypeptide

25  is a linear sequence of amino acids.  So the

1                         J. Ravetch

2  host and the method of production, the method

3  of transformation, do not affect the linear

4  array of amino acids dictated by the DNA

5  molecule.

6        Q.   Do the host, the method production,

7  the method of transformation, do any of those

8  affect the three-dimensional structure of the

9  polypeptide?

10            MR. BERL:  Objection.

11       A.   By definition, the polypeptide has

12 been defined with -- in the patent and, I

13 believe, by the parties involved as the linear

14 array of amino acids dictated by the codon

15 sequence.  And I think that therefore is not --

16 let me go back to the patent, '755, column 8,

17 under line 62.  "Polypeptide:  A linear array

18 of amino acids connected one to the other by

19 peptide bonds between the alpha amino and

20 carboxy groups of adjacent amino acids."  By

21 definition, a linear array is not a

22 three-dimensional structure.

23       Q.   So let's step away from that a second

24 and let's talk about the -- polypeptides as

25 they exist in nature or in culture or are used

J. Ravetch

1    in clinical treatment have a three-dimensional

2    structure, do they not?

3         A.    Counselor, the claim is defined --

4    the claim term is defined by the patent, and I

5    have been asked to apply the claim -- interpret

6    the claim terms in late of the patent

7    specification.

8         If the patent says it's a linear

9    array of amino acids, then it's a linear string

10   of amino acids, you know.  Whether or not you

11   can find a situation where a polypeptide may or

12   may not have a secondary or even tertiary

13   structure is beside the point because I'm

14   following the instructions that I have been

15   given to understand the claim in light of the

16   specification and the file history, and there,

17   it's very clear what a polypeptide is.  And

18   it's also the accepted definition of a

19   polypeptide.

20        Q.    Would the host cell influence the --

21   the glycosylation of the recombinant

22   polypeptide?

23             MR. BERL:  Objection.

24        A.    Once again, the recombinant

J. Ravetch

1    polypeptide is specified by the DNA codon, DNA

2    sequence, which is transcribed into an RNA, and

3    the codons specify the polypeptide.  That's the

4    beginning and end of the definition of

5    polypeptide.  What happens subsequently to the

6    polypeptide is no longer a polypeptide.

7    Q.    How would you describe what happened

8    subsequently, the product of -- what does a

9    polypeptide become subsequently?

10   A.    Becomes a protein.

11   Q.    All right.

12   A.    Polypeptide chains can assemble into

13   a protein.  I'll give you an example.  We refer

14   to hemoglobin as a protein.  It's composed of

15   four polypeptide chains.  Each chain has a

16   particular structure that occurs after the

17   polypeptide has been synthesized in the cell or

18   however else you are making it.  So a

19   polypeptide both in the patent and as molecular

20   biologists understood it because of the

21   universality of genetic code is specified by

22   the DNA as a linear array of amino acids.

23   Q.    And in the case of hemoglobin you

24   mentioned, are any of the four polypeptides

1                    J. Ravetch

2     glycosylated?

3          A.   I don't recall.  I don't believe they

4     are.  I would have to review that.  It's been a

5     while since I've been asked to think about

6     hemoglobin or any other posttranslational

7     modification that might occur.

8               But I think I -- I very clearly say

9     in the -- in my introduction, my background

10    section, when I talk about how polypeptides are

11    made, in paragraph 18:  "After expression, the

12    cellular machinery for assembling polypeptides

13    releases the two molecules, the RNA and the

14    polypeptide, and each gene -- each goes its

15    separate way, the mRNA to be degraded or to

16    direct the synthesis of another copy of the

17    polypeptide, the polypeptide to be processed

18    and folded and put to work as a protein."

19         Q.   So let me understand this, then.  If

20    a polypeptide -- in your opinion, if a

21    polypeptide is glycosylated, it is no longer

22    considered a polypeptide?

23         A.   You might refer to it as a

24    glycosylated polypeptide.  You might refer to

25    it as a protein precursor.  You might refer to

1              J. Ravetch

2   it as any of a number of terms.  But when you

3   define the term "polypeptide," as the patent

4   has done quite explicitly, I don't think

5   there's any real room for redefining it as

6   something else.  It is a linear sequence of

7   amino acids.

8        Q.   Doesn't say whether the -- the

9   definition doesn't say whether it's

10  glycosylated or not, does it?

11       A.   The definition -- the definition says

12  it's a linear sequence of amino acids.  It does

13  not incorporate any changes beyond the amino

14  acids.  What occurs to the amino acid

15  subsequently is not part of the linear sequence

16  of amino acids.  That's specified by the DNA

17  molecule, for now the third --

18       Q.   That definition --

19       A.   -- time.

20       Q.   -- you just read doesn't preclude

21  glycosylation, does it?

22       A.   Yes, it -- yes, it does.  Yes, it

23  does.  Because then, you would not refer to a

24  linear sequence of amino acids, you would

25  say -- if, in fact, you wanted to invent a new

1                    J. Ravetch

2  definition for polypeptide, you would say it's

3  a linear sequence of amino acids that are

4  posttranslationally modified by the following,

5  on and on and on.  Doesn't say that because

6  that's not correct.

7           What is technically correct is a

8  linear sequence of amino acids means exactly

9  what the words say:  Amino acid coupled to

10 amino acid, alpha, carbon to carboxy terminus,

11 peptide --

12           THE REPORTER:  Carbon?  Carboxy?

13           THE WITNESS:  Terminus.

14           THE REPORTER:  Thank you.

15      A.    Forming peptide bonds.

16      Q.    And as soon as that folds in any way

17 and -- and it's no longer linear, it's not a

18 polypeptide, in your opinion?

19           MR. BERL:  Objection.

20      A.    Linear does not refer to a structure.

21 All right?  You're -- you're confusing the

22 notion that some kind of a collagen strand can

23 be a linear protein.  We don't mean linear in a

24 structural sense.  We mean the sequences of

25 amino acids as arrayed as if you were writing

1              J. Ravetch

2    them on a line.  That's what linear means.  A

3    linear sequence of amino acids.  So the

4    polypeptide is no more, no less than the

5    precise amino acid sequence specified by the

6    DNA.

7         Q.   But it does exist in a physical form,

8    does it not?

9         A.   During the -- well, during the

10   translational process, there is a nascent

11   polypeptide which grows off the ribosome.

12   Right?  And then events occur, sometimes

13   co-translationally, sometimes

14   post-translationally, to the polypeptide chain

15   as the protein folding and modifications occur.

16   So that's why we have to define the polypeptide

17   as just the amino acid sequence.  No more, no

18   less.  That's what it is.  And that we know

19   comes from the DNA sequence which is embodied

20   in genetic code which is, with a few

21   exceptions, universal.

22        Q.   Now, different hosts will process

23   that, as you say, nascent polypeptide, in

24   different ways; is that correct?

25        A.   They can.  It's not a hard-and-fast

1                    J. Ravetch

2    rule.

3        Q.   No, I understand.  But they can.

4        A.   If it's made in E coli and the

5    polypeptide has a glycosylation signal,

6    glycosylation will not occur.  E coli doesn't

7    glycosylate.  Other cells have other types of

8    modifications that can occur to the

9    polypeptide, but the polypeptide is the same.

10   You haven't changed the polypeptide.

11            How you express it and what kind of

12   cell, how that cell was transformed, in no way

13   defines the polypeptide.  That is purely and

14   simply defined by the DNA sequence.

15       Q.   Now, how would one administer a

16   polypeptide to a patient?

17            MR. BERL:  Objection.

18       A.   First of all, the claim calls for

19   administering to a patient in need of such

20   treatment a therapeutically effective amount of

21   a composition comprising a recombinant

22   polypeptide.  Right?  So the amino acid

23   sequence is clearly a component of the

24   preparation because it is the basis for the

25   potentially ultimate protein product which

1                        J. Ravetch

2    might be administered.  But you start with the

3    polypeptide.  That is defined by the DNA

4    sequence, so you're -- you're starting to

5    define the amino acid sequence, and that is --

6    and that is later on defined by the claim in

7    the top of column 50 of -- by the DNA

8    sequences.

9              So the DNA sequences that are claimed

10   in this particular invention, alleged

11   invention, are specified by the DNA sequence,

12   and they are part of the composition.  Other

13   things can be added to it, certainly the case,

14   but the composition is the DNA sequence plus

15   other things.

16      Q.   If I understood you earlier -- and

17   please correct me if I misunderstood -- you

18   said that a polypeptide, if it were a

19   glycosylated or modified in any way, is no

20   longer a polypeptide.

21              MR. BERL:  Objection.  He clarified

22         that multiple times.

23      A.   Right.  So -- so I -- once again, the

24   claim reads "recombinant polypeptide."

25              "Recombinant" has a meaning.  Right?

1                    J. Ravetch

2    "Recombinant" tells you that it's been

3    expressed in a nonnatural host.  Right.  So the

4    rest of the claim offers nothing more to the

5    definition of "recombinant polypeptide."

6          If I express a polypeptide in a

7    particular cell, other things can happen to it

8    or not happen to it.  The polypeptide is the

9    amino acid sequence specified by the DNA as

10   claimed in the '755 patent.

11          The fact that it's recombinant tells

12   you that it's been expressed in a variety of

13   different nonnatural cells.  Right?  So the

14   rest of the claim term would have no meaning if

15   it -- all it did was reiterate recombinant.

16   Its meaning is to provide you with how you've

17   done that.  And it tells you how you've done

18   that because you've produced it through a

19   process in a nonhuman host, and that host had

20   been transformed by a recombinant DNA molecule.

21          So the process is laid out for the

22   production of the recombinant polypeptide.

23   That's the way I understand the claim, and I

24   believe that's the way the inventors understood

25   the claim.

J. Ravetch

1

2    Q.    Why do you believe that that's the

3  way the inventors understood the claim?

4    A.    Because they tell you in their

5  patent, as we talked about before, in the

6  abstract and, for example, in the top of column

7  6, that the expression of these recombinant

8  molecules is the invention.  It is a method of

9  making this which is the invention, to then be

10  used for different applications, including the

11  treatment of patients in need of a therapeutic

12  administration.

13    Q.    Well, you'll agree with me that

14  Claim 1 is clearly directed to a method for

15  immodulation or treating a viral condition,

16  disease, cancer or tumors comprising the step

17  of administering to a patient in need of such

18  treatment a therapeutically [sic] amount of a

19  composition"; correct?

20         MR. BERL:  Objection.

21    A.    Produced in a particular way --

22    Q.    I understand --

23    A.    -- so you -- counselor --

24    Q.    I understand.

25    A.    So you --

                        J. Ravetch

1

2          THE REPORTER:  Gentlemen?

3     A.    Let me finish.  You can't remove that

4    from the claim.  I'm sorry.  It's in there.

5    And I understand it to have meaning.  And the

6    meaning I have it -- I understand it to have is

7    a method by which you've made that recombinant

8    polypeptide.

9             Yes, it is a -- the intent of the

10   claim is to, as the preamble lays forth, is to

11   treat by administering something made in a

12   certain way.  So all of that is part of the

13   claim.  Treat, with something, made in a

14   particular way.  That's my opinion of the claim

15   meaning.

16     Q.    Now, in your declaration you refer to

17   statements that were made in the prosecution

18   history beginning at paragraph 38 and

19   continuing through.  You see that?

20     A.    Yes, I do.

21     Q.    Paragraph 39 says, "During the

22   prosecution of the '755 patent, the examiner

23   described the following two claims as

24   containing the same actual process steps and

25   positive process steps."  And then there is a

1              J. Ravetch

2    table presenting two claims.  Are these claims

3    from the '755 patent file history?

4         A.   I would need --

5              MR. BERL:  Objection.

6         A.   I would -- I would need to actually

7    look at the actual cite in the brief.

8              MR. BERL:  You -- and we served

9         a -- an amended corrected version I'm.

10        Not sure why you're using this

11        preamended corrected version of the

12        declaration.

13             MR. SANDEL:  I don't recall

14        receiving a corrected version.  Do you

15        have a copy?

16             MR. BERL:  Yeah, in the other room.

17             MR. SANDEL:  Would you mind getting

18        one for us?

19             MR. BERL:  Sure.

20             MR. SANDEL:  Go off the record for

21        a second.

22             THE VIDEOGRAPHER:  Going off the

23        record.  The time on the video screen is

24        13:48 and 28 seconds.

25        (Discussion held off the record.)

1              J. Ravetch

2         THE VIDEOGRAPHER:  Going back on

3     the record.  The time on the video

4     screen is 13:51 and 10 seconds.  Please

5     continue.

6     (Exhibit No. 6 was marked for

7     identification.)

8  BY MR. SANDEL:

9     Q.   Let me hand to you what has been

10  marked as Exhibit 6, and it is titled

11  "Declaration of Dr. Jeffrey V. Ravetch in

12  Support of the Defendant's Joint Opening Claim

13  Construction Brief."  And, as represented by

14  counsel, this is an amended version that was

15  provided to the Court.

16         MR. BERL:  And filed.

17         MR. SANDEL:  And filed.

18         MR. BERL:  Served.

19  BY MR. SANDEL:

20     Q.   Now, if you would turn to paragraph

21  39 -- you may already be there.

22     A.   I am there.

23     Q.   You are there.

24     A.   I am there.

25     Q.   Great.  And so the question which I'd

1                     J. Ravetch

2    asked is whether these -- the claims that are

3    presented in the chart in Claim 39 were from

4    the '755 patent application.  With the amended

5    report in front of you, can you answer that

6    question?

7         A.   Yes, I can.  The left-hand panel of

8    that chart indicates that this was taken from

9    Claim 31 of the '930 patent.  And on the face

10   of the '755 patent, it indicates that the '930

11   patent was the application number filed May 25,

12   1995, which issued as the '755 patent.

13        Q.   And the '723 patent application which

14   is referenced in the right-hand portion of the

15   chart, that is, to your understanding, a

16   different application?

17        A.   I understand that's a different

18   application.

19        Q.   And you cite the Fletcher

20   declaration, Exhibit 5, at 5, and the Fletcher

21   declaration, Exhibit 6, at 5.

22             Let me ask you, did you review the --

23   were -- were you provided with the Fletcher

24   declaration, Exhibit 5, and Exhibit 6?

25        A.   I -- I was provided with the Fletcher

1                    J. Ravetch

2    declaration, and I was also provided with the

3    file history sections that this part of my

4    declaration pertains to.

5         Q.    Okay.  And you -- you reviewed those

6    in full?

7         A.    I reviewed a significant portion of

8    the -- of the file history surrounding these

9    issues.

10        Q.    Now, the claim that you have chosen

11   to place in the chart is Claim 31; correct?

12        A.    That's correct.

13        Q.    All right.  Did you examine Claim 32?

14        A.    I did.

15        Q.    Let me hand to you Exhibits 3, 4, and

16   5.

17        (Exhibit No. 3 was marked for

18        identification.)

19        (Exhibit No. 4 was marked for

20        identification.)

21        (Exhibit No. 5 was marked for

22        identification.)

23             MR. SANDEL:  And I'll also hand a

24        copy of these to counsel.

25   BY MR. SANDEL:

1                    J. Ravetch

2        Q.    Exhibit 3 bears the Bates numbers

3    BIMA0005639 through 42.  Exhibit 4 bears the

4    Bates numbers BIMA0005496 through 502.  And

5    Exhibit 5 bears Bates numbers BIMA0010885

6    through 92.

7              Now, doctor, are these the portions

8    of the file history that you relied upon in

9    forming your opinions expressed in -- starting

10   at paragraph 39 of your report?

11             MR. BERL:  Why don't you give him

12        the Fletcher declaration so he can see

13        what he's cited?

14        Q.    So I'll represent to you that

15   Exhibit 3 was presented in the Fletcher

16   declaration as Exhibit 5, and what has been

17   marked as Exhibit 5 was presented in the

18   Fletcher declaration as Exhibit 6.

19             MR. SANDEL:  I apologize.  I may

20        have made an error.  While the -- it's

21        easier to give him the Fletcher

22        declaration --

23             MR. BERL:  Right.

24             MR. SANDEL:  -- I don't have a copy

25        of it.

1              J. Ravetch

2         MR. BERL:  Okay, you do now.

3         MR. SANDEL:  Yes, I do.

4    BY MR. SANDEL:

5         Q.   Let me help clarify.

6         A.   Yes.  What is the question?

7         Q.   There isn't a question.  I'm going to

8    help clarify the documents --

9         A.   Oh.

10        Q.   -- you hold before you.

11        A.   Thank you.

12        Q.   What has been marked as Exhibit 3 --

13        A.   Yes.

14        Q.   -- was Fletcher Exhibit 7.

15        A.   Okay, which is not referenced here.

16   Okay.

17        Q.   What you hold as Exhibit 4 --

18        A.   Yes.

19        Q.   -- was Fletcher Exhibit 5.

20        A.   Yes.

21        Q.   And what's before you as Exhibit 5

22   was Fletcher Exhibit 6.

23        A.   Very good.  Thank you.

24        Q.   All right.  Now if you would be so

25   kind as to turn your attention to Exhibit 3 --

1                    J. Ravetch

2        A.    Yes.

3        Q.    -- on the second page --

4        A.    Yes.

5        Q.    -- the second full paragraph, third

6   sentence.

7        A.    Yes.

8        Q.    "The positive process steps in

9   Claim 31 through 34 of the instant application

10  and Claims 31 through 34 respectively of serial

11  number 08/448723 are identical.  The only

12  difference in the claims is in the preamble,

13  i.e., the intended use of the -- of the two

14  processes.  Since the actual process -- process

15  steps of the two sets of claims are the same,

16  the scope of the two sets is the claim -- is

17  the same."  Do you see that?

18       A.    Yes, I do.

19       Q.    Is it your understanding that the

20  examiner, in addition to Claim 31, which you

21  cite here, made the same rejection as to

22  Claims 31 through 34?

23       A.    That's what it says in this document.

24       Q.    And that the positive process steps

25  were contained in Claims 31 through 34?

1                    J. Ravetch

2       A.   The positive process steps are within

3  that range of claims.

4       Q.   Okay.  Now, I understand it's your

5  opinion that the positive -- the only positive

6  process step -- steps that the examiner could

7  have been referring to are "the produced by a

8  host cell, transformed by a recombinant DNA

9  molecule'; is that correct?

10      A.   That's correct.  That's my opinion.

11      Q.   Would you turn to Exhibit 5.  And in

12  particular, to page 6.

13      A.   Yes.

14      Q.   Claim 32.

15      A.   Yes.

16      Q.   Does Claim 32 contain the process

17  steps you've identified of producing by a --

18  "produced by a host, transformed by a

19  recombinant DNA molecule"?

20      A.   It does not.

21      Q.   Does Claim 32 contain the step of

22  administering a pharmaceutically effective

23  amount of a composition?

24           MR. BERL:  Objection.

25      A.   It does.  Doesn't say "step," but it

1                     J. Ravetch

2  says "comprising and administering a

3  therapeutically effective amount," yes.

4       Q.   Does that same language appear in 31?

5       A.   The language "administering a

6  therapeutically effective amount of a

7  composition comprising" appears in Claim 31.

8       Q.   And if you would turn to Exhibit 4

9  and again to page 6 --

10      A.   Yes.

11      Q.   -- Claim 32 --

12      A.   Yes.

13      Q.   -- does Claim 32 of Exhibit 4 contain

14  what you've identified as the process step

15  "produced by a host, transformed by recombinant

16  DNA molecule"?

17      A.   The language "produced by a host

18  cell, transformed by recombinant DNA molecule"

19  is not found in Claim 32.

20      Q.   Does it, in fact, contain a process

21  step?

22      A.   Does what contain a process step?

23      Q.   Claim 32.

24      A.   I'm not sure I can answer that

25  question based on the materials you've given

1                    J. Ravetch

2  me.

3      Q.   It does contain the language

4  "administering a therapeutically effective

5  amount of a composition"; correct?

6      A.   The words are found in that claim,

7  yes.

8      Q.   Now turning back to Exhibit 3 --

9      A.   Yes.

10     Q.   -- which is the office action by the

11  examiner, and in particular, the portion that

12  you quoted earlier, it says that "The positive

13  process steps in Claim 31 through 34 of the

14  instant application -- instant application and

15  Claims 31 through 34 of serial number 08448732

16  are identical."

17     A.   Yes, I see that.

18     Q.   Why in your opinion do you believe

19  the examiner is referring to what you've

20  identified as process steps that appear only in

21  Claim 31 and not a process step which appears

22  in both Claim 31 and 32?

23          MR. BERL:  Objection, lack of

24      foundation.  You can answer.

25     A.   So there are several reasons.  First

                        J. Ravetch

1    of all, it refers to Claims 31 through 34.

2    Claims 33 and 34 are dependent on Claim 31 so

3    therefore, he's referring to Claims 31, 33, and

4    34 by your construction at the very least.

5            It refers to process steps and not a

6    process step.  What you've pointed out in Claim

7    32 if, indeed, it is a process step is not

8    process steps, so there's a multiple,

9    multiplicity of process steps that the examiner

10   is pointing to.

11           He also makes it clear that the

12   positive process steps in these claims are

13   identical.  The only difference in the claims

14   is in the preamble, and the -- the presumptive

15   step that you're referring to in Claim 32 which

16   is repeated in Claim 31 as well as 33 and 34 is

17   in the preamble, as I understand the structure

18   of the claim.

19           In addition, the administration of a

20   therapeutically effective composition is not

21   identical in all the claims.  The words may be

22   identical, but from a practical standpoint,

23   administering -- as the patent teaches us,

24   administering a therapeutically effective

1               J. Ravetch

2    amount for a viral disease is quite different

3    than administering a therapeutic effective

4    amount for cancer immunomodulation.  And we

5    know that because if we turn to the patent, it

6    talks about what doses are required for the

7    different types of applications that a

8    interferon preparation might be put to.  And it

9    makes it clear that, while for viral treatment,

10   brief exposure may be sufficient for antitumor

11   therapy, long-term administration at different

12   doses would be required.

13           So from all of those reasons, I

14   believe it's quite clear that the examiner is

15   referring to positive process steps, not a

16   step.  The only positive process steps,

17   production and transformed, that meets that

18   is -- that's not -- that's -- that's identical

19   in all the claims is that step.

20           And finally, the rest of the file

21   history which I reviewed relevant to this

22   question demonstrated that cancellation of

23   Claim 32 occurred.  Claims 31, 33 and 34 were

24   now the claims that were being considered, and

25   the examiner issued the exact same rejection

                          J. Ravetch

1  that the claims were identical, except -- and

2  they had the positive process steps.

3         So if 32 is taken out of the equation

4  and the same language applies, my understanding

5  therefore is that what the examiner was

6  referring to in the document that you produced,

7  Exhibit 4, is to the positive process steps of

8  producing by a host and transformed by a DNA

9  molecule.

10     Q.   There was a lot to that answer.

11  Let's unpack that just a little bit.

12         First, you mentioned they're not the

13  same because, as you know, the dose for

14  treating viruses is different than the dose for

15  immunomodulation.  The claims don't claim a

16  particular dose, do they?

17     A.   The claims -- these claims that we're

18  discussing at this point?

19     Q.   Correct.

20     A.   Oh.  These claims talk about a method

21  treating either human viruses or a method of

22  immunomodulation, administering a

23  therapeutically effective amount.  By

24  definition, if it's therapeutically effective,

1                         J. Ravetch

2      it has to have an activity that will have

3      therapeutic benefit.  And we know from the

4      specification that those therapeutically

5      effective amounts are different.

6                So yes, it does discuss dose by

7      virtue of the fact that the specification talks

8      about different doses that are therapeutically

9      effective.

10          Q.   Right.  And it -- and it suggests

11     having a therapeutically effective amount for a

12     particular condition; correct?

13          A.   Right.  And these two conditions are

14     different and therefore, the administrating --

15     administering language cannot be identical.

16     You're administering different amounts.  So

17     that's not identical in the context of what the

18     examiner said, that the only thing that's

19     different here are the positive -- as -- as a

20     preamble, because the positive process steps

21     are identical --

22          Q.   And --

23          A.   -- so --

24          Q.   -- when the --

25          A.   -- administering can't be a positive

1                      J. Ravetch

2     process step that's identical.

3         Q.   And when the -- and when the examiner

4     referred to Claim 32 as having the same steps,

5     they were just wrong?

6              MR. BERL:  Objection --

7         A.   The examiner --

8              MR. BERL:  -- misstates the record.

9              THE REPORTER:  I'm sorry?

10             MR. BERL:  Misstates the record.

11             THE REPORTER:  Thank you.

12        A.   The examiner doesn't refer to Claim

13    32.  He doesn't call out Claim 32.  We just

14    read it.  The examiner calls out Claims 31

15    through 34, which are the pending claims of

16    this particular application.  And in a

17    subsequent rejection, after 32 has been

18    canceled, Claims 31, 33 and 34 remain.  And the

19    language -- we can look at that if you have

20    that.  The language is the same, that these

21    claims have the same positive process steps.

22        Q.   All right.  Well, let's stick to the

23    material you actually cite in your report,

24    which is the materials you have before you.

25    And there, the examiner says Claim 31 through

J. Ravetch

34.   That would include 33, would it not?

A.   No, I -- I would -- I would no --

Q.   Or 32, would it not?

A.   Excuse me, counselor.  No, I
definitely talk about the remainder of the file
history in paragraph 41.  So this, 39,
introduces the first statement by the examiner,
but as one reads through the file history, as I
have done, and -- and I say following this
statement by the examiner, Biogen stated and
made various amendments and also -- we didn't
talk about that -- referred to the claims as
reciting a positive process step.

So the additional amendments include
cancellation of Claim 32, and the additional
prosecution by the examiner rejected it with
the same language.

So I think it's a simple logical
conclusion that 32 is included in the range.
And I'm not patent expert.  I'm not presenting
myself as such.  I don't claim to understand
the details of -- of proceedings in the Patent
Office.  But from a purely scientific
standpoint, I would understand that 31, 33, and

                    J. Ravetch

1   34 are the subjects that are being discussed in

2   terms of positive process steps.

3        MR. SANDEL:  And with that, I think

4        we need to change the tape.

5        THE VIDEOGRAPHER:  Here marks the

6        end of videotape number 3 taken in the

7        deposition of Dr. Jeffrey Ravetch.

8        Going off the record.  The time on the

9        video screen is 14:15 and 30 seconds.

10       (A recess was taken from 2:14 p.m. through

11       2:27 p.m.)

12       THE VIDEOGRAPHER:  Here marks the

13       beginning of videotape number 4 taken in

14       the deposition of Dr. Jeffrey Ravetch.

15       Going back on the record.  The time on

16       the video screen is 14:27 and 15

17       seconds.  Please continue.

18  BY MR. SANDEL:

19       Q.   Doctor, before we had to switch tapes

20  we were discussing your reasons why you believe

21  that the process steps referred to by the

22  examiner were not the process of administering

23  a therapeutically effective amount of the

24  composition, and one of the reasons that you

1                      J. Ravetch

2   gave me is that that language is contained in

3   the preamble.  Do you recall that?

4         A.   Yes, I do.

5         Q.   Now, if you could turn to Exhibit 3.

6         A.   Exhibit 3.

7         Q.   Exhibit 3, yes.

8         A.   Yes, right, got it, examiner's

9   statement.  The examiner's statement, yes.

10        Q.   The examiner there specifically

11  identifies the difference in the preamble as

12  being the intended use of the two processes;

13  correct?

14        A.   Yes.

15        Q.   The examiner is not referring to the

16  entire preamble and is not referring to the

17  administration of a therapeutically effective

18  amount of the composition, are they?

19             MR. BERL:  Objection.

20        A.   As -- for the reasons I gave before,

21  as I understand the claim, speaking as one of

22  skill in the art reading a claim, it would

23  include the entire preamble, which is a method

24  of treatment for a particular disease

25  comprising administering a therapeutically

1                    J. Ravetch

2    effective amount of a composition, which is the

3    intended use of the -- of the two processes.

4        Q.    The examiner specifically identifies

5    what they saw as the difference in the

6    preamble, did they not --

7              MR. BERL:  Objection, form.

8        A.    And -- and -- and I --

9        Q.    -- i.e., the intended use of the two

10   processes?

11       A.    Right.  And the intended use is

12   treatment with therapeutically effective

13   amounts, and those are different in the two

14   claims.  Both the -- the disease and the

15   treatment are different.

16       Q.    And you think that that's a -- a -- a

17   more reasonable understanding, then, that Claim

18   31 is -- Claim 31 of Exhibit 5 is a method for

19   immunomodulation and for Exhibit 4 is a method

20   for treating human viruses?

21       A.    Well, since --

22             MR. BERL:  What -- what's the

23   question?

24       Q.    The question is:  So you believe that

25   your interpretation is a more reasonable

1                         J. Ravetch

2    understanding than the possibility that the

3    examiner is referring to the portion of the

4    preamble in which it specifically sets forth

5    the condition to be treated, that is, human

6    viruses or immunomodulation?

7              MR. BERL:  Objection,

8         mischaracterizes the document.

9         A.   Yeah, I -- I think my interpretation,

10   looking at it as one skilled in the art, is

11   more consistent with the entirety of the file

12   history and subsequent rejections and

13   statements by Biogen that would direct

14   attention to the differences, which is the

15   processes -- I'm sorry, which are the -- the --

16   the -- the shared steps, which are the two

17   process steps.

18        Q.   The shared steps as between Claim 31?

19        A.   31, 33, 34, as well as Claim 31 of an

20   application that I referred to in paragraph 41

21   of my report.

22        Q.   But not Claim 32, which does not

23   contain the process steps that you referred to?

24        A.    I don't make any comments on Claim

25   31.  And my analysis, as you see here, is

1               J. Ravetch

2   focused on my understanding of the file history

3   and the -- what a reasonable person would

4   conclude when 32 was taken out of the

5   prosecution and the same language of objection

6   was used.  It recited the same positive process

7   steps, plural.

8       Q.   You mentioned -- and plural is where

9   we were going next.  You mentioned plurality as

10  being another one of the reasons that you

11  believe your interpretation of the claim is

12  correct.  The examiner is referring to multiple

13  claims in the rejection, are they not?

14      A.   He's referring in document marked as

15  Exhibit 3 Claims 31 through 34.

16      Q.   And given that there are multiple

17  claims being discussed, why is it not the case

18  that the use of "plural" when discussing

19  process steps is due to the fact that there are

20  multiple claims being discussed?

21      A.   I think from the subsequent file

22  history you can -- you can reach the conclusion

23  that I've reached, that the examiner's

24  referring to the process steps within a claim,

25  31, or the dependent Claims 33 and 34.  And

J. Ravetch

1    that was the understanding that I believe

2    Biogen gave to the examiner's statement.

3

4          In paragraph 41, I cite to their

5    characterization of Claim 31 from a different

6    patent as having positive process steps, in

7    plural.

8          So all of that combined, I think, is

9    compelling to me that the steps that are being

10   referred to by the examiner are the steps

11   within the claim, as Claim 31, and that Claim

12   31 indeed has multiple steps, a produce step

13   and a transform step at the very least, that

14   are identical.

15        Q.   So I want to understand this.  You

16   think that the word "transformed" as it appears

17   in the claims of the '755 patent represent a

18   process rather than a -- a description of the

19   recombinant polypeptide; is that right?

20        A.   Absolutely.  Neither "produced" nor

21   "transformed" describe the polypeptide.  The

22   polypeptide, as I've said many times, is

23   defined by the amino acid sequence, and the

24   amino acid sequence remains unchanged.  Whether

25   you're expressed in this cell or that cell, the

1                    J. Ravetch

2    amino acid sequence is, in fact, a -- a

3    constant.

4            So, for example, if you glycosylate

5    the polypeptide, it's still a polypeptide with

6    now amino acid sequence, now glycosylated.  If

7    it's folded, it's now a polypeptide that's been

8    folded.  If it's acetylated, lipidated, ADP

9    ribosylated, phosphorylated, citrullinated, on

10   and on, it's still a polypeptide.  Right.  So

11   the "transformed" and "produced" language in no

12   way defines a recombinant polypeptide.

13      Q.   You mentioned, I believe, signal

14   sequence.  Now, if there -- there was a signal

15   sequence, that would be removed depending on

16   the host cell; correct?  Whether the signal

17   sequence was or was not removed would depend on

18   the host cell?

19           MR. BERL:  Objection.

20      A.   The -- that's a processing step of

21   the polypeptide.  But the precursor polypeptide

22   is still defined by the DNA sequence, whether

23   it's a fusion DNA -- excuse me, a -- a fusion

24   polypeptide as disclosed in the patent in many

25   of the examples, or it initiates at a

1           J. Ravetch

2    particular amino acid subsequent to processing,

3    the polypeptide is defined by the DNA.  And the

4    recombinant polypeptide can undergo not just

5    signal sequence cleavage, it can undergo other

6    processing steps.

7           It can undergo cleavages so that the

8    precursor is generated so that you now have

9    multiple chains that assemble and so on and so

10   forth.  Insulin, for example, expressed as a

11   precursor will be processed.  Factor 8

12   expressed as a precursor will be processed to

13   generate different size molecules.  However,

14   the polypeptide is specified by the DNA that's

15   been introduced into the cell, and that is a

16   process that is being defined.

17       Q.   Now, I understand that one of the --

18   moving away from the prosecution file history

19   into the specification itself, you also rely

20   on -- and this is in Claim 44 of your report --

21   your declaration.

22       A.   Paragraph 44?

23       Q.   Yeah.  The use of the word "was

24   transformed" in -- in the specification.

25       A.   Uh-huh.

1                         J. Ravetch

2        Q.    So that you mention that the patent

3   repeatedly states that certain strand of E coli

4   was transformed by specific DNA molecule.  And

5   the next paragraph, you say these results

6   demonstrate that transformation's a process

7   performed upon the host.  Right?

8        A.    That's correct.

9        Q.    Does the claim say "was transformed"?

10            MR. BERL:  Objection.

11       Q.    Look at Claim 1.

12       A.    Yes, Claim 1.  So the relevant

13   section is "a recombinant polypeptide, produced

14   by a nonhuman host, transformed by a

15   recombinant DNA molecule."  I mean, the only

16   way the nonhuman host cell can produce this

17   polypeptide is having undergone a

18   transformation step.  One of skill in the

19   art --

20       Q.    Let's just --

21       A.    -- understands that transformation is

22   an active event.  It's a process.

23       Q.    Well, let's answer my question, then

24   we'll get to your statement.  Does the claim

25   say "was transformed"?

1                    J. Ravetch

2        A.   Well, the word "was" is not in the

3    claim.

4        Q.   Thank you.

5             Now, have you ever heard one describe

6    a cell as a transformed cell?

7        A.   The term "transformed cell" --- well,

8    correctly used for bacterial cells and

9    forgetting about the -- the oncologic

10   implications of transformation for a moment,

11   if -- we agree we can put that aside?

12       Q.   Correct.

13       A.   Okay, fine.  So I'm not referring

14   to -- if we're talking about DNA-mediated gene

15   transfer, then a transformed cell or a

16   transformed cell line is used routinely.

17       Q.   And it's used to describe the cell

18   and something that happened to the cell at some

19   point?

20       A.   It's -- it defines the process by

21   which that cell has been phenotypically altered

22   in a stable fashion.

23       Q.   If I were to walk up to you and hand

24   you a vial of cells and say, here are, you

25   know, transformed X cells, you would understand

1                           J. Ravetch

2      that at some point, although I might have done

3      it, but at some point down the line, those

4      cells underwent a process of transformation

5      with some foreign DNA?

6           A.    Correct.

7           (Exhibit No. 7 was marked for

8           identification.)

9      BY MR. SANDEL:

10          Q.    I've just handed you what's been

11     marked Exhibit 7.  I've also provided a copy to

12     counsel.  It is U.S. patent application number

13     US2008/0206246A1.  You are one of the named

14     inventors on this patent application; correct?

15          A.    Yes, I am.

16          Q.    Do you mind turning to the claims of

17     this patent?  Let's go to Claim 7, which

18     appears on page 12.

19          A.    What -- what -- what -- what claim?

20     Excuse me.

21          Q.    Claim 7.

22          A.    Claim 7.  Sorry.

23          Q.    Claim 7 is "the isolated polypeptide

24     of Claim 1 produced from a recombinant source

25     and lacking FAB region wherein said at least

1                    J. Ravetch

2    one IGGFC region is glycosylated with two

3    galactose moieties."  And --

4        A.    Uh-huh.

5        Q.    -- my question is, in this claim, one

6    which produced from a recombinant source, is

7    that a process or a description of the

8    polypeptide?

9             MR. BERL:  Objection.  Take as much

10            time as you need to answer that

11            question, obviously.

12       A.    So I -- I have -- I have not reviewed

13   this application.  And I haven't seen the

14   published form, actually, so thank you for

15   showing it to me.  I have not reviewed this

16   application.  And I believe it's actually still

17   in prosecution.  This is a publication of the

18   application so I don't know the status of these

19   various claims at this point and what has

20   transpired.

21            But, once again, this -- as I

22   answered in response to your earlier question,

23   in the absence of having the opportunity to

24   review the application and whatever proceedings

25   have occurred in -- in the Patent Office, which

1                        J. Ravetch

2    I imagine are still confidential, I would not

3    be able to provide you with an -- an answer to

4    your question.

5         Q.   So sitting here today, as -- as

6    the -- one of the named inventors -- the first

7    named inventor of this patent application, you

8    can't tell me whether you're claiming a

9    isolated polypeptide or a process?

10        MR. BERL:  Objection.

11        A.   I thought the question was --

12        Q.   Just looking at Claim 7.

13        A.   I thought the question was actually a

14   polypeptide produced by a particular process.

15   And to answer your question, as I said, I would

16   require enough time to review the patent as

17   well as to look at whatever prosecution has

18   occurred to determine what, in fact, is the --

19   the status of the various claims at issue.  So

20   I cannot address your question.  It's certainly

21   possible that -- that the claim refers to a

22   polypeptide produced by a particular method and

23   is providing no further description of the

24   polypeptide, since the polypeptide is defined

25   in Claim 1 with whatever properties it's being

1                      J. Ravetch

2    given.  But that would not be an appropriate

3    answer without the opportunity to review this

4    thoroughly.

5         Q.   And I think I know your answer to

6    this, but let me direct your attention to

7    Claim 9, "an isolated polypeptide of Claim 1

8    derived from a cell line having an enhanced

9    activity of creating alpha 2-6 linkages between

10   at least one galactose moiety and respective

11   terminal sialic acid in the protein's

12   polysaccharide chain."

13        A.   Uh-huh.

14        Q.   Do you see that?

15        A.   Yes, I do.

16        Q.   And sitting here today, can you tell

17   me, the term "derived from a cell line,"

18   continuing on, is that a description of the

19   polypeptide?

20        A.   I -- sitting here today, I can't

21   answer your question.  As I said in -- in

22   reference to Claim 7, it -- it could be a

23   process that is, in fact, used to produce this

24   polypeptide and the polypeptide is defined

25   earlier on, you know.  This -- the general

J. Ravetch

1
2  subject matter of this invention, I can
3  certainly talk about it related to the
4  identification in natural IGG of a composition
5  that conferred antiinflammatory activity.  And
6  recapitulating that activity in a recombinant
7  molecule is one of the topics that we address
8  in this -- in this publication -- sorry, in
9  this patent application, which, of course,
10 relates to publications that we've prepared as
11 well.  So, you know, it -- it is certainly
12 possible that those claims are referring to the
13 process by which one produces the recombinant
14 polypeptide and certain properties that we
15 identify earlier on.  But without reviewing the
16 entire application and prosecution, I can't be
17 certain.
18      Q.   Is it also possible that it's
19 referring to characteristics of the
20 polypeptide?
21      A.   It's unlikely.  Excuse me.  It's
22 unlikely, because we define the characteristics
23 of the polypeptide in the patent as an FC
24 sequence, and that has a defined amino acid
25 sequence.  And, once again, a polypeptide is an

1                          J. Ravetch

2    amino acid sequence that can become

3    subsequently modified.  In this case, specific

4    modifications confer specific biological

5    properties but the polypeptide hasn't -- hasn't

6    changed.  So I'd have to read that more

7    completely to be able to demonstrate what my

8    best understanding would be.

9         Q.   Now, in -- in -- in language, it is

10   possible, of course, to use descriptions or

11   phrases about processes which, in fact, are

12   used to define the characteristics of an

13   object; right?

14             MR. BERL:  Objection.

15        Q.   Let me give you an example.

16        A.   Yes.  I'm lost.

17        Q.   All right.  Fair enough.  Let's --

18   let's take a -- a hypothetical claim.  All

19   right?  How about a method for sweetening

20   pancakes.  All right?  Comprising a -- pouring

21   maple syrup made in Vermont over pancakes.

22   Right?  You understand that?  All right.

23        A.   Fine.  I don't -- I don't --

24        Q.   It's a hypothetical.

25        A.   Yes, no, I'm -- I'm trying to

1                           J. Ravetch

2    understand your hypothetical, and I get it, so

3    right.

4        Q.   The "made in Vermont" portion of

5    that, all right, describes the type of syrup

6    that is being used to sweeten the pancakes;

7    right?

8             MR. BERL:  Objection.

9        A.   I mean, I -- what else do I know

10   about this -- this process?  I mean,

11   distinguishing the process over maple syrup

12   made someplace else and therefore their claim

13   is -- is -- is being defined to a particular

14   subset?  You know, does the patent application

15   provide me with guidance to understand what the

16   terms, you know, are to mean to one of skill in

17   the art?  I'm not a pancake eater.  I'm -- I

18   say right now I'm not one of skill in the art

19   so I think in this case, I can't even offer an

20   expert opinion as one of skill in the art.

21       Q.   Nor was I suggesting that you are an

22   expert in pancakes.  But in simple, everyday

23   English, do you think that that -- this claim

24   would require that somebody who wanted to

25   sweeten their pancakes has to, before they do

1               J. Ravetch

2  it, travel to Vermont, collect sap from trees,

3  boil it down to syrup, and then come back and

4  sweeten their pancakes?  Or is it enough that

5  they have a jar that says "Vermont maple

6  syrup," and they use that to pour on their

7  pancakes?

8            MR. BERL:  Was the "collecting sap

9       from trees" in the claim or not?  I'm

10      lost.

11           MR. SANDEL:  "Collecting sap from

12      the trees --"

13           MR. BERL:  And the claim is --

14           MR. SANDEL:  -- is not --

15           MR. BERL:  Okay.

16           MR. SANDEL:  -- in the claim.

17           MR. BERL:  Okay.

18  A.   All that's in the claim is --

19  Q.   We can --

20  A.   -- "sweeten with maple syrup made in

21  Vermont."  And you're asking is "made in

22  Vermont" a process?

23  Q.   Correct.

24  A.   Right.  So --

25           MR. BERL:  Objection.

1                    J. Ravetch

2        A.   So I can -- I can see a situation

3    where this particular inventor has a, you know,

4    a -- a world of prior art, people who have been

5    sweetening their pancakes with Canadian maple

6    syrup, and he wants to make sure that Vermont

7    maple syrup is distinguished over the Canadian

8    maple syrup.  So it's not the maple syrup

9    that's important but where it was made that's

10   important.

11             So perhaps in his circumstance, "made

12   in Vermont," which is a big deal to people in

13   Vermont, they proudly proclaim "made in

14   Vermont" on their logos, is not irrelevant.  It

15   is, in fact, a -- an -- an important part of

16   the claim.

17       Q.   Okay.

18       A.   So the answer is, one needs to know

19   more in order to understand how to construe

20   that term, and that's exactly the case in this

21   '755 patent.  You need to know what the

22   inventor tells you is the invention and what is

23   discussed during the prosecution to inform an

24   opinion, as I have, of what the claim terms

25   would mean to one of ordinary skill.  And I've

1           J. Ravetch

2    expressed my opinion they mean that it's a

3    method of treatment of particular diseases by

4    recombinant peptides prepared through a certain

5    process.

6           MR. SANDEL:  Go off the record.

7           THE VIDEOGRAPHER:  Going off the

8       record.  The time on the video screen is

9       14:54 and 32 seconds.

10      (A recess was taken from 2:54 p.m. through

11      3:04 p.m.)

12          THE VIDEOGRAPHER:  Going back on

13      the record.  The time on the video

14      screen is 15:04 and 32 seconds.  Please

15      continue.

16   BY MR. SANDEL:

17      Q.   Welcome back.  Now, is there anything

18   about your testimony today that you wish to

19   correct or amend?

20      A.   No.  There's nothing.

21          MR. SANDEL:  Then with that, I have

22      no further questions.

23          THE VIDEOGRAPHER:  Going off the

24      record.  The time on the video screen is

25      15:05 and 8 seconds.

1          J. Ravetch

2      (Discussion held off the record.)

3          THE VIDEOGRAPHER:  Going back on

4      the record.  The time on the video

5      screen is 15:05 and 35 seconds.  Please

6      continue.

7              EXAMINATION

8  BY MR. BERL:

9      Q.   Good afternoon, Dr. Ravetch.  I have

10  a few questions for you.  You were asked by

11  counsel this morning about some consulting work

12  you did in the past for Serono and Novartis.

13  Do you recall that testimony?

14      A.   Yes, I do.

15      Q.   Can you approximate what amount of

16  your income over the last 20 or so years has

17  derived from consulting with Serono and/or

18  Novartis?

19      A.   I think for Serono it would be, you

20  know, essentially nothing.  It was probably a

21  few hundred dollars back 20 years ago when I

22  presented at their facility in Massachusetts.

23          For Novartis, somewhat more, but

24  maybe -- it was at least ten years ago.  And I

25  think I was given about 25,000 a year for two

                        J. Ravetch

1   years, so that's the best of my recollection.

2

3       Q.   And in the last decade, is that a

4   significant portion of your income?

5       A.   No, it's not.

6       Q.   Okay.  Do you have any relationship

7   or have you had any relationship with Biogen or

8   any subsidiary of Biogen?

9       A.   Yes.  I've -- I've had a relationship

10  with an entity called Biogen Ventures, which is

11  a venture investment arm of -- of Biogen.  They

12  invested in a startup company that I founded

13  back in 2007.

14      Q.   And was that a significant investment

15  that Biogen Ventures made in your company?

16      A.   You have to define "significant," but

17  it -- it -- it was a minority position.  There

18  were four lead investors and they had a -- a

19  small side investment.  In their terms, a small

20  side investment, right.  I should point out

21  that Virdante no longer exists so it's not a --

22  a consideration.

23      Q.   Have you had any scientific contact

24  or collaboration with -- with Biogen?

25      A.   I -- I have colleagues at -- at

1          J. Ravetch

2    Biogen, immunologists in particular who I've

3    over the years maintained good relationships

4    with.  I've been invited many times to Biogen's

5    site in Cambridge.  I've lectured, and I've

6    spent the day in discussions related to

7    antibody therapeutics and FC engineering.

8          Q.   If you could take a look at your

9    expert report, which is Exhibit 6, and in

10   particular, in paragraph 24, which --

11         A.   I'm sorry, exhibit -- Exhibit 1, I

12   believe.

13              MR. SANDEL:  Exhibit 1.

14              MR. BERL:  Exhibit 6.

15              THE WITNESS:  Oh, the revised.

16              MR. SANDEL:  The revised.

17              THE WITNESS:  Okay, the revised

18   Exhibit 6, yes.

19   BY MR. BERL:

20         Q.   You were asked about --

21         A.   What -- what paragraph?

22         Q.   Paragraph 24 on page 6.  I -- I just

23   wanted to clear up the record because I'm

24   not -- I'm not sure it was clear.  You were

25   asked various questions about publications of

1                J. Ravetch

2    recombinant expression of human genes.  Do you

3    recall that?

4        A.   Yes, I do.

5        Q.   And were you testifying about what

6    had been done by early 1980 or what had been

7    done by 1981?

8        A.   The statement in the report on

9    paragraph 24, it was early 1980.  I don't

10   believe it includes 1981 citations.

11       Q.   Have -- have you undertaken in

12   connection with this report to determine what

13   had been published between early 1980 and the

14   end of 1981?

15       A.   Not at the present time.

16       Q.   If you could take a look at what I'll

17   have the court reporter mark as -- 8? -- as

18   Exhibit 8.

19       (Exhibit No. 8 was marked for

20       identification.)

21   BY MR. BERL:

22       Q.   For the record, Exhibit 8 is entitled

23   "Expert Declaration of David Jackson."  Have

24   you seen this document?

25       A.   Yes, I have.

1                    J. Ravetch

2       Q.    Do you understand this to be an

3  expert declaration submitted by an expert on

4  behalf of Biogen in this case relating to claim

5  construction?

6       A.    That's my understanding.

7       Q.    And if you could turn to page 7 -- or

8  page 4, excuse me, paragraph 7, do you see

9  there's a section entitled "Level of One of

10  Ordinary Skill in the Relevant Art"?

11      A.    Yes, I do.

12      Q.    Why don't you take a moment to review

13  that paragraph.

14      A.    I see that.

15      Q.    Now, my question is:  If that

16  definition of the person of ordinary skill in

17  the art were applied, would any of the opinions

18  expressed in your expert report or in your

19  deposition today change?

20      A.    No, they would not.

21      Q.    Now, you testified earlier today that

22  you have made recombinant polypeptides

23  yourself; is that right?

24      A.    That's correct.

25      Q.    And you're familiar with others

1                    J. Ravetch

2    likewise expressing recombinant polypeptides?

3         A.   I am.

4         Q.   Are you familiar in your experience

5    in the field with a situation in which the same

6    person or entity prepares a -- a biological

7    composition and then administers that

8    composition to treat disease?

9         A.   I am.

10        Q.   And can you explain that a little

11   more?

12        A.   Well, for example, there are programs

13   at the National Institutes of Health where they

14   have investigators at the NIH who are

15   investigating the biological properties of

16   potentially promising new therapeutics, for

17   example, in autoimmune disease or in cancer,

18   and they are able to produce the recombinant

19   molecules in order to do clinical trials with

20   that material.  So the same laboratory would be

21   involved in designing the recombinant molecule,

22   for example, and then the production that's

23   done is under their supervision and the

24   proteins that were obtained from that are

25   administered to patients in clinical trials.

J. Ravetch

1    That's one of many examples where, quote, an

2    investigator initiated clinical study.

3    Q.    And are there other examples of the

4    same person or entity preparing the biological

5    composition and administering it to treat a

6    disease?

7    A.    So prior to the recombinant days of

8    production, in fact, that was fairly routine

9    that a -- a laboratory would have a -- a

10   promising observation, the material that was

11   identified was then produced, and -- under the

12   laboratory or the entity's supervision, and

13   that material was then used in a clinical

14   study.  And in some of the cell-based therapies

15   that, in fact, are going on at the Rockefeller

16   University, those precise parameters are in

17   place where the same laboratory has people in

18   the laboratory who are preparing various

19   cellular preparations that are then

20   administered to patients by other members of

21   the laboratory for clinical studies.

22        MR. BERL:  That's all the questions

23   I have.

24        MR. SANDEL:  I just have a couple

1                    J. Ravetch

2          brief follow-up questions.

3                    EXAMINATION

4     BY MR. SANDEL:

5          Q.   Outside the context of clinical

6     trials, are you aware of any instance in which

7     the person administering the pharmaceutical is

8     also the person who prepared the

9     pharmaceutical?

10         A.   I'm not quite understanding the

11    distinction.  These are using approved drugs?

12         Q.   Correct.

13         A.   So if a drug is approved, you would

14    be able to potentially obtain it commercially,

15    in which case you would obtain the material and

16    perform the clinical study.  And there's lots

17    of examples of that, of course.  In the IVIG

18    world, you know, there's an immense interest,

19    for example, in using this preparation for

20    treating Alzheimer's disease, and investigators

21    at Cornell use the hospital grade IVIG and

22    perform their clinical studies.

23         Q.   I understand.  Sorry.  Perhaps I

24    misspoke, or I wasn't clear.  Outside of the

25    context of clinical trials, just treatment of a

1                    J. Ravetch

2   patient, have you yourself as a physician ever

3   treated a patient outside the context of

4   clinical trials with a recombinant product that

5   you yourself made?

6        A.   Outside of the context of an

7   investigation into --

8        Q.   Correct.

9        A.   -- a clinical pathway, I personally

10  don't have any experience in that -- in that

11  application.

12       Q.   All right.  Are you aware of any

13  situations outside of the context of clinical

14  trials in which a physician has treated a

15  patient with a recombinant product which they

16  themselves produced?

17       A.   I know of one interesting example.

18  It has to do with the -- changing the

19  formulation of a recombinant product where a --

20  a formulation was developed for a particular

21  therapeutic area and the physicians themselves

22  took it upon themselves to change the

23  formulation by diluting the product

24  dramatically and then using it in a new

25  application.

1          J. Ravetch

2          So that's where the investigator has,

3    in fact, taken the product, the recombinant

4    product, and essentially manufactured a new

5    version of it.  Interestingly, in that -- that

6    particular case, the results were so -- were so

7    satisfactory, the dosing being 1/100 the

8    dosing, and the formulation being different,

9    that the manufacturer now obtained a new

10   product line based on that new formulation.  So

11   the answer is it -- it does happen.

12       Q.   All right.  And in the example you

13   just gave, the physicians weren't -- they

14   didn't transform the cells or produce the

15   recombinant polypeptide; correct?  They

16   diluted --

17       A.   They reformulated the recombinant

18   polypeptide.  But it was a new preparation, and

19   sufficiently new that it was patented and

20   considered to be a -- a new product species

21   that was now, you know, used in different

22   applications.  So, you know, similar,

23   different, whatever.

24       Q.   So going back to my original

25   questions, did -- are you aware in any instance

1                    J. Ravetch

2    in which a physician treated a patient with a

3    recombinant polypeptide which they themselves

4    had produced?

5         A.   You know, I'm not --

6              MR. BERL:  Outside the context.

7         Q.   Outside the context of clinical

8    trials, yes.

9         A.   Right.  I -- no, I'm not.

10        Q.   In your experience as a physician,

11   does the average physician have the equipment

12   and facilities in their office by which to make

13   a recombinant polypeptide?

14             MR. BERL:  Objection, lack of

15             foundation, vague.

16        A.   So it would depend upon what type of

17   physician.  Academic physicians in tertiary

18   medical centers often have research facilities,

19   research laboratories.  My colleagues at

20   St. Jude's, for example, have a GMP

21   manufacturing facility which is at their

22   disposal to do exactly this, to make clinical

23   grade material for clinical investigation.  But

24   it is usually -- I don't know of a -- of a case

25   otherwise -- in the context of an investigation

1                    J. Ravetch

2    into a particular pathway and -- and perhaps

3    treatment.

4            I mean, it -- it's an interesting

5    question because I'm -- it -- it -- it comes up

6    not infrequently where a particular

7    manufacturer has a recombinant product which,

8    for whatever reasons, is not progressing

9    through clinical approval by the FDA, and those

10   materials are obtained by academic groups to

11   continue the process of manufacturing and

12   clinical studies.

13       Q.   But that's within the context of the

14   clinical studies; correct?

15       A.   It -- it's usually preapproval status

16   that I'm aware of.

17       Q.   And you're not aware of any instance

18   of a -- an approved drug, approved

19   recombinant -- approved recombinant polypeptide

20   being administered by the doctor who also then

21   went to the lab and made the recombinant --

22       A.   So -- so I think --

23       Q.   -- polypeptide?

24           THE REPORTER:  Made the

25   recombinant?

1          J. Ravetch

2          MR. SANDEL:  Polypeptide.

3     A.   The best answer is I haven't

4   investigated that question.  Certainly in the

5   case of clinical trials I'm well aware of that,

6   but for the case of approved drugs, you know,

7   I'm thinking of colleagues in other countries

8   where manufacturing and clinical -- of -- of --

9   of clinically approved drugs, in fact, can

10  occur in a -- a different context.  So I'd have

11  to reserve answering until I've had a chance to

12  actually explore that question.

13    Q.   Now, you -- you're a practicing

14  physician; correct?

15    A.   Practicing?  No, I haven't

16  practiced --

17    Q.   Oh.

18    A.   -- in a while.

19    Q.   You're a member of the department of

20  oncology; is that right?

21    A.   Not for a while now.  When I was at

22  Sloan-Kettering, I was a member of the clinical

23  hematology service.  But I am a physician

24  scientist who has spent his career in basic

25  research and clinically relevant applications.

1                    J. Ravetch

2        Q.    Have you ever had an opportunity to

3    treat patients?

4        A.    I have.

5        Q.    Ever treat patients with a

6    recombinant protein or polypeptide?

7        A.    Yes.

8        Q.    What recombinant polypeptides or

9    proteins have you used?

10       A.    Mostly antibody therapeutics.  Sorry.

11   Mostly antibody therapeutics, Recombinantly

12   prepared antibody therapeutics for various

13   oncologic indications, for example, as far

14   as --

15       Q.    Herceptin?

16       A.    Herceptin, Rituximab are some of the

17   molecules that I've published on and have, in

18   fact, used in patients.

19       Q.    And in instances where you treated a

20   patient with Herceptin, did you yourself go and

21   make the -- the Herceptin prior to

22   administering it to the patient?

23       A.    I did not.

24            MR. SANDEL:  I have no further

25       questions.

Page 171

1        J. Ravetch

2            MR. BERL:  No further questions.

3            THE VIDEOGRAPHER:  Thank you.  Here

4        marks the end of videotape number 4,

5        also marks the end of today's proceeding

6        in the deposition of Dr. Jeffrey

7        Ravetch.  Going off the record.  The

8        time on the video screen is 15:22 and 3

9        seconds.

10

11        (Deposition adjourned at 3:21 p.m.)

12

13            _____

14                Dr. Jeffrey V. Ravetch

15    SUBSCRIBED AND SWORN TO BEFORE ME

16    THIS _____ DAY OF _____, 2011.

17    _____

18    (Notary Public)

19    My Commission expires: _____

20

21

22

23

24

25

1           C E R T I F I C A T E

2     DISTRICT OF COLUMBIA:

3

4           I, MARY ANN PAYONK, CRR-RDR, CBC, CCP,

5     CLR, shorthand reporter, do hereby certify:

6           That the witness whose deposition is

7     hereinbefore set forth was duly sworn, and that

8     such deposition is a true record of the

9     testimony given by such witness.

10          I further certify that I am not related

11    to any of the parties to this action by blood

12    or marriage, and that I am in no way interested

13    in the outcome of this matter.

14          IN WITNESS WHEREOF, I have hereunto set

15    my hand this 12th day of September, 2011.

16

17    _____

18          MARY ANN PAYONK, CRR-RDR, CBC, CCP, CLR

19          Shorthand Reporter

20

21

22

23

24

25

Page 173

1                --------------- I N D E X -------------

2       WITNESS                 EXAMINATION BY          PAGE

3       JEFFREY V. RAVETCH

4               Examination by Mr. Sandel   6, 164

5               Examination by Mr. Berl        157

6       --------------- E X H I B I T S ------------

7       NO.                                   MARKED

8       Exhibit No. 1 . . . . . . . .           11

9       Exhibit No. 2 . . . . . . . .           97

10      Exhibit No. 3 . . . . . . . .          124

11      Exhibit No. 4 . . . . . . . .          124

12      Exhibit No. 5 . . . . . . . .          124

13      Exhibit No. 6 . . . . . . . .          122

14      Exhibit No. 7 . . . . . . . .          147

15      Exhibit No. 8 . . . . . . . .          160

16

17

18

19

20

21

22

23

24

25

1  NAME OF CASE:  In Re:  Biogen '755 Patent
2  DATE OF DEPOSITION:  August 30, 2011
3          1.  To clarify the record.
           2.  To conform to the facts.
4          3.  To correct transcription error.
5

   Page _____ Line _____ Reason _____
6  From _____ to _____
7  Page _____ Line _____ Reason _____
   From _____ to _____
8

   Page _____ Line _____ Reason _____
9  From _____ to _____
10 Page _____ Line _____ Reason _____
   From _____ to _____
11

   Page _____ Line _____ Reason _____
12 From _____ to _____
13 Page _____ Line _____ Reason _____
   From _____ to _____
14

   Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
   From _____ to _____
17
18
19          _____
                  JEFFREY V. RAVETCH
20 SUBSCRIBED AND SWORN TO BEFORE ME
21 THIS _____ DAY OF _____, 2011.
22 _____
23 (Notary Public)
24 My Commission expires: _____
25