```
1

2                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
3                     Civil No. 10-CV-2734-CCC

4

5     IN RE: BIOGEN '755 PATENT
      LITIGATION,
6
                                            Transcript of
7                                           Markman Hearing

8     ------------------------------

9

10                                          Newark, New Jersey
                                            January 12, 2012
11

12

13    B E F O R E:   HONORABLE CLAIRE C. CECCHI,
                         UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19              - - - - - - - - - - - -
              Pursuant to Section 753 Title 28 United States Code, the
20    following transcript is certified to be an accurate record as
      taken stenographically in the above-entitled proceedings.
21

22

23                              S/Yvonne Davion
                                Yvonne Davion, CCR
24                              Official Court Reporter

25
```

```
 1

 2                    A P P E A R A N C E S :

 3


 4         NICHOLAS GROOMBRIDGE, ESQ.
           CATHERINE NYARADY,ESQ.
 5         JULIA TARVER-MASON WOOD, ESQ.
           JOSEPHINE YOUNG, ESQ.
 6         MONIKA WROBEL, ESQ.
           For Biogen IDEC MA
 7

 8         KEVIN H. MARINO, ESQ.
           JOHN D. TORTORELLA, ESQ.
           For Biogen IDEC MA.
 9

10         SUSAN ALEXANDER, ESQ.
           MARTHA BORN, ESQ.
           BART NEWLAND, ESQ.
11         For Biogen Idec MA

12         WAYNE BARSKY, ESQ.
           TIMOTHY BEST, ESQ.
13         AMELIA MARGUET, ESQ.
           For EMD, Serono and Pfizer
14
           ROBERT GOODMAN, ESQ.
15         DAVID BERL, ESQ.
           BRUCE GENDERSON, ESQ.
16         GEORGE BERDEN, ESQ.
           For Bayer Healthcare Pharmaceuticals
17
           DAVID DeLORENZI, ESQ.
18         SHEILA McSHANE, ESQ.
           For EMD Serono, Pfizer and Novartis
19
           LESLIE MORIOKA, ESQ.
20         GREGORY PARKER, ESQ.
           For Novartis
21

22

23

24

25
```

1          THE COURT:   We are here on In re: Biogen, the

2    '755 patent litigation.  The case number is 10-2734.   And

3    before we begin, let's just start with our appearances and then

4    we can discuss how the day is going to proceed.  All right? So

5    let us begin.

6          MR. MARINO:   Good morning, your Honor.

7          THE COURT:   Good morning.

8          MR. MARINO:   Kevin Marino on behalf of Biogen

9    Idec M.A.  Seated with me counsel table is Nicholas Groombridge

10   of Paul, Weiss, Rifkin, Wharton & Garrison.  Also in the

11   courtroom, your Honor, in no particular order, my partner John

12   Tortorella from Paul, Weiss; Catherine Nyarady, Josephine

13   Young, Monika Wrobel.  Law clerk Nathaniel McPherson will be

14   doing the presentation for us.

15         Also your Honor seated in the well, Susan

16   Alexander, the executive vice-president and general counsel of

17   Biogen; as well as Martha Born, vice-president and chief

18   litigation counsel; Bart Newland, vice-president of I.P.

19   litigation for Biogen and our expert witness Dr. David Jackson.

20         THE COURT:   Which is the expert witness? Hello.

21   Welcome.

22         MR. JACKSON:  Thank you very much.

23         THE COURT:  Nice to see you.

24         MR. MARINO:  Nice to see you, your Honor.

25         THE COURT:   Nice to see you as well.

1          MR. DeLORENZI:  Good morning, David DeLorenzi with

2     the Gibbons firm with my colleague Sheila McShane on behalf of

3     EMD Serono, Inc., Pfizer Inc., and Novartis Pharmaceuticals

4     Corp.  I am going to allow my colleagues to introduce

5     themselves to your Honor.

6          THE COURT:  All right.  Very well.  Thank you.

7          MR. BARSKY:  Good morning, your Honor.  Wayne

8     Barsky; Gibson, Dunn & Crutcher of Los Angeles.  I have the

9     privilege of representing EMD Serono, Inc and Pfizer, Inc.  And

10    with me in the courtroom are my colleagues Timothy Best.

11         MR. BEST:  Good morning, your Honor.

12         THE COURT:  Good morning.

13         MR. BARSKY:  And Amelia Marguet.  Also with us

14    today, your Honor, from Merck Serono in Geneva is Giampiero

15    DeLuca who is the senior vice-president for licensing and

16    intellectual property of Merck Serono.

17          Thank you, your Honor.

18         THE COURT:  Thank you very much.

19         MR. GOODMAN:  Good morning, Bob Goodman from

20    Greenbaum Rowe for Bayer.  And I am here with, from the

21    Williams & Connolly firm in Washington, D.C., David Berl,

22    seated here, Bruce Genderson and Jonathan Porter.

23         THE COURT:  Good morning.

24         MR. GOODMAN:  Your Honor, also from Bayer, Susan

25    Thatcher Strawbridge Shenae (sic) and our expert witness Dr.

1        Jeffrey Ravetch is here as well.

2                     MS. McSHANE:  I'm Sheila McShane.  As well we have

3        Leslie Morioka and Greg Parker for the Novartis Corporation.

4        And with us also is Tim Wiseman who is in the well as well.

5                     THE COURT:   Excellent.  Thank you very much.

6        Did we get everyone? We got everyone.  Okay.  Very well.

7                     Well, just by way of background I want to note the

8        following:  The parties are here obviously for a claims

9        construction hearing and it's on Biogen's '755 patent which is

10       directed to the drug Avon ex and it's used for the treatment of

11       Multiple Sclerosis.  And we are addressing claim Number 1 of

12       the patent.  More specifically the meaning of the following:

13       Produced by a non human host transformed by a recombinant DNA

14       molecule.

15                     And I understand through the parties' briefing

16       that you are not only in dispute over the meaning of the terms,

17       but you also have an issue with respect to scope.  And I

18       imagine that will be addressed today as well.

19                     And we had an order entered and we had a prior

20       telephone conference regarding how today was going to proceed.

21       I envision it proceeding with the tutorials first and then

22       followed by the argument.  But, if there has been any change or

23       discussion with the parties and you want to let me know of some

24       modification to that, I would be fine and happy to listen to

25       that.

1          Any issues?

2          MR. GROOMBRIDGE:   No, your Honor, we are planning

3   to proceed exactly as the Court had directed in the telephone

4   conference.

5          MR. BARSKY:  Same with respect to us.

6          THE COURT:   Very well.  So everyone is in

7   agreement.   So if you would like to proceed, I have all the

8   handouts from you folks.   So, I think I am ready to go.

9          MR. GROOMBRIDGE:   Thank you, your Honor.

10          THE COURT:  Thank you.

11          MR. GROOMBRIDGE:  I will proceed with the tutorial

12   portion on behalf of Biogen.

13          And this by way of overview, your Honor, what we

14   would like to do is first talk about the background from which

15   the patent emerged.   That's item 1.  And then items 2 through 6

16   what we would like to do here is, if it's not presumptuous, is

17   try to equip the Court with an understanding of what these

18   terms are which we think is probably a good idea as a basis for

19   resolving the disputed issue that the Court accurately captured

20   just now.

21          THE COURT:   By the way, does anyone disagree with

22   what I placed on the record in terms of what the issue is for

23   today? We are all in agreement .

24          All right.  Go forward.

25          MR. GROOMBRIDGE:  So the patent, your Honor,

1    covers a method of treating diseases with a synthetic version

2    of a naturally occurring protein which we will refer to as

3    interferon beta.  And what I would like to do then is just run

4    through these various bullets here and talk about what led up

5    to the emergence of this patent and we will get underway.

6              So, starting with the history of interferons.

7    Interferons were discovered by accident, like many things in

8    science, in the 1950s.  And what interferons are, they are a

9    class of materials produced naturally in the body that help the

10   body to fight viral infection and certain other attacks.

11             And they were originally discovered in a manner

12   that has some similarity with the discovery of antibiotics.  A

13   mistake was made in the lab and it was seen that something had

14   happened that impeded the progress of a virus, and that led to

15   further research.  That was in the 1950s.

16             Scientists over the 1960s and 1970s moved forward

17   trying to understand what was going on.  They came to learn

18   that there was not just one compound, but a family of them

19   which got different names.  One of them not germane to our

20   discussions today is interferon alpha.  But then came

21   interferon beta.  And as scientists learned more about this

22   material, they became interested in using it to treat viral

23   infections and cancer and that interest grew and grew.

24             By the 1970s that interest had reached almost a

25   fever pitch.  There was a belief that interferons would be to

1    viruses, what antibiotics had been to bacterial diseases.  That

2    this had the potential to be a miracle drug that would

3    transform human medicine and protect human beings against

4    viruses like influenza in the same way that Flemings' discovery

5    of antibiotics had transformed medicine with respect to

6    bacterial diseases.

7            Now, the problem with that was that the only

8    source for interferon beta was gathering it from human cells.

9    And the natural product is not made by healthy cells.  It's

10   only produced when the cell is attacked by something like a

11   virus.

12           So the only way to make this back in the 1970s was

13   to collect human cells, samples they might get from hospitals,

14   grow them up in some sort of vessel, challenge them, meaning

15   putting in some kind of virus, causing the cells to produce

16   this interferon as they naturally would, and then trying to

17   collect and purify that.

18           And the problem with that was that it was very

19   difficult to collect and purify and the material was produced

20   by the cells in tiny, tiny amounts.  So that all you ended up

21   with was this material of tremendous medical interest but

22   available only in minuscule quantities at huge cost.

23           And just to drive that home, your Honor, to

24   illustrate this, I don't know if your Honor will remember this

25   magazine.  It's sort of a trip down memory lane.  This

1    particular, this one is the cover of it from July of 1979.  And

2    it had an article about interferon.  And here is the teaser on

3    the cover, Interferon, Miracle Cure at $22 billion per pound.

4    That's a very graphic illustration of what was going on, that

5    it was impossible to get this material in any form or quantity

6    in which it could really be used.

7              In fact, it wasn't even possible to get enough for

8    full scale clinical trials.  There had been some small clinical

9    trials done which were considered very promising.  But, no one

10   could find a way to gather enough of this to unleash its

11   perceived medical promise.

12             And you might say, well, why couldn't they just

13   make it.  The world is full, certainly New Jersey is full of

14   chemical plants making drugs.  What is the problem with simply

15   manufacturing this in the quantities in which the medical

16   profession would have wanted it?  The problem is this, that

17   interferon isn't like say an aspirin or isn't like the drug

18   Lipitor.  Those would be called small molecules.  This is a

19   protein.  And it's very big and very complicated and very, very

20   difficult to make.

21             Let me just explain that a little bit more.

22   What's a protein? Well, proteins are the things that make all

23   living organisms work.  Essentially in any living organism,

24   whether it's a bacteria, a plant, an animal or one of us,

25   what's going on in the cells of that organism are proteins are

1      at work engaged in just about every process that goes on in the

2      organism.   Every cell contains thousands of them and they are

3      the things that makes the cell run.

4              In many functions, and the Court might have, I am

5      sure, have heard some of them enzymes, hormones, antibiotics,

6      these are examples of proteins, and we should look here at what

7      a protein is structurally.

8              Proteins are made up of amino acids.   There are 20

9      different amino acids that can be used to make proteins.   The

10     classic way to represent the structural protein at its most

11     basic level -- and I stress most basic because there are, and I

12     think we will hear perhaps from the defendants some more about

13     other aspects of this structure -- the first order, the first

14     level of this is the protein is a string of amino acids joined

15     together.   And they are sometimes represented, as we have here,

16     like a string of pop it beads.

17             Each bead is an amino acid, and there are 20

18     different amino acids that could be used.   So we could have 20

19     different colors of bead.

20             And a word that is sometimes used synonymously

21     with protein is polypeptide.   There is a potential dispute in

22     this case, or perhaps there is a real dispute that I don't know

23     about, the relationship between protein and polypeptide.   For

24     purposes of this tutorial, I am going to try to avoid saying

25     anything that might be provocative to my adversary.

1          THE COURT:  Understood.

2          MR. GROOMBRIDGE:  They are either the same or they

3     are very close.  And why they are called polypeptides, well the

4     bonds that join the beads together, if we are going to follow

5     that metaphor, are called chemical, are called peptide bonds.

6     Because there's a lot of them, it's a polypeptide.

7          Now, I have depicted this as a string.  And

8     certainly the basic structure is one joined to the next to the

9     next to the next in a line.  But, one of the things that is

10    very important to understand is that in its natural forms in a

11    cell the protein doesn't exist like that.  It is curled up or

12    conformed into a very complex shape.  And its shape is very,

13    very important because it's the shape of the protein that

14    enables it to do its job.  If the shape is wrong, it won't

15    work.

16          In fact, your Honor, many genetic diseases are

17    caused because a particular protein has some mistake in it that

18    makes it misfold and then it won't work and then that can have

19    traumatic and very bad consequences for the individual

20    involved.

21          Now, interferon beta is composed, it turns out, of

22    166 amino acids joined together.  So, if we represented it as a

23    string of beads, it would be 166 beads.

24          This is a standard model.  We didn't create this.

25    We took this from the internet.  This is what is called a space

1       filling model.  It shows you that the purpose of this, your

2       Honor, was to give some idea of the complexity of the

3       structure.  This is the reason why, even back in the 1970s, it

4       was not possible simply to go out and manufacture it, because

5       it is an enormously complicated structure.  And in fact at that

6       time the structure in the sense of the order of what those

7       amino acids were and what order they were in was unknown.

8              Even had it been known, there would have been no

9       means to make it in a chemical fashion.  The only way that

10      proteins could be made meaningfully at that time was by

11      harnessing the mechanisms of cells to do the work for you.

12             And so if we now turn to claim one, what I would

13      like to do is just walk through the claim and talk about some

14      of the concepts here, again not for purposes of argument, but

15      simply to try to put them in the hierarchy of ideas that

16      matters for the purposes of this claim.

17             We begin with a method for immunomodulation here.

18      The method for immunomodulation involves treating a patient,

19      administering to a patient a therapeutically effective amount

20      of the composition.  And then the composition has to include a

21      recombinant polypeptide produced by a non human host,

22      transformed by a recombinant DNA molecule.

23             So what that's telling us is we are going to make

24      a protein that either is beta interferon or is close enough

25      that it will have the right kind of activity, and then we are

1        going to give it to a patient.

2                Now, the Court, adequately, I think quite

3        concisely captured the dispute here.  And I think I don't need

4        to dwell on this.  The question, interesting in this case, the

5        dispute is not so much of what does "transformed by" mean, what

6        does "produced by" mean, but it's really over who has to do the

7        transforming and who has to do the producing and when.

8                And ultimately the question is does this have to

9        be done by the same person who administers the drug, or does it

10       have to be done, or can it be done by someone else.

11               THE COURT:   This is a question for everyone and

12       you can certainly address it as it comes up, but my question at

13       this point is to what extent there is actual agreement on the

14       meaning of the words at issue versus the scope.  Because we

15       have gone through a significant amount of briefing and the

16       emphasis has changed through the briefs as to what the issue

17       is.

18               MR. GROOMBRIDGE:   Exactly, your Honor.  I believe

19       that at this point there is no dispute, certainly no meaningful

20       dispute, over the meaning of "produced by" and the meaning of

21       "transformed by".  I think this is perhaps a rather unusual

22       claim construction dispute where we are not talking about what

23       which it is, the two sides agree.  But they disagree about the

24       legal consequences of this.  And your Honor is entirely correct

25       that the issues evolved through the briefing.

1          One point I would like to make here is at the

2     beginning of the briefing, there was some to and fro about

3     whether this was even a proper claim construction issue.  The

4     defendant said it was, Biogen said it wasn't.

5          We have come to the point where the issue is fully

6     joined.  And we would not want the Court to invest time in

7     deciding that issue.  Biogen is entirely comfortable having

8     that decided now.  We might as well go ahead and get that issue

9     resolved, regardless of whether it falls into the proper bucket

10    of claim construction or otherwise.

11         THE COURT:  I am going to refer to that here, just

12    so everyone understands, as the scope issue versus the term of

13    the meaning issue.  So in terms of the scope issue, it appears

14    that all sides are looking for a decision on that.

15         Is that correct?  Yes?

16         MR. BERL:  Yes, your Honor.

17         THE COURT:  All right.

18         MR. GROOMBRIDGE:  So, we will just go through

19    this and talk about what are the key elements here.

20         So this patent emerges from this background of how

21    do we unlock the tremendous medical potential, that tantalizing

22    promise of here is a compound that has the potential to be

23    tremendously beneficial in medicine but yet we can't use it

24    because we don't know what it is.  We can't make it.  And we

25    don't know how it works in the body.

1          And so what the patent is saying here is first

2     this is a method for immunomodulation.  That's one of the ways

3     that we could use it.  Immunomodulation simply means that it

4     either stimulates or suppresses the immune system.  It's

5     nothing more than that.  It could move it up or move it down.

6     And that's what the patent says in this quotation.

7          The next thing, I will dwell a little more on

8     this, is DNA, because the transformation piece of this involves

9     necessarily an understanding of DNA.  So let me just run

10    through that hopefully in a way that will not try anyone's

11    patience.

12          THE COURT:  No, it's fine.

13          MR. GROOMBRIDGE:  So what is DNA?  Well, we see

14    there a perhaps crude representation of a cell and we will come

15    back to that.  The cell is, in essence, a sac.  It has an outer

16    wall, a membrane that contains a liquid phase cytoplasm,

17    although I would think of it as something like soup.

18          And then in this particular one we see a nucleus

19    with chromosomes which we would find in most human cells, but

20    not all of them, for example.  And in the chromosomes are

21    structures that consist very largely of DNA.  And if we were to

22    unwind a chromosome, what we would see is a tremendously long

23    strand of DNA.

24          And DNA in its typical form consists of these two

25    strands wound around one another, the famous double helix.  If

1    we unwind that to make it easier, the structure, what we see is

2    something like a ladder.  And the ladder is made up, in turn,

3    of a series of these U building blocks or units called

4    nucleotides.  And we see one represented graphically there.

5        The phosphate part of that is the sides of the

6    ladder.  And the other pieces, the sugar and the base, are the

7    rungs of the ladder.  And it is the base here that contains the

8    information content of DNA.  Because the significance of DNA is

9    that it is --

10        THE COURT:  I'm sorry, where is the base?

11        MR. GROOMBRIDGE:  The base, your Honor, is right

12    here.  And --

13        THE COURT:  Where would that correspond to the

14    pictorial?

15        MR. GROOMBRIDGE:   There is four of them and here

16    is how they --

17        THE COURT:  Oh, I see.

18        MR. GROOMBRIDGE:   That's where they fit in.  So

19    we go back, what we see on one side of the ladder we have got

20    the side of it, then we have got kind of half a rung here.  And

21    what's going to happen is on the other side I am going to get

22    the half rung.  And it turns out that of these four bases, it's

23    easier just to call A and T and G and C, A and T like to join

24    together, and C and G like to together.  And that is why the

25    two strands attach almost like two parts of a zipper.  And in

1      their natural form they will join together.

2              And then once they get to be a long enough piece,

3      they will twist around and form that helix.  And it is the

4      information content, the blueprint, many people refer to DNA as

5      the blueprint for living things, what it is that that order of

6      A's and B's and C's and T's is what contains the instructions

7      for making proteins and polypeptides that will then go to work

8      in the body.

9              The patent talks about this and it describes it

10     more concisely and more eloquently than I have done in the

11     definitions piece of the patents there.  And I believe that

12     there is no dispute about this, but it's right in there.  And

13     we see there a definition, DNA sequence.

14             Now, polypeptides, we already looked at but just

15     to review the bidding, it's a string of amino acids that are

16     joined together by peptide bonds.  And in its natural form they

17     kind of coil up into a shape.  And the patent again describes

18     this, it says polypeptide is a linear array of amino acids

19     connected by peptide bonds.  Linear array, I just want to call

20     out that linear means that just like a string of beads, it has

21     to be one single strand, not branches.  But, it's like a string

22     of beads, if I would drop it in my pocket and coil it up and it

23     would still be linear within the meaning of this definition.

24             So, how do I get from DNA to polypepties.  If DNA

25     is the blueprint, what is the mechanism for putting that

1    blueprint into practice?  And that involves an intermediate

2    step.

3              The best way I could describe this is to say that

4    DNA is like the file copy of instructions.  And in the organism

5    we want to safeguard that file copy because we never know when

6    we might want to go back to it and make another protein from

7    this repository of information in DNA.

8              So, in order to accomplish that, what we are going

9    to do is make a working copy that we will actually use to

10   produce the proteins.  And that working copy is RNA, a closely

11   related compound.  We say MRNA is for messenger.  And we will

12   see in a minute why it's called a messenger.

13             We take the information from the DNA, we transfer

14   it into RNA, and then that information is in turn going to be

15   transferred into the sequence of amino acids that make up the

16   polypeptide.  And that, those two processes, DNA to RNA and RNA

17   to protein or polypeptide are called respectively transcription

18   and translation.  So we can put those in there.

19             I have a terrible time remembering which is which.

20   And the only way I managed to do it is they are alphabetical,

21   transcription comes before translation.

22             Now, when we take the two together, the whole

23   process, that is called expression.  So again we can label

24   this, the whole process of going from DNA to a polypeptide is

25   called expression, sometimes referred to as a gene expression.

1          How does that happen? Well, let's go back in to

2     look at our cell again here with the DNA and the chromosomes

3     and the nucleus.  We can zoom in there and there is some DNA.

4     Let's assume the cell has decided, for whatever reason, it

5     would like to go to that file copy and say let's make a protein

6     according to the instructions that are contained in this

7     particular piece of DNA.

8          And the way that that's going to happen, I won't

9     dwell too much on the details, but we will separate it out into

10    a single strand, a particular enzyme, a specific special

11    purpose protein will come along, and that enzyme will assemble

12    RNA so that it replicates the information content of the DNA.

13    It will take similar building blocks.  And they are essentially

14    identical except that we, instead of the T, we have a U here.

15    But, for practical purposes, that doesn't matter for this case

16    I believe.

17         And it will make this RNA that matches and

18    includes information comparable to the DNA.  And then the RNA

19    will go on out, it will leave the nucleus and it will go out

20    into the cytoplasm.  That's why it's called the messenger RNA.

21    It's carrying a message of information out into the cytoplasm,

22    the soup that surrounds the nucleus.  And out in the cytoplasm

23    it's going to encounter something called a ribosome.  And a

24    ribosome is basically a factory for making polypeptides and

25    proteins.

1          Here is how that works.  The ribosome will

2     essentially lockout -- and I apologize to the eminent

3     scientists present in the room because I am going to murder

4     some of these concepts -- but it essentially will lock onto

5     this strand of RNA.  It possesses the ability to read that

6     information and correlate --

7          THE COURT:   I'm sorry, what locks onto the strand

8     of the RNA?

9          MR. GROOMBRIDGE:   This, the structure called the

10    ribosome which is a sort of complex assemblage of protein and

11    it also includes some DNA of its own.  And its job within the

12    cell is as a factory to make proteins.  And what it can do is

13    it can take the instructions from the sequence of nucleotides

14    and correlate that to the amino acids that it wants to join

15    together in the right order to make any given protein.

16          So, understanding how that process works, we have

17    one more concept I want to introduce which is a codon.  This is

18    nothing more than a group of three of those ladders.  The

19    reason we call it a codon is the three ladders taken together

20    are a code for one of the 20 amino acids.  And so what the

21    ribosome -- and that again is defined in the patent -- the way

22    the ribosome works and the codon is produced is floating around

23    in this soup are building blocks to make proteins.

24          And you might say, I thought to myself well that

25    seems very convenient.  But the cell is actually very effective

1       at recycling.  So proteins are not only being created, they are

2       being mucked apart as well.  And the constituents can be

3       available to be reassembled if needed.

4                       So, floating around out in the cytoplasm, we have

5       the requisite building blocks.  Amino acids that are in essence

6       tagged with, and it's what we call an anti code on something

7       that will enable the ribosome to collect the right amino acid

8       and put it together in the right order.  So those ones will

9       match up right there.

10                      And then the ribosome will move along and it will

11      read the next block of three and it will say ah ha, that's a

12      different amino acid.  Let me find one of those and gradually

13      it will move forward.

14                      As it moves along it will join them together.  It

15      will discard the pieces of transfer RNA that it no longer needs

16      and it will build up a protein like this.  And this is how

17      cells work.  It's how, in any organisms, how those proteins are

18      created.  And as we see as this process continues -- let me see

19      if I can speed this up a little here -- that what begins to

20      happen is the protein -- as it leaves the ribosome, this native

21      protein will already begin to fold up in a double shape.

22                      So that's the mechanism by which we go from DNA to

23      RNA to proteins and we end up with the right sequence of amino

24      acids.

25                      Now, the patent includes the sequence for beta

1    interferon, and this is Figure 4 of the patent.  Let's just

2    blow that up and call out the beginning of those 166 amino

3    acids is right there.  We see the first three.  And what we

4    have got is the first three happen to be an amino acid called

5    methionine which is abbreviated MET, then serine which is

6    abbreviated SER and tyrosine abbreviated TYR.

7           And underneath them we see that group of three DNA

8    basis that is the code for each one of them.  The patent then

9    has the whole sequence for all 166.  There is the last part of

10   it.  And if we follow that, what we would find at the end of

11   all of this is that if we can get that DNA into a cell and have

12   the cell or the cellular machinery, the ribosomes, do their

13   job, this is what we would get.

14          Now, the cell is what's going to be referred to as

15   a non human host.  And hosts here just means a cell --

16          THE COURT:  Go right ahead.

17          MR. GROOMBRIDGE:   No problem.   The host just

18   means a cell whose machinery we are going to harness to make

19   these proteins and the patent gives a number of examples.  Most

20   commonly they could be bacteria such as e-coli, a name that's

21   mostly known to us in less beneficial contexts, or they could

22   be animal cells.  The patent gives examples of, for example,

23   monkey cells could be used for this.

24          The patent makes the point, the scientific point,

25   that there is no reason that they should not be human.  The

1       reason the patent says non human host cell is a legal, not a

2       scientific reason.  Because we have decided as a society that

3       it is a good idea not to have patents of humans.  It's called

4       bits of human.  That's why it says non human host cell.  But

5       essentially this could be any kind of cell that we can harness

6       to make the desired protein for us.

7               And the way we would harness it to do that is

8       through this transformation and the recombinant DNA molecule.

9       I will explain those two together because they can vehemently

10      fall into one piece.

11              Here we see a strand of DNA, the double helix.

12      So, some part of this --

13              THE COURT:  Let's just, let me ask you a

14      question.  In terms of this strand of DNA or the sequence of

15      amino acids that we are dealing with here, is that a sequence

16      that was just discovered?  Had it been previously discovered?

17      What is the history of that?

18              MR. GROOMBRIDGE:  So, the history of this, your

19      Honor, is the sequence of those 166 amino acids was not known.

20      Now, one of the frankly major facts in this case is that there

21      was several teams of scientists around the world racing with

22      one another to try to decipher that sequence.  And who did it

23      first is, I suspect, going to be an issue in this case.  And I

24      will talk a little bit more about that and I will be very

25      surprised if we don't hear about it from my learned colleagues

1        here.

2               But, putting aside the work of these groups of

3        scientists who are in this race, the rest of science did not

4        know what that sequence was.  And one of the things that

5        actually was important was a group of scientists, completely

6        unrelated to these, in the Fall of 1979, published a sequence

7        that was the first 13 out of the 166.  They hadn't been able to

8        get past that.

9               THE COURT:   When was that?

10              MR. GROOMBRIDGE:   That was, it was first made

11       known to the world in a conference in New York in October of

12       1979.  And then it was subsequently published in a leading

13       scientific journal in January of 1980.  And that became a fact

14       that helped the folks who were in the race that actually took

15       that piece of information and said ah ha --

16              THE COURT:  It's a point of departure.

17              MR. GROOMBRIDGE:   It's a point of departure.  So,

18       now recombinant DNA, what recombinant means is that we have

19       recombined it.  Before we can recombine it, we have to

20       uncombine it.  So, the details of this are certainly beyond

21       anything that we need to delve into, although there is a great

22       deal of detail should we wish to.

23              But, we can take a piece of DNA and we can cut it.

24       One of the tools that was available in the toolbox of the

25       molecular biologist at that time was something called a

1    restriction enzyme which is like a pair of molecular scissors.

2    But, it doesn't cut the DNA anywhere.  It only cuts in a

3    particular place when it encounters a specific sequence.  So it

4    would be that this particular pair of scissors looks for

5    C,C,G,A,T.  And if it finds that sequence, it cuts.

6         And because I know that, I can use that to excise

7    out, to snip out sections of DNA that I am subsequently going

8    to work with.  And that's what we have shown here.  We have cut

9    one out.  And then what we would do with it in this

10   transformation process, the next thing, the next concept that

11   may be important is something called a plasmid.  A plasmid is

12   a, typically a circle with DNA, double stranded DNA that has

13   the capability that it can be put into a cell.  And when it's

14   put into a cell, as that cell reproduces, the plasmid will

15   reproduce and the progeny --

16         THE COURT:  Is that the DNA running around in a

17   circle?

18         MR. GROOMBRIDGE:  That's the DNA running around

19   in a circle joined up end to end.  And this, the significance

20   of this is this is a vehicle by which I can insert DNA into a

21   cell.  So that the transformation is the putting that DNA into

22   the cell.  The recombination is then this -- that's the

23   definition of plasmid.  I won't go on that.

24         If the Court sees in the patent these figures,

25   circles, they are all plasmids.  And the purpose of this is

1    just to say this is a particular one that they were working

2    with.  But, what I can do is, using those molecular scissors, I

3    can cut the plasmid and then I can splice it into the piece of

4    interest there.  And now what I have got is a recombinant

5    molecule because I have recombined this with a foreign piece of

6    DNA, and that again is defined here.

7            And now that recombined piece is something that I

8    can put into a cell.  And that's the step of transforming in

9    the language of this patent.  And I introduced that into a non

10   human host cell and now I have a transformed non human host

11   cell.  And if I do this in the right way -- the cell is a

12   living organism.

13           If I treat the cell with appropriate care and

14   affection and I feed it, it will multiply, just in exactly the

15   same way that if I go home after I have been away and my kids

16   are at home I may find cheese in the refrigerator on which

17   cells have multiplied.

18           This one will multiply.  And as it multiplies, it

19   will, each copy, each descendent will have the same foreign

20   piece of DNA in there.  And so because bacteria in particular

21   grow at a prodigious rate, this gives me a way to make vast

22   quantities of these transformed cells.

23           Now, again, if I treat them with appropriate care

24   and attention under the right conditions, and that could be non

25   trivial, but under the right conditions I can persuade the cell

1    to go through that process of DNA to RNA to protein and I can

2    harness its machinery, its ribosomes and such like to make

3    protein out starting with this foreign piece of DNA that was

4    never in the cell, but it's the one thing I am interested in

5    that I have transformed it with.  And it will produce the

6    protein that I am looking for.

7            And because I can grow vast quantities of these

8    cells, I can now produce this protein in far greater amounts.

9    Still a difficult process with a lot of steps to it, but I can

10   get it in vastly greater amounts than would have been possible.

11   And to come back full circle then what I would do with that --

12           THE COURT:   Now, is that something that you would

13   have to do from time to time?  Or based on that process being

14   performed once, would there be a sufficient result?

15           MR. GROOMBRIDGE:   So typically, your Honor, what

16   you would do is the process of manipulating and recombining the

17   DNA, you would do once.  And, in fact, the Food and Drug -- if

18   you are going to sell this as a drug, the Food and Drug

19   Administration if you started doing it again would say we have

20   to go back to step one and get a new approval.

21           So typically what you would do is you would

22   manipulate this and you might have a number of experiments.

23   But, when you found one that you liked, what you would do is

24   then you would guard that jealously and that would be -- and

25   you would create a cell line with these transformed cells.  And

1       the way you would manufacture the protein is you would grow up

2       in an industrial reactor, batches of this.  But they would all

3       be genetically identical copies of that original one that you

4       had transformed.  And this is what is shown here is you would

5       grow them up --

6                    THE COURT:   So it contemplates doing the

7       transformation only once.

8                    MR. GROOMBRIDGE:   That's what would be

9       contemplated by the nature of this invention.  You would do the

10      transformation.  You would then have this organism that you can

11      use as your source.  And when you would then cultivate that

12      into living things, you would make sure you don't want it to

13      die, and as you want to produce the protein, you could grow up

14      batches of it, persuade them to produce the protein, and then

15      purify that.  Depending on what kind of cells you use, they may

16      secrete the protein, or you may have to destroy the cell to get

17      it out.

18                   But, they will produce it and you can take it and

19      purify it because you have it in a quantity that far surpasses

20      anything that you would get from the natural source.  And

21      ultimately that's what we are looking for at the end of the

22      day, to harness the medical potential of this.  We want to be

23      able to get this stuff in a pure form.  And that's what the

24      goal of the patent was.

25                   So to come back full circle, we take that then

1     that we have produced in this fashion and administer that to a

2     patient.  And that is the subject matter of the patent here

3     that it was directed to, is how do we deliver on these glimmers

4     of hope that, you know, these frustratingly great glimpses that

5     we have of a radical new drug that we just can't get to.  And

6     the answer is well, here is a technology that will enable us to

7     do that.

8             Now, this is merely the backdrop to it.  Of course

9     the issues about well, is there a difference in terms of patent

10    law between the process and the medical use of it.  Issues, I

11    would say, for the argument piece of this.  But this is simply

12    the backdrop from which this invention emerged.  And that

13    concludes our portion of the tutorial.

14            THE COURT:  Excellent.  Thank you very much.

15    Thank you.

16            Who would like to go next?

17            MR. BARSKY:   Thank you, your Honor.  Wayne Barsky

18    again.

19            THE COURT:   Thank you.

20            MR. BARSKY:   First I just want to invite the

21    Court at anytime, as it has already, to interrupt and ask any

22    questions.  I would much rather direct my comments to matters

23    of interest.

24            THE COURT:   That sounds fine.

25            MR. BARSKY:   So the Court can go through a canned

1    presentation which will, in many ways, replicate some of the

2    materials that the Court just heard from my friend Mr.

3    Groombridge.

4            THE COURT:   I am sure we will have a very

5    detailed legal argument later too.  So I understand that this

6    is the more quiet section of today's presentation.

7            MR. BARSKY:   I am guessing that's right, your

8    Honor.

9            I am going to cover three principle subjects.  And

10   those are really the state of the art in 1980 at the time that

11   the very first application was filed by Dr. Fiers in the U.K.

12           The U.S. application was actually filed a year

13   later in 1981 in the United States.  But, the very first one

14   was filed in the U.K. in April of 1980.  So we are going to

15   talk about the state of the art at that particular time.  And

16   you will see that many of the things that I have to say will

17   cover some ground that has been covered --

18           THE COURT:   Which is fine.

19           MR. GROOMBRIDGE:   -- already.  And I am only going

20   to cover the two issues which I think your Honor has already

21   probably noticed are going to be the focus of the claim

22   construction portion of our discussion that will come later.

23   And that is the process of transformation and the process of

24   production.  These are the claim terms that your Honor

25   identified right at the beginning of our hearing.

1          THE COURT:   And I have read all of your briefing

2    and I am very familiar at this point with it.  But I appreciate

3    whatever light you can shed on that.

4          MR. BARSKY:   Great, because that's at the

5    epicenter of the ultimate dispute here.  So I am going to focus

6    on those two things.

7          But I thought I would start by giving a little bit

8    more of a response to a couple of the questions that your Honor

9    asked.  The first was the question of scope.  And certainly

10   it's correct that it sounds like we all want the Court to

11   address the issue of scope.  That's really what is at issue

12   here.  Because we do agree fundamentally on what it means to

13   transform a host cell with a recombinant polypeptide and to

14   produce a recombinant polypeptide from a transformed cell at

15   bottom.

16         THE COURT:   When we get to the argument section,

17   I won't waste the time now doing this, but I would like to more

18   further explore the specific agreement you might have as to the

19   exact terms at issue.

20         MR. BARSKY:   Sure.  We certainly --

21         THE COURT:   Again I understand the overarching

22   issue of what I am determining to be the scope.  And then we

23   can get into some of the existing case law and how the parties

24   rely upon that.

25         MR. BARSKY:   Certainly, your Honor.

1          And in Biogen's slides, and it's in slide 18 in

2     the book that was provided to you, we suggest on this issue of

3     scope, the question was posed in that first bullet point, and I

4     will pause so you can get it --

5          THE COURT:   Go ahead.

6          MR. BARSKY:    The question was posed by Biogen

7     that the dispute is, are "produced by" and "transformed by"

8     steps in the claimed methods.   And your Honor identified this

9     as the scope issue.

10          And then the second bullet point talks about what

11    Mr. Groombridge described as well, if so, who needs to do it.

12    Who needs to perform those steps, and when.   And we are

13    obviously going to be addressing those issues.

14          So the way we would frame the issue, and we are

15    going to talk about this a lot more later so I will be very

16    quick before I move on, is that whether or not these are

17    processes that are required by the claim and required to be

18    performed in order to practice the claim.   That's one aspect of

19    the scope issue.

20          The second aspect of the scope issue, and this

21    will be addressed to, particularly by Mr. Berl during his

22    presentation later today, is the issue of, that Mr. Groombridge

23    also raised, which is who needs to do it and when and what does

24    the case law say about that.   So that's the first point I

25    wanted to make.

1          The second point or question that your Honor

2     raised was about the history of the DNA sequence for interferon

3     beta.  And you were told by Mr. Groombridge correctly that the

4     first 13 amino acids were identified in October of 1979, and

5     that those and that that sequence was published in January of

6     1980.

7          What I would like to do is just take two minutes

8     to just finish the story and give the Court the punch line

9     here.  The punch line is as follows:  A researcher from Japan

10    by the name of Taniguchi who was affiliated with an

11    organization called Sugano was the individual who first

12    identified the complete and accurate DNA sequence interferon

13    beta.

14          He did that by the end of February of 1980 and he

15    circulated that sequence to hundreds of molecular biologists

16    throughout the world in the period of late March and early

17    April of 1980.  And now I need to slightly correct something I

18    just said.  I said that he, Dr. Taniguchi did it.  Actually Dr.

19    Taniguchi provided his sequence to a scientist named Weissman

20    who is a co-founder of Biogen and Dr. Weissman circulated that

21    sequence to hundreds of scientists throughout the world during

22    that period of time.

23          Mr. Groombridge raised the point that we might

24    dispute the question of or we might have something to say about

25    who was the first to identify the complete DNA sequence for

1      interferon beta.  Actually, your Honor, the federal Circuit has

2      already resolved that issue.  Because there was a proceeding

3      called an interference among three scientists named Fiers, who

4      is the inventor of the '755 patent; a scientist in Israel named

5      Revel, R-e-v-e-l, and Sugano, affiliated with this Dr.

6      Taniguchi.  And there was a contest in the United States Patent

7      Office as to who had the priority of invention with respect to

8      the DNA sequence for interferon beta.

9              That proceeding was resolved in favor of Sugano

10     based on the work of Taniguchi, and the federal Circuit

11     affirmed that decision in 1993.  So there is actually a federal

12     Circuit decision that resolves the very issue that your Honor

13     raised earlier today, namely this priority of invention.

14             THE COURT:   I am sorry you are saying when was

15     that?  What year was that?

16             MR. BARSKY:   1993.  Actually that decision, I

17     believe, is actually quoted in one of the six briefs that was

18     filed in this case.

19             THE COURT: I believe you're right.

20             MR. BARSKY:  All right.  So I promised the Court

21     that I would cover these three subjects.  I am going to do it

22     quickly.  My prepared remarks are about 15 minutes, your Honor.

23     And then I am going to turn it over to Bayer and Novartis and

24     we may hear from Dr. Ravetch on some of these other issues as

25     well.

```
 1                    THE COURT:    Sounds fine.

 2                    MR. BARSKY:    I know that was a long warmup but

 3     now I am going to start my presentation.

 4                    THE COURT:    All right.  Go right ahead.

 5                    MR. BARSKY:    First, you have already heard from

 6     Mr. Groombridge that interferon, the interferons as a class

 7     were discovered in the 1950s.

 8                    One interesting fact that I don't believe Mr.

 9     Groombridge covered, but I expect he will agree with me on, is

10     that the interferons are proteins that have the function of

11     carrying signals to other cells.   And the signal that

12     interferon carries to other cells is that there is the

13     potential or looming invasion of a virus or some other pathogen

14     such as a cancerous cell.   This particular cell has a name, or

15     excuse me, this particular protein has a name.  It's technical.

16     It's called cytokine.

17                    But, the point here is that you can think of

18     interferons generally and interferon beta in particular as kind

19     of the Paul Revere of proteins.  Because when the cells are

20     exposed to a viral invasion, the cells are induced to express

21     or produce interferon beta which then carries the message to

22     surrounding cells that they should expect and prepare for and

23     guard against a viral invasion or some other foreign danger to

24     the cell.

25                    By 1980, certainly at the time that the
```

1          application was filed here, interferon beta had been identified

2          as an important and promising protein within the interferon

3          family.  And as the patent makes clear, it had been extensively

4          purified and characterized and the scientists were excited

5          about the potential that interferon beta presented for

6          controlling viruses and tumors.  And this is all reflected in

7          the text of the '755 patent.  I believe it's in the section

8          entitled Background for some of the invention.

9                    You saw the Omni Magazine cover from 1979.   Well,

10         here is a Time Magazine cover from March of 1980 to give you an

11         idea just how much the interferons had, by this time, made an

12         impression on the public consciousness.

13                   And, once again, what was being experimented with

14         at the time, and even used in small scale clinical studies, was

15         something that you will see in the patent is referred to and

16         you will hear during the course of today's presentation, it was

17         native interferon beta.  It's sometimes called in the

18         literature, I think in the patent as well, authentic interferon

19         beta.  And this is to signify that this is the interferon beta

20         that is produced by the cells, by human cells naturally.  It's

21         the naturally occurring interferon beta that's produced when

22         those cells are facing that viral challenge.

23                   THE COURT:  How effective is this on cancer at

24         this point?  I know we are dealing with this as a Multiple

25         Sclerosis drug, but just out of curiosity, what has resulted in

```
 1          the treatment of cancer through the application of this?
 2                    MR. BARSKY:    Interestingly enough, your Honor, I
 3          think it's fair to say as follows:    The interferons as a class,
 4          and interferon beta in particular, did not live up to this
 5          enormous promise and hope that the scientific and the medical
 6          communities had in 1980.    And I would really just prefer to
 7          leave it to some of the distinguished scientists who are here
 8          today to talk about specific applications for cancer.
 9                    THE COURT:    That's fine.
10                    MR. BARSKY:    But, it is certainly not a treatment
11          that is approved in the United States by the FDA, for example.
12          And I am not aware of any widespread use of the interferon beta
13          to treat tumors or cancer, despite the fact that it did show
14          that it had --
15                    THE COURT:    No problem.    It showed some promise
16          but it hasn't really fleshed out.
17                    MR. BARSKY:    That's my understanding, your Honor.
18                    THE COURT:    Okay.
19                    MR. BARSKY:    All right.    So, the problem as you
20          already heard and as is reflected in the patent is that native
21          interferon beta, authentic, the natural, naturally-produced
22          interferon beta is only produced in infinitesimal amounts in
23          some cells of the body and in some circumstances.
24                    So, as Mr. Groombridge told you earlier, and
25          absolutely correctly, there was precious little of it to go
```

1    around.  And as a result, there was an enormous interest in

2    finding a way to create greater availability of quantities of

3    interferon beta.

4            And at the time the principle technology that

5    scientists and the medical community looked to to solve this

6    problem of limited supply was recombinant DNA technology, and

7    your Honor has heard a lot about that and read a lot about that

8    already.

9            So I will just summarize it as a pretty neat

10   technology that allows you to take some human DNA that codes

11   for a protein of interest and put it into a non human cell such

12   as a bacterium, e-coli you will hear discussed later today,

13   take that human DNA that you are interested in, put it into a

14   bacterium and then use that bacterium, that population of

15   cells, to produce the protein that you are interested in.

16           Perhaps, I'm sorry, perhaps that protein of

17   interest is insulin.  By 1978 we had proof of concept -- excuse

18   me, by 1977 we had prove of concept for the utility of

19   recombinant DNA technology because it had been used to produce

20   an important protein called somatostatin in 1977, again in a

21   bacteria e-coli.

22           In 1978, we were able to use recombinant DNA

23   technology to produce insulin in bacteria.  Insulin is a

24   protein that is necessary to all human life and it was in

25   terribly short supply.  The medical community was actually

1    looking to animals and to pancreases of animals for to obtain

2    insulin, and there was only a limited supply.

3          So, all three of these proteins, insulin,

4    somatostatin, and human growth hormone, by 1980 had been

5    produced in bacteria and e-coli.  It turns out, your Honor,

6    that e-coli is a very friendly bacteria for cell biologists.

7    Because as we will hear in a little while, it has this ability

8    to simply take that human gene, absorb it into its own genome,

9    its own DNA, and then produce it as if it were -- as if it was

10   its own DNA.  And that is why, particularly in the early days

11   but even today, e-coli as a bacteria is so popular.

12         As a result of the fact that we had this terrible

13   shortage of interferon beta on the one hand, and this very

14   promising technology recombinant DNA technology that had been

15   proven to produce human proteins on the other, you had this

16   worldwide race among scientists to first clone and then

17   express -- and I am going to define both of those terms in a

18   moment -- but to clone and then to express interferon beta in

19   bacteria.

20         And at that time it was bacteria, although there

21   are other non human host cells that have obviously been used to

22   produce human proteins.

23         Those scientists were located all around the

24   world.  Dr. Goeddel is not in New Mexico.  He was actually

25   somewhere over here in San Francisco, it just looks like that

1    on our map.  Sugano and Taniguchi were located actually in

2    Japan.  But, Dr. Taniguchi was actually working in Harvard

3    beginning in January of 1980.  And Professor Michelle Revel was

4    at the Weissman Institute of Science in Israel.  Dr. Fiers was

5    at the University of Gent in Belgium.

6            And your Honor may remember I mentioned this

7    three-way interference among scientists who were competing to

8    establish priority to the DNA sequence of interferon beta.

9    That was Dr. Fiers who was affiliated with Biogen; Professor

10   Revel from the Weissmann Institute, and Sugano located in Japan

11   and working through Taniguchi who was then at Harvard.  So, we

12   have this worldwide race to clone and express interferon beta.

13           This brings me, your Honor, to the portion of my

14   presentation about transformation, because it's one of the key

15   processes that is at the core of our discussion here.  What is

16   transformation?  It is the first or it is one of two steps,

17   let's say, in the production of our recombinant protein.

18           What one does, at a very high level, is take

19   genetic material from a human being, from human cells, you

20   isolate the human gene that you are interested in, perhaps it

21   is the gene coding for insulin or gene coding for interferon

22   beta, whatever it may be, and then you cause that genetic

23   material to be absorbed by or taken up by another organism, in

24   this case this attractive depiction of a bacterium.  Now, at a

25   high level is this notion of transformation that you are going

1    to hear about.

2              The second process you are going to hear about is

3    production.  So, you start with that bacteria that has been

4    transformed with the human gene that you are interested in,

5    and then you grow, as Mr. Groombridge said, you feed that

6    transformed cell, you create a colony of cells that all have a

7    copy of that human gene that you are interested in.

8              And then if you have done your job right, if you

9    have built in the proper switches to turn on the expression or

10   the production of that protein, and you will hear about that

11   from Dr. Ravetch in a moment, if you are lucky at the end of

12   the day you get a protein which can then be separated from this

13   bacterial colony purified and then used to treat people for

14   whatever condition it is you have isolated that protein.

15             THE COURT:   Do you believe then the

16   transformation occurs once as well as plaintiffs?

17             MR. BARSKY:   Yes, it does.  It only occurred

18   once.  And, in fact, just by way of background, I can't speak

19   for Bayer, they will have to address this themselves, but

20   certainly with respect to Serono and the transformation that

21   allows Serono to today produce Rebif, that occurred many years

22   ago and long before the patent.

23             THE COURT:   What year did that occur?

24             MR. BARSKY:   Pardon.

25             THE COURT:   What year was that?

1          MR. BARSKY:   If it's all right with your Honor, I

2     will actually defer to Dr. DeLuca because he will know exactly

3     when that occurred.

4          DR. DeLUCA:   Transformation was made in about

5     1981.

6          THE COURT:   1981.  Thank you.

7          MR. BARSKY:   So, let's drill down a little bit on

8     these two processes of transformation and production.

9          I said before that this one of the first early

10     steps is to isolate or clone the gene that you are interested

11     in, the insulin, somatostatin, whatever it may be.  What does

12     that mean?  It means you have to identify, out of this massive

13     human genetic material, billions of nucleotides.  Tens of

14     thousands of genes, where the gene that you are interested in

15     begins and where it ends.

16          And as you heard already, the basic building

17     blocks, the nucleotides, the amino acids for the proteins, but

18     the nucleotides are basically all the same.  It's a defined

19     set.  And so to be able to isolate or clone that gene is this

20     first step in this process of transforming a host cell.

21          So here we have shown that the isolation of the

22     gene of interest, that gene that codes for the human protein is

23     then placed in this circular piece of bacterial DNA and that

24     has, it's called a plasmid.  The human DNA is this darker

25     section.  And the rest of it is just this ring or circular

1      piece of self-replicating DNA.  You then cause that plasmid to

2      be taken up or absorbed, in this case, by bacterium.  And by

3      doing so you have now taken that human gene and placed it

4      within the genome of the bacteria.

5              Your Honor is going to see in the patent, in the

6      file history and perhaps here during the course of the

7      discussion today, the use of the phrase heterologous to

8      describe both the DNA itself, as well as the host.  Here is

9      what I mean by that.  All heterologous really means is, in this

10     context, is it's a different DNA.

11             And so when a DNA molecule, for example, that

12     circular plasmid we looked at earlier, when a recombinant DNA

13     molecule combines both bacterial DNA and human DNA, it is often

14     referred to as a heterologous DNA molecule.

15             Now, we call this recombinant, your Honor --

16     perhaps it's obvious but I will just state it -- we call it

17     recombinant because what we have done is what have combined or

18     recombined this human DNA with the bacterial DNA in this

19     plasmid.

20             So you cause that to be taken up by the bacteria.

21     And now once you have done so you have what is referred to also

22     in the patent and the file history as a heterologous host,

23     which is simply this notion that you have a host cell that is

24     supporting both its own DNA, as well as this foreign DNA, in

25     this case human DNA.

```
 1              Now, let's just drill down a little bit more on

 2     production and then I will be done.  We started, of course,

 3     with that transformed host cell when we placed the plasmid

 4     containing the human DNA into that bacteria.  So you have that

 5     transformed host cell.  And we talked about growing it and

 6     producing the, ultimately at the end of the day if you are

 7     lucky and you have done your job right, producing the protein.

 8              Let me see if I can summarize in an extremely high

 9     level what you heard from in greater detail from Mr.

10     Groombridge and which we will also hear from Dr. Ravetch, which

11     is that all polypeptides or proteins are essentially produced

12     with the following sequence:  It's the, you go from DNA to MRNA

13     to polypeptide or protein.  At least in recombinant DNA

14     technology that is the sequence that is followed.

15              And so here what this is going to depict is the --

16     and I am going to stop this for one second if I can.  So you

17     start with these bacteria.  You have grown them.  And if you

18     have done your job right, what happens is that that piece of

19     human DNA, just like the bacterial DNA, is going to be

20     transcribed into what's called this piece of MRNA called an

21     MRNA transcript.  That MRNA transcript is then translated into

22     a polypeptide.

23              Was that fast enough?  Let me see if there is a

24     way I can stop this.  But this is a high speed version of what

25     you saw the slower speed version of earlier.
```

1              But, to what we are seeing here is that this

2       transcript, the MRNA transcript, what's missing is the ribosome

3       that, among other things, is the ribosome that Mr. Groombridge

4       pointed to earlier.  But, this MRNA transcript is used to build

5       the amino acids which link one to another in sequence and form

6       a polypeptide.

7              Now, the very last -- and this is the obviously

8       the animation of that occurring.  In summary, you start with

9       the transformed host cells having the human DNA of interest.

10      That then is transcribed into MRNA.  And the MRNA is then used

11      by the cells' machinery, by the bacteria, in this case the

12      bacteria's machinery, to build this linear array of amino

13      acids.

14             Now, my last comment is the following, Mr.

15      Groombridge mentioned perhaps there would be some discussion

16      about whether a polypeptide is the same or different than a

17      protein.  There is no question that in the art today those

18      terms are sometimes used interchangeably.  But there is really

19      no need to have any dispute about it for purposes of this claim

20      construction because we have stipulated to the definition of a

21      polypeptide.

22             And what we have stipulated to was the definition

23      that can be found at column -- I have lost my notes -- but I

24      believe it's column 8, lines 61 to 64.

25             And in the case of the '755 patent, and this isn't

1        important for the claim construction obligations that the Court

2        has to shoulder today, but it is important for the case to know

3        that the patent has a very specific definition of the term

4        polypeptide.  And it is not that definition that makes it

5        interchangeable in all respects with a protein.

6                    With that I will conclude and turn it over to my

7        friends from Bayer Novartis.

8                    THE COURT:  I'm sorry, you are going on behalf of?

9                    MR. BERL:  Your Honor, you have already heard two

10       presentations relating to transformation production.  We had

11       planned to have Dr. Ravetch present those concepts as well.

12                   If your Honor would find that useful, we would be

13       happy to have him do so and answer any questions you have.  If

14       it's not worthwhile for your Honor, if you think --

15                   THE COURT:  If there's something that he would

16       like to add that's different, I would be happy to listen.  If

17       it's more of the same, I think I have a handle on what's been

18       presented.

19                   MR. BERL:  Why don't we have him present just one

20       clarifying issue.

21                   THE COURT:  Whatever you feel is appropriate is

22       fine with me.

23                   MR. BERL:  Okay.  Thank you very much.

24                   DR. RAVETCH:  While we are getting the

25       presentation set up, I just wanted to give a historical

1    background to recombinant DNA story.

2          When I started my Ph.D. in 1973 at the Rockefeller

3    University, none of this was possible.  We couldn't isolate a

4    gene from a mammalian cell.  We couldn't clone it.  We couldn't

5    express it in a heterologous cell.  We couldn't even sequence

6    it.

7          So this technology has really evolved in the last

8    40 years, and we now take it for granted because it's so

9    incredibly powerful.  But, it represented the synthesis of many

10   scientists working for many years starting about in the fifties

11   on bacterial genetics and on biochemistry that coalesced in the

12   '70s the early to mid-70s to recognize that a technology was

13   possible that would allow the interchangeability of these

14   molecular entities, DNA from one organism to another.  And that

15   was quite a breakthrough.

16         It was really not anticipated that even though DNA

17   seemed to be the same in all different organisms, that it would

18   be recognized by a bacteria as its own.

19         THE COURT:   Now, would interferon be present in a

20   healthy person?

21         DR. RAVETCH:   Interferon beta can be found in low

22   concentrations in healthy individuals depending upon the normal

23   homeostatic mechanism.  So, the way interferon works in the

24   immune system is as part of the regulatory circuit and it's

25   able to modulate.

1          THE COURT:  So, would it be present even if not

2     challenged with something?

3          DR. RAVETCH:  It can be.  It depends upon the

4     exact circumstances.  So, to say we are not challenged, we are

5     always being challenged.  We live in a world of soup of

6     microorganisms and we are constantly maintaining this kind of

7     balance between responding in a productive way, and over

8     responding in a pathogenic way.  So that these mechanisms are

9     all balanced on a knife's edge.

10          I think we are going to slide five.  So I wanted

11     to clarify really one point.  As I said, you have heard about

12     all of this technology, but I wanted to just talk a little bit

13     about polypeptide and protein.  Not that there is a dispute

14     because the patent makes it very clear what's meant.

15          But, as you heard this process of transcription

16     and translation gives rise to a polypeptide.  And the patent

17     makes it very clear that a polypeptide is a linear array of

18     amino acids linked together in a certain -- in the polypeptide

19     bond fashion.  And when the word "linear array" is meant, is

20     used, it really shouldn't be misunderstood to imply a

21     structure.  It's not a rod.  It's not a string of beads.  What

22     it is is a sequence of amino acids that's absolutely specified.

23          Can you go back please? Absolutely specified by

24     the DNA sequence.  And because of that interchangeability, it's

25     actually possible to not only go from DNA sequence and predict

1        what the polypeptide will be, but to go from the polypeptide

2        sequence and work backwards and write out a DNA sequence that

3        can encode that polypeptide.

4                    And the patent actually addresses that in the

5        elements of the claim.  I can't really see what the -- it's

6        called A.  All right.

7                    In Section A of the claim it talks about DNA

8        sequences derived from certain plasmids that have the capacity

9        to hybridize other sequences.  That's a way of saying that you

10       can have a certain degree of mismatch between the DNA sequence

11       that you are starting with, and the sequence that you are

12       picking up.

13                   So it gives you a population of sequences.  And it

14       says in the end that you could have degeneracy of the code.

15       So without going into much of the detail, the code that

16       specifies a particular amino acid is not absolute in most

17       cases.  You could have several codons all specifying the same

18       amino acid.

19                   In the case of glycine, there are six such codons.

20       In the case of methionine, only a single codon.  But, it means

21       that there are six different ways you could write out the code

22       for methionine, which means that you can actually pick up

23       different DNA sequences that might all encode methionine.

24                   THE COURT:   You are saying you can write out the

25       code in different ways?

1          DR. RAVETCH:  You write out the code for the

2     polypeptide.  There's only one way to write out the polypeptide

3     sequence, that is the linear array of amino acids.  But, there

4     are multiple ways you can write out the DNA sequence and by

5     extension, the RNA sequence, that will give rise to that

6     polypeptide sequence.

7          So, the polypeptide represents what we also call

8     in the art the primary sequence, the primary structure.  So, we

9     have different designations for the degree of structure a

10    protein will adopt.  And the first structure, if you will, is

11    not a structure.  It's simply the sequence.  And it's called

12    the primary structure.

13         So the polypeptide is the primary amino acid

14    sequence.  And as you saw from the patent illustration of the

15    figure showing the sequence of beta interferon, it's written

16    out as a linear array, linear string of amino acids

17    corresponding to a linear string of nucleotides specified as

18    codons.

19         What happens after that, how a polypeptide starts

20    its folding process and its maturation process is what gives

21    rise to the biologically functional molecule.  So, just because

22    you have a polypeptide sequence, doesn't always mean it's going

23    to function for its intended purpose.  It can change because

24    this folding process involves a variety of different steps that

25    are required to create this specific three dimensional

 1          structure that confers its function.

 2                    THE COURT:  So, you are saying it must fold upon

 3          itself.

 4                    DR. RAVETCH:  In order to preserve its function,

 5          it must fold upon itself.  And in some cases other things can

 6          happen to it after it's folded and I showed on this slide the

 7          addition of sugars to it, for example.

 8                    This is a process called glycosylation.  It's a

 9          very common process in mammalian cells.  It doesn't occur in

10          e-coli.  It's a very rare process in prokaryotes and that

11          kingdom.  And this glycosylation can be important or it can be

12          irrelevant.

13                    In the case of beta interferon, the patent told us

14          that if you remove the sugars, you still retain activity.  So,

15          we presume that the glycosylation therefore is not important.

16          But, it can cause structural differences on protein as well.

17          There's some other things that as example of some of the things

18          that can happen to polypeptide in the protein molecules.

19                    So proteins will always have polypeptides.  The

20          polypeptide isn't changed by the folding or by the

21          glycosylation.  It's still a polypeptide.  What has happened is

22          that it adopted specific shapes and can undergo specific

23          processes that are posttranslational after you have made a

24          protein that could effect its function.

25                    So that's, I think, a subtle point but in the

1      business of molecular biology, it becomes a very important

2      point.

3              Let's go ahead just to the recombinant DNA and

4      just to clarify a few points there.  Move ahead, please.  This

5      is a hybridization I told you about.  We can skip ahead, unless

6      you have got any questions about this process.

7              So you heard about the recombinant DNA, how you

8      take these little circles of DNA which are naturally found in

9      bacteria.  They were identified because they confer antibiotic

10     resistance.  And that was a major step that Boyer and Cohen

11     identified that really enabled the recombinant DNA technology

12     that these are autonomously replicating, they can make copies

13     of themselves, they can live within bacteria and they can be

14     moved into bacteria.

15             And the surprise was you can take a foreign DNA,

16     human DNA, insert it into these circles, another -- those

17     enzymes were the contribution of Paul Berg (ph), for example,

18     and another major breakthrough in this field.  So we are kind

19     of naming our process as we go along.  But each one led to the

20     enabling of a technology that allowed for these molecules to be

21     created.  Next slide.

22             But, what was, I think, a surprise was that you

23     can take those combinations of bacterial DNA and human DNA,

24     insert them into, for example, bacterial cells by the process

25     of transformation and the DNA would not only be taken up, but

1    would be replicated.  It would be recognized by all the

2    bacterial machinery, the enzymes that replicate DNA in the

3    bacterium as if it was one molecule.  It didn't distinguish

4    between the human and the bacterial DNA sequences.

5              And it tolerated it quite well so you can identify

6    a host cell that was now transformed by this DNA and that could

7    be grown up, as the next slide I believe shows, into a large

8    culture, as you heard, of cells, all of which contain this now

9    recombinant piece of DNA.  And this was the way we cloned the

10   gene.  This was how we identified a gene.  When I was doing

11   this in my graduate work, it was to identify genes for antibody

12   molecules.

13             And what was an anti-body?  It was the actual

14   molecular structure.  And that is how we did it.

15             THE COURT:  Okay.  And I see that you are using

16   the language host cell line.  What would you define as the

17   difference between cell and the cell line?

18             DR. RAVETCH:  I think that is a question better

19   posed to counsel.  But, the way we use it, when we use cells,

20   we are actually using the cell lines.  So, a bacterial cell

21   represents a strain of bacteria that are able to be profligated

22   so they have the property of continuous growth.

23             THE COURT:  So are you saying, you are using it

24   interchangeably?

25             DR. RAVETCH:  In mammalian cells, for example, you

1    can isolate a cell from the body, a skin cell from the body,

2    for example, and you put it in culture, it won't survive for

3    more than 10 or 20 generations.  Then it undergoes a process

4    called senescence.  So we develop cell lines that are immortal

5    that will last forever in the laboratory and can be grown

6    continuously.

7             So cell lines are what we practically use for

8    these kinds of technologies.  If you want to express a

9    recombinant protein in a mammalian cell, you are using a

10   mammalian cell line like a Chinese hamster or ovary cell line

11   or a fibroblast cell line.

12             THE COURT:  Okay.

13             DR. RAVETCH:  Next, please.  So, the question now

14   is you can clone the DNA, but how do you express the DNA.  And

15   this is where the species difference becomes actually

16   important.  Because the machinery for expressing proteins in

17   mammalian cells, in human cells, are different than the

18   machinery for expressing proteins in bacterial cells.

19             And the signals that tell the ribosome, for

20   example, to start the process of translation, the signals that

21   tell the RNA preliminarily to start making the transcript, the

22   signals that tell the process to stop, all of those signals

23   are, in fact, specie specific.

24             So, in order to basically fool the bacteria to use

25   this genetic code from a beta interferon gene in a bacterial

1       system, you have to put in the correct signals that the
2       bacteria will recognize.  And we call those expression control
3       sequences.  I think the patent talks about them.   And I use a
4       little blue box, next slide, to represent one such class of
5       expression control sequences.  The signals that basically
6       instruct the bacterial cell to express that gene.
7              THE COURT:   Sir, are you saying that there are
8       some differences based upon what the host will be?
9              DR. RAVETCH:  There are, there can be for
10      expression control sequences for the expression process.  It
11      doesn't effect the polypeptide.  That's the end result.  That's
12      specified only by the DNA sequence that was identified from the
13      cloning.  It's the practical nuts and bolts of how you turn
14      this into a factory for the production.
15             And one of the other things that we have to do is
16      to regulate the process.  You heard that you just take this,
17      put it into culture, let the, if you did it right, the culture
18      will make proteins.  Actually you never want to do that.  You
19      want to control the process.  Grow the bacteria.  And then give
20      it a signal to say now start making the protein of interest.
21      Right.
22             And that usually means you add something to the
23      media that tells this sequence, the star sequence, to turn on.
24      Turn the switch on.  And that's an inducer of the gene
25      expression.  The next slide, I believe, shows what happens

1        here.  So you are once again transforming.

2                        Now, a vector that has been engineered to express

3        the gene of interest in a bacterial cell or a heterologous cell

4        you create this transformed cell population.  Next slide.  And

5        this cell in transformation with this new modified recombinant

6        DNA.  And now you put this into a culture.  Once again you grow

7        up lots and lots of bacteria, hundreds of millions of bacteria.

8                        They are not making the protein.  Now you add --

9        the next slide -- something to the media, the inducer, the blue

10       element, if you will.  And by doing that you have induced the

11       expression of this particular gene, this heterologous gene.

12       And now the culture will fill up with the recombinant

13       polypeptide.  Once again specified by the DNA sequence of the

14       gene that you are interested in, but now under the control of

15       the sequences that you need to regulate the process.

16                        And then from this you can purify the protein.

17       And then once you have purified this polypeptide, excuse me,

18       you purify the polypeptide, you often have to go through a

19       series of steps to get it to fold correctly.  So it now has the

20       right shape to be biologically functional.

21                        Often what you get out of the bacteria isn't

22       biologically functional because it's in a very different, what

23       we call natured or unfolded state.  Same polypeptide, but it

24       hasn't gone through the process of folding correctly.  So you

25       have to do biochemical manipulations to get it to fold.   And

1      then you have a biologically active protein molecule.

2              Okay.  So, once again, other things that can

3      happen to a polypeptide which won't change the polypeptide, but

4      will, in fact, potentially influence the protein are the

5      addition of other types of molecules onto the polypeptide.

6      Sugars are added.  That's called glycosylation.  You can add

7      lipids.  That's called lipidation.  You could add other types

8      of molecules, cell groups and so on and so forth.  And all of

9      these processes can occur naturally or not.  And they can

10     influence function or not, depending upon the individual

11     polypeptide.

12             Okay.  That's all I had.

13             THE COURT:  That's good.  Thank you very much.

14             DR. RAVETCH:  Thank you.

15             THE COURT:  Anyone else?  Do you want to respond?

16             MR. GROOMBRIDGE:  No, your Honor.  I think we are

17     ready to go to the argument phase of this.  The only question I

18     would have is given that we have run perhaps a little longer

19     than --

20             THE COURT:  Do you want to take a break now?  Is

21     that it?

22             MR. GROOMBRIDGE:  I am wondering whether given the

23     large assembly of people here, someone might appreciate a

24     break.

25             THE COURT:  Why don't we take a break.  How much

```
 1              time would you like to have?  I'm flexible.

 2                      MR. GROOMBRIDGE:  Ten minutes.

 3                      THE COURT:  Would you like to break for a half

 4      hour?

 5                      MR. GROOMBRIDGE:   What would preferable?

 6                      THE COURT:  Half hour.  Whatever it takes you to

 7      go get something to eat and come back.

 8                      (Lunch recess)

 9                      THE COURT:  We are going to begin now with the

10      argument portion.  Back to our argument.

11                      MR. GROOMBRIDGE:  One other thing, and this may

12      very likely be better taken up with the magistrate judge, but

13      the parties have agreed to a three-month extension of fact

14      discovery.  And we would expect to be submitting something to

15      the Court on that very soon.

16                      THE COURT:   Okay.  Very well.  You can certainly

17      address that with the magistrate judge, but I will pass that

18      along as well.  So that's a three-month extension on fact

19      discovery.

20                      MR. GROOMBRIDGE:   Yes.  That will take us through

21      to the end of June.

22                      THE COURT:  All right.

23                      MR. GROOMBRIDGE:  So, now returning to the matter

24      at hand --

25                      THE COURT:   All right.  Before we begin, I just
```

1          have a very basic question in terms of plaintiff's position.

2                    In terms of the claim itself, how would you refer

3          to it?  Because I have seen the terms used somewhat

4          interchangeably in the papers or maybe in odds on the papers.

5                    Would you describe it as a method with follow-up

6          descriptive terms? Would you describe it as a product by

7          process? Would you describe it as something else?

8                    MR. GROOMBRIDGE:   It's certainly not a product by

9          process claim.  It is a method of treatment claim.  And we

10         might look at it, and this, in fact we have some slides on

11         this.  But this is a hierarchy.  At the top we have a method of

12         treatment, and the method involves giving a patient something.

13         And then dropping down in the hierarchy, the something is

14         defined by how it's made.

15                   So, if one were to break out the something

16         separately, one could say that that is a product by process

17         description.  But, a product by process patent claim is still

18         to a product.  This is not to a product.  It is to a method

19         that involves using a product.

20                   And maybe the best way I can -- the best metaphor

21         I could use here is to say imagine we had a patent claim to a

22         method of sweetening pancakes using maple syrup made in

23         Vermont.  The plaintiff's view is you can practice the method

24         if you go down to the supermarket, buy a jug of maple syrup

25         that comes from Vermont, take it home and put it on your

```
 1        pancakes.  The defendant's view is no, you have to go to
 2        Vermont, tap the trees, boil down the syrup.
 3                    So in that question it would be the maple syrup
 4        made in Vermont could be analogized to a product by process
 5        description.  But the method of sweetening pancakes is still a
 6        method of using something.  It's not a claim to a thing.  All
 7        right.  It's not to the jug of syrup.
 8                    And so ultimately this, the dispute isn't over
 9        what the -- and this is why the dispute isn't over what these
10        terms "produced" and "transformed" mean.  It's over who has to
11        do them and when.  And so we begin and end by saying this is a
12        method of treating patients by giving them a drug.
13                    THE COURT:  And what guideposts do you believe
14        the Court has for ascribing some sort of meaning to the scope
15        of those claims?  How would the Court decide whether it is, in
16        fact, a method with descriptive terms or perhaps something
17        else, an affirmative process?
18                    MR. GROOMBRIDGE:  Well, I think one, the Court
19        would follow the hierarchy of source material that the federal
20        Circuit lays out, you know, most definitively in the Phillips
21        decision.  And this is exactly what I will go through.
22                    The Court would look, first of all, to the
23        architecture of the claim itself and say what, how was this put
24        together and what do the words say.  This is a legal instrument
25        and it was written carefully to convey a particular meaning.
```

1          Then the Court would look at the description in

2    the patent and say, you know, how does this inform.  And

3    finally the Court would look at the patent prosecution and say

4    what light, if any, does this cast on it.

5          THE COURT:   And I certainly understand and I

6    understand the rigors of that analysis.

7          Would you say that there is any close case to your

8    situation?

9          MR. GROOMBRIDGE:   No.  I believe there is no

10   close case to this situation.  And I believe, your Honor, this

11   is a highly unusual, perhaps unprecedented argument made by the

12   defendants because, I don't know of a nice way to say this or a

13   nicer way to say this, they couldn't come up with anything

14   better.

15         And it is a very unusual argument that would lead

16   to, frankly, absurd results.  And that's the nub of the issue

17   we have got here, that what the defendants are trying to do is

18   construe this claim out of existence.  All right.

19         Now, your Honor asked well does the transformation

20   happen once or more than once.  It only happens, I mean in any

21   meaningful process, this is a very difficult, complex operation

22   that is the -- you know, toward the front end of a huge

23   regulatory process.  It takes 20 years to get these products to

24   market.  All right.

25         And the idea that this patent claim was written to

1   require a physician to do something that only a team of

2   molecular biologists with tens of hundreds of millions of

3   dollars and adequate, vast access to resources can do, that the

4   only person who can practice this is a physician who inserts

5   that DNA and grow cultures themselves and grows them up and

6   purifies them and then only then treats the patient, is frankly

7   absurd.   What that means is the claim will never be practiced

8   by anyone.

9           And the reason, you know, and there is no shortage

10  of legal talent.  There is very competent, I mean these are

11  some of the best patent lawyers in the country.  Right.  That

12  the reason this is going on, your Honor, is because basically

13  what this case is about is not whether the patent is infringed,

14  but who invented it first, those scientists around the world

15  who were racing to get there.  The real guts of this case is

16  who thought of this first.

17          And the defendants don't want to go into a fight

18  having to say yeah, gee, we admit we infringed.  So, they have

19  passed through this over and over again and they have come up

20  with a frankly very creative argument.  I take my hat off to

21  them.  But, we labored in vain to find any case where anyone

22  had made an argument like this because it's a very out there

23  argument.  Right.

24          And that is why, in fact, it was even difficult as

25  we progressed through the briefing, the meet and confer process

```
1      and then the briefing, the reason why it involved the briefing
2      is because at the beginning it didn't even seen as though it
3      was a claim construction argument.  It was couched by the
4      defendants in terms of the evidence that the plaintiff would
5      have to adduce at trial in order to prove infringement.  That,
6      you know, that's not claim construction, that's about a burden
7      of proof or something.  Right.
8                   And I guess it evolved and we have certainly come
9      to the point where we say look, issue is fully joined.  Let's
10     just get this resolved.  Let's not put it off.  But, ultimately
11     it's a highly unusual claim construction argument.
12                  In over 20 years of practicing patent law, I have
13     never come across something like this.  I have never seen
14     another case like it.  And ultimately so in terms of looking
15     for guidance in prior precedent, I suspect that that's just not
16     going to be a valuable exercise, and we have certainly looked.
17                  One can break it down.  So product by process
18     claim, I would be happy to talk about, okay, what's the law on
19     product by process.
20                  THE COURT:   They are relying on a number of cases
21     but they rely on the Abbott case.
22                  MR. GROOMBRIDGE:   But, I don't think there is any
23     dispute.  Usually what happens in a product by process case is
24     this, the reason for product by process claims is I have
25     invented something but I can't tell you what it is.  I can only
```

1      tell you how I made it.

2              And very, you know, to give an example, an

3      antibiotic which I produced by fermentation of some particular

4      microorganism that I found out out in the countryside.  And it

5      turns out that it makes just a great antibiotic.  I can't, I

6      don't know what the structure of that is.  I am still entitled

7      to a patent.  And the way I get a patent is I write a claim

8      that says the product that is produced by flattening this

9      microorganism and fermenting it and purifying it, and that's

10     great.  And the reason is I couldn't describe it by what it is,

11     I could only describe it by how I made it.

12             The law says, okay, you are free to do that.  If

13     you do it, the only thing that infringes it is the same product

14     made by the same process.  If somebody can figure a way to make

15     the same product by a different process, they are outside the

16     scope of your patent.  And that spawns disputes like some of

17     the ones that they have cited where we get into court and an

18     accused infringer has figured out, you know, for example,

19     generic drug companies has figured out a clever way to make it

20     that's different.

21             And the patent owner shows up and says that makes

22     me mad, I think you infringed.  And the defendant in that case

23     says no, you are trying to read out these process limitations

24     and we'll work it out with the Court systems.  And the Courts

25     invariably say the product by process claim, the product has to

1    be made by the same process.

2              Now that's all fine.  That's irrelevant here

3    because we don't dispute any of that.  And part of what's going

4    on in their briefs over and over again is an attempt to set up

5    straw men arguments and try to recast what Biogen is saying.

6    They are saying Biogen is trying to read out these limitations,

7    you know, produced by and transformed by affirmative

8    limitations in the claim.  That's absolutely not the case.

9              The reason there is no dispute that there is

10   affirmative limitations in the claim, there is no dispute that

11   that the product that you give the patient has to have been

12   produced has -- has to include a polypeptide produced by a non

13   human host that was transformed with a micro DNA.  Everyone

14   agrees.

15             The other thing that everyone agrees with is they

16   do that.  They did the transformation.  They do produce that.

17   The reason for the disagreement is just as your Honor went

18   exactly to this point, they did the transformation as I just

19   heard in 1981.  And they also, they make these products, some

20   of them outside of the U.S.

21             So the view of the world is look, I did the

22   manipulation of the DNA before your patent issue.  I am doing

23   exactly what your patent says.  Right.  But, I did some of it

24   before that.  And if I could make that an affirmative method

25   stamp, I would have a defense because I have to -- for

1    infringement, the law says in a method claim, the infringer has

2    to practice every step of the method.

3              So, if this claim has three steps instead of one

4    step, and if this is a claim to a method of transforming and

5    then -- a step of transforming and then a step of producing and

6    then a step of administering to a patient, I can say as

7    defendant I did the step of transforming before your patent

8    issued.  I maybe did the step of producing outside of the

9    United States.  I shipped the product in with instructions for

10   physicians to administer it to patients just exactly the way

11   you say.  Right.  And that all happened.

12             The patient got it within the terms of the patent

13   and I made hundreds of millions of dollars doing that.  But, I

14   don't infringe because I did the DNA manipulation many years

15   ago in another country.  And that's what it boils down to.  So

16   that's why, your Honor, we don't have the dispute about the

17   meaning of the terms.

18             Your Honor heard I think the same thing three

19   times over this morning.  I think that what we have a dispute

20   about is if you look at the architecture of this claim, is it a

21   method that has a step of doing something and then a

22   description of the composition?  Or is it a method with three

23   separate steps?  And that's the nub of the dispute.   And I may

24   be wearing out my welcome with this but --

25             THE COURT:  No, not at all.

1          MR. GROOMBRIDGE:  But, I will jump into the slides

2     here.

3          So here is what I would like to go through is the

4     patent, the legal framework very quickly.  The disputed issue

5     which has, as the slide suggests, apropos what I was just

6     saying --

7          THE COURT:  You know what, let me just address the

8     terms "produced by" and "transformed by".  I know we are

9     basically making the same presentation and we seem to be on

10    board with how those terms are defined.

11         Is there a specific agreement that you would like

12    the Court to take as far as those terms?

13         MR. GROOMBRIDGE:  Your Honor, I actually -- from

14    the Court's question this morning, I suspected I might be asked

15    that and I armed myself with page 10 of our opening brief.

16         THE COURT:   All right.  I have that.  I know you

17    have a chart regarding --

18         MR. GROOMBRIDGE:   We have a chart and I don't

19    know that there is need for the Court -- oh, well, everyone is

20    on their way there already.  I was going to say no need to find

21    it.

22         So, our view on produced by a non human host, our

23    first view is this, and basically these words, we are not going

24    to get better by paraphrasing them.  If we wanted to paraphrase

25    them, we could say expressed by a cell line that is not a human

1    cell line.

2            THE COURT:   But, your primary argument is that

3    it's easily understandable at this point.  It need not be

4    further defined, correct?

5            MR. GROOMBRIDGE:  That's right.   You know, there

6    is a possible subsidiary dispute around host.  Is that a cell

7    line or not?  I think based on the remarks this morning we

8    don't appear to have a dispute on that.  And, you know, we are

9    not looking at any magic to these words, you know.

10           If the defendants have a difficulty with some

11    choice of word we have made, you know, that's very resolvable.

12    And I think the same is true with "transformed".  You know,

13    that might have a slight caveat there where there may be again

14    a temporal issue because their proposal is in the present tense

15    and ours is in the past tense.  And that matters precisely

16    because of the dispute about -- but, as far as concept is

17    concerned, you know, we are saying, look, if transformed means

18    you have taken -- the DNA molecule has been introduced into a

19    cell or cell line in a stable, non transient manner, and again

20    conceptually I don't think we have any disagreement, what I

21    would -- my suggestion was going to be, your Honor, that we --

22           THE COURT:   Take a moment to discuss?

23           MR. GROOMBRIDGE:  Yes, exactly.  You know, I think

24    the defendants, there are two defendants, they may need to

25    confer.

1          THE COURT:  And you can certainly start that

2     today.  You could also continue it afterward and get back to us

3     to the extent there is any possibility for agreement on the

4     entirety or even some of those terms.  I would welcome that

5     certainly.

6          MR. GROOMBRIDGE:  So, and just so we are clear,

7     the fourth item here is things like host, does that mean cell

8     or cell line, where I don't -- I think there is no meaningful

9     dispute, but I just want to be clear so we don't have a

10    situation where six months from now we are all saying if only

11    we had raised this with the Judge at the right time.

12         THE COURT:  You know what, I am going to just stop

13    you for one moment because I would like to hear from the

14    defendants with respect to these terms.  I know we are in

15    plaintiff's argument at this point.

16          But, is there any likelihood that we are going to

17    come to agreement with the terms?

18         MR. BERL:   I think with respect to the cell,

19    cell line issue, I think there is likelihood we will come to an

20    agreement.  With respect to the definition of "transform", I

21    think if you look at the two definitions that the parties have

22    proffered, it imbues a certain disagreement about the verb

23    tense, which I think you will hear that from both parties.

24         THE COURT:  The tense I understand.

25         MR. BERL:   Subject to that difference, which I

1      think the Court will resolve in the context of the overarching

2      dispute between the parties, I think we may be able to come to

3      some agreement.

4                      THE COURT:   Okay.  Because I wanted to get some

5      understanding as to that before we embark on a lengthy

6      discussion on this when maybe we should be focusing more on the

7      scope issue.

8                      But, if you think that there is no possibility or

9      a very small possibility on resolution, then obviously I want

10     this full blown so I can hear the entirety of it.

11                     So, it sounds like there is likelihood that you

12     will be coming to agreement on these terms, whether it's today

13     or, you know, in a couple of days, you can certainly address

14     that amongst yourselves.

15                     How does that sound? I think you can go through

16     the rudiments here.  But then I think probably the main focus

17     should probably be on the scope issue.  And certainly if it

18     comes to pass where you have gone back to your offices, talked

19     about this and you have not come to an agreement, I could have

20     you back to revisit if I have any issues concerning it.

21                     I mean hopefully I have everything that I need at

22     this point.  But, to the extent there is any open issues, I

23     could have you do a telephone conference or do whatever. Okay?

24                     MR. GROOMBRIDGE:   Fine with us, your Honor.

25                     THE COURT:   Okay.

1          MR. GROOMBRIDGE:    So, moving right along here,

2     the patent, as your Honor heard this morning, the U.S.

3     application was filed back in April of 1981.  And the very

4     first thing of substance that happened, this was in April of

5     1982, was the patent office issued what is called by patent

6     lawyers a restriction requirement.

7               What the restriction requirement said is you

8     haven't got just one invention, you have got more than one

9     invention.  And, in fact, and this is probably the most

10    fundamentally informed thing in this whole long 28 years in

11    patent office, that the patent office looks at this application

12    right at the get go and says, this is, in fact, five different,

13    separate inventions.   And it lists them out.

14              The first one is, I will abbreviate that to DNA.

15    The second one is the polypeptides themselves, the interferons.

16    The third one, and this is important given the arguments that

17    the defendants are making, is the method of making the

18    polypeptides.

19              The fourth one is a method of detecting DNA

20    sequences.  This one kind of whizzes on the vine.  In the

21    scheme of things this ceases to be important.  The other four

22    are important.

23              And the last one and most important for this

24    patent is the method of treating viruses and cancers.  Because

25    the claims in this patent descend from this part of the

1    restriction requirement.  And the reason I say that, what

2    happens when you get a restriction requirement is that the

3    patent office says these five inventions, five in this case,

4    are distinct and can support separate patents.

5          What it means by that is, even if somebody else

6    invented one of them, you could still go to patent on the

7    others.  They do not stand or fall together.

8          And the reason that this informs pretty much

9    everything that's going on in this case is what the defendants

10   would really like to do is to say to the Court well, you know,

11   as soon as you have got the DNA, everything else just falls

12   into place and is just completely straightforward.  And this is

13   why, your Honor, you heard from Mr. Barsky this morning about

14   that interference proceeding and the Japanese gentleman

15   Taniguchi was awarded priority as to the DNA.

16         What the defendants would like to do is to say all

17   the DNA, also I suspect why we heard from Dr. Ravetch, that

18   there is a one to one correspondence between the amino acids

19   and the polypeptides and the DNA sequence.

20         The problem with this, and the problem for the

21   defendants is that unlike most of what happens in the patent

22   office, a restrictionary requirement cannot be reviewed in

23   court by statute.  That there is a statute that says -- well,

24   what the defendants would like to do is to say once you have

25   got the DNA, Taniguchi had the DNA, all the rest is obvious.

1          What they are really arguing in this is to say,

2     your Honor, well it says it's a method of treating, but, you

3     know, what syringe you pick, that's not the invention.  So,

4     what it really is is a method of making polypeptides, your

5     Honor, and you should construe the claims accordingly.

6          The problem with that is it's inconsistent with

7     this restriction requirement.  The reason they are doing it

8     under the guise of claim construction is because they know

9     perfectly well that the Statute 35 U.S.C. Section 121 says in

10    essence it makes this like the rule of the case, unlike a lot

11    of things where you could go to the Court and say I disagree

12    with what the patent office did.

13         This is a rare situation where the statute says

14    either later on the patent or in court you cannot challenge,

15    second guess this.  You can't say well, I disagree and I think

16    they don't.  They all stand or fall together.  They are not

17    separate inventions.  So their room for maneuver is severely

18    restricted here.

19         And that leads us back then to an attempt through

20    claim construction to say well, the real invention here isn't

21    the method of treating, it's the method of making the

22    polypeptide.  And you know that is just squarely contrary to

23    this finding by the patent office which is now a done deal for

24    reasons of repose, basically.  And ultimately pretty much

25    everything comes back to that.

1          What happens when you get one of these

2    requirements is it, in essence, splits the lineage of the

3    patent application into different branches claiming back to the

4    same original filing.  And one of the things that's important,

5    your Honor, is the procedures in the patent office allow you to

6    split out the patent claims, but they all retain the same

7    specification.

8          So, because the rules of the patent office say

9    very, very rare that you are allowed to edit the specification

10   after it's filed.  It's essentially frozen in time on the

11   filing date.  So, where this has happened what you would have

12   is the patent specification that includes description of five

13   inventions, and separate parallel applications in which the

14   claims then are limited to each one of those inventions.  And

15   that's what happened here, in essence.

16         So, the argument, for example, well, there is a

17   whole lot of stuff in the patent specifications about how you

18   make a polypeptide, therefore the claims must relate to that.

19   Again, it's inconsistent with this.  And ultimately what's

20   going on here is the patent office said the first category is

21   the DNA.  And then there was this interference and Taniguchi

22   won.  And we, Biogen, actually pay royalties to under the

23   Taniguchi patent on DNA.

24         Category 2, the polypeptides, the Court may be

25   surprised to hear that that is still pending in the patent

1     office even after all of these years.  There could yet be

2     another patent on that.

3                 And Category 5, the method of treatment, was

4     granted as the '755 patent eventually and the patent office

5     having full knowledge that the DNA claims have been awarded to

6     someone else.  And it's one of the most experienced patent

7     examiners in the entire patent office, and it's the same

8     examiner who has overseen all of these things.

9                 And the reason for that traces back to this

10    decision in 1982 that these are separately patentable.  And I

11    will get into a little bit why that would be.  Because although

12    the defendants would have you believe the method of treatment

13    is nothing more than picking the right syringe, in fact there

14    is a lot more to it.

15                THE COURT:  You are saying on Category 1 with

16    respect to the DNA, you are saying that Taniguchi was the

17    successor on that?

18                MR. GROOMBRIDGE:  Yes.  Taniguchi won on that.

19    And there is currently, on Category 2, there is currently a

20    dispute in the patent office between Taniguchi and the

21    gentleman from California.  Biogen is not a party to that.

22    But we sort of view that like a kind of NCAA bracket.  When

23    that gets resolved, they may say okay, bring it on Biogen.  And

24    the patent office grinds awfully close.  So this is perhaps

25    years worth of further proceedings there.

1          So, but you know the DNA went to someone else.

2     That doesn't mean, okay, so everything else is just, you know,

3     some sort of trivial implementation once you have got the DNA

4     in place.

5          THE COURT:   Are you saying that that DNA and that

6     analysis is the same as what is described in this claim?

7          MR. GROOMBRIDGE:   Right.   Well, the DNA that

8     Taniguchi, I believe, and I am operating from memory, would

9     have been the same DNA that is described in the DNA part of

10    that Figure 4 that I put up with all the long series.

11         It's not the same exactly as the DNA in claim one

12    of this patent.   This is a more complicated relationship

13    between them, which goes to how Walter Fiers, our inventor, had

14    actually gone about creating this method of treatment.

15         THE COURT:   Well, if it's not exactly the same,

16    is it relevant to us?

17         MR. GROOMBRIDGE:   It is relevant in the sense

18    that, to the extent that we are talking about -- we tried to

19    get and failed, a patent to the DNA for human, for beta

20    interferon.   That was the subject of the interference.   And the

21    courts eventually found that Taniguchi was entitled to that.

22         There is an issue in terms of who was first with

23    the fact that people outside the U.S. -- only activities in the

24    U.S. count.   So, that's, you know, that's a legal principle.

25    But, in terms of the absolute who got there first, there could

1      be a different answer.  And there certainly were groups of

2      scientists racing for the same thing.

3                      THE COURT:   Okay.  But, the fact that that

4      sequence may be different from the sequence that we are

5      addressing here in claim number 1 of the '755, to the extent

6      it's different, wouldn't that impact us?  Because we are not

7      really discussing the same DNA sequence.

8                      MR. GROOMBRIDGE:   I guess what I would say is

9      what we have got here, we have defined four pieces of DNA as

10     alternatives that you could use.

11                     THE COURT:   In this one.

12                     MR. GROOMBRIDGE:   In this one, in claim one.

13     Each one of those pieces is a subset of what Taniguchi had.

14     And if you overlaid them, there is some redundancy between

15     them.  If you overlaid them what you would end up with is the

16     same single piece of DNA.

17                     So, for practical purposes, I don't believe there

18     is a difference.  I think I would say that Biogen had its

19     chance to try and get a patent on the DNA and it lost.  That's

20     done and finished in 1993 in the federal Circuit and too bad

21     for us.

22                     But the point for the future, for now, this case

23     when we are looking in the future, is that because the patent

24     office found the polypeptide, the method of making the

25     polypeptide, and the method of treating human beings with the

1      polypeptide are all separate inventions that stand

2      independently, then it doesn't matter that the DNA is in the

3      prior art.  Someone else invented it.

4              And my client advises me, before I give away the

5      store, that there is actually still a pending dispute on part

6      of the DNA.  And so let me please, your Honor, retract those

7      remarks to the extent anyone would say well, Groombridge said

8      Biogen lost on this.

9              THE COURT:  All right.  Point well taken.

10              MR. GROOMBRIDGE:  It's more complicated than I

11      appreciated, and I apologize.

12              THE COURT:  Thank you.

13              MR. GROOMBRIDGE:   Now, moving along, and I don't

14      want to soak up all the time, but the real purpose of this is

15      just to say that the patent is talking to, not to the lawyers

16      in the room, it's talking to Dr. Ravetch and Dr. Jackson.  And,

17      you know, so if transformed makes sense to them, then that's

18      enough.

19              And then the hierarchy of the source material, we

20      start off with claim language.  And then, you know, the federal

21      Circuit says always start with the claim language.  Most cases,

22      that is kind of, it's nice to know, but it really doesn't help

23      because we are arguing over what widget means.  And all the

24      claim says widget.  This is a different case, the case where

25      the claim language actually is very helpful because of the

1     words chosen, the tense of those words and their arrangement in

2     a logical flow within the claim, as we will see.  So here we

3     would say that, in fact, probably the most helpful source is

4     the claim itself.

5               The specification, again we look at that.  We

6     always look at it and we try to get something in alliance, our

7     view of the claims with what the specification says.

8               THE COURT:   Back to the case law just for one

9     moment.  In terms of how the claim is actually written, you

10    don't believe that there is any case on point with a claim that

11    would be written in a similar matter that has been construed by

12    the courts?

13              MR. GROOMBRIDGE:   To our knowledge, that's

14    correct, your Honor.  And I think the reason is because I don't

15    think an argument like this has been litigated.

16              Now, the prosecution history, the last part of the

17    last leg on the stool, the three legged stool here, we

18    certainly should look at that if it's in evidence.  The Court

19    may be grateful for the fact that we have not included all

20    28 years worth in the record.

21              But, the important thing is this, the relationship

22    between the claims and the prosecution history is sort of like

23    the relationship between a statute and the legislative history.

24    And so the federal Circuit is expressly cautioning us here that

25    because it's not final, it often lacks clarity and it's less

1    useful for claim construction purposes.

2              And we would say given the arguments that have

3    been made, which in my reading of the briefs I have to say a

4    length of clarity this morning was something that came out that

5    we think that this principle is implicated in the dispute here.

6              Finally, extrinsic evidence, the Court is

7    completely free to look at extrinsic evidence.  It just can't,

8    I can't change the meaning of the claim by summoning some

9    silver tongued expert to say well, Judge, let me tell you what

10    they really mean.

11             Now, here is the heart of the dispute.  To us this

12    is a method of treatment consisting of a single step, just the

13    one step, administering a recombinant polypeptide.

14             When we look at the claim, again the very

15    beginning we talk about the claim, it's a method for doing

16    certain things, treating diseases, comprising this step of

17    administering to a patient something.  And the only step that

18    is ever called out, the only time the word "step" appears is

19    right there.  And that is the first or most important thing

20    that I mean in terms of the claim language itself, we think,

21    answers the question.

22             If this were a multi-step method, the word "step"

23    would be in it more than once.  If we pass this claim down,

24    let's just gray out the claim and then put back in the really

25    operative language here, it's a method for treating disease

1       comprising the step of administering to a patient -- that's the

2       only step -- a therapeutically effective amount of a

3       composition comprising.

4               Now, your Honor, as we read this claim that

5       everything that follows that is, in essence, a adjectival

6       description of the composition.   You can call it a product by

7       process description.   You can say the composition is the

8       product and this includes the process.   We don't argue with

9       that.

10              What we are saying is that everything in this

11      claim after that is a description of what has to be

12      administered.   It's not a process step that has to be carried

13      out.   That's why the word "step" doesn't appear here.   It's why

14      administering is in the present tense.   And if we went back and

15      looked, we would see transformed, produced and transformed in

16      the past tense.   It's why we think about sequence of events

17      here.

18              If, in fact, this were the method that the

19      defendants say it is, we wouldn't start by administering to the

20      patient.   We would start by transforming the DNA.   Then we

21      produce the recombinant polypeptide.   And then we would

22      administer it to the patient.   So, it's all in the wrong order

23      if you read it the way they read it.

24              And so what this means, this is the Vermont maple

25      syrup.   And it's saying, yeah, it has, someone had to be in

```
1     Vermont.  Someone had to tap the trees.  Someone had to made
2     it.  That's fine.  But, for practicing this method, all we have
3     to do is go to the supermarket and buy some.  You don't have to
4     go to Vermont and tap trees.
5               Just as Vermont maple syrup is an adjectival
6     description of the syrup, all of this is an adjectival
7     description of the therapeutic drug that has to be
8     administered.
9               THE COURT:   When we started today we had
10    discussed whether it would be a product by process.  And I
11    believe I asked you that and you said no, it's really a method
12    for administration.
13              Do you feel, after thinking about this, that those
14    terms are interchangeable?
15              MR. GROOMBRIDGE:   No, not in the least.  What I
16    feel, and I feel I am not doing a good job of explaining it,
17    but what I feel is this piece is, this is the method.  The
18    method ends up, the last part of the method, in fact the only
19    part of the method is administering the composition.
20              Now, if we just started the claim right here with
21    the composition, we scratched out the method.  Ignore that.
22    And say now I am going to consider this claim as a claim not to
23    a method, but to a thing, a composition.  You could then say
24    the composition is defined in product by process terms.
25              THE COURT:   So, only if it were a thing as
```

```
 1          opposed to a method.
 2                    MR. GROOMBRIDGE:   Right.  That's it.
 3                    THE COURT:   Because that's the distinction.
 4                    MR. GROOMBRIDGE:   Exactly.  It may be a method of
 5          using a product by process and then nested like Russian dolls
 6          inside one another.  But the biggest one is the method.
 7                    THE COURT:   So that's the distinction.  And the
 8          way I read your argument is that you are saying that this claim
 9          is a method of, a step of administering to the patients the
10          following.
11                    MR. GROOMBRIDGE:   Exactly.
12                    THE COURT:   Which is described.
13                    MR. GROOMBRIDGE:   Exactly.  As long as it meets
14          that description and you made it by, you know, transforming the
15          cell and then producing -- as long as it meets that, the fact
16          that you did it some years ago or you did it in China, doesn't
17          matter.  You are still treating the patient and getting the
18          medical benefit and infringing the patent.
19                    Now, again the purpose of this slide was really
20          just to say there is no dispute that the claims require the
21          step of administering the composition.  We all agree on that.
22          There is no dispute that the composition has to have a
23          recombinant polypeptide.   No one is saying you can get the
24          natural stuff and administrate it to a patient and you would be
25          covered by this.  There is no dispute that the recombinant
```

1    polypeptide must have been produced using the transformed human

2    host.  There is common ground for all of us.

3                    The dispute is only over who has to do it and

4    when.  And this is where the defendants have come up with this

5    argument of saying let's rewrite it into a three-step method

6    and say if you are not doing all three steps in the U.S. within

7    the terms of the patent, you are not infringing.  And that's, I

8    think we have covered that conceptually.  But this is where

9    it's laid out in their brief.

10                    Now, the problem with this is that it produces an

11   absurd result that if you look at this claim and you construe

12   it the way that they want to construe it -- again my learned

13   colleague thinks I have skipped over something important here.

14                    So, here they say that these terms was in

15   adjectival terms.  It should be in the present tense and should

16   have the word "step" with them and you have to do that.  And

17   there is an express statement they say it has to be carried out

18   during the term.

19                    So, the argument is going to be not that we are

20   doing something different technically,  medically, from what

21   you describe in your patent.  But, that we structured our

22   affairs in such a way that we have a kind of get out of jail

23   free card that we can do this and still not be covered by your

24   patent.

25                    And the absurd results is the way they want to

1      construe this is to say well, the same person or entity has to

2      manipulate the DNA, produce the protein, purify the protein and

3      then administer to a patient and presumably you get FDA

4      approval somewhere in there.

5                And, you know, there is probably certainly no

6      individual in the world who could ever do that.  It's not clear

7      to what extent there are even institutions that could do that.

8      That basically what they are saying is let's construe this in a

9      way that we construe it down to zero.  And normally when an

10     advocate comes to court and says well, my adversary's position

11     would yield an absurd result, typically what happens there is

12     the adversary stands up and says absolutely it would not.  The

13     result is perfectly acceptable.  But that's not what's happened

14     here.

15                Here when we said well, your Honor, this is

16     yielding an absurd result, the answer, it took us to page 27 to

17     get there but feeling they had to address it, the answer is

18     yeah, so what.  That if it's an absurd result, well, that's

19     just the result that it has to be.

20                But my point is we don't appear to disagree that

21     that would be the result, as a practical matter.  Essentially

22     no one would ever practice this patent.

23                THE COURT:  I believe their argument is it

24     shouldn't matter to the Court whether it's an absurd result

25     because you should really be looking to construe the claim and

1      their scope.

2                  MR. GROOMBRIDGE:  I don't disagree with that, but

3      I think that when we start out and say it is presumptively

4      plausible that a sophisticated company would spend 28 years

5      getting a patent that doesn't cover anything, and that if you

6      are going to make that argument, you had better have some

7      pretty powerful evidence to back it up.

8                  And I would submit, your Honor, that's precisely

9      what is lacking here.  Because coupled together based on a

10     couple of statements in 1996 and 1997 back and forth between

11     the patent office, do not expressly say this.

12                 And if we go through this, I will move along

13     quickly because I think I have already said quite a bit of

14     this.  But, from looking at our triad of sources, the claim on

15     its face only uses the term "step" once.  And it is carefully

16     architected to have that series of indents, if you will, to say

17     the step is just administering the composition.

18                 The specification talks about how this method of

19     treatment is a fundamental aspect of the invention.  You know,

20     and I will come back to this, but in our view one of the

21     differences -- and if you know should we ever reach the trial

22     in this case, this is something that will be front and

23     center -- is that the other scientists who were doing this were

24     focused very much on pure science and they wanted to get that

25     DNA sequence.

1            Fiers in Belgium was focused much more on how do I

2       solve the medical problem.  And the body of work that he did

3       when he described it in this patent differs from the work in

4       the rival patents, and it differs with respect to how do I

5       actually use this stuff in patients and make it medically

6       useful.  And that is why he ended up with the method of

7       treatment, the medical use patent, even though somebody else

8       got the DNA patent.

9            And the third leg of the stool we have here, the

10      one thing that is unequivocal in the patent prosecution is that

11      statement at the very beginning, that a method of treatment is

12      patentably separate and distinct from the method of producing

13      the polypeptide.

14            THE COURT:  We touched upon this before, but what

15      do you make of defendant's argument regarding the step of

16      administering to the extent this is open ended?

17            MR. GROOMBRIDGE:  I am not sure that I understand.

18            THE COURT:   As opposed to describing what the

19      means of administration are, it just provides the step of

20      administering.

21            MR. GROOMBRIDGE:  Because the point of the method

22      of treatment, the invention doesn't reside in what syringe you

23      use or what kind of things have to be injected or what kind of

24      pill you put it in.  But it's an attempt to trivialize the

25      invention by saying well, they purported to get a patent on

```
 1          some delivery mechanism.  No one is saying that.
 2                    THE COURT:   You are saying the method is the fact
 3          of treatment.
 4                    MR. GROOMBRIDGE:   The method is the ability to
 5          make something, and here's the important part, and know that
 6          that something will actually work to treat human disease.  And
 7          the patent goes into fulsome detail about how you do that
 8          second part.  Because I agree absolutely with what Dr. Ravetch
 9          said this morning.  You can take that DNA and you can make a
10          polypeptide and you could get a complete dud.  The polypeptide
11          can be worthless.  It can be ineffectual, have no biological
12          activity.
13                    And the key part of this patent, and the part that
14          supports the method of treatment is a very rigorous body of
15          work on proving up how you know when you have done this, that
16          this thing will actually work in human beings and be used in
17          treating disease.  It is that work that supports -- and,
18          moreover, how you get enough of it.
19                    Because remember the claim was also a
20          therapeutically effective amount.  Because part of the problem,
21          if all I have got is something that costs $22 billion a pound,
22          that can't be treating anyone.  And what this inventor did was
23          to say I am not just interested -- on an academic level it's
24          great to get that sequence and put it in a more prestigious
25          scientific journal fantastic.  But, my interest is I want to
```

1    treat human beings.

2              I mean this isn't on the record but what he did

3    was assemble a multi-disciplinary team.  But, he did a more

4    difficult and extensive body of work.  What is in the record is

5    his description of what he did in the patent.  And that's why

6    we come out in a different place here.

7              So, to come back to the Court's question, it's

8    not, the method of administration, the invention here is not

9    picking the right syringe or the right diluent, you know, if

10   you want to put it in a pill to a degree or a pill --

11             THE COURT:   Just the fact that you have a

12   substance that is suitable to treat.

13             MR. GROOMBRIDGE:   Precisely, that has biological

14   activity.

15             THE COURT:  I understand.

16             MR. GROOMBRIDGE:   And so what the defendants are

17   trying to do is rewrite the claim.   In their brief they say

18   well, the process included the step of transforming.  And, you

19   know, I would just like to point out that's precisely what

20   isn't in the claim.  It says transformed.  It exactly doesn't

21   say the step of transforming or producing.

22             And again note how they have reversed the order

23   here because if it did mean what they would like for it to

24   mean, it would be in a different order.  It would have to be

25   reversed.  You can't give somebody something that you haven't

1    made yet.

2              So, the fact that you have to in your brief

3    rewrite the language of the claim is a pretty good indication

4    that the claim doesn't mean what you say it means.

5              And I think this is just a synopsis of the points

6    that I have made.  So, I will, you know, there's others slides

7    but unless the Court has a question, I don't think I will go

8    back through it.

9              The architecture of this claim is carefully worded

10   as a legal instrument to say there is just one step and the

11   composition is described historically not in the present tense

12   through a series of steps.

13             Now, if we turn to specification, the

14   specification calls out that the purpose of this is to produce

15   things that we could actually use in a medical context.  That

16   we want to be able to have things that will actually have

17   biological activity.  And it calls out the problem with the

18   state of the art that is what we call the intriguing and

19   fascinating substance, but it's in very minute quantities.

20             Then it says with this we can get polypeptide that

21   does have the right activity for use in treatments and it

22   allows, moreover, the production in amounts by method not

23   available.  In other words, we are actually going to be able to

24   treat human beings in a medical context.

25             Now, I said the specification went into some

1          detail on this and here the slide 34, this is the portion of

2          the specification that talks about how medical activity was

3          proved.  So we are looking at columns 37 through 46 of the

4          specification.

5                    And just to call out the headings there, all of

6          this part of it, it's not about how you make the polypeptide

7          which is described certainly in great detail, but how you know

8          that it has biological activity.  Because just as Dr. Ravetch

9          said, you could go through this whole exercise and very easily

10         end up with something that has no activity and is useless in

11         medical treatment.

12                   And after this is another part of the patent

13         specification that talks about again how we approve the yield

14         and activity.  So, because precisely what we want to do here is

15         to have the activity, the right kind, and also get enough.  You

16         know, if I have three molecules of this, even if they have the

17         right activity, that's interesting, but I don't have a

18         therapeutically effective amount.

19                   And ultimately to come back to that is why, your

20         Honor, the patent office said these are different inventions.

21         And it is why the method of producing polypeptides is item

22         number three in the five different inventions.  And the method

23         of treating viruses and cancers, the ancestor of these claims.

24                   THE COURT:   And I'm sorry, the application with

25         the five different claims was called the?

1           MR. GROOMBRIDGE:   It's called the 609

2     application.

3           THE COURT:   Okay.

4           MR. GROOMBRIDGE:   And it is the very first one

5     that was filed in the United States.

6           THE COURT:   Okay.

7           MR. GROOMBRIDGE:   Now, also in the prosecution

8     history I would point out that I have said several times that

9     the claim only uses the term "the step of" once.   It didn't

10    always even have that language.   It used to say just

11    administering.

12          So, in the prosecution history this language "the

13    step of" was added.   It wasn't always there and carried along.

14    And again this may not be the, you know, the rock crush of a

15    point, but our view, your Honor, is that if they had meant to

16    put it in three times, they would have put it in three times.

17    That when they put it in, they put it in once and they did that

18    deliberately.

19          Defendant's arguments, I think I probably don't

20    need to dwell on this too much, I think we have covered much of

21    this.   But I will go talk about the first point because the

22    core of their argument is essentially to say well, look, in the

23    back and forth with the patent office, you said process steps

24    plural and therefore there has got to be more than one.

25          So let's drill down on that and see what actually

1     happened.  And this finds the origin in the statement not by

2     Biogen, but by the patent examiner.  And remember now there are

3     multiple parallel applications.  The patent examiner looks at

4     some of these applications then pending and says well, the

5     positive process steps in this group of claims, claims 31

6     through 34, of the instant application, that's the 930, and the

7     positive process steps in claims 31 to 34 of another

8     application, the 723 application, are identical.

9            What the examiner is saying is you can't get two

10    patents on the same thing.   And in our view, your Honor, the

11    reason why the examiner is using this locution, positive

12    process steps, is because he is talking about eight claims,

13    four in one application and four in the other application.  And

14    even though those claims have one single step each, there is

15    eight of them.  So it natural to write positive process steps

16    when you refer to them collectively.

17           Now, the defendants take a different view and they

18    say well, the examiner must have meant that there were multiple

19    process steps.  And I would submit, your Honor, that as soon as

20    we are in a place where it is not the examiner said, it's the

21    examiner must have meant, we are at the land of inference.

22    When we are in the land of inference, that's not the clarity

23    and lack of ambiguity that is required for the exercise that

24    they want to indulge in.

25           When we look at this, the problem with it doesn't

1      end there.  It is not simply a problem that they are drawing an

2      inference.  The problem is that the inference they are drawing

3      is wrong when we look at what the examiner was talking about.

4      We see why it's wrong.

5              This claim they focus on.  This is the ancestor of

6      claim one of the '755 patent that the time before it had "the

7      step of" added to it and a few other things were added to it.

8      And they say well, the examiner must have meant that the

9      positive process steps in plural were administering, produced

10     and transformed.   That that must have been what he was talking

11     about.

12             Remember he was comparing two things.  When we

13     look at the comparison, and let's just go to the comparison

14     here, the other claim that he was looking at has that step, the

15     administering.  What's strikingly absent from it is the

16     language "produced or transformed".   It's just not in this

17     other claim.

18             So, if you are trying to draw the inference that

19     he must have been talking about produced and transformed, you

20     are wrong because those words aren't even one of them.  And

21     ultimately we come back and look at this it says again there is

22     a gross disparity between what the defendants say in their

23     brief the examiner said, which is here on slide 45, and what

24     the examiner actually said, which is on slide 46.

25             This is their editorial, their description of the

1        examiner asserted that the steps of transforming a non human

2        host with a recombinant DNA molecule and producing a

3        recombinant polypeptide in a non human host were actually

4        positive process steps.  This is what the examiner actually

5        said.  It doesn't say that at all.  Those words just aren't

6        there.

7                    And that's why when we look at their brief, the

8        only quote is the word "actual" standing by itself and the

9        words "positive process steps" standing by itself, because that

10       was the only bit they could excise that would actually support

11       what they were trying to say.

12                   Now, what they also rely on is one single instance

13       in the 28 years of patent prosecution where Biogen said, with

14       reference to a single claim, yes, there are positive process

15       steps in the plural.   And, your Honor, we concede that is a

16       mistake.  Our patent prosecution attorney made a mistake in the

17       writing of that response.  He should -- I mean, he shouldn't

18       have said that.  But a mistake, one mistake in 28 years' worth

19       of patents prosecution is not a basis to construe the claims

20       down to nothing.

21                   Here is what he said.  This is the statement.

22       Claim 31 co-pending application also only a single claim, also

23       recites those positive process steps.   Now right before that,

24       the lawyer repeats what the examiner said.  But the examiner

25       was comparing multiple claims and it used the plural for that

1    reason.

2                Our belief, your Honor, is that, and I mean I view

3    the fellow as not having been deposed yet, but what happened

4    here is he just carried along the plural that he had used here

5    and in error.  He shouldn't have said that, but he did.

6                Now, in the exact same document, this submission

7    in 1997, what he also did, this was the place where he added

8    the words "the step of".  And in this instance he did it in

9    the singular and he certainly didn't do it with respect to

10   transformed or produced.

11               So, what we see here, your Honor, is look, we have

12   got a document that has part of which deals with the operative

13   legal language, the statute, if you will.  And part of which is

14   the legislative history, the editorial going along with it.  He

15   meant -- there's a disjunction between them.  He made a mistake

16   in the non operative part of it.  He didn't make a mistake in

17   the operative part of it.  And we suggest, your Honor, pretty

18   much any lawyer knows when you are comparing the operative part

19   of the legal document and the non operative part, which one

20   would control.  So, this is --

21               THE COURT:   So, are you saying that he used

22   "steps" after the, after claim 32 was canceled?

23               MR. GROOMBRIDGE:  Yes.  He used steps in reference

24   here to claim 31.  I have to confess I don't actually know

25   whether he had canceled, at this point, claim 32 because it's

1    in another application.   But, I have a map of those two side

2    by side.   But, I think, I am not sure it depends on claim 32,

3    but I think I would say that it's clear that in this statement

4    he is talking about a single claim be he uses the plural.   And

5    he shouldn't have said that.   It doesn't have multiple steps.

6            But, when he was writing the claim itself, that

7    very claim, claim 31, he didn't use the plural and he didn't

8    put in the word "step" when he was talking about transforming.

9    He was doing this in the same document.   It's not like it was a

10   different application or some years later.   This is the exact

11   same document.

12           So our view of that answers the question.   It

13   would tell you it's a mistake.   And, you know, ultimately this

14   is where we come back to the law is the law, quite plain, that

15   if you are going to have this situation where you say well, you

16   have made a disavowal of claim scope, which is the argument

17   that is made here by the defendants, you have -- in essence

18   what this is saying is I know what the plain language of the

19   patent claim says, but I am going to give it a different

20   meaning because something happened in the patent prosecution

21   that compels differently.

22           And the federal Circuit has said repeatedly that

23   principle can only be invoked where the statements are clear

24   and unmistakable in the patent prosecution where they are not

25   subject to more than one reasonable interpretation.   And if

1    there is ambiguity, you can't invoke this principle.  And our,

2    I guess where we come out, your Honor, is to say look, if the

3    Court finds itself saying it's not clear what happened in this

4    patent prosecution, this particular piece of it, that is in

5    itself the answer to the question.

6          If it's not clear, then it cannot be a clear and

7    unmistakable disclaimer, and there is no disclaimer.  So,

8    trolling through all of these things in multiple applications

9    and trying to figure out who meant what when, it is a perfect

10    example of why this all exists.  There is no express statement

11    saying oh, no, our claim has multiple steps.  And that should

12    be the end of the story.

13          THE COURT:  And as far as being a mistake by this

14    attorney, I am sorry, was there something submitted by this

15    attorney?  You said he wasn't deposed.

16          MR. GROOMBRIDGE:  No, he has not yet been

17    deposed.  We certainly expect at that deposition it will

18    happen.  That is not something we have put in the record.  We

19    rely solely on the difference between the language he used in

20    the claim and that remark in the accompanying description.

21          THE COURT:  And I understand your argument to be

22    there is no disavowal because at best it could be questionable.

23          MR. GROOMBRIDGE:  Precisely, your Honor.  Now,

24    just to wrap up, I think we have probably covered this more

25    than sufficiently.  But, these ancillary disputes that the

1       parties will attempt to work out is the tense issues is really

2       the exact same thing as when the transformation is going to

3       take place.

4               Host, again I gather that it's likely we will be

5       able to reach an agreement.  Our view is it can't be a single

6       cell, because a single cell can never produce --

7               THE COURT:  Is there still a dispute with respect

8       to the use of a genome?

9               MR. GROOMBRIDGE:   I think there possibly is, and

10      let me explain what that is.  Here this is the same language

11      where we have the present versus the past tense.  And here the

12      genome, the issues -- there may be that there is no dispute.

13      But for the Court, to explain the reason for the debate is

14      coming back to our favorite picture of the rather attractive

15      bacterium here, or if we had a cell from a mammal, it would

16      have a nucleus.  And in the nucleus would be typically what's

17      referred to as a genome, although it would be chromosomes that

18      would contain the native DNA of the cell itself.

19              THE COURT:  Genome is defined in the patent itself

20      in the bottom of column eight.

21              MR. GROOMBRIDGE:   Yes, it is.  The point here is

22      the inserted DNA doesn't necessarily have to be in a

23      chromosome.  It can be in one of these plasmids.  There's loops

24      just sitting there by itself.  And the other issue with it is

25      that it has to be in the host and it has to be stable so that

1    you can have these multiple generations that is not just going

2    to be in there and disappear over time.

3          Again, we don't think that there is any technical

4    disagreement.  This is an answer that Dr. Ravetch put in the

5    deposition.  So on a technical level we seem to be all in

6    agreement.  It's a wording concern, stable, non transient, we

7    can work with.  The concept I think we are in agreement.

8          THE COURT:  Fine.  Understood.

9          MR. GROOMBRIDGE:   My conclusion is really your

10   Honor asked did we find any precedent on this.  We couldn't.

11   And part of the reason --

12         THE COURT:  Or negative precedent.  Certainly

13   they are citing to a different line of cases and they are

14   extracting different arguments from the same material.  I

15   understand that.  But, do you see anything that goes either way

16   and addresses a similar situation to your own.

17         MR. GROOMBRIDGE:   We do not see cases on this

18   situation.  Part of the reason we respectfully think that this

19   type of claim, this claim written in this hierarchy is not an

20   uncommon thing.  Pharmaceutical companies burgeon method of

21   treatment claims all the time.

22         Here is one from Bayer.  Does this look familiar?

23   A method of treatment, comprising, administering,

24   therapeutically effective amount of a thing produced by another

25   thing.  It is strikingly similar to this claim and there are

1        other examples in our briefs.

2                But the point, your Honor, is everyone in this

3        business knows what these claims mean.  They are written this

4        way.  This isn't some bizarre foible that Biogen is engaged in.

5        And ultimately what is going on in this case --

6                THE COURT:  You are saying this is a typical

7        structure for a claim and how it's written.

8                MR. GROOMBRIDGE:  Absolutely.

9                THE COURT:   What I gather you are going to say is

10       the only reason we are discussing this in the context of scope

11       is because it's a very unusual defense.

12               MR. GROOMBRIDGE:  That's right, your Honor.  And

13       ordinarily what a defendant would do is say when I have a

14       disagreement about what "transform" means and I didn't, you

15       know, when I made this, I didn't transform anything, right, but

16       that's not the argument that's being made.

17               Sure we transformed it.  We just did it in 1981.

18       That there is no technical difference.  What is attempted to be

19       made here is to create a legal difference to say well, we would

20       like to interpret this claim with multiple steps so we can

21       argue not only that they all have to be practiced in a

22       particular time frame and in the United States, but also that

23       they all have to be practiced by the same entity.

24               So that if I make the drug and I give it to a

25       physician who administers it, different people are doing

1    different steps, and again I get a get out of jail free card,

2    all this is is an attempt to take a claim that is written in a

3    perfectly normal format for this industry and construe it out

4    of existence because it can't find, despite the great array of

5    legal talent who couldn't come up with a better infringement

6    argument, the case is really about who invented this first, not

7    whether it was infringed.

8                    THE COURT:   All right.   Thank you very much.

9                    Good afternoon.

10                   MR. BERL:   Good afternoon.   David Berl from

11   Williams & Connolly for defendant Bayer.

12                   The short answer to your question is, your Honor,

13   there is a case.   If you will give me ten minutes and indulge

14   me, I will get there and I will explain it.   But the answer to

15   your question is yes.

16                   Let me begin by framing the issue here.   There is

17   no dispute in this case any longer, there was at the beginning,

18   that the recombinant polypeptide administered in claim one in

19   fact has to have been made by the process set forth in claim

20   one.   It has to have been produced by a non human host and

21   transformed by a recombinant DNA molecule .   There is no

22   dispute about that.   The only question is who has to do it and

23   when it has to be done.   And the answer to that question is

24   repeatedly given by fundamentals of patent law.

25                   The Supreme Court laid out in 1997 something

1     called the All Elements Rule.  This is black letter patent law.

2     And what it says is that each element contained in the patent

3     claim is deemed material to defining the scope of the

4     invention.

5              There are all sorts of different kinds of

6     limitations.  There are process limitations.  Those process

7     limitations define what a defendant must do in order to

8     infringe a claim.  What process it has to undertake.   There

9     are product limitations.  And those product limitations define

10    the product.   We have another copy.

11             THE COURT:  You know what, I have it here.

12             MR. BERL:  You are where I am getting soon.

13             THE COURT:  Yeah, I am.

14             MR. BERL:  There are product limitations that

15    define the characteristics of the product that defendants have

16    to sell.

17             What plaintiff has tried to do here is, what

18    Biogen has tried to do here is create an all new kind of

19    limitation.  There is nowhere present in the entire history of

20    the American patent jurisprudence that is some kind of

21    limitation that has to have been conducted, a process that has

22    to have been conducted, produced and transformed, but somehow

23    does not limit what the defendants have to do or when they have

24    to do it.

25             And we submit to you that the fact that Mr.

1     Groombridge stood here and said that he has no case despite

2     searching in vain that stands for this proposition, means

3     something.  And what it means is that there is no such thing.

4     They are trying to create something new because what's old,

5     what's existing in controlling case law tells you that every

6     limitation of the claim is material and it must limit what the

7     defendants do.

8             Let's take a look for a moment at the structure of

9     the claim, because Mr. Groombridge commented on this for quite

10    awhile and your Honor asked various questions.  The claim

11    starts with a method of immunomodulation.  It is indeed a

12    method of treatment claim.

13            And with respect to his argument that there was a

14    restriction requirement and the method of treatment is separate

15    from the method of making the recombinant polypeptide, that's

16    right.  They are separate concepts.  And we are not arguing

17    here, inconsistent with the restriction requirement, that they

18    don't have a method of treatment claim.  They do. But, it's not

19    a normal method of treatment claim.  It's not like any of the

20    claims that Mr. Groombridge put up in his brief or just put up

21    from Bayer that says a method of treating using X even made by

22    a hybrid donor it says.

23            And the reason is that the claims continues after

24    where Mr. Groombridge wants you to stop reading.  It's a method

25    of immunomodulation for treating various diseases using a

```
 1       particular composition.  So, it's a method using a particular
 2       composition, and that composition is a recombinant polypeptide
 3       that has to be administered.  But the claim doesn't stop there.
 4       This is not sweetening pancakes by using maple syrup made from
 5       Vermont.  It doesn't just stop at polypeptide made
 6       recombinantly.
 7               The claim continues.  The claim recites specific
 8       steps.  Mr. Groombridge called them steps this morning.  He is
 9       comfortable with that, that produced and transformed are steps.
10       Both experts agreed that they are processes for making a
11       recombinant polypeptide.  They are set forth in the claim
12       explicitly.  This is like a method of sweetening a pancake
13       using maple syrup made in Vermont wherein you chopped down the
14       tree, you get the maple out, you purify the maple, you then
15       extract it, and then you put it into a bottle and pour it on
16       the bottle (sic).
17               He wants to ignore the fact that the steps are set
18       forth in the claim.  That's not an artifice of defendants or
19       their legal team.  That's something that Biogen put in its
20       claim.  And there is no authority in hundreds of years of case
21       law for the idea that one can simply erase, as Mr. Groombridge
22       wants to do for purposes of assessing the defendant's behavior,
23       language in a claim, language that is the only language that
24       tells you what a recombinant polypeptide is.
25               It's defined by how it's produced.  That language
```

1     is meaningful.  And as a matter of controlling law, it must

2     limit what the defendants do or what they make.  It can't be

3     neither.  It can't be neither a process limitation nor a

4     product limitation.

5              THE COURT:   What do you think of his discussion

6     that the use of the word "step" here, there was only one

7     reference to step.  It was added in subsequently and it was, in

8     fact, in the first paragraph.

9              MR. BERL:   Sure.  Two answers to that.  One of

10    which my colleague Mr. Barsky will get into in more detail,

11    which is that they call these produced and transformed steps

12    throughout prosecution and long before the word "step" was ever

13    added to the step of administering.

14              So, the notion is there is some kind of disparate

15    treatment of administering being a step.  And the other one's

16    not being a step is belied by the thirty years of prosecution.

17    But I think the second and more important answer is that the

18    presence or absence of the word "step" is nowhere suggested by

19    any court in America to make any difference to the salient

20    question here which is, is there a process limitation in this

21    claim.

22              Are there process limitations when it says

23    produced and transformed? Do you find, in any of the case law,

24    judges searching for the word "step" or making a decision about

25    whether something is a process limitation or not, depending on

1  the presence or absence of the word "step".  And the answer to

2  that question is no.

3          THE COURT:  Isn't every word important?

4          MR. BERL:  Every word is indeed important but the

5  absence -- the words that are important here is "produced" and

6  "transformed".  And there is an inquiry that courts go through,

7  and we cited the Gemtron decision and the Abbott decision and

8  the Amgen decision the courts go through to determine whether

9  those words like "produced" and "transformed" are process steps

10  that limit the process that a defendant must carry out in order

11  to infringe a claim.

12          And so with or without the word "step", those

13  cases stand for the proposition that words like "produced"

14  "transformed" are process limitations.

15          THE COURT:  So you view this as positive process

16  steps.

17          MR. BERL:  They are process steps.

18          THE COURT:  Process steps that need to be

19  undertaken.

20          MR. BERL:  That's right.

21          THE COURT:  You do not view them as descriptive

22  material.  You view it as a process and one must undergo the

23  process in order to be found responsible to be infringing.

24          MR. BERL:  That's correct.  I think one can call

25  it descriptive material in the sense that it describes it by

1      the process used to prepare it.  That's the only description of

2      the recombinant polypeptide that is there.  It's a process of

3      producing and transforming.  And those are, in fact, process

4      steps that have to be carried out.  That's the only description

5      of recombinant polypeptide they provide.  And under the law

6      that means that they are process steps that have to be carried

7      out.

8              Well, we will go to that in a moment.  Let's go

9      back to --

10             THE COURT:  In terms of your case law -- and I

11     know we are going to be getting to the case law and obviously I

12     am interested in it -- but, do you have any cases that show or

13     require that the direct infringer has to engage in the process?

14             MR. BERL:  Yes, I do.  And Abbott talks about

15     that and Monsanto addresses that question squarely.  And if you

16     would like, I would be happy to go through that with you.

17             Why don't we skip ahead to page 13 of Biogen's

18     brief.  Because what Biogen did in its brief, just to get there

19     quickly, is Biogen has admitted, which it did not in its first

20     brief, that the recombinant polypeptide must be one produced by

21     a non human host and not simply a polypeptide with similar

22     characteristics.

23             Produced and transformed is not some product

24     description.  It's not defining what characteristics the

25     polypeptide has.  They say it has to have been produced that

1          way.   These are indisputably claimed elements that must be met

2          to prove infringement.   And they say if Biogen doesn't contend

3          that it's the direct infringer of uses of polypeptide made by a

4          different process, that they infringed.   You have to have

5          carried out that process.

6                      And the only question -- and Biogen admitted the

7          same thing in their ensuing brief -- the only question is who

8          and when, which Mr. Groombridge said earlier today.   Biogen

9          also makes clear that to the extent that there is a process

10         step in the claim, the established law is that that step needs

11         to be performed during the step of the patent.   The only

12         remaining question then is whether these are process steps or

13         something else.

14                      And why does Biogen say they are not process

15         steps? They say because none of the cases defendants cite

16         support the proposition that it's the defendant who has to make

17         it during the term of the patent.   They say the cases we cite

18         are, as they put it, silent on this issue.

19                      And let's take a look at the Abbott case for a

20         moment.   Now, Abbott was an en banc decision of the federal

21         Circuit written by Chief Judge Rader that followed

22         approximately two decades of a lack of clarity about process

23         terms in product by process case law.

24                      THE COURT:   I believe it was en banc as to

25         certain -- as to certain issues there was a dissent as well.

1          MR. BERL:   That's correct, there was a dissent.

2    But, as to the issues that I will be addressing here which is

3    what is the effect of process language in a product by process

4    limitation, that part of the opinion was en banc.  And it was

5    explicitly rendered in order to resolve those ambiguities and

6    lack of clarity from Atlantic Thermoplastics and other cases.

7          What they held is that process terms in product by

8    process claims serve as limitations in determining

9    infringement.  In other words, there was a dispute about

10   whether there was something special about process terms,

11   process terms like these, that were present in product by

12   process limitations.  Did the usual rules apply, or was it

13   something different because the process language was simply

14   describing a product rather than, in a usual process claim,

15   where you have steps one, two and three.

16          And they said they serve as limitations in

17   determining infringement.  Why?  Because where the inventor

18   chooses to claim the product in terms of the process, that

19   definition governs the bounds of enforcement of the patent

20   right.  Where the only description of a product of a

21   recombinant polypeptide is the method used to prepare it, a

22   Court simply cannot ignore as verbiage the only definition

23   supplied by the inventor.

24          You can't simply ignore that in the infringement

25   analysis and suggest that the defendant doesn't have to do it

1    or that the usual rules of process case law, that it has to be

2    done during the term of the patent, magically disappear.

3              THE COURT:   Well, does Abbott address whether a

4    direct infringer has to be indicated?

5              MR. BERL:   Let's take a look at that question

6    here, because the dissent raises that question.  And Judge

7    Rader, writing for the court, addresses it.  And he says that

8    the dissenting opinion lament the loss of a "right" that has

9    never existed in practice or precedent.

10             The right to assert a product by process claim

11   against a defendant who does not practice the express

12   limitations of the claim, the federal Circuit after two decades

13   of lack of clarity is telling courts around the country here is

14   what the law is.  Here is how you address it.

15             And in language that couldn't be more clear, I

16   would submit, is saying there is no right.  You have no right

17   to assert a product by process claim against a defendant.  Not

18   against anyone.  Not against something you buy at the

19   supermarket like maple syrup.  Against a defendant who does not

20   practice the express limitations of the claim.

21             The notion that Abbott is silent on the question

22   of who must practice the claim, is respectfully not correct.

23   They address the dissent directly and say there is no right to

24   sue a defendant who does not practice the express limitations

25   of the claim.  Why?  Because those limitations of the claim are

1    process limitations.

2         And all of the rules that apply to process

3    limitations must be carried out by the defendant during the

4    term of the patent, applied just the same when it's in what Mr.

5    Groombridge himself called a product by process sort of

6    description.

7         But, Abbott is not the only issue or not the only

8    case that addresses this question, because Abbott addresses

9    what.  Monsanto, we submit, addresses the questions of who and

10   when.  Abbott addresses who; Monsanto addresses who and when.

11        And we submit, your Honor, that this case is on

12   all fours.  You asked several times, is there any claim that

13   looks like this.  Is there any claim with this sort of

14   structure that answers the question of whether, in a claim like

15   this where you have a process using a product that's made by a

16   process, whether those steps of making the product are limited,

17   whether those have to be carried out by the direct infringer

18   during the term of the patent.

19        At issue in Monsanto was claim four.  Now, claim

20   four in Monsanto was directed to a process of obtaining progeny

21   from a fertile transgenic claim.  But, unlike most process

22   claims, it didn't stop there.  It didn't say a method of using

23   a transgenic claim.  It had additional language.  It says that

24   that transgenic claim has to have been made in a certain way,

25   has to have been obtained in a certain way.  What is that way?

1      It referred to the process of claim one.

2              As you see this is called a dependent claim

3      format.  Claim four refers to and is dependent upon claim one.

4      What that means by operation of law, 35 USC 112 paragraph 4, is

5      that that claim in dependent four, that's claim four in

6      Monsanto, shall be construed to incorporate by reference all of

7      the limitations of the claim to which it refers.  In other

8      words, claim one is in claim four, just as if those steps were

9      written in the claim, as they are in our claim of the '755

10     patent.

11             So, what exactly do you have in Monsanto and what

12     do you have here?  You have a process.  They are right.  This

13     is a process claim.  It is not the traditional product by

14     process claim.  It is a process claim.  But, it's not a usual

15     process claim.  The Court can see that.  It's not simply a

16     claim that says do steps one, two and three.  It uses a

17     particular product.

18             In Monsanto, it's a process comprising of

19     obtaining progeny, so that's the process, from a fertile

20     transgenic plant.  A thing that's used in the process.  Here

21     it's a method of treating cancers and other things comprising

22     administering a composition that is a recombinant polypeptide.

23             In both claims you have a process that uses a

24     particular product, but again the claim doesn't stop there in

25     either case.  It makes clear in the Biogen claim that that

1    recombinant polypeptide is produced by a given process.  And in

2    the Monsanto claim is obtained by a given process.  And with

3    respect to the tense issue that we keep hearing about, and we

4    will look at more cases later, it's worth noting that this is

5    the same tense obtained by, that is produced by in claim one of

6    the '755 patent.

7         The idea that everything has to be in the present

8    tense in order to be in a process limitation, the claim, is

9    frankly refuted by not only Monsanto, but numerous other cases

10   I will discuss in a moment.

11        There is then a recited process for preparing the

12   product used in the process.  In the Biogen claim it's produced

13   by non human host, transformed by a recombinant DNA molecule.

14   And in the Monsanto case it is obtained by a process that has

15   three steps.

16        So again, as Mr. Groombridge put it, this is like

17   a process of using a product made by a process.  That's exactly

18   what we have in the Biogen case.  He is right to phrase it that

19   way.  That's exactly what we have in Monsanto, a process using

20   a product, a fertile transgenic plant, obtained or made by a

21   particular process.

22        THE COURT:  But wouldn't you believe there is a

23   distinction in Monsanto based upon the fact that it refers to a

24   process, specifically refers to a process? Whereas the other is

25   the method of administering.

```
 1                    MR. BERL:  Well, this --
 2                    THE COURT:  I mean its second word is "process".
 3                    MR. BERL:  You are looking at this process?
 4                    THE COURT:   Yes, right at the top of your screen.
 5                    MR. BERL:   Right.  Method and process are used
 6      synonymously in patent law.  This is a method of treatment or
 7      process of treating.  Under 35 USC 101, it lays out that one
 8      can have various kinds of inventions, one of them is a product
 9      invention, for example, composition of matter.  Another is a
10      process.
11                    THE COURT:   You are saying method and process are
12      used interchangeably,
13                    MR. BERL:  Yes.
14                    THE COURT:  And one should draw no distinction
15      between them.
16                    MR. BERL:   There is no distinction between those
17      two words.  This is the same thing as a method of
18      administering.  And Biogen and Mr. Groombridge agree that this
19      is process for immunomodulation and that requires a step of
20      administering recombinant polypeptide.  The dispute is as to
21      whether these likewise are required.
22                    THE COURT:   Although if you move down to the next
23      section of highlighted language, obtaining progeny from a
24      fertile transgenic plant under the Monsanto column, that is
25      actually getting something out of the process.  The other,
```

1    Biogen section, is administering something to the patient,

2    which plaintiffs are alleging is the entirety of what this is

3    about, administering something therapeutic to the patient.

4              MR. BERL:   Right.  And here the obtaining

5    progeny, that is what one does in the process.  So, that's

6    obtaining something else.  The progeny are kind of later

7    downstream children plants, so to speak, in the Monsanto case.

8              So, in the Biogen process, it's a method of

9    treating by giving someone a recombinant polypeptide.  That's

10   what you do in the process, you administer the recombinant

11   polypeptide.

12             In this case, you also do something in the process

13   using a product.  You take that transgenic plant and you do

14   something with it.  Obviously you don't administer a plant to a

15   person.  They are doing something else.  You get children from

16   the plant.

17             THE COURT:   Then we are down to the next obtained

18   by and then we are back to the process and how you produce it.

19             MR. BERL:   Again, so this is not how someone

20   obtains the progeny.  This is how you got the thing, the

21   fertile transgenic plant that you are using in the process.

22             THE COURT:   Whereas I think you can draw a

23   distinction, you can say in the Biogen section column, you

24   know, it's claim language, you know, perhaps it is descriptive.

25   Perhaps it could refer back to the actual stuff that's getting

1     injected.

2              Whereas if you look at the Monsanto language

3     that's highlighted up on the screen, I don't see how you could

4     say in any way, shape or form that that is descriptive because

5     it's actually providing steps for a process.

6              MR. BERL:  Well, it's not providing steps for the

7     claims process.  These are not the steps of obtaining the

8     progeny, which is the claim process.  It's reciting the steps

9     of how you obtain the transgenic plant.

10             So this is, how did you get, how did you obtain or

11    make what you used in the process.  And you obtain this

12    transgenic plant by doing bombarding, identifying or

13    regenerating.

14             Biogen is answering the exact same questions.  How

15    do you get this recombinant polypeptide that you used in the

16    process.  How did you obtain it? You obtained it by producing a

17    non human host transformed by a recombinant DNA molecule.

18             In both cases it's describing, if you want to use

19    the word "descriptive", it's describing what you used in the

20    process by the method used to produce it or obtain it.  And in

21    that sense it's an exact parallel to both cases.

22             To be clear, this process is of how one obtains

23    the fertile transgenic plant is not the same process of

24    obtaining progeny.  The claim is to obtain progeny from a

25    fertile transgenic plant that itself was obtained by the

1    following three step process, just as the Biogen claim is to

2    administering a recombinant polypeptide that itself was

3    obtained by the produced and transformed process.

4            It's interesting, though, it's not only the claims

5    that are parallel in the Monsanto case and in our case.  It's

6    the arguments.  Respectfully, this sounds exactly like what we

7    heard twenty minutes ago, that Monsanto said claim four is, by

8    itself, a single step process.  There is one step, we heard

9    over and over twenty minutes ago.  It's just the administering

10   step.  They say here it's just the process of obtaining

11   progeny.  It's a single step process.

12           And the rest of the claim they said in Monsanto,

13   that's just reciting a product that's made by an earlier

14   process claim.  It doesn't matter whether you bought it at the

15   supermarket or how you got it.  It's just a starting material.

16   Claim four is just claiming the process of using the starting

17   material that you got by the steps in claim one.

18           That's what Mr. Groombridge is trying to say here.

19   He is basically saying, listen, this is a single step, a method

20   of immunomodulation by therapeutically administering

21   recombinant polypeptide that was made that way.  The

22   recombinant polypeptide is just a product.  It's just a

23   starting material that's used in the claim.  And it doesn't

24   matter who made it, when it was made, as long as it was made

25   and you can pick it up at the supermarket, that's good enough

1      for government work.

2                      And that's the exact argument that they were

3      making in Monsanto.  It's just a starting material that was

4      made by that process, not a normal claim.  And what they tried

5      to say is listen, this is like a product by process claim.

6      They said, this is just like saying that the product has been

7      made by a given process.  That doesn't mean that you have to

8      carry it out during the term of the patent or that the

9      defendant has to do it.

10                     And the federal Circuit dismissed this summarily

11     and squarely.  The Court finds this argument irrelevant to the

12     resolution of this issue.  Even if claim four is a product by

13     process claim, or more aptly a process of using a product made

14     by a given process, which is how Mr. Groombridge termed our

15     claim a few minutes ago, Syngenta, not anyone, Syngenta, the

16     defendant in the case, would still have to perform the steps of

17     the process of claim one to infringe the claim.  The defendant

18     has to carry it out in order to infringe the claim.

19                     Now, Monsanto, the patentee in that case, just as

20     the patentee here, basically said it doesn't matter that some

21     of the language in the claim about how the product used in the

22     process was made, weren't carried out during the terms of the

23     patent.  They said that's just a trick.  We heard that

24     twenty minutes ago too, that they arranged their affairs so

25     they wouldn't have to practice all those claim steps during the

1    terms of the patent.  They did it earlier so they can get out

2    of jail.

3           And the federal Circuit looked at that argument

4    and said, what do we think about the argument that you can

5    infringe, even though what you made, in that case the

6    transgenic plant, in our case the steps of transforming and

7    obtaining that recombinant polypeptide, was obtained before

8    patent issuance.

9           The federal Circuit said that is inconsistent with

10    the basic rule for infringement.  For infringement of a process

11    invention, all of the steps must be performed either as claimed

12    or by an equivalent.  And 271(a) requires use without

13    authority during the term of the patent.  And the consequence

14    of that was clear as it is here.

15           This case lacks any basis for infringement under

16    claim one because those steps occurred before patent issuance.

17    Because the product that was used in the process was made

18    before patent issuance.  And because the patentee, just like

19    the patentee here, chose to include that language in the claim

20    by depending on claim one there by writing it into their claim,

21    in our case you are done.  Go home.  Infringement is not

22    possible .

23           One of the first three steps of the claim process

24    are performed before the issuance of the patent.  That is black

25    letter law that simply is controlling, and we submit on, on all

1    fours.  When you have a process that uses a product made by a

2    process, the steps of making that process, whether they are the

3    steps in Monsanto or the steps of producing and transforming to

4    prepare the recombinant polypeptide here, must be performed by

5    the defendant and must be performed during the term of the

6    patent.

7              Now, Mr. Groombridge made quite a bit of hay about

8    the plain language of the claim and the fact that, in his view,

9    it supports the idea that these are not process steps laid out

10   in claim one, that produced and transformed are not process

11   steps.  And, in particular, he said that they are in the past

12   tense.  That they are not using the same kind of language as

13   administering there in the past tense.  And therefore that

14   somehow answers the question about when they must be performed.

15             We just saw the Monsanto case which says "obtained

16   by".  Here are four other cases all controlling authority,

17   produced from, from the Supreme Court.  It's such identical

18   language to what we have here.  A hundred forty years ago there

19   was no problem with the Supreme Court saying produced from

20   requires, as a matter of infringement, that it be produced in a

21   certain way.  This is a process limitation.  The tense doesn't

22   matter.  Formed by, in In Re: Hughes.

23             Similar language, how are you forming it?  How are

24   you making it?  Obtainable by in the Abbott case, the en banc

25   case that we just looked at.  Purified from, how you are

1    getting it?  How are you making it?  Using terms like this in

2    the past tense does not convey, in any way, that the terms of

3    the patent is irrelevant.  That the defendant need not carry

4    that out during the term of the patent.  In fact, we saw in

5    Monsanto the rules apply.

6              The question for the Court is are these process

7    limitations, or are they product limitations.  And we submit

8    that question has been answered.  It's been answered by the

9    fact that Biogen agrees that the process has to have been

10   carried out.  It's answered by the fact that there is no

11   dispute that the language confers no structural definition on

12   the recombinant polypeptide.  It defines it by a product or by

13   a process used to prepare it rather than a structural

14   characteristic.

15             The last argument that Biogen made, as I heard it

16   in this sense, is that there is no language that says "the step

17   of" and that somehow that should be determinative as to whether

18   there is a step.

19             Meaningfully in their brief and today, Biogen

20   cites not a scintilla of authority standing for the proposition

21   that the absence or presence of the word "step" is somehow

22   relevant to the determination of whether something is a process

23   limitation.  Again, the same cases produced from, obtainable

24   by, it doesn't say obtainable by the step of acidifying a

25   solution in Abbott.  It need not say that.

1          The question is, is this defining a process or is

2     it defining a product.  The tense doesn't matter.  The presence

3     or absence of the word "step" doesn't matter.  Is it defining a

4     product or is it defining a process?  That's what Gemtron says.

5     That's what all these cases say.

6          So, we then asked the defendant or Biogen's

7     experts -- because at the beginning of the briefing they said

8     this is describing somehow some structural feature of the

9     recombinant polypeptide.  So we asked them, does this language

10    only limit the process by which it's prepared.  And they said

11    that's right.  We said well, what if one were to remove that

12    language from the claim?  Is it correct that you wouldn't

13    change or enlarge the structural scope of the recombinant

14    polypeptide using the applicable definition in the patent?  The

15    answer was, I believe that's correct.

16         It could not be more clear in this case that this

17    language produced by a non human host transformed by a

18    recombinant DNA molecule is defining the process by which the

19    recombinant polypeptide is prepared, nothing more, nothing

20    less.  Not end product characteristics, just the process.

21         And for a hundred forty years the law has been

22    clear about what that means.  Every patent for a product or

23    composition must identify it so it can be recognized aside from

24    the description of the process for making it.  And if it's not,

25    nothing can be held to infringe it which is not made by that

```
 1        process.

 2                     And I heard some argument today, I think, from Mr.

 3        Groombridge suggesting somehow that Dr. Fiers made something

 4        different.  He made something that could be used to treat,

 5        whereas everyone else around the world was making something

 6        that wouldn't be used for treatment.  He was somehow making

 7        something different.  He had something different in his bottle.

 8                     We asked the Biogen expert about that too.  Does

 9        the patent provide any description of a structural difference

10        between native beta interferon -- and that's what existed

11        before, that's what's in our bodies -- and recombinant beta

12        interferon produced by mammalian host cells within the scope of

13        the claim.  Certainly not, he says.  The patent doesn't discuss

14        anything made by mammalian cells, let alone the structure of

15        something. Yes.

16                     So, we asked him what about the pharmacological

17        differences?  What about the differences in being able to treat

18        patients?  Which Mr. Groombridge was now saying was a great

19        breakthrough by Dr. Fiers.  Any disclosure whatsoever between

20        the interferon beta that Dr. Fiers tells you how to produce and

21        the native one that's as old as the hills that has been in our

22        bodies since time and memorial?  No.

23                     The expert was confused.  I am misunderstanding

24        your question.  He certainly doesn't claim it, because he

25        hasn't even produced it and tested it.  So I don't see how he
```

1　could possibly claim it.  The idea that we heard here today

2　that Dr. Fiers somehow advanced the art of treating patients

3　with beta interferon, respectfully, is refuted by the entire

4　record in this case.

5　　　　　He did not identify any property that it had

6　pharmacologically that would help him treat patients.  He

7　didn't identify any clinical study that he did that showed that

8　what he treated patients.  He never even tested the

9　pharmacological properties, according to Biogen's own expert.

10　　　　　We asked, he couldn't have known about any of

11　those differences because he never actually tested it.  Right.

12　And just in case they were going to say this was unclear, we

13　said just to be clear, the skilled artisan reading this

14　disclosure would not understand that Dr. Fiers was in

15　possession of any pharmacological or other difference between

16　recombinant beta interferon and natives.

17　　　　　He didn't know of any structural difference and

18　their expert said I think that's correct.  There is no

19　definition anywhere in the patent of a structural difference

20　between beta interferon made by Dr. Fiers' method and beta

21　interferon in the prior art.  There is no structural

22　description.  All that's there is the description of the

23　process used to make it.

24　　　　　And where there is a description of process used

25　to make it, the law is clear about what that means.  It's a

1    process limitation.  And where you have a process limitation,

2    the answer is, once again clear, it has to be carried out

3    during the term of the patent and by the accused infringer.

4           Now, two final points.  First, Mr. Groombridge

5    went through the specifications and talked about the fact that

6    in his view there is a significant amount of information there

7    which they, by the way, didn't rely on in their briefing at

8    all, relating to treatment and the method of treatment.

9           In reality, the law is clear that you look at the

10   specification and see what construction aligns with the

11   specification.  What the specification reveals, as we explained

12   in our declaration and brief, is that the entire patent is

13   about a process of making beta interferon.  They want to ignore

14   that process.

15          I don't know what we did this morning.  We spent

16   two hours and you heard three presentations about these

17   processes of producing and transforming that they now say

18   somehow they aren't even part of the claim.  That this is all

19   about a method of treatment.

20          Everything we have done here is inconsistent with

21   that, and the specification is inconsistent with that.  Ninety

22   eight percent of the specification is about how you make and

23   use the stuff.  And the tests that they pointed to in their

24   presentation are tests directed to whether you know you got

25   beta interferon, not tests directed to a method of treatment.

1          With respect to the method of treatment, all the

2     patent says in column two is, you do what you did in prior art.

3     We are relying on the prior art.  And just to confirm that we

4     were reading correctly, we asked their expert, In your review

5     of the patent, did you find any clinical use for beta

6     interferon that Dr. Fiers purports to have invented?  No.

7          Did you find any novel treatment regimen? Any new

8     way to treat a disease? No.  Any novel composition, any new

9     thing that he had in his hands that could treat a disease? No.

10    How about any novel diseases that weren't in the prior art that

11    he claims can be treated by beta interferon? No. No. No. No.

12         Dr. Fiers didn't claim to have invented anything

13    with respect to a method of treatment.  And the idea that this

14    claim should be turned on its head so that its sole step in the

15    claim is treating rather than what this patent is really about,

16    which is making beta interferon, is consistent with the

17    specification and frankly inconsistent with the entire record

18    in this case.

19         Now, there's one other argument that bears

20    addressing and that is the absurdity argument which we heard in

21    the briefs and Mr. Groombridge discussed at length, that

22    somehow the result that defendants urge here is absurd.

23         Let me start with a factual question.  It's not

24    absurd at all.  The prior art contained an example, at least

25    one example, of an institution that both made beta interferon

1        and used it to treat.  That was the basis upon which Dr. Fiers

2        was building.  That was the state of the art at the time.

3                It's an article by Carter that we discussed again

4        with their expert.  We asked them, this is describing a program

5        at Rosswell Park Memorial Institute in New York.  And he said

6        yes.  And that institute is both generating interferon beta

7        and administering the treatment of diseases, correct?  Answer:

8        That's right.  And that was the part of the prior art relating

9        to the treatment of the disease using beta interferon, correct?

10       Answer:  Yes.

11               So the idea that this is absurd, that there is no

12       way that they would have gotten a claim that somehow can't be

13       infringed, is belied by the fact that the people who were doing

14       the treatment of beta interferon at the time, it was sometimes

15       just one institution doing both the making and the treatment.

16               So it's not an absurd result at all.  But, the

17       really issue here is it's not for the Court to decide what an

18       absurd result is.  The result is whatever the federal Circuit

19       law mandates with respect to the infringement inquiry that's

20       coming next.

21               The federal Circuit has been clear over and over.

22       We cited the Smith-Klein case where Judge Posner sitting by

23       designation attempted to construe the claim to avoid an absurd

24       result.  And the federal Circuit said no, we are reversing you.

25       You can't do that.  This is not a policy-driven inquiry.  And

1    we cite case after case.

2         The BMC Software case is an example where the

3    patentee came in and said if you construe this claim like the

4    defendants urge, no one could infringe.  It's non infringeable.

5    It's a ridiculous, absurd claim.  And the answer from the

6    federal Circuit time after time after time after time is who

7    cares.  You look at the claim language.  You look at the

8    controlling law.  And the infringement inquiry is the

9    infringement inquiry.  It's not a policy-driven inquiry.  And

10   it's perfectly acceptable to have a claim that's not infringed.

11        In fact, it's no coincidence that they have a

12   claim that's not infringed.  You heard today that this patent

13   was in prosecution for 30 years.  That's not a coincidence.

14   They tried to get a claim to the DNA sequence.  They failed.

15   They tried to get a claim to the polypeptide.  They failed.

16   They tried to get a claim for a method of treating using beta

17   interferon without reciting process steps for making beta

18   interferon.  They couldn't do that either because that's in a

19   prior art.

20        THE COURT:  So, are you saying that this is the

21   best they could accomplish and it's no wonder that it would

22   have a negative result?

23        MR. BERL:  Yes.  That's exactly right.  They

24   tried everything in the federal Circuit and the patent office

25   told them time after time, sorry, that's someone else's

1    invention.  You can't have that.  So what they end up with is

2    this mongrel claim where they have got a method of treating

3    using a recombinant polypeptide prepared by a given method.

4    The kind of claim that you got in Monsanto and Monsanto said

5    listen, that's not fair.  They are not going to infringe that.

6    The federal Circuit said sorry, you are out of luck.  I'm

7    sorry, they are infringing.  Those are the rules and you have

8    to live by them.

9           We didn't draft this claim.  We heard ourselves

10   and our legal team blamed for coming up with this idea.  This

11   wasn't our claim.  The master of this claim for 30 years was

12   Biogen.  And the federal Circuit said in BMC Software when the

13   patentee made the exact same complaint, here you're giving me a

14   claim that wasn't infringed.  The federal Circuit said, we're

15   not doing that to you.  You did that to yourself.

16          Proper draftsmanship, the federal Circuit said,

17   could have avoided this result by simply reciting, as every

18   method in the claim, something that one person would do.  So,

19   if they wanted a claim like that, they could have tried to get

20   it.

21          The fact of the matter is they couldn't get it

22   because that's someone else's invention.  The fact that they

23   couldn't get it is not our fault and is not a reason to set

24   aside a century of controlling authority about what it means to

25   define claim by a process.

1          Finally, with respect to an absurd result, the

2     result that I would submit is absurd here is the idea that

3     liability should be triggered against the defendants.  When you

4     heard today that the transformation that they conducted, that

5     Serono conducted, occurred in 1981.  Absent that

6     transformation, if that transformation didn't occur, according

7     to Biogen itself, there is no liability here.  That

8     transformation has to have occurred.

9          They are asserting that whenever the

10    transformation occurs, whether it's 1981 or the year their

11    patent expires in 2026, defendants are somehow liable as a

12    result of that transformation.

13         THE COURT:  Well, they do have a conceptual

14    difference.  They are saying this is a one-step claim.  And the

15    one step is the method of administering this.  Whenever it was

16    done, whenever it was transformed, so be it.  That's their

17    argument.

18         MR. BERL:  But, if it's really a one-step claim,

19    then they wouldn't need to prove that it was ever transformed.

20         THE COURT:   They are saying it's described by

21    transformed and produced.

22         MR. BERL:  And that those are prerequisites in

23    order to prove infringement.

24         THE COURT:  To describe what the substance is that

25    is being administered.  As best as I can discern of the

1    argument, and I hope I am doing justice to it, but that's the

2    way I heard it.

3                    MR. BERL:   That's the way I heard the argument

4    too.  The problem with that is that the only way that describes

5    the recombinant polypeptide that we just saw is by the method

6    of making it.  It doesn't describe it in any structural or

7    physical sense.

8                    THE COURT:   I mean I understand there is a

9    fundamental difference in terms of how you view the language

10   and the implications thereof.

11                   MR. BERL:   And therefore because it's described

12   by the process, that process, by their own admission, has to

13   have been carried out.  They dispute who and when.  But, they

14   agree, they have to come into court one day and show that

15   someone did this transformation sometime.   And that sometime,

16   according to them, could be anytime between when they filed

17   their patent application in 1980 or maybe even before, and

18   2026.

19                   That is a 46-year term during which people have

20   liability as a result of the transformation they did.  Where

21   absent that transformation, no liability would ensue.

22                   THE COURT:   Are we making an absurd result

23   argument?

24                   MR. BERL:   That would be an absurd result.  I am

25   not suggesting you should consider it after I just told you the

1    federal Circuit doesn't allow you to do that, but as a

2    practical matter that is every bit as absurd as that scenario

3    that Biogen suggests.

4              THE COURT:   I am not suggesting that that is what

5    I am concluding.  I am just simply asking --

6              MR. BERL:   That is what I am suggesting.  So,

7    with that, if you have any questions, I would be happy to

8    answer them.

9              THE COURT:   I am fine.  But what I am going to

10   suggest is we take a five-minute break.  We will give our court

11   reporter a chance to rest and then we will come back.  After we

12   come back, what will we have left?

13             MR. BARSKY:   I am going to briefly address the

14   history, the file history, the prosecution history, and I

15   believe then we are finished.

16             THE COURT:   Okay.  Then what I would like to do

17   is just a short give and take on some points that I view as

18   meeting that and then I think we should be wrapping up.

19             MR. BARSKY:   Sure.

20             THE COURT:   Thank you.

21             (Whereupon a short recess was taken.)

22             THE COURT:  I just want to follow-up with one

23   question for counsel before we start in.   With respect to the

24   last argument we were making in terms of what was left for the

25   plaintiff to proceed on, after the five claims had been severed

1    by the patent office, they sent them back, indicated that they

2    should be presented separately.  So why do you think the patent

3    office would permit the claims to be severed if there was no

4    support for a method of treatment claim?

5              MR. BERL:  The question of whether there was

6    support for method of treatment claim in the specification is

7    separate from the question of whether a method of treatment

8    claim is, in fact, patentable.

9              The law is clear that a restriction requirement is

10   not a rejection on the merits.  In other words, it's not the

11   patent office evaluating the requirement for patentability like

12   written description and novelty and non obviousness and saying,

13   you know what, you can get a claim on this.

14             It's simply a statement you have multiple

15   inventions, you have to split it.

16             THE COURT:  But, by asking that to be separated,

17   wouldn't that indicate that they believe that there were five

18   separate inventions to proceed upon?

19             MR. BERL:  That there were five different classes

20   of invention and this is done, in part, based on what the

21   search terms are.

22             THE COURT:  So, if Dr. Taniguchi, if he had the

23   DNA aspect of it and the fifth claim was the method claim and

24   it was method of administration, you know, plaintiff here is

25   saying well that's what was left, that is what they proceeded

1    with, that's what they have here and they have a step of

2    administering and they are describing the substance that is

3    administered.

4              And I understand that defendants have a very

5    different view of, you know, what we are proceeding on.  But,

6    if the claims were, in fact, requested by the patent office to

7    be severed into separate inventions with the fifth one

8    apparently being a method of treatment claim, why would this

9    not be a method of treatment?  Why would you perceive it to be

10   something more than that invoking the process?

11             MR. BERL:   Okay.  And I think the quick answer to

12   that is if the claim ended after the orange on the board, if

13   the claim ended after recombinant polypeptide, then they would

14   have a typical method of treatment claim.

15             THE COURT:   I'm sorry, if it ended after

16   polypeptide?

17             MR. BERL:   Yes, because then they would have a

18   method of treatment claim and they do have a method of

19   treatment claim.  But in that case it would be a method of

20   treatment of cancer.

21             THE COURT:   Your argument is any descriptive

22   language reduces their claim as opposed to assists them by

23   providing a description as to what the substance is, which is

24   their argument.

25             MR. BERL:   That's the all elements rule.  Every

1      limitation of the claim narrows the claim.  Every time you add

2      language, you are narrowing the scope of the claim.  The

3      question is how.

4            THE COURT:   How would they -- and this is just a

5      background question, how would a infringer, someone who is in

6      this area, know what to administer if it was just ending at

7      polypeptide?  How would you know what the substance is to be

8      protected by the patent?

9            MR. BERL:   Well, they could have said beta

10     interferon polypeptide or they --

11           THE COURT:   So then it couldn't have just ended

12     at recombinant polypeptide.

13           MR. BERL:   It could have ended at recombinant

14     polypeptide and then had A what is intended A which describes

15     the DNA sequences that the recombinant DNA molecule would have.

16     That would have been a method of treatment claim that would

17     have said I am claiming treating cancer by using a recombinant

18     polypeptide that was made from a DNA sequence basically with

19     these oh.

20           THE COURT:   If he says that was made then we are

21     talking about produced and perhaps even transformed.

22           MR. BERL:   They could have alternatively said the

23     recombinant polypeptide with the following sequence and had the

24     sequence in Figure 4 of the claim.  That would have defined

25     structurally what they were administering.

1          Rather, what they did was they defined it by the

2     process used to make it with explicit process limitations.

3          THE COURT:    Then back to the fact that the patent

4     office did actually accept this and it did end up with five

5     separate inventions, what is deemed to be inventions to begin

6     with, it severed them off and it left this as a method claim.

7          MR. BERL:    And it is a method of treatment, but

8     it's a method of treatment that is limited by the process by

9     which the recombinant polypeptide is prepared.

10         The patent office did not say you can have any

11    method of treatment claim in the world.  They just said that's

12    a different class of inventions because we searched for it

13    differently and it's a different kind of invention.

14         THE COURT:    But, if the DNA was already protected

15    by a separate patent, then how could this be anything else

16    beside descriptive matter?

17         MR. BERL:  Well, because they are not claiming the

18    DNA, per se, or they are not even claiming per se here is a

19    method of making polypeptide by producing and transforming.

20    That would be a separate claim.  They could have a claim that's

21    a process of preparing a recombinant polypeptide by producing

22    from a non human host and transforming with the recombinant DNA

23    molecule.  That's not this claim.

24         What they have done here is it's a method of

25    treatment using recombinant polypeptide made in a certain way.

1    So they have, in a sense, combined different parts of what they

2    claim to have invented into a single claim that has all these

3    aspects.

4            And according to the federal Circuit, the Supreme

5    Court, you can't ignore any of those aspects in construing the

6    claim.  They are all limited by, in this case, the process

7    steps that they recite in the claim.

8                THE COURT:   Okay.  Thank you.

9            Go right ahead.

10               MR. BARSKY:   May I just address a couple of

11   points to that, your Honor?

12               THE COURT:   Sure.

13               MR. BARSKY:   And that is this, I think in the

14   course of this discussion, you know, unfortunately I think far

15   too much weight is being given to this restriction requirement

16   that issued in 1982.

17           And the reason for it is is that all the patent

18   office was saying at the time, and Mr. Groombridge put up

19   Section 121, 35 ISC, and all that Section 121 says is that once

20   you divide applications into separate claimed inventions -- and

21   that's what the patent office, by the way, was saying in 1982.

22   Not that there were five separate inventions as the slides

23   stated.

24               THE COURT:   But, in any event, it's my

25   understanding the doctor obtained the DNA patent.  And right

1          now Biogen is currently paying a license with respect to that.

2          So, the DNA was covered by a separate patent.  So, the DNA

3          wouldn't thereafter or shouldn't be covered by the same, I

4          mean, the same DNA description here shouldn't be the same one

5          contained in the patent on the DNA that the doctor obtained.

6                     MR. BARSKY:   After the restriction requirement,

7          your Honor, what was clear was that once Dr. Taniguchi was

8          entitled to a patent on the DNA,  no one else would be entitled

9          to a patent on the DNA.

10                    THE COURT:   Well, then my question is, wouldn't

11         that support that the DNA reference in here is descriptive

12         rather than a process?  That's the question.

13                    MR. BARSKY:   If by DNA -- I am not certain

14         exactly what your Honor is referring to by the DNA reference.

15         But, if your Honor is referring to these inserts here --

16                    THE COURT:   I am referring to the entirety of the

17         produced by a non human host transformed by a recombinant DNA

18         molecule comprised of a DNA sequence selecting in the group

19         consisting of A, B and so on.

20                    MR. BARSKY:   Yes.  So, if Dr. Taniguchi were

21         entitled -- and no one knew this in 1982, of course.  This was

22         long before that interference proceeding ever began, this

23         restriction requirement.  That the interference didn't occur

24         until the late 1980s.  It wasn't finished until the early

25         1990s.

1          So, at the time, 1982, this was just within a year

2     of the United States application being filed.  All the patent

3     office said was look, you're claiming five different

4     classifications of inventions.  And for the patent office, we

5     have to divide those out because you can only pursue one

6     classification in each application, a very common practice.

7          THE COURT:   Understood.  But, what I am working

8     with now is with the DNA aspect of that, took on its own life

9     through a separate patent not possessed by the plaintiff here.

10    Because Dr. Taniguchi received the DNA patent.

11         MR. BARSKY:   Ultimately, yes.  That's correct.

12         THE COURT:   Okay.  So then what was left, there

13    were five separate potential inventions that were addressed by

14    the patent office.

15         MR. BARSKY:   And there is no question that Dr.

16    Fiers was entitled to pursue, and he did receive a method of

17    treatment claim.  And we are not arguing, and never have, that

18    Dr. Fiers and Biogen did not receive a method of treatment

19    claim.  We can see it in black and white in claim one of the

20    '755 patent.

21         THE COURT:   You are saying it would not be

22    inconsistent if he were to receive a method of treatment claim

23    and that Dr. Taniguchi received the DNA patent.

24         MR. BARSKY:   Yes.  And it would also not be

25    inconsistent, in fact, the reason it took 30 years is because

1        at the end, we know he couldn't get the DNA claim.  We know he

2        couldn't get the protein claim.  We know he couldn't get simply

3        the method of producing this recombinant DNA, excuse me, this

4        recombinant protein.  And so what he ended up with at the end

5        was this amalgam that Mr. Groombridge says is routine and

6        typical and claims are written like this all the time.  It's

7        exactly the opposite in my experience, your Honor.

8                What we ended up with is this amalgam where he

9        gets a method of treatment claim with a particular composition

10       that is made in accordance with a specified process which

11       process must be carried out in order to practice the invention.

12               And the answer to the question that your Honor

13       asked just moments ago is simply this:  That he could not have

14       received this claim without building into the limitations and

15       building into the scope, the very process by which that

16       recombinant DNA -- recombinant protein is produced and

17       expressed.

18               And my comments are going to be directed to the

19       prosecution history.  And one of the things we see in the

20       prosecution history, your Honor, is that Biogen justified its

21       entitlement to a patent in this case by distinguishing Biogen's

22       claimed invention over the prior art by those very processes by

23       pointing to the fact that it was those processes which entitled

24       Biogen to an invention.

25               And that loops me back to your Honor's very first

1    question at the beginning of this Markman cycle which is with

2    respect to transformation and production, what are the

3    guideposts that the Court can look to to determine whether

4    transformation and production are processes that are required

5    by the claim.  And that is precisely what I want to direct all

6    of my comments to, your Honor.

7              THE COURT:  Okay.

8              MR. BARSKY:  Because the answer to that question

9    is first we have already talked about the claim language and

10   the specification.  But if the Court is looking for guideposts

11   and additional guideposts, here they are.  The Court can look

12   to how does Biogen understand its invention.

13             Back in the day when it was still seeking to

14   procure a patent from the patent office, how did the examiner

15   who spent a career working with Biogen's patent applications,

16   understand that claim? What did Biogen tell the patent office

17   about what was required by its claims when it was seeking to

18   receive a patent?  And how does that compare to Biogen's

19   position today, now that they have a patent?  And what was

20   Biogen's position before, when it was seeking to persuade the

21   examiner to allow a patent before billions of dollars in sales

22   of Avon ex and Betaseron and Rebif were at issue.  And before

23   Biogen had any incentive to spin the scope of its claim.

24             And that is why, your Honor, those are the

25   guideposts that the Court can look to and that I am going to

1    address now.  Because what this claim construction hearing

2    really is about ultimately, your Honor, is fundamental

3    fairness.  It's the principle that, as we will shortly show the

4    Court, it's the principle that if you obtain a patent by

5    representing to the patent office --

6              THE COURT:  I know you are going to argue that you

7    should be held to what you represented.  And I certainly

8    understand your argument from the briefing and I have studied

9    the prosecution history as best as I can study that.

10             So, if you have certain guideposts for me that are

11   specific based on the prosecution history, I would think that

12   would be very important.

13             MR. BARSKY:  And I will get right to that then,

14   your Honor.  But, I did want to start just by reiterating, this

15   is why we look to the file history.  And, in other words, it

16   is to look at how the inventor understood the invention and how

17   the patent office understood the invention.  And what was

18   represented about the scope, the very issue your Honor has

19   acknowledged is now at issue.  What was said about the scope at

20   that time.

21             So, that's why I say this is about fundamental

22   fairness.  And so we all know what the issue is here.  The

23   issue is whether claim one of the '755 patent -- and before I

24   go any further, may I approach, your Honor?

25             THE COURT:   Sure.

1           MR. BARSKY:  I have prepared just a book of

2     excerpts.  I have prepared just a book of some of the excerpts

3     from the file history that are already in the record.  And then

4     I am going to be referring to during or that I may refer to

5     during my comments.  But, because we are using the power point

6     presentation, I want to make sure that if the Court wants to

7     see a context of anything that we are pointing to, or more of

8     the document, it has the ability to do that.

9           THE COURT:  That sounds good.  Thank you.

10           MR. BARSKY:  In order to make it as confusing as

11     possible for the Court, the exhibit numbers don't correlate

12     necessarily with the tab numbers.

13           THE COURT:  I see.  Okay.

14           MR. BARSKY:  So, I will be indicating what the,

15     both the exhibit and tab numbers are for the record.

16           So, we know what the issue is here, and that is,

17     does claim one of the '755 patent recite multiple process

18     steps, or does it recite a single process step.  I take it your

19     Honor is well versed, well versed in what that issue is.  So I

20     don't need to recapitulate it.  But, I will say this, that if

21     Biogen is right and the only process step in claim one is the

22     step of administering, then the litmus test for whether this is

23     accurate or not is to see whether Biogen ever referred to a

24     single claim as having multiple process steps.

25           Because your Honor knows from the study of the --

1          THE COURT:  Well, I think plaintiffs have already

2     said they had one instance of that and the attorney made an

3     error in this regard.

4          MR. BARSKY:  Yes.  That's right.  In fact, that's

5     not actually accurate and I am going to explain why

6     momentarily.

7          But, the specific issue arose -- arises out of, in

8     the first instance, out of this office action from

9     September 23, 1996, your Honor.  And this is tab four, exhibit

10    -- tab four in the book, exhibit 7.  Here is what Mr.

11    Groombridge said about what the examiner was doing here in

12    making this comment that the positive process steps, I think he

13    said, in this group of claims are identical to the positive

14    process steps in this group of claims.

15         And I wrote it down because I wanted to make sure

16    I got it right.  What he said was that the examiner was saying

17    here, that you can't get two patents on the same thing.  We all

18    agree that the examiner was referring to two separate

19    co-pending applications, the 723 application and the 930

20    application.  The application which ultimately matured into the

21    '755 patent.

22         The examiner went on to talk about the two

23    processes in those claims, and pointed out that the actual

24    process steps of the two sets of the claims are the same.

25         Now, here are the two claims that the examiner was

1      talking about when the examiner said that they have the

2      identical positive process steps and which we have obviously

3      indicated is a reference to the production step and the

4      transformation step as being identical.  Biogen argues no, it's

5      the administration step that occurs at the very beginning.

6             If we go back, your Honor, so, what Biogen's

7      argument is is that the reference to positive process steps is

8      to multiple occurrences of a single step in co-pending claims.

9      Multiple occurrences of the administration step in co-pending

10     claims.

11            Let's take a look at what Biogen's response was.

12     And you saw this earlier because Biogen showed it to you during

13     its presentation.

14            Biogen, referring to a single claim, claim 31 of

15     the 658 application, says that claim also recites those

16     positive process steps.  This was the remark that Mr.

17     Groombridge said was a mistake.  It was a one off.  It was a

18     one time problem that never repeated itself.  And we are going

19     to test that in a moment.

20            But, I want to just put this in context, your

21     Honor, because the examiner was looking at the 723 and 930 and

22     saying the positive process steps in those two co-pending

23     applications are identical.

24            Biogen comes back and says well, actually, your

25     Honor, we have a third co-pending application, all right.

1     That's the 658 application.  And that third -- and in that

2     third application claim 31 recites those positive process

3     steps.  So let's take a look at that claim, claim 31 of the 658

4     application.  And you will see that it has the identical

5     production, the transformation elements, as well as the

6     administration element.

7          And at this time, and you heard this before but I

8     will reiterate it because it is an important point, the

9     language, the step of administering, was not in this claim.

10          THE COURT:  It was added.  I understand.

11          MR. BARSKY:  And what's significant about that,

12     your Honor, is this:  That long before that phrase, "the step

13     of" was added to this claim, the examiner, we saw the

14     examiner's comments moments ago, the examiner looked at this

15     claim and saw positive process steps.  Didn't need to see the

16     word "step of" in order to find positive process steps in this

17     claim, which is incompatible with Biogen's repeated insistence

18     in its briefs about how the only step of anywhere in the '755

19     claims is the step of administering and therefore that's the

20     only step.  So, we will come back to this in a moment.

21          If, your Honor, by the way, I mentioned the -- I'm

22     sorry, that was tab 5, Exhibit 8.  And I was just looking, your

23     Honor, I believe it was, hold on one second, I believe it was

24     page 2.  Excuse me.  It's page 3.

25          If we flip the page, the first, first was this

```
 1        reference then to the 658, the single claim from the 658

 2        application that Biogen represented had those positive process

 3        steps, which we contend are clearly the production and

 4        transformation steps.

 5                     If you turn the page in that exhibit, your Honor,

 6        you will see that Biogen then directs its attention, and this

 7        is at the top of page 4, internal page 4.

 8                     THE COURT:  Oh, yes, I have it.

 9                     MR. BARSKY:  Okay.  So, this is on the top of

10        page 4, tab 5, Exhibit 8.  Sorry.

11                     THE COURT:   No, I'm good with it.

12                     MR. BARSKY:   Now Biogen is talking not about the

13        658 application and claim 31 of the 658 application.  Now

14        Biogen is talking about amended claim 31 of the 930 application

15        and amended claim 31 of the 930 application issued as claim one

16        of the 755 patent, the very subject of this claim construction

17        proceeding.  I just want to make sure your Honor is --

18                     THE COURT:  I am with you.

19                     MR. BARSKY:   All right.  Thank you.  What is

20        recited here, your Honor, is that Biogen says about that single

21        claim, once again, that it has multiple, positive process

22        steps.  It says that the preamble of amended claim 31 now

23        recites the several intended uses for the positive process

24        steps claimed.

25                     So this wasn't one instance of a reference to
```

1    claim 31 of the 658 application.  This wasn't a mistake or an

2    oversight that we are arguing should somehow warp the

3    construction of this claim and the determination by this Court

4    as to whether or not this claim requires these processes.  This

5    was a very clear and consistent reference to single claims,

6    single Biogen claims as having multiple positive process steps.

7            And the significance, once again, is this was the

8    claim, this is the claim that is now at issue, so the claim 31

9    now claim one of the 755 patent.  So here is what it looked

10   like at the time, claim 31 of the 930 application.  See the

11   production and the transformation steps.  And here is the

12   office action that the examiner was referring to, once again,

13   about claims 31 through 34.

14           Now, one of the things that Mr. Groombridge

15   referred to, and this is in slide 41.  I am afraid I am going

16   to need to refer you, your Honor, to the Biogen book for a

17   second.

18           THE COURT:  To which one?

19           MR. BARSKY:  This is the Biogen book and it is

20   slide 41.  Let's start here.  I would put it up if I could.

21   I'm sorry.

22           THE COURT:   No, that's okay.  I have it right

23   here.  All right.

24           MR. BARSKY:   So what struck me about this was not

25   the excerpt from the file history, so much as it is the bullet

1    point title, because this was a claim that was made in the

2    briefs.  But, the claim made by Biogen was that there was some

3    amendment that was made and that was the adding of the language

4    or the phrase "the step of" to administer.

5                And this suggestion has been made that that

6    amendment was made quote to make clear that the only method

7    step is the step of administering to a patient.  There is

8    nothing in this file history that says anything like that

9    anywhere.  And, in fact, as we saw, the examiner reviewed this

10   as being, as being steps regardless of whether the language

11   "the step of" was in the claim or not.  And there is nothing to

12   suggest anything about the intent or the reason even for adding

13   "the step of" administering.

14               And, in fact, administering, as Mr. Groombridge

15   himself just said, is just as much a step when it says simply

16   administering as when it says the step of administering.

17               So, this amendment had no impact whatsoever on the

18   substance or the scope of his claim.  And to suggest that there

19   was some intent here, that the reason that amendment was made

20   was to make clear that this was the only step, first of all, it

21   doesn't say the only step anywhere.  And second, there is no

22   support for that.  And, in fact, as we just saw, Biogen looked

23   at its own claims and saw multiple positive process steps in

24   single claims.

25               THE COURT:  I just want to stop you one moment.

1    It says defendant's exhibit 7 over there.  What should that be

2    in my packet here?

3                    MR. BARSKY:  Defendant's exhibit 7 is tab four.

4    And I can direct you to where that language occurred on page 3

5    right underneath the blocked quote.

6                    THE COURT:  I have got it.  So now just to

7    reiterate, is it two places or is it more places where you are

8    stating that the plaintiffs referred to steps versus step when

9    there was only one claim left?

10                   MR. BARSKY:  No, there are actually multiple times

11   when they use the phrase "positive process steps".  What I am

12   saying --

13                   THE COURT:  If there's multiple claims, I

14   understand where that could come from.  But if there are not

15   multiple claims, are you alleging twice or more than that?

16                   MR. BARSKY:  That occurred twice, your Honor.

17                   THE COURT:  And there's a March 24, 1997

18   instance.  And what is the other one?

19                   MR. BARSKY:  It's in the same exact paper.

20                   THE COURT:  It's the same paper, so it's one

21   document?

22                   MR. BARSKY:  Yes, it is, your Honor.  So there

23   were two instances in which Biogen referred to a single claim

24   as having multiple positive process steps.

25                   Now, you heard Mr. Groombridge address what Biogen

1      contends is this anomaly because claim 32 only has the

2      administration step and there is no reference to production or

3      -- explicit reference to production or transformation in claim

4      32.

5              First of all, there is no anomaly there, and I

6      will explain why in a second.  But, more importantly, any

7      ambiguity that may arise by the fact that the examiner here --

8      and this is the language that gives rise to Biogen's claim.

9      And your Honor will see that claim 32 is not called out

10     individually obviously.  It's just among the set of four claims

11     that the examiner treated in one fell swoop as claims 31 to 34.

12             But, any ambiguity that may arise out of that is

13     swept away by the fact that Biogen, in referring to single

14     claims, referred to single claims as having multiple, positive

15     process steps.  And Biogen in its papers -- today was the first

16     time we heard any explanation as to claim 31 of the 658

17     application -- it didn't address that issue at all in its

18     papers.  It ignored that and it went to what it claimed was

19     this anomaly by the examiner's statement.

20             Today was the first time Biogen, to my

21     recollection, ever took the position that what happened here

22     was a mistake by the prosecuting attorney.  So, instead of

23     addressing Biogen's own statements about single claims having

24     multiple, positive process steps, they point to this supposed

25     anomaly.

1          And here is why there is no anomaly at all, your

2     Honor.  Claims 31 to 34 are a basket of interrelated claims.

3     And this is where patent law and prosecution gets really fun,

4     your Honor, because the claims 33 and 34 are dependent claims.

5     And they depend, meaning that they descend from or that they

6     incorporate all the elements of two independent claims.  Each

7     of them does that.

8          So, claim 33 depends alternatively from claim 31

9     or claim 32.  And claim 34 depends alternatively from claim 31

10    or claim 32.  So, you have these cross links between the

11    claims.

12         The examiner, as we saw, chose to treat that

13    basket of interrelated claims in one fell swoop.   Could he

14    have been more precise and pointed out in two pages rather than

15    in that one sentence what steps were in each of those claims?

16    Sure.  But, the fact that he didn't is not -- doesn't raise any

17    ambiguity or anomaly.  That's not, as I say, dispelled by

18    Biogen's own reference to its own claims as individual claims

19    as having multiple, positive process steps.

20         Now, I want to address an issue that Mr.

21    Groombridge raised towards the end of his presentation.  He

22    argued that what we are really arguing about here is a

23    disavowal of claim scope or a waiver, and that there is a

24    higher evidentiary standard that we should meet in terms of the

25    clarity that is required in those circumstances, and that's

1     exactly wrong.

2             Disavowal arises when you have a claim that is

3     directed to a specific scope.  And the argument is --

4             THE COURT:  You can go ahead.

5             MR. BARSKY:  Disavowal arises when a claim has a

6     specific scope.  And the argument is that the applicant in

7     seeking the patent from the patent office, disavowed part of

8     that scope.  So the scope may be a genus of compounds, or the

9     scope may be elements one through ten, or the scope may be a

10    class of proteins.   And on its face the argument would be, the

11    disavowal argument is yes, the claim on its face extends to all

12    of those things, but you disavowed a part of it in order to get

13    your patent.  So you are actually only entitled to less.

14            That's what disavowal is here.  We are not arguing

15    disavowal here.  We are not arguing waiver or anything like

16    that.  What we are arguing is that the plain meaning of this

17    claim, from the language of the claim itself, to the

18    specification, to the file history, all support a single

19    construction --

20            THE COURT:  I understand your point.

21            MR. BARSKY:  Okay.  Two points, your Honor.

22            The federal Circuit -- or two cases.  I am just

23    very quickly.  The federal Circuit rejected exactly the

24    argument that Biogen makes here in the 800 Adept case that is

25    cited in our papers.

1                    THE COURT:    Can you give me the full cite just

2        once again?

3                    MR. BARSKY:    May I come back to that, your Honor?

4                    THE COURT:    Sure.  Unless someone else has it.

5                    MR. BARSKY:    We will get it, your Honor.

6                    MR. BERL:    It's 539 F 3d 1354.

7                    THE COURT:    Thank you.

8                    MR. BARSKY:    Don't go away, Mr. Berl.  The

9        Schindler Elevator case.

10                   MR. BERL:    593 F 3d 1275.

11                   THE COURT:    Thank you.

12                   MR. BARSKY:    Thank you.  And so in both of those

13       cases the federal Circuit rejected exactly the kind of argument

14       that Biogen is making here about this disavowal notion.  And it

15       rejected the suggestion that you can't hold the patentee to the

16       patentee's words during the prosecution.  Because in those

17       cases, as here, the argument was not that there was a disavowal

18       of scope, but rather that the prosecution history was being

19       used to support the claim construction demanded by the plain

20       language of the claims and the specification.

21                   That's the single point that I wanted to make on

22       that.  Thank you for the time.

23                   THE COURT:  Thank you.  Thank you very much.

24                   MR. BARSKY:   I'm sorry, I am sorry if I suggested

25       I was done and I know we have been going --

1          THE COURT:   What else do we have because we are

2     going way over time.

3          MR. BARSKY:   I aware of that, your Honor.  Let me

4     try and be very quick and get very quickly through this because

5     this is very important.

6          THE COURT:  Sure.  Go ahead.

7          MR. BARSKY:   I don't want to give it short

8     shrift.

9          This wasn't the only time, Mr. Groombridge

10    suggested, that this was just this 1995 to 1997 chapter in the

11    history of the interchange between Biogen and the patent

12    office.

13         In fact,  your Honor, as late as 2004, here is

14    what the examiner said.  And this is the examiner, by the way,

15    your Honor, who has, as I mentioned earlier, specially trained,

16    has spent much of his career working with the Biogen

17    applications.  And if the Court is looking for someone with no

18    ax to grind and with no dog in this fight who has enormous

19    intimacy with what Biogen's patent applications are directed

20    to, I would suggest that the examiner is just one such person.

21         And here is what the examiner said in 2004.  This

22    was in a chapter of the history.

23         THE COURT:  Hold one moment.  I see that there's

24    exhibit 12 which translates to tab 6 but I am not on tab 6

25    right now and I don't see that.

1              MR. BARSKY:   It is tab 6 and it's the page 3,

2       your Honor.  I'm sorry, I should have waited for your Honor to

3       get that.

4              THE COURT:   I see.  You know what, a different

5       section is highlighted.  Okay.  I'm there.

6              MR. BARSKY:   Here is this examiner with enormous

7       familiarity with the Biogen file history and the patent

8       application, no ax to grind.  And what he does in May of 2004

9       is he looks at the claim that the Court is now charged with

10      construing, or at least the predecessor of that claim, claim 31

11      of the 930 application, and says that claim is -- I'm going to

12      reject that claim under a section of the Patent Act called

13      102(g).

14             In the course of doing that, your Honor, here is

15      how the examiner characterizes those claims.  The examiner says

16      that the claims require the use of the DNA to produce the

17      polypeptides.

18             Your Honor, we talked about scope earlier.  At the

19      very beginning of this proceding your Honor brought up the

20      issue of scope and we have all been talking about it.  That's

21      precisely what the examiner is talking about here .  And he is

22      not saying, he is not saying, as Biogen has suggested, that the

23      claims require the use of a recombinant polypeptide, a product

24      having certain characteristics and here they are.  He is saying

25      that the claims require a process, the use of the DNA to

1    produce the polypeptides.  Clear as day.

2              This was never the subject of any substantive

3    response by Biogen.  They suggested at one point that we took

4    this out of context because we didn't quote what it was

5    responsive to.  But, they never suggested there was any

6    ambiguity about this, nor could there be.

7              And, your Honor, Biogen did respond to this.

8    They did say well, 102(g) is inappropriate to invalidate those

9    claims because these two referenced patents, these two Sugano

10   patents that are referenced in that first sentence, are not

11   102(g) prior art.  And you know what, it turns out they were

12   right.  It wasn't prior art.

13             But they never once said to Mr. Martinell (ph) you

14   know, we find it surprising that after 25 years you don't

15   understand the scope of our claims.  Our claims don't require

16   the use of the DNA to produce the polypeptides.  They never

17   said that and they had many opportunities to do so.

18             I will just skip forward very quickly because

19   there was a number of exchanges after this time just in this

20   one chapter of the file history on the 102(g) rejection.  And

21   these are both office actions and responses by Biogen.  Never

22   once did Biogen say that you've got our claims wrong.  They

23   don't require the use of the DNA to produce the recombinant

24   polypeptide.

25             THE COURT:  Okay.  This chart or page appears

```
 1          where?

 2                      MR. BARSKY:  This is in our file -- this is not in

 3          the booklet.

 4                      THE COURT:  It's not in my packet.

 5                      MR. BARSKY:  No.  The booklet is just the file

 6          history excerpts, your Honor.

 7                      So, just to sum up this point, the examiner said

 8          the claims require the use of the DNA to produce the

 9          polypeptides.

10                      THE COURT:  You know what, what you can do is

11          tomorrow when you can get it together, if you want to just send

12          us, overnight those, that would be fine if you that.  I have

13          those sheets, that hard copy sheets, or is it contained in one

14          of these other compilations?  Your presentation.

15                      MR. BARSKY:  Oh, yes.

16                      THE COURT:  Is it contained in one of these other

17          folders?  No?

18                      MR. BARSKY:  Are you talking about this slide,

19          your Honor?

20                      THE COURT:  Yes, that slide.

21                      MR. BARSKY:  This slide is in the spiral book of

22          our presentation.

23                      THE COURT:  So what you can do is anything that I

24          haven't received from you, you can print a copy and send it to

25          us.
```

```
 1                    MR. BARSKY:   Sure.

 2                    THE COURT:  Okay?

 3                    MR. BARSKY:  Absolutely.  Did your Honor want me

 4        to go on then?

 5                    THE COURT:   Sure.  I am just saying I have

 6        everything else from all the slides, but this is first section

 7        that I don't believe I have in hard copy, correct?  Because I

 8        received everything else.

 9                    MR. BARSKY:   No, we did give the Court a copy.

10                    THE COURT:   I just asked that question.   Because

11        these are the ones -- I just said are they contained here.

12                    MR. BARSKY:  I'm sorry I confused the Court.  My

13        fault, your Honor.  The booklet is the book of file history

14        excerpts.

15                    THE COURT:   This is in?

16                    MR. BARSKY:   The slide is in the color power

17        point printout.  I'm sorry.

18                    THE COURT:  That's all right.  Okay.  I'm ready.

19                    MR. BARSKY:  I'm sorry, your Honor.

20                    THE COURT:   Not a problem.

21                    MR. BARSKY:  So, we are urging, your Honor, in

22        summary, a construction of this claim that is faithful to the

23        plain language, the specification and the file history.  We

24        have looked at the language, and the Court is familiar with the

25        language of the claim.  We have looked at the file history and
```

1    what the examiner has said with respect to the claims requiring

2    the use of the DNA to produce the polypeptides.

3    And that was a reference, your Honor, just to

4    close the loop on this discussion, that was the reference to

5    claim 31 as it was then pending and had obviously those

6    identical production and transformation elements.

7    And that claim then issued as claim one of the

8    '755 patent with those same production and transformation

9    elements.  The same steps that we believe the examiner was

10   clearly referring to as when he indicated that the claims

11   require the use of the DNA to produce the polypeptides.

12   So, I have done that already.  I am going to skip

13   over -- well, I will point out this, there was a reason why

14   Biogen did not, did not ever have to tell the patent office or

15   the examiner, you have got my claims wrong.  And that is

16   because it was completely consistent with their point of view.

17   We saw that in the references to the single claims

18   including claim one of the 930 as having multiple positive

19   process steps.  But, we also saw it when Biogen summarized what

20   it considered to be its invention in the 930 application long

21   after the restructure requirement 15 years earlier.

22   What Biogen said in this supplemental information

23   disclosure statement to the PTO, and this is exhibit 13 which

24   is tab seven, your Honor.  And it's at page 25.  I know it's a

25   long document.

1          THE COURT:  I have it.

2          MR. BARSKY:   What Biogen said at the time -- and

3    again, this is in order -- this is as part of a discussion, as

4    your Honor can see, in which the applicant Biogen is trying to

5    distinguish what it did from the prior art.   And what the

6    applicant said was that we, Biogen, won the race to express

7    active recombinant interferon beta polypeptide, the subject

8    matter of the instant application.

9          So, just to finish up then, we are proposing a

10   claim construction here that is faithful to the claim language.

11   That's faithful to the specification or title of the patent,

12   the technical field of the invention where it's described, in

13   part, as being a process for producing human fibro active

14   interferon like polypeptides.  And you saw this, actually you

15   saw this section earlier during Biogen's presentation, as I

16   recall.  And what it points out is that the processes of this

17   invention --

18          THE COURT:   I'm sorry, this is from what

19   document?

20          MR. BARSKY:  I'm sorry, I should have pointed out.

21   This is exhibit 1.  It's a '755 patent.  It's exhibit 1.

22   That's in the book of excerpts as well, your Honor.

23          THE COURT:  Okay.

24          MR. BARSKY:  Same is true, obviously, of this

25   document.  And so here Biogen is saying that the processes of

1          this invention may be used in the production of polypeptides.

2                    The disclosure section of the invention in this

3          portion is talking about how a host is transformed.  That's an

4          obvious typo.  The host is transformed to produce a

5          polypeptide.

6                    So we have already walked through the file

7          history.  I don't need to recapitulate that.  But we obviously

8          saw two instances in which Biogen referred to single claims as

9          having multiple, positive process steps.  We saw the examiner

10         saying very explicitly that the claims require the use of the

11         DNA to produce the polypeptides.

12                   And so I will end where I started, your Honor,

13         this claim construction hearing really is about fundamental

14         fairness.  Because it is so clear that Biogen told the patent

15         office one thing when it was trying to distinguish the prior

16         art, when it was trying to procure the patent, and it is

17         telling this Court an entirely different thing now, now that

18         there is so much at stake.

19                   So, our point and the punch line of all of this is

20         that we are just simply asking the Court to say about this

21         claim what the examiner said about the claim and what Biogen

22         said about the claim before this patent issue, and that is that

23         it has multiple process steps.  And those steps include the use

24         of the DNA, for example, in the words of the examiner, to

25         produce the recombinant polypeptides.

1          And I thank the Court for its endurance and for

2     hearing me out.  I have lost my client.  I have missed my

3     plane.  But, I am glad I had the opportunity to finish what I

4     started.  So, thank you very much.

5               THE COURT:  Sounds good.  Thank you.  You can

6     certainly respond.

7               Is anyone else desiring to speak on the part of

8     the defendants? No.  Okay.  There is a lot in there to respond

9     to.

10              MR. GROOMBRIDGE:  Right.  And I will be happy to

11    respond to anything the Court feels might be helpful.

12              THE COURT:  Why don't you begin and I will ask a

13    question of couple.

14              MR. GROOMBRIDGE:  So, the file history.  In all

15    these 28 years he says there are two instances where he said

16    Biogen used the term "steps" plural.  The second one is not a

17    mistake.  All right.  It's in that same document, the March 24,

18    1997 response.  That one is correct.  And the reason why it's

19    correct is because this may perhaps be helpful in this fog of

20    what was going on there.

21              What the state of play at the time were there were

22    three parallel applications, the applications that Mr. Barsky

23    mentioned.  And the difference between them -- the only

24    difference, and this is the issue that the examiner raised, he

25    said you have got three parallel applications and one of them

 1          is directed to immunomodulation.

 2                    THE COURT:    So we are back to the March 24,

 3          1997 --

 4                    MR. GROOMBRIDGE:    Exactly.  Yes.  So, at that time

 5          the three applications, they are on three different diseases.

 6          Immunomodulation is one then pending application.  And treating

 7          viruses is a second then pending application.  And treating

 8          cancer is a third then pending application.

 9                    The examiner said, well, you can't have three

10          patents because the only difference -- and this was the whole

11          point of the examiner's raising this -- the only difference is

12          the intended use.  The step of administering to the patient in

13          each of these three applications is the same.  And it's only a

14          mental difference that the physician might have with why I am

15          actually giving you this drug.  What disease I think you are

16          suffering from.  And that means there is no difference in the

17          actual methods.  And that was what spawned this dialogue.  And

18          the examiner said that about two of these applications.  Biogen

19          pointed out that well it was actually three of them, and that

20          was where the mistake was made.

21                    But then on the next page of the document, what

22          Biogen says is the examiner fixed this problem.  What we are

23          doing is combining all three diseases into one single claim.

24          So we are just going to have one claim that talks about

25          immunomodulation treating viruses and treating cancer.  And

1    that is why the Biogen word says the steps plural have been

2    combined into one claim because he is taking the step from each

3    of the three patent applications and merging it together.  And

4    that's why he uses the word plural, the steps plural.  And

5    that's why it is not a mistake.  It's correct.

6             There's only one place where it was a mistake and

7    it was on the page before that.  And the Court will appreciate,

8    given what we have heard just over the past two hours, of how

9    complicated all of this is and how easy it would be to make

10   such a mistake.

11            THE COURT:  You are saying on page 3, that one is

12   actually accurate?

13            MR. GROOMBRIDGE:  That's exactly what I am saying,

14   your Honor.  Now, the --

15            THE COURT:  I mean, not accurate, but it was just

16   referred to as --

17            MR. GROOMBRIDGE:  It was intentional and it's not

18   wrong because he is referring to three different steps that

19   have been combined together into a single claim.

20            THE COURT:  So page 3 is the only one you are

21   actually saying is incorrect.

22            MR. GROOMBRIDGE:  Again my colleague says, tells

23   me on page 4.  Since he has the benefit of the document in

24   front of him, I will inure to him.

25            THE COURT:  At the bottom of three and the top of

```
1         four?
2                      MR. GROOMBRIDGE:    The correct statement is on
3         page 4 and the incorrect statement is on page 3.
4                      THE COURT:    Okay.
5                      MR. GROOMBRIDGE:    The fact remains it's one
6         statement.  Now, in 28 years of the prosecution, I mean frankly
7         if it where two statements, they are in the same document.  I
8         don't think it changes qualitatively.
9                      You know, Mr. Barsky said that well, they are not
10        arguing clear disavowal.  On page 12 of defendant's responsive
11        brief it says, however, even if the Court were to find that the
12        plain meaning of the tort, the claim supported Biogen's
13        position, Biogen's statements constitute a clear disavowal of
14        its present argument that produced and transformed the terms in
15        our process step.
16                     So, you know, look, it's totally okay for your
17        positions to evolve, but we had understood them to at least
18        until just now to be arguing disavowal.  Whether it's a
19        disavowal or not, that doesn't change the legal principle which
20        is the one on our slide 18 citing Phillips saying where the
21        federal Circuit says the prosecution history often lacks the
22        clarity of the specification and is therefore less useful.
23                     And we submit, your Honor, that what we have just
24        heard is pretty much a good demonstration of lack of clarity.  I
25        mean I don't mean to be facetious, but I sort of hold this up
```

1          as exhibit A as lack of clarity.

2                      It's a complicated thing.  It's susceptible to a

3          number of interpretations.  It's not a basis on which to say I

4          am going to whittle back the scope of this claim to nothing.

5          Now, the two other things from the patent prosecution that I

6          would like to refer to -- before we leave that exchange, it was

7          in order to cure this ambiguity that the Biogen prosecution

8          lawyer put in the word "the step" precisely to make it clear.

9          All right.  And we submit, your Honor, that's what he did.

10         That's why that language was added.

11                     Fast forwarding to May of 2004, May 28, 2004,

12         where the examiner says I am going to reject you over the DNA

13          -- and this, your Honor, by the way, is the exact issue that

14         the Court raised about well, if Taniguchi got a patent on the

15         DNA, how can, you know, what is the implication of that.  And

16         this was debated and ultimately this very accomplished patent

17         examiner agreed, I don't think that is a problem.  That's how

18         come this patent issued.

19                     But, the language that was called out there where

20         the examiner says the claims require the use of DNA to produce

21         the polypeptide used in the claimed method that we don't -- I

22         don't think it was disputed with that.  That language was

23         silent about who would do it and when it would be done.  All it

24         refers to is the word "produced" in that claim.  And no one

25         disagrees with this that that's required.  The disagreement is

1      over who has to do it and when.  So we would just say it's

2      not -- it doesn't cut one way or the other.

3              The last item from the patent prosecution that Mr.

4      Barsky raised was that -- it's tab seven in your Honor's book

5      at page 25, the lengthy document, where he says well, back in

6      the 1990s, Biogen says we won the race.  And I would say, yes,

7      that's exactly right.  That language is precisely what we are

8      talking about here because Mr. Barsky read this but he didn't

9      emphasize it, the word "active".  We won the race to express

10     active interferon beta, and that's precisely why we, Biogen,

11     get the medical treatment patent.

12              And the, I guess I would go back.  The only other

13     things that I would want to touch on here, your Honor, are when

14     Mr. Berl was speaking he talked at some length about the Abbott

15     and Monsanto cases.  And the Abbott case merely stands for the

16     unremarkable proposition, which I think I mentioned in my

17     opening remarks, that a product by process claim is only met if

18     the product that's alleged to infringe was made by the process.

19     And there has been some outlying case law, some of it authored

20     by the judges of the federal circuit who dissented, to which

21     the Court alluded, that called that principle into question.

22              We are not relying on that.  We are not

23     challenging it.  We never would.  We are not saying that a

24     dissent was right in that case.  All that Abbott says is that

25     product by process claims apply to a product made by the same

1     process.

2              Even if this is a product by process claim, the

3     composition part of it, we are happy to take our lumps on that.

4     We will prove up that this was made by that process.  It just

5     doesn't have to be done during the term of the patent or in the

6     United States.  And there's nothing in Abbott that's contrary

7     to that.

8              Monsanto, you know, the real issue with Monsanto

9     is that the wording of the claim is different.  That Monsanto,

10    the claim at issue specifically has four steps called out

11    expressly.  And what the federal Circuit held in that, it

12    rejected Monsanto's argument that it was a single step method.

13    Precisely because it said when you prosecuted this claim, you

14    merged these two together and you told the patent office that

15    this, your amendment that did that, was directed to matters of

16    form not effecting the scope of the invention.

17             Now you are coming in front of us and saying,

18    trying to depart from that, that this was then and is now a

19    four step method.  That's why it's got four steps laid out in

20    the claim that was shown in the Biogen demonstrative.  The word

21    "process" appears twice and the word "steps" appears or "step"

22    and then alluded to multiple steps we find in the present

23    tense.

24             The language of that claim is fundamentally

25    different from the language of this claim.  And thus the

1    response from Biogen is this, it's unremarkable in a legal

2    instrument using different words.  It effects a different

3    result.  Just like putting "not" in front of that changes the

4    meaning of that.  So Monsanto is not on point here.

5             I will wrap up, unless the Court has questions,

6    with one final observation that Mr. Berl said well, there was

7    one time back in 1978 when some institution Roswell Park, one

8    institution actually made, there was no DNA that was before

9    these inventions.  So they were purifying it from human cells.

10            But, I think what we can take from that is the

11   defendants have gone out and scoured and they can't find a

12   single instance in history in which anyone has done something

13   that they think would be covered by this claim.  And that, in

14   our view, your Honor, highlights exactly what the problem is.

15   If the Court has any questions --

16            THE COURT:   I am good.  Thank you very much.

17   Any response?  Anything that anyone wants to add ?

18            MR. BARSKY:  I will just add one thing very

19   briefly, your Honor.

20            THE COURT:  Sure.

21            MR. BARSKY:   That is to follow-up on what Mr.

22   Groombridge just said about that 2004 statement.  The examiner,

23   which if I understood the comment correctly, was that he had no

24   issue with the examiner saying that the claims require the use

25   of the DNA to produce recombinant polypeptide.

1          I think we can make a lot of progress today in

2    this hearing if we stipulate, and we so offer right now, that

3    the claims of the '755 patent require, as the examiner said, as

4    Mr. Groombridge just said he has no issue with, require the use

5    of the DNA to produce the polypeptide.  I believe that would

6    substantially advance the cause of this hearing and potentially

7    resolve some of the issues.

8                    THE COURT:  Okay.

9                    MR. BERL:  Could I clarify one issue?  Are you

10   done, Mr. Barsky, or no?

11                   THE COURT:  Should we get a response to that?

12                   MR. GROOMBRIDGE:  Your Honor, what we are saying,

13   if I may, I will walk across to the claim here, is this:  The

14   claim, by its very words, says in non human -- a recombinant

15   polypeptide produced by a non human host transformed by a

16   recombinant DNA molecule.  That's a claim limitation.

17         We will stipulate that this is the method in which

18   you have to employ a polypeptide made using recombinant

19   technology in which you've manipulated a non human host to put

20   in foreign DNA.  We are fine with that.  That's not going to

21   get us anywhere because that's exactly what the defendants do,

22   right.

23         What they are trying to say is you have to do that

24   in the United States and during the term of the patent.  And

25   that we will not stipulate to.

```
 1              MR. BARSKY:  I haven't addressed any of that.  I
 2     actually just offered a stipulation to what the examiner said.
 3     And I think the answer we just got was no from Biogen.
 4              THE COURT:   I think that's right.  In terms of
 5     any stipulations, though, to be serious about it, we do have
 6     issues with respect to the terms anyway.  So you folks are
 7     going to be speaking.  And if there are issues that come to
 8     light after this, after people are contemplating what went on
 9     today, if you can reach common ground on anything, obviously
10     that is of assistance to the Court.
11              MR. BERL:  Two very quick points, your Honor, in
12     one minute.  One of them is responsive to the question that you
13     asked.  If Taniguchi got the patent to DNA sequences, is that
14     somehow inconsistent with this process being part of claim one.
15     The answer to that is no.
16              If someone gets a claim to a new kind of tire with
17     vulcanized rubber and they patent that, someone else can come
18     along and patent a method of driving a car very fast using that
19     vulcanized rubber tire as a limitation of that claim.  There is
20     no conflict there between the two.  This is just an element or
21     a limitation of the broader claim.  The broader claim recites a
22     method.
23              The second thing is with respect to Monsanto.  The
24     distinction I just heard is that in Monsanto, it recites a
25     second process, that is a process of obtaining the transgenic
```

1      plant that's used in the process.   There has been no dispute

2      here, as far as I have heard today from the tutorials, to the

3      moment I am speaking now, that producing from a non human host

4      transformed by a recombinant DNA molecule is in fact a process

5      of preparing a recombinant polypeptide.

6              The dispute is whether it's limited.   But, it's

7      clearly a process.   It's clearly recited in the claim.   So this

8      claim likewise recites a method for immunomodulation by

9      administering, and then another process, producing a

10     recombinant polypeptide from a non human host transformed by a

11     recombinant DNA molecule.   In that sense, like every other, we

12     submit, this claim is just like the Monsanto claim addressed by

13     the federal Circuit and should be treated in the same way.

14     Thank you, your Honor.

15             THE COURT:   Thank you.  Anyone else? Anything

16     else?  No.

17             Okay.  Well, we are going to go off the record

18     just for one moment.

19             (Discussion off the record)

20             THE COURT:  Does anyone have anything?

21             MR. BARSKY:   May I just say thank you.  I am sure

22     I speak for all concerned.

23             THE COURT:   I would like to thank everyone.

24             MR. BARSKY:   Particularly the Court's staff and

25     your Honor for enduring us today.

 1            THE COURT:   Thank you very much.   Again I really

 2   appreciate all the work that went into this and it was very

 3   very helpful today.   I know we had a long day and certain

 4   people missed their flights.   But, I do sincerely appreciate

 5   the time and effort that everyone put into this.   And I think

 6   your efforts will be well served.   We will take a look at this

 7   and we will provide you with a decision.

 8            But, in the meantime, I urge you to follow the

 9   path which I previously discussed and you could get back to me

10   with respect to whether there is any interest in terms of

11   mediation.

12            Again, thank you very much.   Be well everyone.

13   Take care.

14            (Whereupon the matter was concluded)

15

16

17

18

19

20

21

22

23

24

25