1

2           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
3                Civil No. 10-CV-2734-CCC

4

5   IN RE: BIOGEN '755 PATENT
    LITIGATION,
6
                                       Transcript of
7                                      Motion Hearing

8   ------------------------------

9

10                                     Newark, New Jersey
                                       February 25, 2015
11

12

13   B E F O R E:   HONORABLE CLAIRE C. CECCHI,
                     UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19              - - - - - - - - - - - -
          Pursuant to Section 753 Title 28 United States Code, the
20   following transcript is certified to be an accurate record as
     taken stenographically in the above-entitled proceedings.
21

22

23                         S/Yvonne Davion
                           Yvonne Davion, CCR,
24                         Official Court Reporter

25

```
 1                      A P P E A R A N C E S :

 2

 3
              NICHOLAS GROOMBRIDGE, ESQ.
 4            JOSEPHINE YOUNG, ESQ.
              ERIC STONE, ESQ.
 5            DAVID BALL, ESQ.
              KEVIN MARINO, ESQ.
 6            JOHN TORTORELLA, ESQ.
              For Biogen IDEC MA
 7
              DAVID I. BERL, ESQ.
 8            DAVID M. KRINSKY, ESQ.
              BRUCE R. GENDERSON, ESQ.
 9            C. BRIAN KORNBREK, ESQ.
              For Bayer.
10
              WAYNE BARSKY, ESQ.
11            ROBERT VINCENT, ESQ.
              For EMD Serono and Pfizer.
12
              LESLIE MORIOKA, ESQ.
13            DAVID DE LORENZI, ESQ.
              For Novartis
14
              ALSO PRESENT:
15
              Stephen M. Greenberg
16            Jonathan J. Lerner

17            Martha Born, Esq.
              Beth Anne Hurley, Esq.
18            Chase Romick, Esq.
              Louis Silvestri, Esq.
19

20

21

22

23

24

25
```

```
 1                    THE COURT:  So, good morning, everyone.  We are
 2          here on In re: Biogen '755 Patent Litigation.  And the civil
 3          action number is 10-2734.
 4                    Let me have your appearances, please.
 5                    MR. MARINO:  Good morning, your Honor.  Kevin
 6          Marino; Marino, Tortorella & Boyle for Biogen.
 7                    THE COURT:  Thank you,
 8                    MR. MARINO:  To my right is Nicholas Groombridge
 9          of Paul Weiss.  Mr. Groombridge will be presenting argument on
10          behalf of Biogen today.  Those to my left are Josephine Young
11          also from Paul Weiss.  John Tortorella of my firm.  Eric Stone
12          also of Paul Weiss.  And in the gallery we have David Ball also
13          a Paul Weiss lawyer.  And from Biogen, Martha Born who is head
14          of litigation at Biogen.  And Beth Anne Hurley also in-house
15          counsel at Biogen.
16                    THE COURT:  Thank you very much.
17                    MR. GROOMBRIDGE:  Thank you, your Honor.
18                    THE COURT:  And on this side.
19                    MR. DE LORENZI:  David De Lorenzi with the Gibbons
20          firm on behalf of Merck Serono, Pfizer and Novartis.  And given
21          the number, I will allow everyone to introduce themselves.
22                    THE COURT:  That will be fine.  Thank you.
23                    MR. BARSKY:  Good morning, your Honor.  Wayne
24          Barsky from Gibson Dunn representing EMD Serono and Pfizer.
25                    MR. VINCENT:  Robert Vincent from Sisca &
```

```
 1          Associates also representing EMD Serono and Pfizer.
 2                    MR. KORNBREK:  Brian Kornbrek from Greenbaum,
 3     Rowe, Smith & Davis on behalf of Bayer Healthcare
 4     Pharmaceuticals.  Also here on behalf of Bayer is from the
 5     Williams & Connolly firm Bruce Genderson, David Berl and David
 6     Krinsky.
 7                    THE COURT:  Thank you very much.  Anyone else?
 8     Did we miss anyone?
 9                    MS. MORIOKA:  Good morning, Leslie Morioka from
10     White & Case for Novartis.
11                    THE COURT:  Thank you.  Anyone else?  Anyone else
12     that you need from the rear of the gallery here?
13                    MR. BARSKY:  Your Honor, I know I can introduce
14     Chase Romick who is in-house counsel at Pfizer, Inc in
15     Manhattan.
16                    THE COURT:  Okay.  Thank you.
17                    MR. SILVESTRI:  I'm Louis Silvestri also in-house
18     counsel.
19                    THE COURT:  Thank you very much.  All right.  So,
20     do we have all counsel accounted for?  Yes.  You're nodding.
21     We have our mediators present as well and I would like them to
22     introduce themselves so they can make an appearance on the
23     record.  And I want to also thank them very, very much for
24     their assistance in this matter.
25                    I know they are working very, very hard.  And you
```

1    folks are very lucky because they are top notch at their game.

2    So, thank you.

3                    MR. GREENBERG:  I'm Steve Greenberg, Pilgrim

4    Mediation.  Thank you for the kind words, your Honor.

5                    MR. LERNER:  Yes, Jonathan Lerner also Pilgrim.

6    Thank you, your Honor.

7                    THE COURT:  Thank you.  All right, folks, we may

8    begin.   Now, I have read your briefing thus far and I am

9    familiar with the issues.  I have reviewed the caselaw as well.

10                   And just to summarize where we're at, before the

11   Court is EMD Serono's motion for partial summary judgment to

12   preclude Biogen I.D.E.C. from recovering lost profits, lost

13   profit damages in the event the defendant is found liable for

14   infringement of U.S. patent number 7588755.

15                   By way of background, this proceeding began in May

16   of 2010 when Bayer filed a declaratory judgment action against

17   Biogen asking this Court to declare the '755 invalid, not

18   infringed and unenforceable.  The very next day, I believe,

19   Biogen filed a patent infringement suit against multiple

20   defendants.

21                   In its amended complaint, Biogen seeks relief

22   under several remedies, one of which is in the form of Biogen's

23   alleged lost profits.  The two lawsuits were consolidated on

24   October 1, 2010 presently Biogen asserts the '755 patent

25   against Bayer Healthcare Pharmaceuticals, Inc., Pfizer, Inc.,

1    Novartis Pharmaceuticals Corp, Harris Trading, S.A. and EMD

2    Serono, Inc.

3            One week after the cases were consolidated,

4    defendants Ares filed a motion to compel arbitration to

5    determine the validity and enforceability of an agreement

6    between Biogen and Ares and its affiliates, including Serono.

7    The Court subsequently ordered the parties to arbitration and

8    the arbitration proceeding issued an award that this Court

9    confirmed on September 28th and that was 2012.

10            On April 29, 2013 this Court appointed a mediator

11    to facilitate the resolution.  On April 16, 2014 the defendants

12    collectively notified this Court that one joint mediation

13    session where all parties were present had been conducted.

14    Serono filed the present motion for summary judgment as to

15    Biogen's claim of lost profits on June 27, 2014.  And Bayer is

16    joining the motion.  Biogen opposes the motion.

17            If anything is incorrect there, you folks can

18    speak up.  Is that an accurate recitation of where we're at at

19    present?

20            MR. GROOMBRIDGE:  On behalf of Biogen, your Honor,

21    we believe that's accurate.  Thank you.

22            MR. BARSKY:   We agree, your Honor.

23            THE COURT:   Thank you.  So, as I've indicated, I

24    am very familiar with your papers and the caselaw that we are

25    addressing today.  So, I ask you now to present your oral

```
 1          arguments.  Let us begin with Biogen, please.
 2                    MR. GROOMBRIDGE:   Certainly, your Honor.
 3                    THE COURT:  Thank you.  Actually, you know, I'm
 4          going to switch that up.  This is actually Serono's motion.
 5          Why don't we start with them first.
 6                    MR. GROOMBRIDGE:  Totally okay with us.  I will
 7          yield the floor to Mr. Barsky.
 8                    THE COURT:   Thank you.  I just need one moment to
 9          correct something that's going on with my computer.
10                    Good morning.  You may begin.
11                    MR. BARSKY:   Thank you very much, your Honor.
12          May I inquire on behalf of all parties how much time we should
13          assume the Court has set aside for the hearing this morning?
14                    THE COURT:   You know, I'm dealing with this in a
15          very flexible manner.  So, to the extent you folks have a
16          little bit more to say than you would otherwise have to say,
17          I'm fine sticking around and listening to the entirety of your
18          argument.
19                    If you want to give me some sort of rough idea,
20          that's fine as well, just so we know how long this proceeding
21          might take.  So, in terms of your presentation, how much time
22          do you think that you will need?
23                    MR. BARSKY: Sure.  Thank you, your Honor.  Here's
24          what I would propose to do, which is to summarize briefly and
25          perhaps 10, perhaps 15 minutes of what the argument is that
```

1        Serono and Pfizer are making on this motion.

2                    I then want to turn to the arguments that are

3        being made by Biogen and address those arguments as well.  I

4        think that will take me probably other 10 or 15 minutes, if

5        that's acceptable to the Court as well.

6                    THE COURT:   That would be fine.  That would be

7        fine.

8                    MR. BARSKY:   I would like to reserve a little bit

9        of time at the end, if it's acceptable to the Court, to address

10       the Court again after Biogen has made its presentation.

11                   THE COURT:   That sounds perfect.   Let me hear

12       from Biogen in terms of how much time they are anticipating.

13                   MR. GROOMBRIDGE:   Your Honor, I am expecting 30

14       or 40 minutes, something like that.

15                   THE COURT:   That's fine as well.  We may proceed.

16                   MR. BARSKY:   Thank you very much, your Honor.

17       Given the number of briefs and letters that have been exchanged

18       in connection with this motion, let me start off, if I could,

19       by identifying what I believe are some of the things that we

20       actually agree on both in terms of the legal principles that

21       govern this motion, and the facts that are either uncontested

22       for purposes of this motion, or have been established by the

23       arbitral award and are thus law of the case.

24                    One of the things that I think that the Court will

25       see is that if we look only at those undisputed principles of

1     law and the uncontested facts or the facts that are now law of

2     the case, they are determinative and dispositive, in all

3     respects, of the relief we are requesting in this motion.

4          This is not a boundary case, your Honor.  We are

5     not contesting or even approaching the limits of the lost

6     profits jurisprudence of the federal courts.  The arguments

7     that we are making here are squarely within the settled law of

8     the Federal, of the Federal Circuit and the Supreme Court as it

9     is developed in the context of lost profits over the course of

10    the past 40 or 50 years.

11         So, let me start, if I can, then with one

12    principle which I think we all agree on and that is that lost

13    profits are not presumed.  They have to be proven and they have

14    to be proven by the plaintiff.  That's the law that is set

15    forth in the Federal Circuit's decision in the Lantech case,

16    Kaufman versus Lantech.  It's cited in the parties' brief.  And

17    it was followed explicitly by this District Court in the Fuji

18    Photo case, also cited in the briefs.

19         The determinative question, according to the

20    Supreme Court, in terms of an award or potential award of

21    damages is had the infringer not infringed, had a patent

22    infringer not infringed, what would the patent owner have made?

23    That is the determinative question that guides the compensation

24    to be paid to a patent owner where the patent owner succeeds in

25    proving infringement.

1           The Federal Circuit's decision in the Grain

2   Processing case, which is a direct descendent of the Supreme

3   Court's decision in Arrow, is the most important case in the

4   federal courts today on the circumstances under which an award

5   of lost profits will be made to a patent owner.

6               This is why the Grain Processing decision, which

7   is the subject of a lot of briefing on this motion, your Honor,

8   is something that is discussed at such length.  It's because it

9   really does guide the outcome in many ways of this motion.

10              So, what do we know from Grain Processing and

11  Arrow and its progeny?  What are the legal principles then that

12  we all must agree on and which this Court must follow?  The

13  first is that what Grain Processing tells us is that for Biogen

14  in this case to collect lost profits from any of the

15  defendants, it must show that it would have actually made

16  Serono sales but for the infringement.  It's a "but for" test.

17              And Grain Processing requires that for the Court

18  to analyze that question, it has to engage in this hypothetical

19  reconstruction of the market in order to answer that question

20  of whether or not Biogen can prove that but for the infringing

21  sales, that Biogen would have made those sales itself.

22              So, in terms of this hypothetical market that has

23  to be created, the Court has to factor out the question of

24  infringement.  The Court has to ask the question, what would

25  that hypothetical market look like in the absence of the

1          alleged infringement in this case by Serono.

2                    And a necessary part of that reconstruction of the

3          market is that the Court must consider what alternative actions

4          Serono could have taken in that hypothetical world where there

5          is no infringement.  The alternative actions that Serono could

6          have taken in order to continue competing with Biogen in this

7          particular market, the market for the sale of the

8          beta-interferon biologicals that are at issue in this lawsuit.

9                    If Serono, if any defendant had an alternative

10         action, an alternative way to compete without infringing,

11         looking back at the hypothetical market, it cuts off the chain

12         of causation that Biogen must prove in order to collect lost

13         profits.

14                   THE COURT:  Now, with respect to the issue of an

15         alternative action --

16                   MR. BARSKY:  Yes.

17                   THE COURT:  -- I know your adversary looks at that

18         phrase, looks at those words and is quizzical and really

19         focuses on other cases where they address products as opposed

20         to actions.  How would you respond?

21                   MR. BARSKY:   Yes.  Well, Grain Processing says

22         explicitly that all alternative actions must be considered by

23         the District Court.  All alternative, I might say any,

24         alternative actions must be considered by the District Court.

25         It's at page 13-51 of the Federal Reporter.

1          And if we look at the caselaw that has since

2     developed in the wake of Arrow and Grain Processing, we see

3     cases that not only deal with an alternative product.  But, for

4     example in the Fuji Photo case from this District Court, the

5     possibility of the accused defendant making a refurbished

6     product that would not infringe the patent, the possibility of

7     them doing so, cutoff lost profits.

8          In the Slim Fold case from the Federal Circuit, it

9     was an old product that the defendant used to sell that was not

10    infringing that might not have had the advantages of the newer

11    infringing product, but, that the Court said well, the

12    infringer could have reverted to that older non-infringing

13    product.

14         In the Cardiac Pacemakers case, it wasn't a

15    different product at all.  It was the same product sold under a

16    license.  What happened there was that the defendant originally

17    had a license to the plaintiff's patent, but, a merger occurred

18    between Venture Techs and St. Jude.  And as a result of that

19    merger, Venture Techs lost its license.

20         And so once the merger went through, the Court

21    found that the continued sale of those same products were

22    infringing.  But, lost profits were rejected in that case

23    because the Court said that the alternative action here, there

24    in that particular case, was the forbearance of the parties

25    from going through with that merger.  If they didn't go through

1    with the merger, they would have preserved the license and

2    there would have been no infringement.

3              So, there is no sound argument to be made that the

4    alternative action, and that's the language of Grain Processing

5    is action, not product.

6              THE COURT:   And I've read Grain Processing and I

7    have looked at the exact language and I do recognize that they

8    state that.

9              Is there anything in Grain Processing where they

10   actually define what action is?

11             MR. BARSKY:   Do they define what action is?  No, I

12   think they leave it very broad and open.  In that case, your

13   Honor, the alternative action that preclude, that was available

14   to the infringer and that was found to preclude an award of

15   lost profits, was the possibility of the infringer developing a

16   new product that had not developed.  But, developing a new

17   product that did not infringe.

18             Now, the defendant in Grain Processing infringed

19   for all of 12 years, the entire period of time that the

20   plaintiff in that case owned the patent and sued.  So, the

21   infringer infringed for 12 straight years.  It could have

22   adopted a non infringing -- developed and adopted a non

23   infringing product.  That was the finding of the District Court

24   and the Court of Appeals for the Federal Circuit in that case.

25             The reason why it didn't do so during those

1    12 years is because it would have been more expensive.  It

2    required a particular enzyme that would have resulted in its

3    costs going higher.  So, it continued with what was ultimately

4    found to be the infringing product.

5            Now, in that case it was not a product that was

6    actually on the market.  It wasn't a product that had been

7    developed.  It was a product that the accused infringer could

8    have developed because it had the materials, it had the

9    technology, it had the know how.  It knew about the properties

10   of that particular enzyme.  It just didn't do it because it was

11   more expensive.

12           But, because it could have switched to that

13   non-infringing product, the Federal Circuit found that a cut

14   off precluded any claim for lost profits by the patent owner.

15   Why?  Because it broke the chain of causation.

16           This case, your Honor, is far stronger than Grain

17   Processing.  Far stronger.  Because ██████████████████████

18   ████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ██████████████████████████ --

22           THE COURT:  Now, do you believe there's been any

23   case, there have been any cases since Grain Processing that

24   have used sort of the alternative action language to preclude

25   damages in any cases?  And could you list those off, please.

1                MR. BARSKY:  Yes.  From this District Court, your

2   Honor, if I understood the question correctly, if the question

3   is has the language in Grain Processing been used by any later

4   District Court to preclude lost profits, yes.  This court in

5   Fuji Photo relied explicitly on Grain Processing to find that

6   the defendant in that case could have used these refurbished

7   shelves or products that would not have infringed, would not

8   have infringed the plaintiff's patents.

9                And pertinent to the argument that Biogen is

10  making here, the defendant in that case did not do so, but this

11  Court found, I believe correctly, that it could have done so

12  and therefore it precluded an award of lost profits.

13             This case is also stronger than Fuji Photo, your

14  Honor, as well as Grain Processing.  And the reason for that is

15  that in the year 2000 at a time when Serono was selling its

16  products overseas but not yet in the United States, at a time

17  when Biogen was selling its product in the United States and

18  was trying to get a patent out of the United States Patent

19  Office but it was having serious trouble doing so, ███████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ██████████.

24             Now, at that time, this was nine years before the

25  '755 patent issued in this case and it was some 18 or 19 years

1   after Biogen had filed its application in the Patent Office.

2   So, nine years before the patent in this case was issued,

3   ██████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████████

8   ██████.

9          THE COURT:  You know what, let me just stop you

10  there because we are talking about some of the numbers and I

11  just want to have some idea as to the scope.  And both parties

12  can chime in on this.

13         But, in terms of what we are estimating the lost

14  profits to be, just some vague range versus what the royalties

15  would be in this case.

16         MR. GROOMBRIDGE:  Well, your Honor --

17         THE COURT:  I'm not going to pin you down on it

18  but just something very general.

19         MR. GROOMBRIDGE:  One of the issues here is the

20  meter is running every single day.  So, every day the defendant

21  sells several million dollars worth of products that we believe

22  to be infringing.

23         I don't have, as of today, a snapshot for what the

24  numbers are.  But, my guess is that if, if we progressed and we

25  brought this case to a jury, and if we did that a year from

1      now, that the damages on the damages theory that we believe we

2      have, which is not purely lost profits, it's a mixture of lost

3      profits and royalty, would be in excess of $10 billion.  In

4      fact, I think it would be a candidate to be the largest damages

5      demanded in any patent case in this country ever.

6                  THE COURT:  You say that's a combination of

7      royalties and lost profits?

8                  MR. GROOMBRIDGE:   That's a combination.  Our

9      theory, your Honor, recognizing that of course we haven't yet

10     had expert discovery, is this, that we agree that there has to

11     be a reconstruction of the market.

12                 THE COURT:  I'm sorry, you agree there has --

13                 MR. GROOMBRIDGE:  We agree there has to be a

14     reconstruction of the market.  And there are several players in

15     the market and indeed those players have changed over time.

16     But, what you would do in our theory is you would say if the

17     Serono product REBIF had gone away when this patent issued in

18     2009 and the Bayer products, Betaseron had gone away, if you

19     take the chunk of the market that they had, how would you

20     reallocate that?

21                 Clearly Biogen would get some of it.  Clearly

22     there's at least one other market participant that would get

23     some of it, and there may be more.  And for the piece that

24     Biogen would get, we would seek lost profits which we think is

25     certainly the biggest driver here.  And for the piece that

1    would go to other market players, we would get a royalty.  And

2    we think that under that theory, we are looking at a damages

3    award that is certainly in the $10 billion range.

4              THE COURT:  I'm sorry, could you break that down

5    one more time?  Lost profits would be attributed.  Go ahead.

6    Start from there.

7              MR. GROOMBRIDGE:  Surely.  So, what we think is a

8    snapshot, we are looking at the period of time from 2009 to

9    whenever trial takes place.  And we would say during that

10   period of time the defendants have sold their infringing

11   products.  Assume you take them out of the picture, that they

12   were gone, their chunk of the market for Multiple Sclerosis

13   therapy, let's assume that that's 30 percent of the overall

14   market, maybe 40 percent, how would that piece of the pie be

15   reallocated if they had not been in the market.

16             And in our view -- and so if I might analogize

17   here, if Chrysler stopped selling pickup trucks tomorrow, what

18   would happen to sales of General Motors and Ford.  Well they

19   would both sell more pickup trucks.  Who would sell exactly how

20   many?  That's what we need expert witnesses for.

21             But, what would happen in our analysis is we would

22   say well look at the piece of the pie that each of the

23   defendants has, and an economist will come in and say here's,

24   I've studied the market and here's how I think that would have

25   been reallocated amongst the remaining players.

1            The big one in the analysis is a company called

2     Teva that your Honor I'm sure has heard of, that sells a

3     product called Copaxone.   And for much of the damages period

4     you could look at the market as being made up of the three

5     products that the companies present in this courtroom sell.

6     Avonex which is the Biogen product.   REBIF, the Serono product.

7     And Betaseron, the Bayer product, in addition to Copaxone, the

8     Teva product.   And Copaxone is a different molecule.

9            These three are all the same molecules so these

10    ones are closer to one another.   But, Copaxone clearly competes

11    for the same market.

12            THE COURT:   Is there anyone else out there with a

13    different molecule besides Copaxone?

14            MR. GROOMBRIDGE:   What has happened during the

15    pendency of the lawsuit, your Honor, is that other molecules

16    have come onto the market.   So, the answer is yes.   One of the

17    big changes that has happened, last year, I want to say last

18    year, on that I'm probably falling behind myself, but within

19    the past two years Biogen itself has introduced a new product

20    that has become very successful and may be now the market

21    leader.

22            Biogen is introducing other products.   Novartis

23    has introduced at least one new product.   And there are others

24    waiting in the wings.

25            So, during the, what will be the damages period,

1    the market is evolving and other people are coming in.   And it

2    will be in our view, your Honor, the task of expert witnesses,

3    economists to do a reconstruction of this and say here's how it

4    would have looked over the relevant time if the infringement

5    were factored out.

6            But, it's certainly the case, your Honor, that

7    royalty damages, all other things being equal, tend to be lower

8    than lost profits damages.   There's no legal requirement of

9    that.   And, in fact, I was telling my colleagues yesterday, I

10   was once involved in a case where a jury in New York awarded a

11   royalty of a 140 percent so.   So, it's not foreclosed to go

12   very high, but they are typically lower, and that's why Serono

13   has made this motion.

14           But, there is a point that is important, your

15   Honor, that if this motion were granted, we of course think it

16   should not be, cannot be, the royalty analysis would be

17   different than the royalty analysis which would make up a

18   component of a hybrid model where we got part of the lost

19   profits and part of the royalty.

20           And the reason for that is if we are looking under

21   the hybrid model, the royalty analysis by definition is

22   directed to sales that Biogen could not make.   That's why we

23   are talking about a royalty.   And that will drive down the

24   royalty cost.

25           If we say no lost profits at all and we are

1    looking now for a royalty for 100 percent of the market, that

2    will drive up the royalty rate.  And so a royalty analysis in

3    the world in which there are no lost profits is higher, in fact

4    in our view a lot higher, than the royalty analysis that is

5    merely a kind of also RAND in what is first and foremost a lost

6    profits case.

7              So, in terms of quantitating those numbers, we

8    have not done that.  But, as a gut feel I would say that if we

9    were presenting nothing but a royalty case here, the damages

10   award would be in the several billion dollar range.  If we were

11   presenting the theory that we believe is the appropriate theory

12   would be probably it could be twice that, maybe a factor of 2

13   to 3 times greater.

14             THE COURT:   Thank you.  But, and it also sounds

15   like, from your perspective, it's subject to change depending

16   upon how long this process takes, who else might enter the

17   market, how they enter the market, what their chemical

18   structure is.

19             MR. GROOMBRIDGE:  That's right, your Honor.  It's

20   not subject -- it's locked in for what's happened from the day

21   the patent issued until now.  But, it's evolving as we move

22   forward.  And these are, you know, as I think will be readily

23   apparent to the Court, these are potentially factual issues.

24   So, who is coming in, when they are come in, what the effect of

25   that is, and most importantly of all what -- in the language of

1  economics, how close are these products as substitutes for one

2  another.

3             In other words, you know, so just to elucidate

4  that a little, our view of the world is look, there are three

5  companies that sell this molecule beta-interferon.  Those are

6  the three companies present in this courtroom.  When a

7  physician prescribes that molecule in the form of the Bayer

8  product or the Serono product, the physician wants her or his

9  patient to get that molecule.

10            And if they can't get it from Bayer or Serono,

11 their first preference is going to be to get it from Biogen.

12 Now, some physicians will say the Biogen product has certain

13 attributes that I am not keen on or I'm not familiar with.  And

14 some of those sales will go elsewhere.  But, in our view the

15 products at issue in this lawsuit are all the same molecule and

16 they are the closest ones.  They are thus the best substitutes

17 for one another.  And that tends to drive up the lost profits

18 analysis.

19            THE COURT:   Thank you.  Counsel.

20            MR. BARSKY:   Yes.  So, a couple of things, your

21 Honor.  That was actually very helpful because I think that we

22 now know, regardless of the Court's ruling on this motion,

23 Biogen is going to be pursuing damages in this case in the

24 billions.

25            And so at the end of this analysis if the Court

1    were to grant this motion, Biogen will be left, by Mr.

2    Groombridge's own account this morning, with a multi-billion

3    dollar reasonable royalty claim.

4              And I do want to correct my friend on one point,

5    one thing he said, which is that he thought that a $10 billion

6    award from this Court would be approaching, I think I believe

7    that was his words, approaching the largest damages verdict

8    ever.

9              In fact, it would swamp the largest damages

10   verdict from a jury which is 1.65 billion in the Carnegie

11   Mellon case by a factor of whatever it is, 7, 8, whatever that

12   multiple may be.  So, if I could return to where I was, your

13   Honor.

14             THE COURT:   Yes.  Absolutely.

15             MR. BARSKY:   Which was -- although I do want to

16   address any lingering questions the Court has on this.

17             THE COURT:   If I have them I will chime in.  Thank

18   you.

19             MR. BARSKY:   Thank you, your Honor.  The bottom

20   line is that to prevail on the lost profits case, Biogen must

21   prove that it would have made Serono sales in a hypothetical

22   world where there was no infringement.  And obviously for

23   purposes of this proceeding we're assuming that there is

24   infringement.  Obviously it's our position that there is not.

25             THE COURT:   I understand it's a "but for" world

1    we are creating hypothetically.

2              MR. BARSKY:  Thank you, your Honor.  Now, let's

3    turn to the facts which are established as the law of this case

4    or otherwise conceded, your Honor, because this is where this

5    motion -- where this motion becomes so clearly based on

6    dispositive, conceded facts that are law of the case.

7    ████████████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████████████████

10   ██████.  It's Exhibit 1, your Honor.

11             THE COURT:  I have it right here.

12             MR. BARSKY:  Thank you.  ███████████████████

13   ███████████████████████████████████████████████

14   ██████████████████████████████████████

15   ███████████████████████████████████████████████

16   █████████████████████████████████████████

17   ██████████

18   ███████████████████████████████████

19   ███████████████████████████████████████████

20   ███████████████████████████████████████████████████

21   ███████████████████████████████████████████████████

22   ██████████████████████████████████████

23   ███████████████████████████████████████████████

24   ██████████████.

25             So, what does that mean, your Honor? That means

1  that ███████████████████████████████████

2  ██████████████████████████.   This motion is about precluding

3  Biogen's claim of lost profits.   The only reason why a patent

4  owner has the ability, theoretically at least, to prove a lost

5  profits case, is because lost profits are the compensation that

6  a patent owner gets when it loses its ability to exclude people

7  from competing with it.

8          So that if Biogen were to prove its case, Biogen

9  would be entitled to lost profits for sales that it could have

10 stopped.  ████████████████████████████████████

11 ███████████████████████████████████████████

12 █████████████████████████████████████████████

13 ████████████████████████████████████████

14 █████████████████████

15           ██████████████████████████████████

16 ██████████████████████ and yet here we are with Biogen

17 pursuing this multi-billion dollar damages claim that

18 presupposes it could exclude Serono from competition in the

19 market.

20          I'm going to get to, in a moment, the various

21 arguments that Biogen makes about well, █████████████████████

22 ███████.   How could you possibly claim that it stops Biogen from

23 pursuing lost profits and some of the other related arguments

24 that Biogen makes.

25          But, I'll stop here and just say the following:

1    At the very beginning of this lawsuit, as your Honor knows,

2    Biogen tried to destroy this agreement.  They argued that it

3    was invalid, revoked, terminated, breached and void for lack of

4    consideration.  We went to an arbitration.  We had a trial.

5    And every argument that Biogen made was rejected by a unanimous

6    arbitral panel consisting of very sophisticated intellectual

7    property practitioners.

8              That arbitral award has since been confirmed by

9    this Court and it is law of the case.  It's law of the case,

10   your Honor, that Biogen, under no circumstances after 2000 when

11   this agreement was signed, ███████████████████████████

12   ever excluded Serono, could it have ever stopped Serono from

13   marketing its product in the United States in direct

14   competition with Avonex.

15             These facts, your Honor, are undisputed and they

16   are law of the case.  They've already been decided and they are

17   dispositive of the motion that's now pending before this Court.

18             So, your Honor, in Grain Processing, to return to

19   our guiding star on this particular motion, in Grain Processing

20   the Court made clear that if an accused infringer has some

21   alternative action by which it can continue competing with the

22   patent holder, it breaks the chain of causation required for

23   lost profits.  And that's because an accused infringer is

24   hardly likely, the Federal Circuit said, hardly likely to walk

25   away from an established market when it could continue

1    competing by some alternative action that was available to it.

2              THE COURT:   Now, in terms of dealing with the

3    alternative action, we have Cardiac Pacemakers.  And didn't

4    that issue end up going to the jury of lost profits?

5              MR. BARSKY:  Not the specific issue I raised.

6    What went to the jury, your Honor, was whether or not in fact

7    the sales would have been the same had the merger not gone

8    through.

9              We relied on Cardiac Pacemakers for a very simple

10   proposition and that is that the actions, the alternative

11   actions that are available to infringers are not limited to

12   products.  And in Cardiac Pacemakers the alternative action was

13   not going through with a corporate merger.

14             That ruling was actually in both of the District

15   Court decisions in the Cardiac Pacemakers case.  The issue that

16   went to the jury that Biogen seeks to make much of in their

17   opposition papers was not that issue.  The issue that went to

18   the jury was well, but wait a minute, we have to figure out had

19   the merger not occurred, would Venture Techs actually have

20   continued to make all of those sales, or would Venture Techs or

21   might Venture Techs have lost some of those sales to the

22   plaintiff, to the patent owner Cardiac Pacemakers.

23             THE COURT:  But if it's a "but for" market, we are

24   really dealing with actions that would have been foreseeable.

25   Why did that become a question of fact?

1          MR. BARSKY:  In the Cardiac --

2          THE COURT:   In Cardiac Pacemakers.  Couldn't that

3     have just been a "but for" as a possibility as opposed to

4     something where the Court actually sent that to the jury?

5          MR. BARSKY:  Well, again, your Honor, if I

6     understand the Court's question, there was no dispute that the

7     alternative action could consist of the merger not going

8     through.  The only question for the jury is how do we now

9     calculate the amount of lost -- excuse me, how do we now

10     calculate whether, in fact, every one of those sales would

11     still have been made by Venture Techs or whether they would

12     have lost sales in any event to the patent owner.

13          Had they lost sales in any event to the patent

14     owner, then the patent owner could have argued that it wouldn't

15     have mattered whether they went through with the merger or

16     didn't go through with the merger.  We still lost profits as a

17     result of the, as a result of this transaction.

18          And so again, Cardiac -- the ruling in Cardiac

19     Pacemakers is clear that a corporate unwinding or foregoing a

20     corporate merger can be a type of action that an infringer can

21     take in order to avoid infringement and thereby cutoff at least

22     some lost profits.  And that's the issue that went to the jury,

23     your Honor, whether it would cutoff all of those profits or

24     only cutoff some of them.  I hope I haven't confused it more.

25          THE COURT:   No, I've got your position.  Thank

```
1    you.
2              MR. BARSKY:   Sure.   So, your Honor, I started to
3    say earlier that this case was stronger than the Grain
4    Processing case for the preclusion of lost profits.   And that
5    it's stronger than this Court's decision in the Fuji Photo case
6    for the preclusion of lost profits.   And this Exhibit 1, ████
7    ████████████████████████████████████████████████████████████████
8    ██████████████████████████████████████████████████████
9    ████████████████████████████████████████████████████
10   ██████████████████████████████.   Not one of them.
11                          ██████████████████████████  not give
12   up their right to exclude the infringing defendant in Grain
13   Processing or the infringing defendant in Fuji Photo.  ████████
14   ███████████████████████████████████████████████████████████████
15   ██████████████████████████████████████████████████████████████████
16   ██████████████████████████████████████████████████.
17              That's law of this case.   And that's why this case
18   is so much stronger not only than Grain Processing and Fuji
19   Photo, but any reported federal decision on the rejection of
20   lost profits.
21              There's no other case like this where ███████████
22   ███████████████████████████████████████████████████████████████
23   and then sues that competitor for lost profits.   It doesn't
24   exist.   So, when Mr. Groombridge tells you or when Biogen tells
25   you that Serono doesn't cite a single case involving ██████████
```

1    █████████, they're right.  But, it's because there's no case

2    that is this strong for the rejection of lost profits.

3                   And so, that is the summary, your Honor, of the

4    motion that we've presented to the Court.  It's based on facts

5    that are established as law of the case.  And it's based on

6    legal principles that are clear and that have guided the

7    development of our lost profits jurisprudence for decades.

8                   At this point if your Honor doesn't have any

9    questions, I'll turn to some of the arguments that Biogen has

10   asserted.

11                  THE COURT:  That would be fine.

12                  MR. BARSKY:  Thank you, your Honor.   Excuse me.

13                  THE COURT:  Yes.

14                  MR. BARSKY:  So, the first is this, Biogen has

15   said from day one, wait a minute, Serono, ██████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   █████████████████████████████████████████████████

21   ███████████████████████████████████████████████

22   ████████████████████████████████████████████.

23                  What they are saying, your Honor, is that ████████

24   ██████████████████████████████████████████████████████

25   ██████████████████████████████████████████████.  And

1   they say as much in their papers.  I believe it's at page 25 of

2   their opposition brief, they say exactly that.  That if ███

3   ██████████████████████████████████████████████████████████

4   will become a non infringing alternative from that point

5   forward".

6           So, what they are saying is once you pursue your

7   non infringing alternative, at that point you can cutoff lost

8   profits, but not before.  Okay.  Your Honor, that is not the

9   law.  And, in fact, it would upend decades of established law

10  in this area and here's why, because at every single lost

11  profits case, by definition, the accused infringer has not

12  pursued a non infringing path.

13          The defendant in Grain Processing infringed for

14  12 years, did not pursue a non infringing path.  The defendant

15  in Fuji Photo infringed, did not pursue a non infringing path.

16  If they had, there wouldn't have been a lawsuit and there

17  wouldn't have been an opinion.

18          What Biogen is saying is contrary to every case

19  that has ever been reported on the issue of lost profits

20  availability by the Federal Courts from Grain Processing on

21  down.

22          They are saying that you have to actually pursue

23  the non infringing alternative to be able to argue that it cuts

24  off lost profits.  We know that's not the case, your Honor.

25  It can't be the case.

1           They rely, your Honor, on Pall versus Micron in

2     order to try to further push this argument.  And I'll say this

3     at the outset, your Honor, Pall versus Micron did not upend

4     five decades of lost profits jurisprudence.  It didn't announce

5     that Grain Processing and all of its progeny were wrongly

6     decided.

7           Pall versus Micron, your Honor, is directed to a,

8     in fact, it's directed to the example that Mr. Groombridge gave

9     earlier this morning when he was talking about if Chrysler

10    goes, if Chrysler stops selling trucks, then there's a question

11    as to how you allocate the trucks that Chrysler would have

12    sold.  Some would have gone to Ford.  Some would have gone to

13    General Motors, whatever it may be.

14          The decision of the Federal Circuit in Pall versus

15    Micron goes to the question of when a defendant is excluded

16    from competing against the patent owner in the hypothetical

17    market, which already -- by the way, your Honor, already with

18    that statement we are far afield from this case.  But, when the

19    patent, when the defendant is excluded from competing and

20    you're trying to allocate, as Mr. Groombridge said earlier, you

21    are trying to allocate those sales and ask well, how many of

22    those sales would have been made by the patent owner?  How many

23    of those sales would have been made by other car manufacturers,

24    truck manufacturers? Okay.

25          In those instances you can only allocate, you can

1    only take away sales from the patent owner and allocate them to

2    a non infringing party.

3             And so what Pall versus Micron says again in the

4    context of the defendant excluded from the market, is that

5    someone who has a license to the patent is only licensed and

6    therefore non infringing after they take their license.

7             We agree with that.  We have no quibble with that.

8    It has nothing to do with this case.  It has nothing to do with

9    this motion.  Why?  Because Serono would not be excluded from

10   this market in the hypothetical world.  In the hypothetical

11   world ████████████████████████████████████████████████

12   ███████████████████████████████ it could continue to sell in the

13   United States market.

14             THE COURT:  So, your position on Pall is it's

15   irrelevant to this case.

16             MR. BARSKY:  It is irrelevant to the motion that

17   is before the Court right now, your Honor.  Yes.  And it's

18   simply because of this, your Honor, that Pall is directed to

19   the hypothetical world where you're trying to calculate, as to

20   an excluded defendant, a defendant who had no alternative

21   actions to continue competing.  How are we going to allocate

22   that excluded defendant's sales, in the hypothetical world,

23   among other players in the market?

24             That's not what this motion is about.  So, yes,

25   Pall versus Micron is irrelevant to this motion.   That's

1    correct.

2                The next argument that Biogen has made is that

3    okay, Serono, ████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    ███████████.  But, you wouldn't have really walked away from

6    your product REBIF -- excuse me, ██████████████████████████

7    ████████████████████████████████████████████████████████████

8    ██████████████████████████████████████████.

9                That is the only scenario, your Honor, by the way,

10   and it's completely implausible, and I will explain that in a

11   moment.  That's the only scenario under which Biogen could

12   potentially recover lost profits against Serono is if Serono,

13   in the hypothetical world, ██████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ███████████, rather than doing that, if Serono had walked away

17   from its flagship product -- this is a billion dollar a year

18   product in the United States alone, your Honor.

19                And I don't know what the percentages are offhand

20   or what they were, rather, in 2009 as to Serono which was an

21   independent company, I believe at that time, not part of Merck

22   KGAA.  But, it was, without question, the single largest

23   product sold by Serono.  And it's its flagship product.

24                So, what Biogen is suggesting in its opposition

25   papers is that ████████████████████████████████████████████████

1 ███████████████████████████████████████████

2 ████████████████████████████████████, rather than

3 doing that, Biogen is telling this Court that Serono would have

4 walked away from REBIF, folded its tent and committed the

5 equivalent of corporate suicide, your Honor, by walking away

6 from a billion dollar a year product here in the United States

7 alone.

8          It is just not a plausible argument.  So, where

9 did they get this from?  Where did they get this notion that we

10 would have walked away from our flagship product? The only

11 testimony that they rely on, the only evidence that they rely

12 on is the testimony of John Pierre DeLuca.  Dr. DeLuca was the

13 director of Serono's, director of intellectual property for

14 Serono.  And he testified in the arbitration proceeding in this

15 matter and that testimony was submitted by Biogen in opposition

16 to our motion.

17          During that testimony, he was asked ████████████

18 ████████████████████████████████████████████

19 ██████████████████████████████████████████████████

20 ████████████████████████████████████████████

21 ██████████████████████████████████████

22 ████████████████.

23                   ███████████████████████ -- he was asked this

24 question actually by one of the arbitrators, ████████████████

25 ██████████████████████.  And what did you, Dr.

1    DeLuca, tell Biogen during your discussions with them that

2    preceded the filing of this lawsuit.

3         And what Dr. DeLuca testified to was that █████████

4    ████████████████████████████████████████████████████

5    ████████.  And he went on to explain exactly why there was a

6    question as to ████████████████████████████████████

7    ███████.

8         So, Biogen seizes on that and they say well, your

9    Honor, if Dr. DeLuca was █████████████████████████████

10   ██████████████████████████████████████████████████████

11   ██████████████████████████████████████████.

12        That's the logical chain that Biogen's argument

13   distills to.  Because Dr. Deluca ██████████████████████

14   ██████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████

16   ████████████████████████████.  And therefore why would have

17   Serono -- this is yet conjecture piled on top of that

18   speculation -- █████████████████████████████████████

19   ████████████? That's it.  That's it.   That's the only thing they

20   rely on is this testimony from Dr. DeLuca.

21        Now, your Honor, it's just --

22        THE COURT:  Did the arbitrator make any statement

23   or conclusion drawn from that?

24        MR. BARSKY:  No, he didn't.  He asked a question

25   or two and that was it.  And if memory serves, I don't believe

1    there was any follow-up by Biogen's counsel in response to

2    those particular questions by the arbitrator.  That was it.  It

3    was a page, maybe a paragraph of testimony.

4            It doesn't amount to a statement by Serono that

5    ████████████████████████████████████████████.  It's a

6    statement by Dr. DeLuca that he told Biogen during the

7    negotiations where Biogen was pushing Dr. DeLuca ████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████.

10           THE COURT:  Putting that aside, do you believe

11   your responsibility here in advancing your argument is limited

12   to what options there could be, as opposed to what you would

13   actually do.

14           MR. BARSKY:  Exactly right.

15           THE COURT:  Okay.

16           MR. BARSKY:  The second point here, your Honor, is

17   it doesn't matter whether we actually -- excuse me, let me

18   backup.

19           That the test is not whether an infringer actually

20   would have implemented an alternative action to avoid

21   infringement.  It's whether the accused infringer could have

22   done so.  That's the law of Grain Processing.  And Grain

23   Processing 12 years in the infringement, there is not a single

24   bit of discussion about what that defendant would have done.

25   Only that the defendant could have developed a new product.

1          The same with Fuji Photo.  Only a discussion about

2     what the defendant in Fuji Photo could have done.  There's not

3     a single reported case that I know of, your Honor, where

4     there's actually any discussion for these purposes as to what

5     the infringer actually subjectively would have done.

6          But, it doesn't matter, your Honor, whether the

7     test is could Serono ███████████ or whether the test is

8     would Serono ██████████, it's all the same result.  The

9     record is replete, your Honor, with references by Dr. DeLuca,

10    by Cathy Gebhard who is an intellectual property lawyer working

11    for Serono, and the arbitral award itself, that the whole

12    purpose ████████████████████████████████

13    ████████████████████████████████████

14    ██████.

15          The arbitral award itself recites that and there's

16    testimony that we have submitted of Dr. DeLuca and Miss Gebhard

17    to that effect.  And there's just simply no genuine issue here

18    that ████████████████████████████████████

19    ██████████████████████████.

20          THE COURT:  And just to clarify, from your

21    perspective, ███████████████████████?

22          MR. BARSKY:  Absolutely.

23          THE COURT:  And from the perspective of the

24    arbitrator ██████████████████████?

25          MR. BARSKY:  Absolutely.

```
 1              THE COURT:  Let me ask Biogen.  And as far as your
 2    understanding goes, ███████████████████████████████████
 3    that correct?
 4              MR. GROOMBRIDGE: ██████████████████████████████
 5    ████████████████████████████████████████████, your
 6    Honor.
 7              THE COURT:   All right.  Thank you.
 8              MR. BARSKY:   And so the only other point I
 9    mention on this, your Honor, is that Grain Processing talks
10    about this.  This is why Grain Processing tells the District
11    Courts that the Court must consider all alternative actions.
12    It's because an accused infringer is quote hardly likely to
13    walk away from a market when it can compete in a non --
14    continue to compete in a non infringing manner.
15              And that's exactly what ███████████████████████
16    ██████████████████████████████████████ and why it's
17    determinative of this motion.
18              One more point, your Honor, before I wrap up and
19    that is the argument that Biogen makes.  This is actually their
20    lead argument, your Honor.  They say that look, rejecting a
21    license offer doesn't confer immunity on you, Serono, so how
22    can you take that position on this motion.  Rejecting a license
23    offer doesn't give you immunity from an award of lost profits.
24              Well, there's a simple answer to that.  We agree.
25    We've never taken that position.  We've never asserted that
```

1    position.  We've never believed that to be the law and we don't

2    assert it to be the law.  It would be a foolish rule of law to

3    say that a patent owner who offers a license to an infringer

4    only to be rejected has thereby forfeited a claim for lost

5    profits.

6            We never have taken that position.  Although

7    Biogen says we did about 15 times in their papers and then

8    proceeds to try to knock down that argument by citing the

9    Beatrice Foods case.

10           So, we actually never took that position.  And as

11   far as the Beatrice Foods case goes, that's simply a case where

12   you have someone who is infringing for six straight years, is

13   offered a license by the patent owner, continues to infringe

14   three more years, okay.  There's then a judgment or, excuse me,

15   there's then a lawsuit filed.

16           The infringer then destroys all of its records of

17   its infringing activity.  But, never mind that.  And then

18   argues, according to Biogen, according to Biogen then argued to

19   the District Court that the offer of a license represented an

20   alternative action that it could have taken to avoid

21   infringement and thereby preclude lost profits.

22           Now, Beatrice Foods doesn't actually say that and

23   I will explain that in a moment.  But, before we get there, it

24   doesn't matter.  Because even if it did, we are not in a

25   situation like the defendant in Beatrice Foods who never had

1    any rights whatsoever in the plaintiff's patent.  The defendant

2    in Beatrice Foods infringed, rejected an offer to take a

3    license, and continued infringing.  We have never rejected any

4    offer to take a license.

5              On the contrary, your Honor, before this patent

6    issued, ███████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ███████████████████████████████.

9              So, we're not in the same category, or even close,

10   as the defendant Beatrice Foods.  For those six years leading

11   up to that offer, that fleeting offer of a license, for those

12   six years the defendant in Beatrice Foods had no right to

13   compete against the patent owner with an infringing product.

14   Had no right to take a license.

15             For a fleeting moment it could have negotiated

16   with the patent owner to take a license, could have accepted

17   that offer, but rejected it and continued to infringe.  But, it

18   never had the rights ████████████████████████████████.

19             And so, on that basis alone the Beatrice case, as

20   well as the other rejected license offer cases, the Globespan

21   Virata case and the Oscar Mayer case that are cited by Biogen

22   on this point, that whole line of cases doesn't apply because

23   we never rejected an offer.  ████████████████████████████████

24   ███████████████████████.

25             THE COURT:  Your distinction is that you are still

1    able to pursue that at this point.

2              MR. BARSKY:   Absolutely.

3              THE COURT:   Whereas in the other situation the

4    argument is that the offer has been rejected, there are ████

5    ███████████████████████████████████████████████████████.

6              MR. BARSKY:   May I just pin one clarification to

7    that, your Honor?

8              THE COURT:   Yes.

9              MR. BARSKY:   Yes.  But, there's more of a

10   distinction than that.  Because the defendant in Beatrice Foods

11   never had the ability, from day one when it started infringing

12   and for the six years --

13             THE COURT:   It was for six years.

14             MR. BARSKY:   -- ██████████████████████████.

15             THE COURT:   I understand that.

16             MR. BARSKY:   Okay.  ███████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████████████

20   ██████████████.  And that is what cuts off Biogen's claim of lost

21   profits and what was not present in any of these rejected offer

22   cases.

23             I also point out the following, your Honor:

24   Biogen represented to the Court in its opposition papers that

25   the defendant in Beatrice "that the defendant argued in that

1    case", this is on Page 3 of its opposition brief, "because it

2    could have taken a license, its hypothetical license sales were

3    non infringing alternative precluding lost profits liability".

4    That's what Biogen said about what the argument that the

5    defendant made, the infringer made, in Beatrice Foods.  That's

6    not true.

7              Biogen, excuse me, the Beatrice case does not say

8    that.  No such argument was ever made by the infringer in

9    Beatrice.  And no such argument was ever rejected by the

10    District Court.

11              In fact, your Honor, if we look at the sole

12    excerpt from the Beatrice Foods case on why the Federal Circuit

13    found that lost profits were appropriate on a reasonable

14    royalty, we can see that the defendant  -- just to parse this

15    particular section, your Honor, the first paragraph just

16    indicates that at some point an offer was made.

17              The second paragraph is the key paragraph, your

18    Honor.  It starts with the words New England argues that

19    Webcraft's offers to license others where no actual dispute has

20    arisen is probative of the damages that should be assessed

21    against New England.

22              So, what the defendant was saying there was that

23    look, the patent owner in this case offered licenses to parties

24    with whom it was not in the middle of litigation.  And that's a

25    pretty good approximation of what the patent owner thinks its

1    technology is worth.  And that's the basis on which damages

2    should be awarded.

3              But, there was no discussion, there is no

4    discussion in the Beatrice Foods case about how the offer of a

5    license was argued to be a non infringing alternative and

6    represented an alternative action in a hypothetical world.

7    But, the key point here, your Honor, is not this.

8              The key point is that even if the Federal Circuit

9    said exactly what Biogen said it said, it wouldn't matter

10   because this is not a rejected license offer case.  ██████████

11   ████████████████████████████████████████████████████████████

12   █████████████████████████████████████████████████████████████

13   ██████████████████████████████.

14             So, I can wrap up now, your Honor, in about five

15   minutes.

16             THE COURT:   That would be fine.  Actually, one

17   further thing to address, and I know it's been woven through

18   your argument today, but to the extent that Biogen is arguing

19   that there is a question of fact that prevents the granting of

20   summary judgment here, if you could clarify your position on

21   that, please.

22             MR. BARSKY:  Your Honor, there are no fact that

23   are at issue, your Honor.  It is law of the case that we had a

24   non infringing alternative action that we could have taken at

25   all times.

1          THE COURT:   And your position is the fact that

2    that is in existence is sufficient to eliminate any question of

3    fact.   ███████████████████████████████████████████████

4    that becomes another alternative available option and that's

5    sufficient to do away with any question of fact.

6          MR. BARSKY:   Yes.  But, the other reason there's

7    also -- yes, and that is sufficient.  But, what Biogen says is

8    that well, there's an issue as to whether ████████████████████

9    ████████████████.

10          Our point there is there's no, there's no issue

11   because the testimony they point to doesn't support the

12   proposition they want to advance, which is that Serono believed

13   that, excuse me, █████████████████████████████████████████████

14   ████████████████████████.

15          THE COURT:   And is your secondary position with

16   respect to that that you need not go and parse through that at

17   all because it is what foreseeable action there is?

18          MR. BARSKY:   I would say it's actually our primary

19   position, your Honor.

20          THE COURT:   All right.

21          MR. BARSKY:   But, I don't think it matters.  But,

22   yes, our primary position --

23          THE COURT:   How would you organize it so I can

24   follow you?  Go ahead.

25          MR. BARSKY:   Thank you.  I'm sorry.  I have

1    obviously done a good job of confusing things.  Let me see if I

2    can set it straight.

3         Our first argument, your Honor, is that for, as a

4    matter of law, the issue is whether the accused infringer could

5    have pursued an alternative action that would have enabled the

6    infringer to continue competing without infringement.  Could

7    have done so, not would have.

8         But, even if -- and this is the secondary

9    argument.  But, even if the test was would have and whether

10   █████████████████████████████, as Biogen claims in this

11   case, there's no issue as to whether we would have because we

12   tendered evidence, substantial evidence, showing that this is

13   precisely why ██████████████████████████████████████████████

14   ████████████.

15        And evidence that they cite to the contrary does

16   not create any genuine issue because it doesn't stand for the

17   proposition that they say it stands for which is that Serono

18   would have walked away from its flagship billion dollar a year

19   product.

20        So, your Honor, I conclude simply by saying this,

21   Rule 56 exists because, precisely because of the fact that

22   claims and defenses that are without merit should not go to a

23   jury.  This is just such a claim where Biogen is pursuing a

24   lost profits claim that presupposes that it could have excluded

25   us from the market when it is law of the case that they could

1   not have done so.

2           They have held this multi-billion dollar claim

3   over our heads like a Sword of Damocles and it has had other

4   negative effects including, in my opinion, presenting or

5   profoundly hindering the mediation process in this case.  And

6   there being no genuine issues of fact and the law in this area

7   being clear and settled, we would ask that the Court bring this

8   claim to an end.  Thank you very much.  I appreciate the Court

9   and the Court staffs' time.

10          THE COURT:  Thank you.

11          Anyone else from this side of the table who is

12  going to speak before we turn to Biogen?

13          MR. KORNBREK:  Not right now, your Honor.

14          THE COURT:  All right.  Thank you.

15          Let's hear from Biogen, please.  Also, if you have

16  copies of the slides that were just up, if you could provide

17  them to the Court.  Thank you.

18          MR. BARSKY:  I'm sorry, your Honor.

19          THE COURT:  I was just saying if you have copies

20  of the slides that were up, you can provide them to the Court.

21  If you don't have them today, you can send them in.

22          MR. BARSKY:  We do.  Thank you very much, your

23  Honor.

24          THE COURT:  Thank you.

25          MR. GROOMBRIDGE:  Hello, your Honor.

1          THE COURT:  Hello.

2          MR. GROOMBRIDGE:  We certainly have copies too and

3     we will provide those.

4          THE COURT:  Thank you.

5          MR. GROOMBRIDGE:  So, let me see, just maybe in

6     the beginning touch on some of these things.  I don't think we

7     need to go back to the basis of the patent damages.  But, the

8     one point I would like to make here with respect to the law on

9     lost profits is, looking at this Right Sight (ph) case, which

10    is one of the seminal Federal Circuit cases, it's an en banc

11    case on the availability of lost profits.

12          The general rule would be in a situation such as

13    this where the parties compete with one another, that lost

14    profits would be the measure of damages.  And yes, of course,

15    we have to prove them, like any plaintiff has to prove

16    entitlement to them.  But, that's the expectation of the patent

17    law.

18          Now, one of the things that we've struggled with

19    in connection with the papers in this motion has been Serono --

20    it seems hard for us to pin down what exactly it is that Serono

21    is arguing.  Sometimes the issue is framed as one of patent

22    law.  And we talk about what happened in Grain Processing and I

23    certainly intend to address that, your Honor.

24          But, other times it's framed as one of contractual

25    rights.  And I just heard from my learned friend here many

1    times that repetition that Serono was asking for the benefit of

2    the bargain.  It's different from every other

3    similarly-situated infringer because it had bargained for some

4    rights.

5              But, when we try to pin Serono down on that, they

6    don't want to be pinned down.  And they walk away and they say

7    ███████████████████████████████████████████████████████████████

8    ████████████████████████████████████████.

9              Now, many times it was just stated that, and I

10   wrote down one of them, we, that would be Serono, ██████████████

11   ███████████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████████

15   ██████████████.

16             And the answer is, of course, ██████████████████████

17   ██████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████?

22             And the answer, your Honor, is because they are

23   trying to have it both ways.  The entire reason we are standing

24   in this courtroom and the entire reason that underlies this

25   motion is an effort ████████████████████████████████████████████



1  ███████████████████████████████████████████

2  ████████████.

3          And what do I mean by that?  ████████████████

4  ███████████████████████████████████████████

5  ███████████████████████████████████████████

6  ████████████████████████.  And there is no doubt that

7  REBIF would be a potential non infringing alternative for the

8  infringement to limit the damages consequent to the

9  infringement byplay.  ███████████████████.

10              █████████████████████████████████

11  ████████████████████████████████████████

12  ████████████████████.

13          THE COURT:  But, in a "but for" world, if we are

14  dealing with a "but for" world ████████████████████████

15  ████████████████████?

16          MR. GROOMBRIDGE:  If the law is such that one of

17  the things that the "but for" world contemplates is a change in

18  the legal status, yes, █████████████████.  And that is an

19  alternative action in the "but for" world, then yes.

20          What we're saying, your Honor, is that's not the

21  law.  It's never been the law.  And there is no case that they

22  can point to where that ever happened.  And I'll be happy to

23  address that.

24          If we talk about Grain Processing, this entire

25  motion is based upon a single sentence in the opinion in Grain

1      Processing.  It's based upon the sentence that reads as

2      follows:  "A fair and accurate reconstruction of the 'but for'

3      market must take into account whereof and alternative actions

4      the infringer foreseeably would have undertaken had he not

5      infringed".

6              Now, this is an awfully big legal theory to build

7      upon the slim raft of a single sentence in a case in which this

8      issue was not in play.  What happened in Grain Processing?  In

9      Grain Processing there was a -- first of all, relevant in Grain

10     Processing is it's a processed patent.  So, part of the reason

11     that the Court would be talking about actions has to do with

12     the fact that it's a processed patent.

13             Over many, many years there was a long great

14     protracted patent litigation, and the infringer in that case is

15     not one, but four separate processors to make the material that

16     was the subject of the damages claim.  Processes 1, 2, 3 and 4

17     were found to infringe.

18             Ultimately at the end after a decade or so of this

19     12 years, I believe, the infringer switched to another process,

20     process 4 which was found not to infringe.  And the entire

21     debate in Grain Processing is could the infringer have switched

22     to process 4 way back on day one and thereby cutoff damages, or

23     not.

24             And the focus of the -- the legal argument that's

25     going on there is one side is saying an alternative that was

1      not actually available cannot legally be considered for this

2      purpose.  And the other side which won was saying an

3      alternative for that that wasn't actually in commercial use,

4      but I could show I would have gone to, does qualify.  And that

5      was the view of that one.  I will come back to the would have

6      could have debate in a little bit.

7                  But, there was never a debate in Grain Processing

8      about changing the legal status of the product.  And in fact

9      the very next sentence in the opinion, the one that Serono

10     doesn't like and never quotes says, "without the infringing

11     product, a rational would-be infringer is likely to offer an

12     acceptable non-infringing alternative if available to complete

13     with the patent owner rather than leave the market all

14     together.

15                  What was going on there, the reason that the Court

16     was talking about actions here, like all of the other lost

17     profits cases in the Federal Circuit, it's about the

18     alternative is an alternative in the physical aspects of the

19     product.  Let me come back to that in a second.

20                  The reason they are talking about actions, the

21     actions involved were putting an extra enzyme into the reactor

22     when you made the product that had the effect of taking it

23     outside the scope of the patented process.

24                  And, yes, the infringer hadn't done that.  They

25     hadn't done it because the enzyme costs a certain amount.  They

1    didn't want to spend that money.  But, in the end they were

2    willing to spend it rather than infringe.

3         The debate there was whether they would have done

4    that earlier.  And contrary to a lot of what I think we just

5    heard about there being, this was all hypothetical and they

6    could have done it and there was no evidence, there was a very

7    intense factual debate in that case about what they would have

8    done.

9         And the fact that it took them only two days to

10   make the change from process 3 to process 4 when they wanted

11   to.  And that they had all the taught and all the know-how in

12   place throughout the entire 12 years.

13        THE COURT:  Let me just stop you for one moment.

14   Is there any case out there that actually restricts the meaning

15   of alternative action to a process or a method or a product?

16   And specifically state so.

17        MR. GROOMBRIDGE:  No, not to our knowledge, your

18   Honor, nor is there any case, except for possibly the Cardiac

19   Pacemakers' decision from the District of Indiana, that says

20   that alternative actions can involve a change in the legal

21   status of the product.

22        So, there isn't a case one way and there isn't a

23   case the other way.  What there is, for example, we invite your

24   Honor to look at this, the Appendix A that we submitted with

25   our opening brief is 20 years' worth of Federal Circuit

1    decisions on non infringing alternatives.  And every single one

2    of them is about a physical change, a physically different

3    product.

4           When your Honor asks this question to Mr. Barsky,

5    he talked about three cases, Fuji Photo, which was a

6    refurbished product, a physically different, a product that

7    came from a different source, but a product that was different.

8    Slimfold (ph), an old product.  They could have gone back to

9    one they were selling before.  Again, a different product.

10          Cardiac Pacemakers is the only case where a Court

11   has ever held that a change -- to the knowledge of these

12   parties, as far as we can tell, where a change in the legal

13   status of a product can make that same product a non infringing

14   alternative to itself.  And what they are arguing here is yes,

15   REBIF is a non infringing alternative to REBIF.

16          Now, Cardiac Pacemakers, your Honor asked didn't

17   that go to the jury.  The answer is yes.  There is no case,

18   Cardiac Pacemakers included, in which any Court has ever done

19   what they ask your Honor to do, to grant summary judgment on

20   this issue.

21          The only cases where this issue may have gone, may

22   have gone forward and been decided that we can tell are Cardiac

23   Pacemakers and the Globespan Virata case before this Court in

24   which I believe it was already Chief Judge Brown addressed the

25   same issue in the context of sort of a RAND obligation, which I

1      will talk about.

2              THE COURT:   In terms of Cardiac Pacemakers, the

3      question I had asked counsel about what went to the jury, if

4      you could clarify that as well.

5              MR. GROOMBRIDGE:   I can completely clarify, your

6      Honor.   It went to two rounds of Cardiac Pacemakers because it

7      went up to the Federal Circuit and got reversed on other

8      grounds and came back.

9              On the first round, the question, what went to the

10     jury was whether the possibility, the factual issue that the

11     merger might not have proceeded and thus Venture Techs, one of

12     the defendants, would have continued to have a license and thus

13     the Venture Techs products would not be infringing because they

14     would be licensed.

15             That issue went to the jury as a contested issue.

16     All right.   And the jury instruction appears, it's at the very

17     end of the first of the two decisions.   I can't, I think it's

18     only reported in Westlaw.   But, in my copy it's on page 76 of a

19     77-page opinion.

20             And it says in part that the jury instruction

21     says, this is the Court speaking to the jury, As you know,

22     Venture Techs was licensed to practice the two patents before

23     it merged with St. Jude.   Because the merger caused the

24     termination of that license, any infringement began with the

25     merger.

1          If the merger had not occurred, that is if the

2    infringement had not occurred, the license would have allowed

3    Venture Techs to continue manufacturing and selling its

4    products as an independent company.

5          When reconstructing the market in the absence of

6    infringement, you may take this possibility into account, the

7    possibility that the merger would not have taken place, and the

8    legal status of the product would have continued to be

9    licensed.  And the jury found that.  Right at the very end of

10   the opinion it says the jury reasonably found that no lost

11   profits had been proven.

12         And then, now, your Honor, in that case that was

13   allowed to go to the jury over the objection of the patent

14   holder who said, as a matter of law, this change in legal

15   status argument doesn't make it a non-infringable alternative

16   and you shouldn't let this go to the jury, Judge.  And the

17   Judge said I'm going to let it go to the jury.

18         It went to the jury and the jury, at least as far

19   as we can tell from the post trial motions, adopted that theory

20   and awarded no lost profits.  Although they did award

21   $140 million in apparently royalty damages.  That issue was

22   never appealed.

23         Venture Techs -- the Cardiac Pacemakers is a very

24   complicated, protracted case.  But, the patent owner in that

25   case had certainly incurred the displeasure of the trial Judge.

1    Their expert was proven to have committed perjury during the

2    jury trial and they elected not to appeal on those issues.

3    They appealed on a different issue and it came back down.  And

4    this time the defendant, now on a different patent but same

5    legal theory, the defendant makes a motion that is the code

6    name of the motion Serono is making here.

7            It says, there can, as a matter of law, be no lost

8    profits because of these facts, right, because of a legal right

9    to maintain the status of the product that's licensed.  And the

10   Judge denies that motion, says I'm going to send that to the

11   jury.  Not clear if it ever went to the jury or if it was

12   resolved at that point.  But, no Court, including Cardiac

13   Pacemakers has ever granted the type of summary judgment motion

14   that Serono here makes.

15           And I would say the Cardiac Pacemakers in our

16   view, your Honor, is inapplicable for two reasons.  First of

17   all, even if you accept that it's correct, the alternative

18   there was a license that was in existence and could not, and it

19   could have continued in existence and not been terminated.

20           Here, the opposite is true.  There is no license

21   ████████████████████████████████████████████████████████████.

22   But, REBIF has never been licensed under the '755 patent.  So,

23   we think it's factually distinct.

24           THE COURT:  ███████████████████████████████████

25           ████████████████████?

```
1              MR. GROOMBRIDGE: ████████████████████████████

2    ████████████████████████████████████████████████

3    ████████████████████████████████████████████████

4    █████████████████████████████████. And there's a very good

5    reason for that.

6              The only thing I would just say before I leave

7    Cardiac Pacemakers, your Honor, is we think it's wrongly

8    decided because when we look at what the Court says there,

9    among other things, it says that one of the alternatives that

10   the infringer would have is not to infringe at all.  And that

11   can't be right.  That just cannot be right.

12             It can't be the situation that I can say, you

13   know, if I had known that you were going to lose the lawsuit

14   and be found to be an infringer, I would never have done this

15   in the first place and therefore I don't owe you lost profits.

16             And what I would suggest, your Honor, is that that

17   Judge, probably for very good reasons, was looking at an

18   intensely complicated dispute and may have said some things

19   that were in the course of resolving post trial motions that

20   were perhaps inopportune.  But, that's, again, a very thin reed

21   on which to build an entire legal theory.

22                        █████████████████████████████████

23   ███████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████,
```



 1  ████████████████████████████████████████
 2  ████████████████████████████████████████
 3  ██████████████
 4              ████████████████████████████████
 5  ███████████████████████████████████████
 6  ███████████████████████████████████████████
 7  ███████████████████████████████████████████
 8  ██████████████████████████.
 9              So, here's, what does that mean? It ████████████████
10  ███████████████████████████████████████████
11  ████████████████████████████████████████
12  ████████████████████████████████████████████
13  ███████████████████████████████████████████
14  ███████████████████████████████████████
15  ████████████████████████████████████████████
16  ██████████████████████████████████
17              ████████████████████████████████████
18  ████████████████████████████████████████
19  ████████████.  They have a choice to make.  And the entire
20  purpose of this motion is to say we want to have it both ways.
21  ████████████████████████████████.  But, we also want
22  to be able to take a swing at the patent.  And we don't want
23  you to, Biogen, to be in a position where ████████████████
24  ████████.
25              THE COURT:  I understand your argument which is to

1    have your cake and eat it too argument.  However, if we are

2    dealing with the "but for" world, why wouldn't they be able to

3    use the fact that it's out there?

4          MR. GROOMBRIDGE:  The "but for" world, and this

5    brings us right back to it, because the law says you can't.

6    The law says an unaccepted offer isn't part of the "but for"

7    world.  For the exact same reason, your Honor, that I can't, if

8    we at the beginning of the lawsuit I say let's settle, we work

9    out a deal and then I say I'm not going to take it.  And then I

10   come back, I litigate the case and then I come back and say

11   that in a "but for" world, I wouldn't have taken it.

12         It cannot be the case that you can have it both

13   ways.  And the law says you can't have it both ways.  And, in

14   fact, this was an issue in the arbitration.

15         Now, I heard Mr. Barsky say many, many times law

16   of the case.  One of the things that Biogen argued in the

17   arbitration was ███████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   █████████████████████████████████████████████████████████

20   ████████████████████.  You can't do that.  And your effort to do

21   that, we argue, ██████████████████████████████████████████████

22   ████████████████████████.  You had every piece of information you

23   needed.

24         On the day the patent issued, two days after the

25   patent issued, we sent you a letter saying we got this patent,

1    ████████████████████████████.  We gave you everything

2    you wanted.  We sat and came and met with you.  And you said I

3    can't make up my mind.  I don't know.  I'm not sure.  I don't

4    know.

5         And you forced us, in the end, to go into a

6    lawsuit and go through all of these proceedings for the past

7    five years that are still going on.  And your argument is going

8    to be if you lose, you know, no harm, no foul.  I would just

9    like -- I can go back in the "but for" world and be where I

10   would have been in the first place.

11        And the arbitral tribunal says, you know, it's a

12   tough question.  But, we are going to come down in favor of

13   Serono in this.  And the reason we are going to come down in

14   favor of Serono is this, that if Serono wishes to challenge the

15   validity of the '755 patent, ████████████████████████████████

16   ███████████████████████████████, exposing itself to

17   substantial, potential damages.  That's what the arbitral

18   tribunal said.

19        And having made the argument that ██████████████

20   ████████████████████████████████████████████████████████

21   ██████████████████████████████.  It ill behooves and

22   it seems frankly inappropriate to us for Serono to now come

23   into this court and say that's all a terrible misunderstanding

24   and in fact we are not exposed.  We have no downside.

25        Now, I would like to point something out.  When

 1          your Honor asked the parties what do you think is the

 2          difference between a reasonable royalty analysis, the damages

 3          under a royalty analysis and the damages under a lost profits

 4          analysis, I stood up and I answered.  What we didn't hear from

 5          Serono is what Serono thinks the damages would be under a

 6          reasonable royalty analysis.

 7                    And the reason for that, I suspect, your Honor, is

 8          because Serono and indeed its co-defendants are carefully

 9          guarding their ability and their plan to argue that the damages

10          would be the royalties that are payable under the 1, 2 or

11          3 percent regime of this agreement.

12                    THE COURT:   Well, we can get counsel to elicit a

13          little bit on that.  We can do that right now.  If there's

14          anything further that counsel for Serono wants to say with

15          respect to the calculation of the royalty versus lost profits

16          and how that would proceed.

17                    Again, it's very general.  I'm just trying to get

18          a scope here.

19                    MR. BARSKY:   I would be happy to, your Honor.

20                    THE COURT:   Thank you.

21                    MR. BARSKY:   Maybe we could take actually a look

22          also, after I answer this question, at the entirety of that

23          paragraph.  Maybe we can see that it doesn't mean what that one

24          sentence excerpt suggests.

25                    THE COURT:   Not a problem.

1          MR. BARSKY:  But, the answer is simply this, we

2     are obviously not at a point where we are engaging experts and

3     analyzing the issue of what a reasonable royalty is.  But, we

4     know that the test is if a willing licensor and a willing

5     licensee were to sit down, presuming infringement and validity

6     and a willing licensor, a willing licensee were to sit down on

7     the eve of infringement and negotiate a license, what would it

8     look like.

9          And the whole purpose of the 15 factor test that

10    the Federal Circuit has set forth in that regard is to try to

11    adjust that negotiation as closely as possible to what the

12    reality is in terms of the competitive situation between the

13    licensor and the licensee.

14          And obviously one of the key factors that both

15    sides would rely on in such a negotiation in September of 2009,

16    which is when Biogen alleges that the infringement began, a key

17    factor for both sides would have been ████████████████████████

18    ████████████████████████████████████████████████████████

19    ███████████████████████████████████████████████████████████████

20    ███████████████████████████████████████████████████████████

21    █████████████████████████████████.

22          And so as far as the reasonable royalty analysis

23    goes, that's certainly, ██████████████████████████████████████████

24    will certainly loom large in any such analysis, I assume, by

25    either of the parties' experts in this case, your Honor.

1          Does that answer your Honor's question?

2          THE COURT:  It does.  Thank you.

3          MR. BARSKY:  I think I said earlier, if I didn't I

4    will say it now, that what -- remembering, again, that the

5    purpose of damages is not to punish.  It's to compensate and

6    put the patent owner in the position it would have enjoyed had

7    there not been any infringements.

8          In this case had ███████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████.  That's what would have

14   been Biogen's expectation interest on the eve of alleged

15   infringement.

16          But, the lost profits claim they are asserting in

17   this case dwarfs that by a factor of at least 25.  And if I

18   heard Mr. Groombridge correctly this morning in suggesting, we

19   thought it was only 4 billion, but if it's as high as a hundred

20   billion, excuse me, I'm sorry.  If it's as high as $10 billion,

21   then I don't know how he allocates that among the various

22   defendants, but I think we have one of the largest market

23   shares out there other than Biogen.  So, presumably the lion's

24   share is ours.  But, it dwarfs it by a factor of far more than

25   25 whatever that number may be.

1          And that does violence or would do violence, your

2     Honor to what the Supreme Court has said in Arrow and other

3     cases, which is that you don't punish.  That the purpose of

4     compensation or damages is not to punish.  It is to compensate

5     the patent owner for what it lost as a result of the

6     infringement, not the competition, but the infringement.

7          THE COURT:    Under your lost profits analysis you

8     would be returning back to your royalty, to ████████████████

9     ██████████████████████████████████████████████████████?

10         MR. BARSKY:  If Biogen -- our position is that if

11    Biogen is successful in proving a valid infringed and

12    enforceable patent, then, as a matter of law, they are entitled

13    to no less than a reasonable royalty under the, under 35 U.S.C.

14    I want to say it's 284.

15         THE COURT:  Okay.

16         MR. BARSKY:  Thank you, your Honor.

17         THE COURT:  Thank you.

18         MR. GROOMBRIDGE:  Just to confirm then what I

19    think we just heard is the position is in Serono's view of the

20    world, ████████████████████████████████.  If you win,

21    we go back and in the "but for" world ████████████████████

22    ████████████████████████████.

23         Now, what's wrong with that?  There's a number of

24    things wrong with that.  The first thing wrong is that's not

25    how the law works.  And I will talk in a minute about why it is

1   that the failure to accept an offer cannot be -- an offer

2   that's made and not accepted, and not necessarily rejected, but

3   not accepted, does not operate to create a non infringing

4   alternative as a matter of law.  That's the number 1 issue.

5          THE COURT:  Although the cases that we've looked

6   at, they appear to be rejections as opposed to offers that are

7   not accepted.

8          MR. GROOMBRIDGE:  In several of these cases, the

9   patents are subject to obligations.  For example, in Globespan

10  Virata there's a so called RAND obligation which means that the

11  patent owner make an irrevocable offer to the world saying I

12  will give you a license on reasonable and non discriminatory

13  terms whenever you want one.

14          And so I would say, your Honor, that that's not,

15  it's not capable of being revoked.  And that's the point that

16  even an offer that subsists forever, if not accepted, could

17  still be accepted.  You didn't lose the right to it by saying

18  no.  It's out there.  It's out there for everyone.  It's out

19  there forever.  And that doesn't operate to cutoff lost

20  profits, right.  ▬▬▬▬▬▬▬▬▬▬▬▬

21  ▬ have here, right, conceptually.

22          And in the Oscar Mayer case, what the patent

23  holder had done was to license a third party.  And in that

24  license it said you, third party, will give anyone in the rest

25  of the world who wants a sublicense, a sublicense on reasonable

1     terms.

2               So, again, the patent there by contract had been

3     encumbered with the rights for the world to take licenses.   And

4     that didn't operate -- it wasn't terminated.   It was out there

5     forever.   And had the infringer wanted to, they could go back

6     at anytime and get one.

7               THE COURT:   Well, in the, I'm not sure on the

8     pronunciation, it's Globespan Virata.

9               MR. GROOMBRIDGE:   I think it's Globespan Virata.

10              THE COURT:   Globespan Virata.   In that case,

11    though, didn't the defendant actually reject the license after

12    the infringement began?

13              MR. GROOMBRIDGE:   Apparently so.   But, the point

14    here --

15              THE COURT:   Isn't that distinct from our case?

16              MR. GROOMBRIDGE:   No, I don't think so because the

17    RAND commitment, the patent owner has said to the world,

18    anybody that wants one at anytime can come and take a license

19    on reasonable and non discriminatory terms, hence RAND.

20              So, the infringer can come back at any point,

21    anyone in the world can come back at any point.   It's an

22    irrevocable offer.   And, your Honor, ████████████████████████

23    ████████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████████.

25              In terms of the way we are required to analyze

```
1    this, ██████████████████████████████████████
2    ████████████████████████████████████████████████
3    ██████████████████████.   And so the legal analysis tends to be,
4    does an unaccepted offer constitute an alternative in the "but
5    for" world.   And the answer to that, we suggest, your Honor, is
6    that the cases that address this that are on point tell you
7    absolutely not.
8              THE COURT:   What do you believe your strongest
9    cases on that point are?
10             MR. GROOMBRIDGE:   I think it's probably Oscar
11   Mayer.   But, I think all three of them, you know, they are
12   slightly different.   And I think in the Globespan Virata case
13   the fact of the RAND commitment makes it very apposite here.
14             And I think that the other, in answer to your
15   Honor's question about why is it that the "but for" world
16   doesn't allow them to do this, because, you know, the law --
17   where parties have arranged their affairs in a contract, you
18   can't then come in and use tort law to say I will get a better
19   deal.   And you can't use tort law to say I'll take the bits of
20   the contract that I like, but I won't take the bits of the
21   contract that I don't like.   If that were the case, then
22   contracts would be gutted.
23             ████████████████████████████████████████
24   ████████████████████████████████████████
25   ██████████████████████████.   That's their argument.
```

1    They say because in the "but for" world, I would have known I

2    was going to lose the case.  I would have known I infringed.

3    So, I never would have challenged, right.  ████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    █████████████████████████████████.

7            Because you think about what would have happened

8    here, your Honor.  ████████████████████████████████████████

9    ████████████████████████████, you know, this, I don't think

10   there's been any reason for the Court to be aware of this, but,

11   probably the biggest part of this lawsuit is the validity

12   challenge that the defendants are making to the '755 patent.

13   If they had done that, ███████████████████████████████████

14   ████████████████████████████████████████.

15           And with respect to all of the arguments that

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   █████.  The only reason that's in there I say, ██████████████

19   ████████████████████████████████████████████████████████████

20   ██████████████████.

21           And we're playing a shell game here to say I can

22   get around that by going into this hypothetical "but for"

23   world.  And I can get a deal that in the real world I am

24   absolutely prohibited from having.  And that cannot be the law.

25   It isn't the law.

1          So, we have Beatrice.  We talked about.  I think

2     we looked at this but the, and I don't know that we need to

3     dwell on it, but, in the timing issue we would say in our view,

4     your Honor, is irrelevant.  It doesn't matter that there has

5     been -- in a lost profits analysis we look at the entire time

6     period.  So, for example, in the Pall case, the fact that one

7     of the products becomes licensed halfway through the damages

8     period is a relevant fact.  And we look at that as a non

9     infringing alternative after its licensed and not before.

10         So, the timing issue that Serono points to is a

11    way to try to distinguish that Beatrice is not relevant, is not

12    germane.

13         THE COURT:  It is a distinction, nonetheless.

14         MR. GROOMBRIDGE:  I don't think so because in the

15    analysis, the way lost profits law would work is assume that

16    premise is correct, all it would mean is that it was operative

17    to cutoff damages from the time the offer was made, but not for

18    the six years preceding that.

19         So, I will scroll forward through this, but,

20    somewhere in here, here the Pall case, so there's one

21    plaintiff, two defendants.  Plaintiff sues both defendants.

22    Partway through that, the legal proceedings, the licensor

23    settled the license with one of the defendants.  And what we

24    see there is the Cuno Products become non infringing

25    alternatives.

1          Now, when we are looking at damages as against the

2     non-settling defendant for this period of time Cuno Products

3     are not non infringing alternatives because they are

4     infringing.  Then after they become licensed, they are

5     infringing alternatives.  That's the way the Federal Circuit

6     instructs us to look at this.

7          We are not looking at a point in time, we are

8     looking at a continuum.  And any events that happened during

9     the continuum are relevant, but they are relevant only for the

10    period which they apply.

11         So, trying to distinguish Beatrice on the basis

12    that there was six years that transpired before the offer was

13    made is irrelevant.  If the premise were correct that an offer

14    not accepted can be an alternative action, then it would be

15    that at the time when the offer was made going forward.  And it

16    wouldn't undermine the legal validity of that premise, the fact

17    that there was six earlier years in which they didn't apply.

18    That's a conceptual point I think I'm trying to make, your

19    Honor.

20         If we look up what happened in the, what happened

21    in Oscar Mayer, this is the District Court speaking in Oscar

22    Mayer, right.  It says well, you've, the patent owner had

23    licensed this third party Purac.  And the defendant could have

24    gone to Purac at anytime and obtained a license.  So, in our

25    view again that's directly analogous.  Has the ability

1    unbounded in time to go and get a license.  It doesn't.

2          Then comes in and says that the plaintiff, by

3    virtue of entering into a deal by which licenses are available

4    to the world, precluded itself from recovering lost profits,

5    right.  In essence that's the same argument that's being made

6    here. ███████████████████████████████████████████████

7    ██████████████████████████████████.

8          The Court rejects that.  District Court rejects it

9    and says defendant cites no authority for this proposition, nor

10   Serono.  And the fact that a patentee has offered a license to

11   the infringer or others does not preclude the patent holder

12   from suing for lost profits.

13         THE COURT:  But, in that case didn't ConAgra not

14   accept the license that was offered to it?

15         MR. GROOMBRIDGE:  The defendant didn't accept it

16   but, again, because the license was available -- they could

17   have gone back at anytime and said yes, I'll take it.  That

18   what the patent owner had done was go to a third party and say

19   we are giving this patent to you and we are going to require

20   you, by contract, to grant licenses to anybody else in the

21   world who wants one, at anytime.

22         And so ConAgra rejected it then but they could

23   have gone back at any time and accepted it.  So, in our view

24   that is directly analogous to --

25         THE COURT:  Although in this case we don't have a

1    rejection.  ███████████████████████████████.

2                    MR. GROOMBRIDGE:  Fair enough.  But, that's

3    absolutely right, your Honor.  But, why is it that there's a

4    distinction there?  The reason that this matters is it's the

5    idea that what brings something to the point of being a non

6    infringing alternative is when it's licensed and authorized.

7    That's what we see in Pall, right.

8                    The mere fact that I could have changed the legal

9    status and didn't, right, conceptually that's no different than

10   saying I could have settled.  And in the "but for" world I

11   would have known I was going to lose and I would have already

12   done that.  That cannot be the law and it isn't the law.  And

13   what's going on here is an effort to say, to go back in, take

14   advantage of that use of the word "actions" in the one sentence

15   in Grain Processing and say oh, I would have done this, right.

16                    It can't be the case that I would say, you know,

17   if I would have known I was going to lose, I wouldn't have

18   infringed in the first place.  That cannot operate to cutoff

19   damages.

20                    And again that's, you know, Oscar Mayer went up on

21   appeal and it's a non precedential decision, but again we

22   submit directly on point here, your Honor.  And here the

23   Federal Circuit in framing the arguments says well, the

24   infringer here says all right, you agree to license anyone

25   else, anyone who makes a reasonable offer gets a license,

1    right.   Very analogous to ████████████████████████

2    ███████████████████████████.

3              And the infringer argues that by this agreement

4    the patent holder bargained away the right to exclude others

5    contained under the right to collect a royalty.   That sounds

6    very much like what I just heard from Mr. Barsky.

7              The Federal Circuit rejected that and says because

8    these two companies are competing in the marketplace,

9    regardless of the fact that the patent holder has said I'll

10   license the world whenever they want a license,  if someone

11   doesn't accept that offer, they don't have to reject it, they

12   just don't have to accept it, then the patent holder can go

13   forward and collect lost profits.

14             And that's why I say, your Honor, when you look at

15   these two, this case, both the District Court and the Federal

16   Circuit decision here, that this, I think, is probably the

17   clearest articulation of the fact that merely because someone

18   had a contractual right to take a license, doesn't eliminate

19   the patent holder's ability to get lost profits where the two

20   companies, the infringer and the patent holder, are in direct

21   competition.   You can't reconcile this with the argument that

22   Serono makes here.

23             And lastly, I think we have touched on Globespan

24   Virata, but again in our mind, in our view, your Honor, the

25   significance of this is that RAND commitment which again is an

1        irrevocable offer to license.  So, if someone rejects it, it

2        doesn't go away.  It's still there.  They can come back the

3        next day and say, you know, I accept it.

4                The patent holder has encumbered the patent with

5        an obligation to license the world at anytime.  It could not

6        have refused to license.  It gave a binding commitment to

7        license this technology to anyone in the industry.  So, this

8        infringer again has an unfettered right to take a license

9        anytime it wants to.  Comes in and says that means there can be

10       no lost profits.  The Court disagrees.  The Court says it

11       doesn't mean that.

12               Chief Judge Brown saying, and he says, refuses.

13       But here again because of the RAND terms you can come back

14       anytime you want and accept and so it's an irrevocable offer.

15               THE COURT:  But, again, that defendant had

16       reflect rejected it.

17               MR. GROOMBRIDGE:  It had rejected it, your Honor.

18       But, if the point was to say but I could have gone back anytime

19       I wanted, had I known I was going to be found liable, I would

20       have accepted it.

21               So, you know, the offer never went away, right, it

22       subsisted.  The rejection didn't terminate the ability to take

23       that license.  And I think that's the key distinction.

24               I think we talked about Pall versus Cuno.  There

25       is a burden of proof issue that I'm not sure is necessarily

1     important and worth talking about unless the Court has

2     questions on that.

3                 THE COURT:  No, I'm fine on that.  Thank you.

4                 MR. GROOMBRIDGE:  What I would like to do then is

5     talk about the fact issue here.  Now, Mr. Barsky said that it

6     could have is enough and you don't have to prove would have.  I

7     think that's not a fair reading of Grain Processing.

8                 Now, Grain Processing says A fair and accurate

9     reconstruction of the "but for" market also must take into

10    account whereof and to alternative actions that the infringer

11    foreseeably would have undertaken had he not infringed.

12                And the entire point of the debate in Grain

13    Processing is, is this concrete and actual enough, as a matter

14    of fact, that we can understand that you would have done this.

15    Not merely that you're making some area arguments oh, if I

16    would have known this would have come out badly, I would have

17    done something different.

18                And Grain Processing is very much about the could

19    have versus would have distinction.  And it's saying the

20    standard is would have, but, in this instance because of the

21    very powerful facts on behalf of the infringer, the infringer

22    has met the would have standard.

23                Now, here what I would like to do is talk about

24    the evidence that we submitted with respect to Serono's state

25    of mind at the time shortly after the patent issues.  There was

1    a debate between the two companies.

2                    Now, ████████████████████████. All

3    right.  Mr. Barsky's argument was all based on well, that

4    doesn't make sense. ████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ██████████

8              ████████████████████████████████████

9    ████████████████████████████████████████████

10   ███████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   █████████████████████████████████████████

14   ██████████████████████████████

15             ████████████████████████████████████

16   ██████████████████████████████████████████████

17   ██████████████████████████████████████████████

18   ██████████████████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████

21             ██████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████

1   ███████████████████████████████████

2   ██████████████████████████

3              ██████████████████████████████

4   ████████████████████████████████████

5   ██████████████████████████████████████

6   █████████████████████████████████████

7   ██████████.

8              And it is true that there was some testimony about

9   this at the arbitration.  And we see there that he testified at

10  the arbitration ██████████████████████████████

11  ███████████████████████████████████████

12  █████████████████████████████████████████

13  ███████████.

14             Now, it's not correct that there was no follow-up

15  on this.  The follow-up was in the form of a deposition of Mr.

16  DeLuca in this action which I took which occurred in Belgium.

17  And we had testimony in there about this and that's in the

18  record here too.  I actually believe that this may be an

19  incorrect citation because I suspect that this is testimony

20  from his deposition.  But, it's certainly in the record.

21             And he testified at his deposition that ███████

22  ██████████████████████████████████████

23  ██████████████████████████████████████

24  ███████████████████████████████.

25             THE COURT:  You know what, if you could, just for

```
 1    ease of reference and the record, ████████████████
 2    ████████████████████████████████████.
 3                 MR. GROOMBRIDGE:  Certainly, your Honor.
 4                 THE COURT:  Thank you.
 5                 MR. GROOMBRIDGE:  ████████████████████
 6    ████████████████████████████████████████████████████
 7    ██████████████████████████████████████████
 8    ████████████████████████.
 9                 THE COURT:  Thank you.
10                 MR. GROOMBRIDGE:  So, Mr. DeLuca gave evidence
11    that he said, and in fact he told Biogen when they were
12    discussing Biogen saying ████████████████████████████
13    ████████████████████████████████████████████████████
14    ████████████████████████████████████████████
15    ████████████████████████████████████████████████████
16    ████████████████.  Now --
17                 THE COURT:  Well, at this point let me just hear
18    from counsel on this so I can get a dialogue going back and
19    forth.  Thank you.  Go ahead.
20                 MR. BARSKY:  Your Honor, first let me put this
21    into context.  I was taking careful notes.  I think what Mr.
22    Groombridge just said was that because Dr. DeLuca expressed
23    some question about ████████████████████████████████
24    ████████████████████████████████████████████████████
25    ██████████████████████████████████████,
```

1   ██████████████████████████████████████████████████████.

2          It's piling conjecture upon speculation upon

3   nothing.  And it does not add up to any genuine issue.  That's

4   where Mr. Groombrige is going.  But, I also heard him just say

5   and it very much surprised me, that Dr. DeLuca testified that

6   ████████████████████████████████████████████████████████████████

7   ███████████████████████████████████████.  I didn't hear

8   a citation.  I didn't see a quote on the board.  That testimony

9   does not exist.

10         This was all in the context, by the way, your

11  Honor, in early 2010 when Biogen was saying to Serono, █████████

12  ██████████████████████████████████ because you're

13  infringing our patent.  And what they want you, the Court, to

14  believe is that the director of intellectual properties for

15  Serono sat across from Biogen and said, you know, I don't think

16  so because ██████████████████████████████████████████

17  ██████████████████████████████████.  So, I

18  just think we're out of luck.

19         That's the proposition that we're hearing.  And

20  it just, it makes no sense.  It strains credulity and it's

21  exactly the kind of testimony where Matsushita, the Supreme

22  Court in Matsushita, 30 years ago I think it was, said that if

23  you are trying to create a genuine issue of fact to defeat

24  summary judgment and you are asking the Court to accept an

25  economically implausible argument, then you have to come

1    forward with more persuasive evidence than you would otherwise

2    be required.

3              So, this is exactly the kind of nonsensical,

4    economically crazy argument that falls within that category of

5    evidence that Matsushita was talking about.  This just makes no

6    sense.  But, I'll answer whatever questions you have.

7              THE COURT:  Let me ask counsel, does this relate

8    to the royalty or are you asserting that this relates to the

9    product itself?

10             MR. GROOMBRIDGE:  It relates to both, your Honor,

11   because ███████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ████████████████████████████████████████.

20             THE COURT:    And I understand what you are saying.

21   But, was he talking about the royalty?

22             MR. GROOMBRIDGE:  No.  What he was talking here

23   about ████████████████████████████████████████████████████

24   ██████████.  So, what was going on here, your Honor, and I believe

25   this is in the record, but one of my colleagues will check,

1    that when the patent issued, Biogen contacted Serono and said

2    look here is the ███████████████ exercise.  And they

3    had a series of meetings that went on over about 5 or 6 months.

4         And in those meetings Dr. DeLuca said we have some

5    real questions about whether this patent, ███████████

6    ████████████████████████████████

7    ██████████.  And one of the things he did in the course of

8    that was say, you know what, ████████████████

9    ████████████████████████████

10   ██████████████████████████████████

11   ███████████.

12        And our submission here, your Honor, is look, ████

13   ██████████████████████████████████

14   ████████████████████.  And if -- a jury could

15   infer from this testimony, quite fairly, that what Dr. DeLuca

16   said in that testimony was an accurate statement of Serono's

17   views at the time.

18        And if Serono believed that, and it believed

19   that's fine the way the patent came out it ended up -- and

20   remember, your Honor, ██████████████████████

21   █████████████████████████.

22        THE COURT:   Although if you are dealing with the

23   standard of economic implausibility, how would you respond and

24   how would you marshal those facts?

25        MR. GROOMBRIDGE:   What I would say it's not

1    economically implausible at all.  The ████████████
2    ████████████████████████████████████████████████████
3    ████████████████████.  The patent and the claims didn't even
4    exist at that time.
5            When the claims came out, DeLuca looked at them
6    and he, taking them at face value, said I ███████████████
7    ████████████████████████████████████████████████████
8    ███████.
9            And now remember also while we are talking about
10   economic implausibility, ████████████████████████████
11   ████████████████████████████████████████████████████
12   ████████████████████████████████████████████████████
13   ████████████████████████████████████████████████████
14   ████████████████████.  And that's not, it's economically
15   plausible that you wouldn't do that.  ███████████████████
16   ████████████████████████████████████████████████████
17   ████████████████████████████.
18           And, you know, that could be, a jury would be
19   perfectly entitled to look at that and draw that conclusion and
20   say ██████████████████████████████████████████████
21   ████████████████████████████████████████████████████
22   ████████████████████████████████████████████████████
23   ████████████████████.  So, they didn't do it.  It turned out
24   they were wrong.  But, if we are going back and looking up what
25   they would have done, right, this is evidence upon which a jury

1    could infer that.

2              Now, if Serono wants to bring Dr. DeLuca to court

3    and say this was just a negotiating tactic, ███████████████

4    ████████████████████████████████████████████████████████████

5    ███████████████████████████████. I was doing that because

6    I was trying to negotiate a better deal with Biogen.  They can

7    do that and the jury can choose whether to believe him or not

8    believe him.

9              But ironically, your Honor, the only party that

10   has submitted any evidence on this issue, I suggest, is us on

11   what Serono actually would have done, right.  And this is as

12   the non movant what Mr. Barsky is saying is let's draw

13   inferences against Biogen.  This just doesn't make sense.

14             Well, with all due respect it's the province of

15   the jury to figure this out.  It's not attenuated.  It's not

16   speculative.  It's the decision maker at Serono saying ████████

17   ████████████████████████████████████████████████████████████

18   ██████████████████████████.

19             And my colleagues have just passed me Exhibit 7 to

20   our papers, for example, where at Page 240 Mr. DeLuca says ████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████.

24             In response to again Sandel Exhibit 8, Page 269,

25   we were saying he's talking about how █████████████████████

1    ███████████████████████████████████.  That the

2    testimony goes directly to the question of whether in 2009

3    Serono believed, having looked at the claims of this patent,

4    █████████████████████████████████.

5              And if the answer as we know from Grain Processing

6    the legal standard is what would you have done, this is more

7    than sufficient evidence for a jury to say ███████████████

8    ██████████.  And on a summary judgment standard, you know, our

9    submission is clear, your Honor.  You can't just resolve that

10   against us.

11             Like all the other cases where these things have

12   been raised, it needs to go to the jury.  No Court has ever

13   taken this issue away and said I'll just decide this as Serono

14   asks here.

15             THE COURT:   Okay.  Let me hear a response.

16             MR. BARSKY:   Your Honor, let's keep in mind what

17   the punch line is here.  The punch line is that because of the

18   testimony of Dr. DeLuca ████████████████████████████████

19   ████████████████████████, that Serono would have voluntarily

20   quit the market for a billion dollar product rather than pay --

21   a billion dollar a year product, █████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████████

25   ████████████████████████████.

1          That's the punch line here.  That's this chain of

2     logic that Biogen's arguments are proceeding with that he

3     questioned ████████████████████████████████████████████████

4     ████████████████████████████████████████████████

5     ████████████████████████████████████████████████████

6     ████████████████████████████████████████████████████

7     ████████████████████████████████████████████████████████

8     ████████████████████████████████████████████

9     ██████████████████████████.  That's what the punch line

10    is here.  That's point one.

11         Point 2, in response to what the Court just heard

12    about this testimony and presenting an alleged issue of fact is

13    simply this, Biogen concedes that ███████████████████████

14    ███████████████████████████████████████████████

15    ███████.

16         And all those discussions that were had between

17    the parties and that are cited in this slide on the board or at

18    least the arbitral testimony which Mr. Groombridge didn't

19    address in his remarks, was Mr., excuse me, Dr. DeLuca

20    recounting what he was telling the Biogen representatives in a

21    discussion that followed the Biogen representative's request

22    that ████████████████████████████████████.

23         So, Dr. DeLuca was not testifying about the "but

24    for" world where you presumed infringement and validity of a

25    patent.  Dr. DeLuca was testifying about here's what I said to

1    Bart Newland or here's what I said to the other representatives

2    from Biogen who were present at the time when we were talking

3    about ███████████████████████████████████████████████

4    ████████████████████████████████████.

5              I told them, you know, you see it right there,

6    ████████████████████████████████████████████████████████

7    ████████████████.  That's what this entire argument rests upon.

8              THE COURT:  So, you're saying the bottom line is

9    here no one is in dispute that ████████████████████████████

10   ██████████████████████████████████████████████

11   ████████████████████████.  And the under layer to the story is

12   this was a negotiation going on at the time between this

13   individual and his adversary as to what amount would actually

14   be paid.

15             MR. BARSKY:  What amount the parties might agree

16   on.  So, here's the other thing that Biogen didn't tell the

17   Court, this entire discussion that Dr. DeLuca was testifying

18   about, and the Court can see this, not only in the actual

19   testimony that was submitted in this motion, but the Court can

20   also see this in the arbitral award.  The entire discussion was

21   based on the fact that Serono's position in late 2009 and early

22   2010 and in fact today, is that they did not see any

23   possibility that the Fierce patent, the '755 patent that issued

24   in September of 2009 was valid.  They just didn't see that

25   possibility.

1          It would have been revoked in Europe.  It was a

2   subject of dispute in Israel.  And the parties, excuse me,

3   Serono did not think it was valid, did not think that their

4   product infringed because it was being made abroad and for

5   other reasons that they explained to the Biogen representatives

6   at the time.

7          And what preceded was a discussion about okay, how

8   can we resolve this though.  You think it's valid and

9   infringed.  We think it's not valid, not infringed and we don't

10  need a license. ████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████.

14          Because Dr. DeLuca is saying look, let's not argue

15  about this. ████████████████████████████████████████████

16  ████████████████████████████████████████████.  Biogen

17  didn't take it and here we are today.

18          But, for all that it is, what it's clearly not,

19  your Honor, is any statement by Serono or any possible

20  inference that could arise from any statement by Serono, that

21  somehow Serono didn't believe ████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████.

25          That's what is not present here.  And it is at

1    best ironic that Biogen concedes the point.  So, Biogen is

2    asking this Court to believe that at this meeting that was

3    attended by these representatives, that Biogen was saying █████

4    ████████████████████████████████████████████████████████████████

5    ███████████████████.  And the director of intellectual property

6    for Serono, Dr. DeLuca, was saying ██████████████████████████

7    ████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ██████████.

10              Unless the Court has any questions about that, I

11   just want to briefly respond to a couple of the other issues

12   that Mr. Groombridge addressed.

13              THE COURT:  Is that okay?  How much more is left?

14              MR. GROOMBRIDGE:  I was actually thinking I was

15   done, your Honor.

16              THE COURT:  Okay.

17              MR. GROOMBRIDGE:  But, there is a point that I

18   wanted to make.  I can make it now or simply wait until Mr.

19   Barsky is completed.

20              THE COURT:  Let me Barsky go.  He can complete his

21   then we can go back to you.

22              MR. GROOMBRIDGE:  Certainly.

23              THE COURT:  Thank you.

24              MR. BARSKY:  Very briefly, your Honor.  Going back

25   to the very beginning of the hearing your Honor asked a

1    question about what the scope of alternative actions are.  And

2    you heard from Biogen they believed alternative actions means

3    alternative products.

4          What we didn't hear is any logic for why that

5    would make sense.  Why would it make sense, your Honor, that

6    for purposes of determining whether an infringer can avoid

7    infringement and continue to compete, whether they could avoid

8    doing so by having an old product, develop a new product, ███

9    ███████████████████████████████████████████.  There's no

10   logic to the distinction.

11         I understand that Biogen thinks that the Cardiac

12   Pacemakers decision was wrongly decided and the Court should

13   disregard it.  And I understand that all the other cases have

14   to do either with older products or a new product that could be

15   developed.  But, what they haven't explained ever is why it

16   would make sense to limit it in that way.  And the answer is it

17   wouldn't make sense.

18         What cuts off the chain of causation is any action

19   that -- and that's the language of Grain Processing, not any

20   product, any action, that the infringer could take to continue

21   competing with the patent owner.

22         Next point, your Honor.  There was a discussion

23   about Oscar Mayer and Globespan Virata and there was a

24   suggestion that these cases are directly analogous.  And that

25   what we have here is ██████████████████████████████████████

1      ████.  And so this case is identical to those 2 District Court

2      cases.

3                  I think it's been very clear from the presentation

4      thus far that ████████████████████████████████████████████

5      ████████████████████████████████████████

6      ████████████████████████.  Because if your Honor looks at

7      Exhibit 1, ████████████████████████████████████████████████

8      ██████████████████████████████████████████████████████

9      ██████████████████████████████████████████████████████

10     ████████████████████████████████.

11                 THE COURT:  And you know what, and since this is

12     an important point, we have been discussing it most of the

13     morning --

14                 MR. BARSKY:  Yes.

15                 THE COURT:  In terms of the difference between ████

16     ████████████████████████████████, do you see any other

17     distinctions that you would like to highlight at this point?

18                 MR. BARSKY:  Well, yes.  The Globespan Virata,

19     Oscar Mayer and Beatrice Foods case, which was their lead

20     argument in opposing this motion, in fact, we were chided in

21     their papers for not citing the Beatrice Food case about which

22     we heard almost nothing from Biogen today.  But, all of those

23     cases stand for the unremarkable proposition that just because

24     a patent owner offers a license to someone or even, as in

25     Globespan Virata, offers licenses on fair and reasonable terms

1    to all comers, doesn't mean that they have cut off their right

2    to pursue infringers for lost profits.  We get that.

3              But, this case isn't about an offer or an

4    ability -- excuse me, let me break that in two parts.  This

5    case isn't about an offer from Biogen to Serono to take a

6    license.  ████████████████████████████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████.

12             In Globespan Virata and Oscar Mayer, those

13   parties, the defendants in those cases never had a right, a

14   contractual right to take a license.  The fact that in

15   Globespan Virata, for example, there was a RAND commitment

16   there.  That's a commitment that the patent owner never made to

17   the defendant.  It's a commitment that the RAND, that the

18   patent owner made to the standard setting organization so they

19   could get its patent adopted as an industry standard.  I will

20   negotiate in good faith with all comers and offer my patent on

21   fair and reasonable terms.

22             There was no commitment that was ever made.  And

23   there was no right that the defendant had other than to

24   negotiate in good faith, excuse me, to negotiate with the

25   patent owner for fair and reasonable terms.  They rejected it

1   in Globespan Virata.  It was rejected in Oscar Mayer.  And it

2   was the same in Oscar Mayer.

3          There was never any right that the third party,

4   that the defendant had to take a license.  What they argued in,

5   the defendant argued in both of those cases was look, you're

6   the patent owner.  You're licensing your patent.  How can you

7   sue us for lost profits?  That's not this case.

8          So, we think that all of these rejected license

9   offer cases Beatrice, Globespan Virata and Oscar Mayer are all

10  off point.



16         And what Mr. Groombridge said, if I remember it

17  correctly, is that it's unfair that in this "but for" world,

18  that Serono ███████████████████████████████████████

19  ██████████████████████████.  Well, that's not the "but

20  for" world, your Honor.  The "but for" world is a world in

21  which ████████████████████████████.

22         Mr. Groombridge wants the Court to say oh, but you

23  also have to import into the "but for" world, the fact that we

24  are now defending ourselves in this lawsuit by challenging the

25  validity that Biogen -- of the patent that Biogen chose to sue

1   us on.

2           They made the same argument about this unfairness

3   of challenging the validity of the patent ████████████████

4   ████████████████████████████ to the arbitrators.   The

5   arbitral panel rejected that outright and said that it was

6   Biogen who chose to join Serono in the lawsuit.

7           It was Biogen who forced us to defend ourselves

8   and then rejected out of hand any alleged unfairness arising

9   from the fact that we were, that we somehow gained some special

10  advantage or that Biogen was unfairly disadvantaged because we

11  defended ourselves in this lawsuit in response to a claim of

12  infringement, while at the same time ██████████████████████

13  ████████████████████████████.

14          That's the argument that Biogen just made to this

15  Court.  They are trying to revive that same argument here when

16  they've lost that argument, and that's in the arbitral award

17  Exhibit 2.  And I'll get the paragraph number when I go back to

18  the desk and provide it to the Court.

19          They also refer to the Paragraph 43 of the

20  arbitral award.  This is the paragraph where they excerpted a

21  sentence about how the arbitrator said that we were taking a

22  substantial risk ████████████████████████████████████████

23  ████████████████.

24          Well, we are taking a risk by doing so.  You heard

25  it this morning, your Honor, when Biogen told this Court that

1    even if lost profits are knocked out of this case, they still

2    have a multi-billion dollar claim against us.  You heard it

3    when Mr. Groombridge said that ████████████████████████

4    ████████████████████████████████, we, Biogen, are

5    not limited by that in asserting a reasonable royalty against

6    you as an infringer.

7                    They are arguing for, they have accused us of

8    willful infringement which would entitle them, if proved by

9    clear and convincing evidence, to enhance damages of up to

10   three times whatever it is they proved.  They are asking for

11   attorneys' fees.  There's no mention in the arbitral award.

12   There's nothing in the arbitral award that says if you defend

13   yourself in the lawsuit ████████████████████, that Biogen

14   can pursue you for lost profits, which is obviously the

15   conclusion that Biogen wants the Court to reach here.

16                    So, with that, your Honor, again, I find myself

17   indebted to the Court and its staff.  And thank you very much

18   for your time.

19                    THE COURT:  Thank you very, very much.  Much

20   appreciated.

21                    Mr. Groombridge, anything further the last couple

22   of minutes? Yes.

23                    MR. GROOMBRIDGE:  I would just say, your Honor, if

24   you look at -- if we are going to say what actions, if actions

25   mean I could change the legal status of my product, the

1    infringer in Globespan Virata could have gone and said I will

2    take that RAND license.  The infringer in Oscar Mayer could

3    have gone and said I will take the license that is available to

4    the world.  The infringer in Beatrice could have said, you

5    know, I would have taken the license.

6         And if you're talking into going into a "but for"

7    world and saying well, actions means ████████████████,

8    there's no principal distinction between those cases.  Those

9    infringers ████████████████████████ too.  And that can't be

10   what it means to take an action to avoid infringement in the

11   "but for" world.

12        The last thing I would like to say is I think that

13   there's been, Mr. Barsky just said that we presume validity and

14   infringement in the "but for" world.  And I think that there is

15   a risk of some confusion between the law of reasonable royalty

16   and the law of lost profits here.

17        In the law of reasonable royalty we rewind the

18   clock to the day the infringement first began and we posit a

19   hypothetical negotiation between the infringer and the

20   patentholder.  And for that negotiation we presume validity and

21   infringement.  And the reason is we're trying to quantify the

22   value of the patent and we only reach that point if validity

23   and infringement would have been found, liability has been

24   established.

25        And so there's no discount in the royalty rate as

1    there would be in a real world negotiation where there is

2    always some doubt, maybe I don't infringe.

3             So, in royalty law we certainly do presume

4    validity and infringement.   In lost profits law, that's not

5    the case.   That is a principle from reasonable royalty law.

6    And I think what Serono is doing here is trying to buttress its

7    argument by saying well, if we go back to the beginning, Dr.

8    DeLuca would have known that Serono, that his arguments for the

9    patent was invalid, was going to lose, that liability was going

10   to be found.   So, let's presume validity and infringement.

11            And then of course the logical thing to do ████████

12   ████████████████████.   That's not what the law says.   You have

13   to look at actual evidence of what they would have done and

14   they did not provide any.

15            We can haggle over whether this is, whether the

16   evidence we provided is good enough.   But, the irony here is

17   the party that is making that argument offered nothing except

18   the fact that they could have done it.   We offered evidence

19   showing they wouldn't have done it.   Now, there's a complaint

20   that that evidence isn't good enough.

21            Now, you know, his testimony is clear and

22   unequivocal.  ████████████████████████████████████████████████

23   ████████████████████████████████████████████████████

24   ██████████████████████████████████.

25            If that's an accurate reflection of what Serono

thought in 2009, then it would make no economic sense ███

████████████████████████████████████████████████

████████████████████████████████████████████████

██████.

So that, in our view, is more than enough to say a jury could find ██████████████. And yes, they are totally entitled to argue that's unfair, you are drawing an inference, you know, that's not what he meant, that was just a negotiation. It was something, it was a negotiation tactic.

They can argue all of that. That's what a jury is for is to decide that. But, what they can't do is come in and say let's disregard his unequivocal testimony, that it's not in, that ██████████████████████████████████

█████████████████████. So, that's all I have, your Honor.

THE COURT: Thank you very, very much. Much appreciated.

Mr. Barsky, any response to that last point?

MR. BARSKY: If the Court would like one I can certainly do so. Otherwise, I'm happy to give Mr. Groombridge the last word.

THE COURT: That's fine with me . Okay. That would be fine. All right. Anyone else in the room? Would anyone like to speak? No? All right. I'm going to take a moment. You folks can chat for a bit.

1                          (Whereupon a short recess was taken.)

2                    THE COURT:  All right.  Is there anything further

3     from counsel?  We are about to conclude on the record?  Is

4     there anything additional?

5                      MR. GROOMBRIDGE:  Not from Biogen, your Honor.

6                    MR. BARSKY:  Not from Serono or Pfizer, your

7     Honor.

8                    THE COURT:  That concludes the hearing on this

9     matter.  Again, thank you very much.  Take care, everyone.

10                 ALL ATTORNEYS:  Thank you.

11                 (Whereupon the matter was concluded).

12

13

14

15

16

17

18

19

20

21

22

23

24

25