```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

BAYER HEALTHCARE                    .
PHARMACEUTICALS INC.,               .
                                    .
        Plaintiff,                  .  Case No. 10-cv-02734
                                    .
vs.                                 .  Newark, New Jersey
                                    .  February 24, 2016
BIOGEN IDEC INC.,                   .
                                    .
        Defendant.                  .
```

```
                 TRANSCRIPT OF TELECONFERENCE
           BEFORE THE HONORABLE JAMES B. CLARK, III
                UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

```
For Bayer                 ROBERT M. GOODMAN, ESQ.
Healthcare                Greenbaum, Rowe, Smith & Davis, LLP
Pharmaceuticals           75 Livingston Avenue
Inc. and Biogen           Suite 301
Idec MA Inc.:             Roseland, NJ 07068-3701
                          (973) 535-1600
                          rgoodman@greenbaumlaw.com

                          JOHN D. TORTORELLA, ESQ.
                          Marino, Tortorella & Boyle, P.C.
                          437 Southern Boulevard
                          Chatham, NJ 07928-1488
                          (973) 824-9300
                          jtortorella@khmarino.com

                          KEVIN HARRY MARINO, ESQ.
                          Marino Tortorella & Boyle, PC
                          437 Southern Boulevard
                          Chatham, NJ 07928-1488
                          (973) 824-9300
                          kmarino@khmarino.com
```

1          NICHOLAS P. GROOMBRIDGE, ESQ.
           Paul, Weiss, Rifkind, Wharton &
2          Garrison LLP
           1285 Avenue of the Americas
3          New York, NY 10019-6064
           (212) 373-3212
4          Ngroombridge@paulweiss.com

5          DAVID J. BALL JR., ESQ.
           Paul, Weiss, Rifkind, Wharton &
6          Garrison LLP
           2001 K Street, NW
7          Washington, DC 20006-1047
           (202) 223-7352
8          Dball@paulweiss.com

9          PETER SANDEL, ESQ.
           Paul, Weiss, Rifkind, Wharton &
10         Garrison LLP
           1285 Avenue of the Americas
11         New York, NY 10019-6064
           (212) 373-3198
12         Psandel@paulweiss.com

13         ERIC C. WIENER, ESQ.
           Williams & Connolly LLP
14         725 Twelfth Street, N.W.
           Washington, D.C. 20005
15         (202) 434-5342
           Ewiener@wc.com
16
           DAVID M. KRINSKY, ESQ.
17         Williams & Connolly LLP
           725 Twelfth Street, N.W.
18         Washington, D.C. 20005
           (202) 434-5338
19         Dkrinsky@wc.com

20         DAVID I. BERL, ESQ.
           Williams & Connolly LLP
21         725 Twelfth Street, N.W.
           Washington, D.C. 20005
22         (202) 434-5491
           Dberl@wc.com

23

24

25

```
 1   For EMD Serono,        CHARLES H. CHEVALIER, ESQ.
     Inc., and Pfizer       Gibbons PC
 2   Inc.:                  One Gateway Center
                            Newark, NJ 07102
 3                          (973) 596-4500
                            cchevalier@gibbonslaw.com
 4
                            WAYNE BARSKY, ESQ.
 5                          Gibson, Dunn & Crutcher LLP
                            Century City Office
 6                          2029 Century Park East, Suite 4000
                            Los Angeles, CA 90067-3026, USA
 7                          (310) 557-8183
                            Wbarsky@gibsondunn.com
 8
                            TIMOTHY BEST, ESQ.
 9                          Gibson, Dunn & Crutcher LLP
                            Century City Office
10                          2029 Century Park East, Suite 4000
                            Los Angeles, CA 90067-3026, USA
11                          (213) 229-7659
                            Tbest@gibsondunn.com
12
                            ROBERT VINCENT, ESQ.
13                          Gibson, Dunn & Crutcher LLP
                            2100 McKinney Avenue
14                          Suite 1100
                            Dallas, TX 75201-6912, USA
15                          (214) 698-3281
                            Rvincent@gibsondunn.com
16

17   For Novartis          LESLIE MORIOKA, ESQ.
     Pharmaceuticals       White & Case LLP
18   Corp.:                1155 Avenue of the Americas
                            New York, New York 10036-2787
19                          (212) 819-8200
                            Lmorioka@whitecase.com
20
     Audio Operator:
21
     Transcription Service:      KING TRANSCRIPTION SERVICES
22                               3 South Corporate Drive, Suite 203
                                 Riverdale, NJ  07457
23                               (973) 237-6080.

24   Proceedings recorded by electronic sound recording (not all
     parties were discernible on the record); transcript produced
25   by transcription service.
```

1            (Commencement of proceedings at 12:06 P.M.)

2

3            THE COURT:  Hey, folks, Judge Clark here.  I hate

4  to do this to you again, because I know you just went through

5  the appearances with my clerk in chambers, but we're on the

6  record, so if I could get everybody's appearances.

7            Can we start with Mr. Marino.

8            MR. MARINO:  Yes, good morning, Your Honor, it's --

9  Marino, Marino Tortorella & Boyle for plaintiffs.

10            And with me are -- is my colleague John Tortorella,

11  and also from Paul Weiss, we have Nick Groombridge, David

12  Ball, and Peter Sandel.

13            THE COURT:  Good morning to all of you.

14            MALE SPEAKER:  Good morning, Judge.

15            THE COURT:  All right.  And how -- how about

16  Pfizer, Novartis?

17            MR. CHEVALIER:  Good morning, Your Honor, this is

18  Charles Chevalier from Gibbons PC for EMD Serono, Pfizer and

19  Novartis.  And there are separate cocounsel on the line for

20  each.

21            THE COURT:  All right.

22            MR. BARSKY:  Good morning, Your Honor, this is

23  Wayne Barsky from Gibson Dunn for Serono and Pfizer.  And

24  with me on the line are my colleagues Timothy Best and Robert

25  Vincent.

|Teleconference
|10-cv-02734, February 24, 2016

 1          THE COURT:  Good morning.  I guess, good afternoon,

 2   at this point.

 3          MS. MORIOKA:  Good morning, Your Honor, this is

 4   Leslie Morioka, White & Case for Novartis Pharmaceuticals

 5   Corporation.

 6          THE COURT:  Okay.  Anybody else -- everybody --

 7          MR. GOODMAN:  Yes, Judge, from Bayer, Bob Goodman

 8   from Greenbaum Rowe, and from Williams & Connolly, Eric

 9   Wiener, David Krinsky, and David Berl.

10          THE COURT:  Good afternoon.

11          MALE SPEAKER:  Good afternoon, Your Honor.

12          THE COURT:  Did we get Leslie Morioka?

13          MS. MORIOKA:  Yes.

14          THE COURT:  We did?  Okay.

15          MS. MORIOKA:  Your Honor, I -- yes.

16          THE COURT:  And did we have Mr. Best enter an

17   appearance as well?

18          MR. BEST:  Yes, Your Honor.

19          THE COURT:  Okay.  All right.  It looks like we

20   have everybody.

21          Folks, I know we've gotten a raft of letters.  I

22   apologize for not having gotten you on the wire earlier, but

23   we've got you on the line relatively soon.  The

24   correspondences I have are Number 384 from counsel for Serono

25   and Pfizer; 387 from counsel for Biogen; 388 from counsel for

1  Serono and Pfizer; 389 from counsel for Bayer; and then 390

2  from counsel for Biogen.  And they're all the correspondences

3  that bear on today's phone call.

4           We really have three issues.  One -- the first

5  issue is the question of whether or not Biogen needs to

6  produce somebody for a 30(b)(6) deposition.  Now, it appears

7  that Biogen freely admits that Serono and Pfizer are entitled

8  to take a 30(b)(6) deposition.  It's just a question of

9  whether or not the person that's deposed can be asked for

10 legal questions or legal conclusions or work product or

11 things that would tread on what, you know, would normally be

12 an attorney's opinion, rather than -- rather than bare facts.

13          Now, Mr. Marino, I -- you know, I understand your

14 position, and I generally agree with it.

15          But why -- I mean, do you think that counsel for

16 Serono and Pfizer is wrong in saying, hey, look, we'll have

17 the deposition, and we'll ask the questions, we'll try to

18 confine it to facts, but if they find something is

19 inappropriate, they can object.

20          MR. MARINO:  Well, you know, Your Honor, I'd like

21 to have Mr. Groombridge weigh in on it, but I think --

22 they've already made clear -- I mean, I would certainly agree

23 with the Court in the normal course, you know, you await the

24 event.  Right?  They can take a 30(b)(6) deposition.  We

25 produce the appropriate corporate representative, and then,

|Teleconference
|10-cv-02734, February 24, 2016

1  you know, what questions are permissible and impermissible

2  await the event.

3          Here, they've made clear that they intend to probe

4  impermissible questions.  And so rather than get into a

5  situation where the deposition's proceeding and then we have

6  to stop the deposition and try to engage Your Honor on an

7  emergent basis, I thought it made sense -- we thought it made

8  sense to tee this issue up and have resolution of it.

9          Those types of questions, I think -- and Your Honor

10  indicated you tend to agree -- those questions are not

11  permissible.  Those are -- that's -- that's not fact

12  questions of the type that a corporate representative

13  typically is asked to or does provide on behalf of the

14  corporate entity.

15          THE COURT:  Well, let me -- let me interrupt you,

16  Mr. Marino, because I -- the letters were from you, but do

17  you want Mr. Groombridge to do the talking for your --

18          MR. MARINO:  I'm happy to have -- Nick -- Nick, I

19  think you may want to weigh in on this?

20          MR. GROOMBRIDGE:  I would like to, and thank you,

21  Your Honor.  Nick Groombridge.

22          So there's been a fairly lengthy meet-and-confer on

23  this and on the -- with the upshot of it is we, Biogen, we'd

24  be perfectly happy to provide a witness regarding facts that

25  are in Biogen's possession.  And we've said that over and

1    over again.  And just to be clear, Your Honor, we actually

2    think that all of the relevant facts have already been the

3    subject of discovery, but if Serono believes we're wrong on

4    that, we're happy to provide another witness.

5           The dispute, as we understand it through the

6    meet-and-confer is whether Biogen is required to provide a

7    witness about what Serono wishes to ask.  And the -- what --

8    what brings -- Your Honor saw here is the fact that the --

9    the category -- including any contention that Serono would

10   have withdrawn Rebif from the market rather than -- and at

11   the best we can tell through the meet-and-confer process,

12   what Serono wants is a witness to testify about what Serono

13   would have done.

14          And in our view, Your Honor, that's not an

15   appropriate topic for this type of discovery, that that's

16   purely a contention, and it seems to be -- we've made this

17   point to them -- it would be the witness.  Are you requiring

18   us to --

19          THE COURT:  In this regard --

20       (Simultaneous conversation)

21          THE COURT:  -- are you -- are you objecting,

22   though, to that question on so much because it's a legal

23   issue or just because it sounds speculative?

24          MR. GROOMBRIDGE:  Well, I think, Your Honor, we

25   that have a whole variety of differences of opinions with

1    Serono about whether that's a proper question.

2            But I think we're objecting because we feel that

3    that is, by its very nature, a question that's a contention.

4            And quite frankly, the way we see it, the only way

5    we can answer that would be to have a member of our

6    litigation team be the witness.  And they would ask, Tell us

7    what you've learned from us in discovery, and tell us what

8    your -- what our witnesses said that leads you to argue that

9    we would have taken -- or not taken --

10           And that seems to be the area of dispute.

11           We have repeatedly said, if what you want is --

12   from Biogen to talk about predicate facts, such as if Biogen

13   has enough manufacturing capacity to make these products or

14   what would Biogen's profit margin be, totally fine.  We will

15   absolutely give you such a witness, not a problem.

16           If what -- and every time -- and, you know, we went

17   around this three or four times in the meet-and-confer

18   process, every time that the response was that's not

19   sufficient, that's not what we're interested in.  What we're

20   interested in is something -- is someone to testify about

21   what you say we, Serono, would have done.

22           And that's, I think, the nub of the question.

23   If -- in our view, Your Honor, there's been copious discovery

24   on the true underlying facts.  And there doesn't seem to be

25   any allegation that that's deficient.  If they want more,

 1   we're happy to provide it -- given -- but the dispute isn't

 2   about that type of discovery at all.  I think it's about this

 3   idea of you've got an obligation to produce someone who will

 4   give deposition testimony regarding its -- contention.

 5          And in our view, that's just not an appropriate --

 6   and when we've asked them, who would the witness be, you

 7   know, we --

 8          THE COURT:  It's going to hard --

 9      (Simultaneous conversation)

10          MR. GROOMBRIDGE:  -- we can only see that --

11          THE COURT:  It's going to be hard to narrow down --

12   it's going to be hard to narrow down, though, and I have

13   letters, but I have precious little in the way of examples.

14          And they're certainly allowed to probe what it is

15   you claim are damages, and, you know, it's a -- and even what

16   it is you would have done, that doesn't smack to me of a

17   legal conclusion so much as it smacks to me of a -- a kind of

18   exercise in speculation.  It may not be appropriate, but --

19   well, let me -- let me ask the other side.

20          And, Mr. Barsky, are you going to speak on behalf

21   of Serono?

22          MR. BARSKY:  If that's all right with the Court,

23   yes, Your Honor.  Thank you.

24          THE COURT:  Fine.  So what do you say?

25          MR. BARSKY:  Well, Your Honor, I hope -- the Court

1   just put its finger on the issue, which is, from our view,

2   we're entitled to probe the basis of their lost profits

3   claim.

4          From the beginning of this case, they have had a

5   claim that but for Serono and Pfizer's alleged infringement

6   of their patent, we would -- that Biogen would have made the

7   sales that we otherwise would have made.

8          Now, what we all know is that the core of that

9   claim is the suggestion by Biogen that rather than having --

10  taking action that would be not -- noninfringing in some

11  hypothetical world, because that's what the lost profits

12  argument requires, it's the -- is an examination of this

13  hypothetical world, rather than taking some noninfringing

14  action in order to continue competing with Biogen, that,

15  instead, Serono would have withdrawn its billion-dollar

16  a-year flagship product from the market.

17         That has been their contention in this case from

18  day one.  And when we presented a motion for summary judgment

19  on their lost profits claim to Judge Cecchi, the hearing for

20  which was held approximately a year ago, Biogen told Judge

21  Cecchi at that time that there were disputed factual

22  issues --

23         THE COURT:  Right.

24         MR. BARSKY:  -- with respect to whether or not

25  Serono and Pfizer would have, in fact, pursued a

1   noninfringing alternative or instead would have tried to

2   continue competing -- excuse me -- would have instead removed

3   Rebif from the market.

4        So at the core of their claim, at the core of

5   Biogen's lost profits claim is the suggestion that Serono

6   would rather have withdrawn Rebif from the market and pursued

7   a noninfringing alternative.

8        That is precisely the position that we have been

9   trying to probe since October, because all -- Mr. Marino's

10  suggested that, you know, Biogen --  in fact, what has

11  happened is that since October -- a -- an effort to try to

12  get a deposition on this one subject that goes directly to

13  their lost profits claim as to the new products Tecfidera and

14  Plegridy that Biogen heard were so important that they

15  merited a supplemental discovery period.

16       As the Court knows, we opposed that effort.  We

17  didn't think it was appropriate.  The Court ordered that the

18  supplemental discovery should go forward, and we cooperated

19  in every respect with that effort.

20       In total, there's probably been 70 or 80

21  depositions, individuals deposed in this case in the last

22  four or five years.

23       This is the only deposition for which any party has

24  ever heard that -- special rules.  And to be clear, that's

25  Biogen's position that --

|Teleconference
|10-cv-02734, February 24, 2016

1              THE COURT:  Mr. --

2              MR. BARSKY:  -- how much every other deposition --

3              THE COURT:  All right.

4              MR. BARSKY:  I'm sorry, Your Honor?

5              THE COURT:  No.  That's -- you're right.  Let me

6    just ask Mr. Groombridge.  It's a little ironic.  You were

7    the folks that came to me looking for an avenue additional

8    discovery and now you're resisting additional discovery.

9              MR. GROOMBRIDGE:  Your Honor, if I may -- but, yes,

10   by no means resist additional discovery.  We've produced

11   hundreds of thousands of pages.  We made many witnesses

12   available for deposition.

13             And to the extent there was some suggestion that we

14   have been -- I would say, Your Honor, there's something like

15   80 percent of the supplemental discovery has taken place over

16   the past few months comes from Biogen and not from the other

17   parties.

18             And --

19        (Simultaneous conversation)

20             THE COURT:  Well, I --

21        (Simultaneous conversation)

22             THE COURT:  I appreciate Mr. Marino's observation

23   that you know, we like to tee things up when we can, but this

24   has only been teed up in the most bare-bones of ways.  I have

25   some very short letters saying that, oh, they want to probe

1   what we're going to be doing and that -- what we might have

2   done, and that does tread on contingent interrogatory -- or

3   contentions, and contentions need be answered by lawyers and

4   cannot be answered by -- a 30(b)(6) fact witness.

5         I'm not entirely sure that the observation that

6   contentions need to be answered in interrogatories rather

7   than in depositions is correct.  But I think the only -- the

8   only option, really, practically available to me right now is

9   to direct that the 30(b)(6) discovery deposition go forward

10  and to leave it to counsel for Biogen to -- to object, you

11  know, when there is a genuine question of whether legal

12  opinions or legal analysis is what's being sought from the

13  30(b)(6) witness.

14        And I'll caution you, Mr. Groombridge, I'm going

15  to -- you know, err on the side of allowing testimony.  I

16  don't want this to become a really obstructive thing.  I

17  don't imagine -- I think there's probably a lot of things

18  that counsel for Serono implies it can ask that would have

19  nothing to do with legal opinions or, you know, how the law

20  applies to the facts of the case.  And I do -- you know, we

21  did order extra discovery to allow people to probe it.

22        And it does sound like, you know, at the summary

23  judgment argument, it was offered to Judge Cecchi, but there

24  are fact issues that exist with respect to damages and need

25  to be -- and need to be explored.

1           So, you know, the 30(b)(6) deposition will go

2    forward, again with the right of the -- of Biogen to object

3    as appropriate.  But --

4           MR. MARINO:  But, Your Honor, may I --

5           THE COURT:  Go ahead.

6           MR. MARINO:  -- not to -- Kevin Marino.  Just a

7    question on that, because I certainly -- I hear Your Honor

8    saying, you know, the deposition will go forward, and, you

9    know, as the questions are asked, appropriate objections will

10   be interposed and obviously not in an obstructive way.

11          But I think we would -- and, you know, I'll again

12   welcome Mr. Groombridge to interrupt if he has a different

13   thought, but we'd like to have more guidance at time on what

14   the Court thinks would be an appropriate area of inquiry for

15   these witnesses.  Your Honor seemed to -- there are a number

16   of questions that could be asked.  But it seems to me that

17   part of what they're asking for here goes to very much a -- a

18   legal position.  You know, they seem to be challenging the

19   legal position that we've taken.  And I don't really

20   understand what a 30(b)(6) witness, a corporate

21   representative for the company, is going to be able to

22   provide to illuminate that separate from impropriety of

23   asking them when you say, you know, you don't have to --

24   necessarily interrogatories as opposed to depositions.

25          I -- you know -- the distinction isn't so much

1    between the forms of discovery that are taking as between who

2    provides them.  And the thought is -- I think that if you're

3    probing the legal reasons, that is to say the reasons we

4    believe the law precludes this type of inquiry of a fact

5    witness, I -- for a legal battle.  And I agree, it's to --

6    been sketched out -- terms in the papers.

7           But I do think we're heading down a road of not

8    only that it's going to be fruitless, I don't think it's --

9    it's difficult for me to conceive if it's not -- what might

10   be perceived as obstructive, because I'm not -- to -- all

11   sort of questions they could ask that would be appropriate.

12          MR. BARSKY:  May I address that, Your Honor?

13          THE COURT:  Mr. Barsky, yeah.

14          MR. BARSKY:  Just very briefly, first, we're not

15   interested in asking purely legal contentions, such as what

16   do you contend is the statute of limitations that applies in

17   this case?  What do you content is the appropriate standard

18   for determining the doctrine of equivalents and the like.

19          What we need -- intend to pursue -- is the basis of

20   their lost profits claim.  They're the ones who have that

21   claim.  And in order to defend our client against this

22   multibillion -- claim, we would like just to have a witness

23   testify as to all information that's available to the

24   company.

25          And I think what I heard Mr. Marino just suggest

```
 1    was that there are different rules that somehow apply to
 2    Biogen and this deposition than all of the other parties and
 3    all of the other 80 depositions in this case, that somehow
 4    there has to be some negotiating structure for this
 5    deposition.
 6              And that's what we find so anomalous here.
 7              THE COURT:  Well, Mr. Marino, I mean, it sounds to
 8    me like this is being a lot more complicated than it needs to
 9    be.  If they want to ask you questions about lost profits --
10    you know, you're claiming lost profits, that's -- how in the
11    world is that not an appropriate factual inquiry?  That --
12    that's one of the most factual inquiries you're going to
13    engage in.
14              MR. GROOMBRIDGE:  Maybe -- Nick Groombridge --
15    response.
16              THE COURT:  Sure.
17              MR. GROOMBRIDGE:  I think the -- the problem is
18    this that we perceive Your Honor, to the extent they want to
19    ask us about facts that we know, that's totally fine.
20              But what they want to ask us is facts about what
21    they know.  And what I heard Mr. Barsky just say and what I
22    think the dispute is about is they say, Biogen, please
23    produce a witness to testify about what Serono would have
24    done.  And in our view, Your Honor, that's -- how do we know
25    what they would have done --
```

1          (Simultaneous conversation)

2               THE COURT:  Well, and that's probably --

3               MR. GROOMBRIDGE:   -- the fact is you --

4          (Simultaneous conversation)

5               THE COURT:  -- that's probably what the answer's

6     going to be.  But even there, I don't know that I'm getting

7     into legal territory.  I'm just getting into questions that

8     you probably have no basis or your witness would probably

9     have no basis for answering.

10              MR. GROOMBRIDGE:  I think, Your Honor, that may

11    provide us the guidance that we need.  If what we -- if the

12    Court's direction here is that we find a -- an appropriate

13    corporate representative from Biogen and produce that person

14    to testify about facts known to Biogen -- the lost profits

15    claim, that will be fine.  And if there be questions what

16    does Biogen know about what Serono would have done, I presume

17    the answer will be, Biogen doesn't know anything -- any sort

18    of knowledge is what's happened in discovery in this lawsuit,

19    which is not -- the Biogen witnesses are not allowed to see

20    that on the protective order.

21              THE COURT:  That --

22              MR. BARSKY:  Your Honor, very briefly, this is

23    Wayne Barsky.

24              You know, that was all very clever, but the problem

25    with that is that the basis of Biogen's claim of lost profits

|Teleconference
|10-cv-02734, February 24, 2016

1    is inherently a position about what Serono would have done.

2    And so we cannot defend our client in this

3    multibillion-dollar claim, we cannot prepare for the trial of

4    this case and what Biogen claims are all these disputed

5    issues -- unless and until we know what the basis of that

6    position is.

7              And 30(b)(6) doesn't simply stand for the

8    proposition that a witness be produced with blinders on who

9    is oblivious to facts that perhaps were the subject of

10   discovery.  It requires that they produce a witness who will

11   educate him or herself as to all facts that are reasonably

12   within the -- within the ken of the corporation upon -- upon

13   reasonable inquiry.

14             And so, you know, I don't think what

15   Mr. Groombridge just tried to do to re- -- to recast what the

16   Court just -- the Court just articulated is the purpose.

17             Now, if Biogen wants to concede that it has no

18   information whatsoever about what Serono would have done in

19   this hypothetical world where Serono would not have allegedly

20   infringed, that's a different -- that's a different story.

21             But Mr. Groombridge is never going to concede that,

22   because that's the very core, the heart of his lost profits

23   claim.  And that's what we want to explore.

24             THE COURT:  Well, Mr. Groombridge, I mean --

25        (Simultaneous conversation)

1          MR. GROOMBRIDGE:  -- of the Court --

2          THE COURT:  -- Mr. Groombridge, I do -- I do --

3      (Simultaneous conversation)

4          THE COURT:  Their point, you know, I don't know

5  whether you institutionally have that information or not,

6  but, again, I'm not entirely sure how it treads on legal

7  opinion or contentions.  I mean, they're asking what you know

8  about what they might have done.  It's still -- it maybe

9  attenuated, and it may be speculative, but it still seems

10  like it's a -- the fact -- question is based in fact or based

11  or your knowledge of what the facts would be.

12          MR. GROOMBRIDGE:  Your Honor, I think what it's

13  based on is -- is -- to say, please review all of these --

14  someone should review all of the discovery that Serono has

15  provided in this case and then go through and say, what do

16  you find in there that in your view supports your argument,

17  and the -- that brings us back to the situation of what -- in

18  our view, then you put the 30(b)(6) as a discovery tool is

19  appropriate for saying, tell us what Biogen knows.  But it's

20  not appropriate for it at all to say that -- and have them go

21  through the entire body of discovery, which is asked in this

22  case.

23          THE COURT:  Well, Mr. Barsky, you're not --

24      (Simultaneous conversation)

25          MR. GROOMBRIDGE:  -- be cross-examined by an

1   opposing counsel on their -- their theories and contentions

2   and arguments that will be made by some fact discovery that,

3   in our view, that that -- what that is, really, is trying to

4   get a head start on expert discovery.  The experts will do

5   those kind of things.

6             THE COURT:  Well, Mr. Barsky --

7             MR. GROOMBRIDGE:  -- expert --

8             THE COURT:  Mr. Barsky, are you suggesting that

9   they find somebody to go through all of the discovery you've

10  provided from -- on your end and make, you know -- and offer

11  opinions on that discovery as to what might have happened?

12  Or are you asking for, you know, what might fairly have been

13  the institutional knowledge of Biogen at the relevant time

14  period?

15            MR. BARSKY:  Well, Your Honor, at the outset of

16  this lawsuit, they brought the lost profits claim against us.

17  And that lost profits claim is based on the suggestion that,

18  had we not infringed, we would have simply withdrawn from the

19  market.

20            At the summary judgment argument, they -- they

21  contended that there were disputed facts.  We would like to

22  be able to defend our client by finding out what is the basis

23  for their session that Serono would have soon have withdrawn

24  its flagship, billion-dollar-a-year product from the market,

25  than, for example, in this case, executed an option agreement

```
 1  which would have given Serono a contractual right to sell

 2  Rebif -- in direct competition with Biogen.

 3              THE COURT:  Have you asked that --

 4              MR. BARSKY:  We want an answer to that question

 5  and --

 6         (Simultaneous conversation)

 7              THE COURT:  Have you asked that question in

 8  interrogatories?

 9              MR. BARSKY:  I believe we have, but --

10              THE COURT:  Did you get an answer?

11              MR. BARSKY:  -- I don't remember -- if Mr. Vincent

12  is online, he might be able to -- on this.

13              MR. VINCENT:  We have asked interrogatories that go

14  to the basis of their lost profits claim in a general -- in a

15  general manner.  And we have not -- you know, as far as I

16  understand, the -- the responses that we have received have

17  not provided any kind of delineation of the factual issue

18  that would preclude some -- for example -- support their

19  claim that we would have taken that off the market.

20              MR. GROOMBRIDGE:  Your Honor -- sorry, I don't mean

21  to interrupt you Mr. Vincent.

22              THE COURT:  Go ahead.

23              MR. GROOMBRIDGE:  I'm sorry.  But what -- they have

24  asked an interrogatory, and we have responded to them, and

25  until today, there has been no suggestion that the response
```

 1    to that was in any way deficient, and --

 2            MR. BARSKY:  Well, Your Honor, if -- if that

 3    interrogatory --

 4        (Simultaneous conversation)

 5            MR. BARSKY:  -- has provided Biogen's complete

 6    explanation for its position that we would have withdrawn

 7    from the market in event of non -- alleged noninfringement,

 8    then I'm certain that Biogen would have brought that to the

 9    Court's attention before now.

10            But it doesn't.

11            My recollection of the response is that that this

12    is -- you know, wait till expert discovery, we'll provide an

13    expert on this, and you can cross-examine our expert, which

14    is obviously not the case.

15            THE COURT:  Yeah, I mean, Mr. Groombridge, if there

16    are -- if there are -- if there is anything in the way, you

17    know, of factual knowledge -- I agree with Mr. Barsky, we're

18    not supposed to show up with a 30(b)(6) witness who's not

19    done any homework and who simply, you know, sits in the chair

20    and says, I don't know, I don't know, I don't know, I don't

21    know.  That's -- that is kind of defeating the purpose.  I

22    also don't know that you have to speculate on things that

23    come out of discovery that's been provided to you by the

24    other side.  It's -- facts that were known to Biogen during

25    the relevant period of time.

1       But I certainly think that at least preliminary

2   inquiry into what your contention -- you know, the -- that

3   they would have withdrawn from the market or that they -- I

4   mean, if it was -- if it was an expectation that Biogen had

5   that something may happen, you know, I don't know --

6   what's -- what's incorrect about answering a question like

7   that?

8       MR. GROOMBRIDGE:  Your Honor, to the extent that

9   there were underlying facts here, I think it would -- it's

10  totally fine to us about -- and by the way, I think they

11  have.

12      But I do want to be clear that many times now

13  Mr. Barsky has said -- has made this allegation that we

14  contend they would ave withdrawn from the market.

15      That's not the basis of Biogen's position.  And in

16  our view, this is all -- this is addressed in the pending

17  summary judgment motion --

18      THE COURT:  Well, that's Mr. Barsky's problem, if

19  he -- if he doesn't understand your position or is

20  mischaracterizing it, then he's doing that at his own peril

21  and maybe he won't be able to sufficiently rebut your

22  arguments.

23      But I just don't see where we're treading into --

24  you know, impermissibly into legal opinion or legal

25  conclusion.  You know, there's got to be some latitude to ask

| Teleconference
| 10-cv-02734, February 24, 2016

1   these questions.

2          I'm back to where I was at the beginning.  You

3   know, I appreciate the fact that we've -- that we've tried to

4   see this up, but I think the deposition has to go forward.  I

5   think some of the distinctions here are distinctions without

6   a difference, and we're -- I won't say we're being cute, but

7   we're being hypertechnical, perhaps.

8          But the -- the scope of discovery's broad.  They're

9   allowed to ask questions with respect to facts, and facts

10  sometimes include an element of expectation or -- or, you

11  know, a supposition.  There comes a point where supposition

12  and expectation become pure speculation, and I don't know

13  that that's appropriate for a deposition.  But you're going

14  to have to deal with those one at a time as you go through

15  the deposition.

16         And I'll be honest with you, if you have to come

17  back to me with a couple of discrete problems, that's great.

18  But I'm not -- I can't imagine that a deposition conducted in

19  good faith here is going to be -- you know, come back to me

20  with 500 questions, 500 objections and instructions not to

21  answer, and we're going to have to parse through this and

22  take a whole day doing it.  I'm not -- that's not my aim.

23  And I don't think that that should be -- the result of the

24  30(b)(6) deposition in this particular situation.

25         All right, folks?

 1            UNIDENTIFIED SPEAKERS:  Thank you, Your Honor.

 2            THE COURT:  So that's what we're going to do with

 3    the 30(b)(6) deposition of Biogen.

 4            The other issue -- there's two issues.  One is can

 5    we extend the expert deadline for four weeks?  And I know

 6    Biogen wanted to do that and that there was some resistance

 7    from Serono -- or Serono and Pfizer.

 8            We've already gone past the time a little bit by at

 9    least a few days.  And I think we're going to have to do the

10    four-week extension because we have a problem between Bayer

11    and Biogen with respect to the documents that Biogen wants to

12    show to Dr. Denis -- is it Denis or Denis?

13            MR. GROOMBRIDGE:  Denis, Your Honor.

14            THE COURT:  All right.  Now, you flagged that issue

15    for me.

16            So -- so let me say first, we will extend the

17    expert deadline for four weeks.  But we now have to deal with

18    this -- this issue, does Dr. Denis get to see these

19    particular documents.  And quite frankly, both sides Bayer

20    and Biogen have only in very, very cursory terms even

21    discussed what documents we're talking about, and frankly

22    both of you also invited or urged me to consider supplemental

23    briefs on the question.  So I think I'm going to -- I think

24    I'm going to ask you to do that.

25            How many documents are we talking about,

1  Mr. Groombridge?

2          MR. GROOMBRIDGE:  I don't believe it's very many,

3  Your Honor.  The -- I don't know the exact number, but I

4  think it's probably in the --

5          THE COURT:  All right.  Well, can you -- and, you

6  know, given that we're sort of working on a tight time frame,

7  how soon -- I guess, you'd be the first one, you are the one

8  that wants to show the documents to your expert, so you'd be

9  the first one to give me a brief.  How soon could you give me

10  something?  And let's keep it manageable, you know.  Five --

11  well, you tell me, you tell me, how soon can you do it, and

12  how long would -- how many pages would you want to do?

13          MR. GROOMBRIDGE:  If we -- first of all,

14  Your Honor, we could do -- if it's more convenient with the

15  Court, we could do this in the form of a follow-up letter.

16          THE COURT:  That would be fine.

17          MR. GROOMBRIDGE:  And we could certainly do -- do

18  that a week today.

19          THE COURT:  All right.  And then for Bayer,

20  Mr. Goodwin [*sic*], would you be able to respond a week after

21  that?

22          MR. GOODMAN:  -- from -- colleague respond to that,

23  Judge.

24          MR. WIENER:  Your Honor, this is -- Your Honor,

25  this is Eric Wiener from Williams & Connolly.  A week after

1   Biogen's letter to respond is fine with Bayer.

2              THE COURT:  All right.  And I will -- because we're

3   on such a tight time frame, we will endeavor to get you a --

4   an answer to the question as quickly as we can so we can --

5   so we don't have to go past -- any past the four-week

6   extension we're already -- we're already imposing on the

7   expert deadlines.  All right?

8              MR. GROOMBRIDGE:  Yes.

9              THE COURT:  So I think -- those were the three

10  things I could -- I could tell from the letters -- from the

11  five letters I've gotten in recent weeks with respect to the

12  case.

13             Is there anything else that we needed to discuss

14  today?

15             MR. WIENER:  Your Honor, this is Eric Wiener from

16  Williams & Connolly for Bayer.

17             Just so we understand and have clarity on the

18  extension, are -- is -- what is the exact date that the

19  expert deadline would be?  Is it four weeks from the original

20  deadline, *i.e.*, four weeks from last Friday?  Or is it four

21  weeks from today?

22             THE COURT:  Well, let's -- let's see.  It's --

23  we're going to take -- the briefing is going to take you to

24  March 9th.  Four weeks from the old deadline would be

25  perilously close to that date.

|Teleconference
|10-cv-02734, February 24, 2016

1          So I think it probably should be four weeks from

2    today.  All right?  Just so we build a cushion in so that the

3    experts can do what they have to do.  I think that the

4    extension, I think we're already about five or six days past

5    what the old deadline was, but we'll make it four weeks from

6    today.  All right?

7          MR. WIENER:  Yes, Your Honor.  This is Eric Wiener

8    again.

9          Just to be clear, that means the new deadline would

10   be March 23d?

11         THE COURT:  Looks like it.

12         MR. WIENER:  Thank you, Your Honor.

13         MR. BARSKY:  And, Your Honor, Wayne Barsky.

14         Not to belabor the instruction, but I assume that

15   the -- that Biogen will be in a position to provide a

16   30(b)(6) witness during this extended period of time?

17         THE COURT:  Yeah, I --

18      (Simultaneous conversation)

19         MR. BARSKY:  Within the next four weeks.

20         THE COURT:  I am not putting a deadline on it, but

21   that's a fair question.

22         Now, Mr. Groombridge, is that -- are you going to

23   be able to do that?

24         MR. GROOMBRIDGE:  I think we can do that,

25   Your Honor.  And I think we would rather just get this done

|Teleconference
|10-cv-02734, February 24, 2016

1   with and see if we can move forward.

2           THE COURT:  All right.  Then we'll -- -- we'll have

3   that -- we'll have that 30(b)(6) deposition conducted within

4   the stay [*sic*] period.  All right?

5           MR. GROOMBRIDGE:  Yes, Your Honor.

6           THE COURT:  All right.  Anything else, folks?

7           MR. BARSKY:  Just thanks for the Court for hearing

8   us this morning.

9           THE COURT:  Oh, like I said, I'm sorry I -- I

10  probably -- I was out at a -- at my daughter's -- they have a

11  junior parents weekend at her college, and that ate up most

12  or -- a part of last week.  I should have probably gotten you

13  on earlier than now, but we'll try to keep things moving, and

14  we'll try to get you a decision on the -- the two letter

15  briefs you're going to send as quick as we can.  All right?

16          (Conclusion of proceedings at 12:43 P.M.)

17

18

19

20

21

22

23

24

25

```
|Teleconference
|10-cv-02734, February 24, 2016
Certification
```

1                      Certification

2        I, SARA L. KERN, Transcriptionist, do hereby certify

3  that the 31 pages contained herein constitute a full, true,

4  and accurate transcript from the official electronic

5  recording of the proceedings had in the above-entitled

6  matter; that research was performed on the spelling of proper

7  names and utilizing the information provided, but that in

8  many cases the spellings were educated guesses; that the

9  transcript was prepared by me or under my direction and was

10 done to the best of my skill and ability.

11       I further certify that I am in no way related to any of

12 the parties hereto nor am I in any way interested in the

13 outcome hereof.

14

15

16

17

18  s/ *Sara L. Kern*                    25th of February, 2016

19  _____     _____
    Signature of Approved Transcriber              Date

20

21

    Sara L. Kern, CET**D-338
22  King Transcription Services
    3 South Corporate Drive, Suite 203
23  Riverdale, NJ  07457
    (973) 237-6080

24

25